**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **PAMALON ROLLINS; SHEMEDREA JOHNSON, RENODA THOMAS, TAMARA WARD, individually and on behalf of the class they seek to represent,** | ) ) ) ) ) | **CIVIL ACTION NO.: 2:09-cv-636-WHA** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **ALABAMA COMMUNITY COLLEGE SYSTEM; et al.,** | ) ) ) | |
| **Defendants.** | ) | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
OF A COLLECTIVE ACTION UNDER THE EQUAL PAY ACT**

---

Robert T. Meadows, III
Christopher W. Weller, Sr.
Terrie S. Biggs

Capell & Howard, P.C.
P.O. Box 2069
Montgomery, AL 36102-2069
(334) 241-8000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................iv

I.      INTRODUCTION....................................................................................... 1

II.     STATEMENT OF THE LAW.......................................................................2

        A.      THE EQUAL PAY ACT.................................................................2

        B.      STANDARDS FOR §216 (b) COLLECTIVE ACTIONS ........................4

                1.      TWO-STATE PROCEDURE FOR DETERMINING CERTIFICATION
                        IN SOME COLLECTIVE ACTIONS. ......................................5

                2.      THE STANDARD FOR THE NOTICE STAGE IS MODIFIED IN THIS
                        CASE BECAUSE THE PARTIES ALREADY HAVE COMPLETED
                        EXTENSIVE DISCOVERY. ...................................................6

                3.      STANDARD FOR "SIMILARLY SITUATED.". .......................8

III.    ARGUMENT   ...........................................................................................11

        A.      THE LENIENT STANDARD ADVOCATED BY PLAINTIFFS IS NOT
                APPLICABLE TO THIS CASE BECAUSE THE PARTIES HAVE ENGAGED IN
                EXTENSIVE DISCOVERY................................................................ 11

        B.      THE NAMED PLAINTIFFS' INDIVIDUAL CLAIMS ARE NOT SIMILARLY
                SITUATED TO THE PROPOSED CLASS, AND THE OPT-IN PLAINTIFFS
                HAVE NOT MADE ANY SHOWING THAT THEIR CLAIMS ARE SIMILARLY
                SITUATED TO THE NAMED PLAINTIFFS OR EACH OTHER ...............12

                1.      THE NAMED PLAINTIFFS ...............................................13
                2.      THE OPT-IN PLAINTIFFS.................................................17
                3.      ALLEGED COMPARATORS ...............................................18

        C.      PLAINTIFFS ARE NOT SIMILARLY SITUATED WITH RESPECT TO THEIR
                EMPLOYMENT SETTINGS, JOB REQUIREMENTS AND PAY PROVISIONS ..........21

                1.      THE INDIVIDUAL PLAINTIFFS ARE NOT SIMILARLY SITUATED
                        BECAUSE OF THEIR DISPARATE FACTUAL AND EMPLOYMENT
                        SETTINGS....................................................................21

                        a.      THE ALABAMA COMMUNITY COLLEGE SYSTEM. ..............22

                        b.      ACCS INSTITUTIONS AND LEADERSHIP..............................22

i

      c.      COMPENSATION POLICIES – THE C-3 SALARY SCHEDULE ..24

      d.      THERE ARE NO UNIFORM C-3 SALARY CRITERIA ................27

      e.      DIVERSITY OF JOBS AND SALARIES WITHIN THE
            C-3 SALARY SCHEDULE. ....................................................32

   2.      THE 27 ACCS INSTITUTIONS ARE NOT A SINGLE
       ESTABLISHMENT UNDER THE EPA ...................................................36

   3.      THE ACCS DEFENDANT INSTITUTIONS ARE LEGALLY AND
       FUNCTIONALLY SEPARATE ENTITIES THAT HAVE DIFFERENT
       AND DIVERSE C-3 SALARY POLICIES..................................................42

D.     PLAINTIFFS CANNOT SHOW THAT THEY ARE SIMILARLY SITUATED
      BECAUSE OF THE MANY AFFIRMATIVE DEFENSES AVAILABLE TO
      DEFENDANT UNDER THE EPA ....................................................43

E.     PLAINTIFFS CANNOT SHOW THAT THEY ARE SIMILARLY SITUATED
      BECAUSE UNDER THE EPA REGULATIONS, THE ANALYSIS OF
      WHETHER THE JOBS ARE EQUAL IN SKILL, EFFORT AND
      RESPONSIBILITY IS NECESSARILY FACT SPECIFIC AND
      INDIVIDUALIZED. ........................................................................45

F.     PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVIDNG THAT
      DEFENDANTS ENGAGE IN A COMMON SCHEME, PLAN OR POLICY ................50

   1.      PLAINTIFF'S STATISTICAL EVIDENCE DOES NOT ESTABLISH A
       COMMON SCHEME, PLAN OR POLICY ..................................................52

      a.      PLAINTIFFS' STATISTICAL REPORT COTAINS
            SIGNIFICANT AND SUBSTANTIVE ANALYTICAL
            DEFICIENCIES SUCH THAT THE ANALYSES FAIL TO
            ESTABLISH THAT DISCRIMINATION IS THE ACCS'
            STANDARD OPERATING PROCEDURE ...................................53

      b.      DR. BRADLEY'S MODELS COMBINED THE 907
            SCHEDULE C-3 EMPLOYEES REGARDLESS OF
            COLLEGE, POSITION OR YEAR BASED ON THE
            INCCORECT ASSUMPTION THAT THE DEFENDANT
            ACCS COLLEGES EMPLOYED UNIFORM, WHOLLY
            SUBJECTIVE CRITERIA IN THE ASSIGNMENT OF
            EMPLOYEES TO THE C-3 SALARY SCHEDULE AND THE
            SUBSEQUENT DETERMINATION OF PAY INCREASES .............55

      c.      DR. BRADLEY FAILED TO SUFFICIENTLY CONTROL

FOR THE DIFFERENT POSITIONS/JOB TITLES THAT EXIST AT THE 27 ACCS INSTITUTIONS, THEREBY OVERLOOKING SIGNIFICANT DIFFERENCES IN THE SKILLS, DUTIES, AND RESPONSIBILITIES PRESENT AMONGT THE 130-PLUS DIFFERENT C-3 POSITIONS .............57

d.   DR. BRADLEY UTILIZED OVERBROAD EDUCATION CATEGORIES THAT FAIL TO SUFFICIENTLY DELINEATE EMPLOYEES BY EDUCATION LEVEL.....................................61

e.   DR. BRADLEY DID NOT ASCERTAIN THE EFFECT OF BEING FEMALE BY INSTITUTION, STEP, YEAR, AND EDUCATIONAL LEVEL ..........................................................63

IV.   CONCLUSION ...........................................................................................65

## TABLE OF AUTHORITIES

**Case**                                                                                    **Page**

*Abram v. UPS of N. America, Inc.*,
   200 F.R.D. 424 (E.D. Wis. 2001) .......................................................................51

*Alexander v. University of Michigan-Flint*,
   509 F. Supp. 627 (E.D. Mich. 1980) ................................................................39

*Anderson v. Cagle's, Inc*,
   488 F.3d 945 (11th Cir. 2007) ..................................................................*Passim*

*Arrington v. Cobb County*,
   139 F.3d 865 (11th Cir. 1998) ..........................................................................45

*Ash v. Tyson Foods, Inc.*,
   546 U.S. 454 (2006) ..........................................................................................53

*Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*,
   328 F.3d 309 (7th Cir.2003) .............................................................................59

*Barron v. Henry County School System*,
   242 F.Supp.2d 1096 (M.D. Ala. 2003) .............................................................51

*Brennan v. Goose Creek Consolidated Indep. Sch. Dist.*,
   519 F.2d 53 (5th Cir. 1975) ........................................................................36, 40

*Briggs v. U.S.*,
   54 Fed. Cl. 205 (2002) ......................................................................................52

*Brooks v. BellSouth Telecommunications, Inc.*,
   164 F.R.D. 561 (N.D. Ala. 1995) ..........................................................6, 10, 51

*Brown v. Am. Honda Motor Co.*,
   939 F.2d 946 (11th Cir.1991) ...........................................................................59

*Cameron-Grant v. Maxim Healthcare Services, Inc.*,
   347 F.3d 1240 (11th Cir. 2003) ..........................................................................5

*Cooper v. Southern Co.*,
   390 F.3d at 695 (11th Cir. 2004) *overruled on other grounds* ................*Passim*

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974) ...........................................................................3, 43, 45

*Davis v. Charoen Pokphand (USA), Inc.*,
    303 F. Supp. 2d 1272 (M.D. Ala. 2004) ...............................................7, 10, 11

*Dybach v. State of Florida Department of Corrections*,
    942 F.2d 1562 (11th Cir. 1991) ..................................................................4, 8

*EEOC v. Joe's Stone Crab, Inc.*,
    220 F.3d 1263 (11th Cir. 2000) ...............................................................52, 54

*Foster v. Arcata Assoc., Inc.*,
    772 F.2d 1453 (9th Cir. 1986), *cert. denied*, 475 U.S. 1048 (1986) ..............................38

*Gerbush v. Hunt Real Estate Corp.*,
    79 F. Supp. 260 (W.D.N.Y. 1999), *affirmed* ...................................................41

*Glenn v. General Motors Corp.*,
    841 F.2d 1567 (11th Cir. 1988) .................................................................3, 44

*Grayson v. K Mart Corp.*,
    79 F.3d 1086 (11th Cir. 1996) ................................................................6, 8, 9

*Haynes v. Singer Co.*,
    696 F.2d 884 (11th Cir. 1983) ........................................................................6

*Hipp v. Liberty Nat. Life Ins. Co.*,
    252 F.3d 1208, (11th Cir. 2001) .............................................................4, 5, 7

*Hoffmann v. Sbarro, Inc.*,
    982 F. Supp. 249 (S.D.N.Y. 1997) .......................................................9, 10, 52

*Hoffmann-La Roche, Inc. v. Sperling*,
    493 U.S. 165 (1989) .............................................................................4. 51

*Holt v. Rite Aid Corp.*,
    333 F.Supp.2d 1265 (M.D. Ala. 2004) .........................................................7, 8

*Irby v. Bittick*,
    44 F.3d 949 (11th Cir. 1995) ...........................................................3, 43, 44, 45

*Kennedy v. Allied Mutual Ins. Co.*,
    952 F.2d 262 (9th Cir. 1991) .......................................................................38

*Mackenzie v. Kindred Hosps. East, L.L.C.*,

276 F.Supp.2d 1211 (M.D. Fla. 2003) ............................................................................11

*Marsh v. Butler Co. Sch. Sys.,*
242 F. Supp.2d 1086 (M.D. Ala. 2003) ..........................................................................8

*McCray v. Wal-Mart Stores, Inc.,*
2010 WL 1784247 (11th Cir., May 5, 2010) ................................................................45

*Meeks v. Computer Associates Intern.,*
15 F.3d 1013 (11th Cir. 1994) ........................................................................ 37, 38, 39

*Miranda v. B & B Cash Grocery Store, Inc.,*
975 F.2d 1518 (11th Cir.1992) ...............................................................................3, 45

*Mooney v. Aramco Servs. Co.,*
54 F.3d 1207 (5th Cir.1995) ...............................................................................5, 9, 52

*Morgan v. Family Dollar Stores, Inc.,*
551 F.3d 1233 (11th Cir. 2008) ....................................................................................4

*Morisky v. Public Serv. Elec. & Gas Co.,*
111 F. Supp. 2d 493 (D.N.J. 2000) ...............................................................................8

*Mullhall v. Advance Security, Inc.,*
19 F.3d 586 (11th Cir. 1993) .......................................................................... 36, 43, 44

*Rhodes v. Cracker Barrel Old Country Store, Inc.,*
213 F.R.D. 619 (N.D. Ga. 2003) .................................................................................53

*Robinson v. Metro-North Commuter R.R. Co.,*
267 F.3d 147 (2d Cir. 2001) ........................................................................................63

*Sheffield v. Orius Corp.,*
211 F.R.D. 411 (D. Or. 2002) .....................................................................................52

*Stastny v. Southern Bell Tel. & Tel. Co.,*
628 F.2d 267 (4th Cir. 1980) .......................................................................................53

*Steger v. General Elec. Co.,*
318 F.3d 1066 (11th Cir. 2003) .............................................................................43, 44

*Thiessen v. Gen. Elec. Capital Corp.,*
267 F.3d 1095 (10th Cir.2001) ...........................................................................6, 9, 22

*Tucker v. Labor Leasing, Inc.,*
872 F. Supp. 941 (M.D. Fla. 1994) .......................................................................10, 51

*Tyler v. Payless Shoe Source, Inc.,*
 2005 WL 3133763 (M.D. Ala. 2005) ...............................................................8

*Wards Cove Packing Co. v. Atonio,*
 490 U.S. 642, 656-57 (1989) ..........................................................................59

*Waters v. Turner, Wood & Smith Ins. Agency, Inc.,*
 874 F.2d 797 (11th Cir.1989) ............................................................................3

*Watson v. Fort Worth Bank & Trust,*
 487 U.S. 977 (1988) ........................................................................................51

*Webb v. Merck & Co., Inc.,* 206 F.R.D.
 399, 408 n.2 (E.D. Pa. 2002) ...........................................................................53

*White v. Osmose, Inc.,*
 04 F.Supp.2d 1309 (M.D. Ala. 2002) ............................................................6, 8

*Winther v. City of Portland,*
 31 F.3d 1119 (9th Cir. 1994) ...........................................................................42

## Statutes

29 U.S.C. § 206(d)(1) ........................................................................... 2, 3, 43, 45
29 U.S.C. § 216(b) ......................................................................................2, 4
29 C.F.R. §§ 1620.13-1620.18................................................................49, 50
29 C.F.R. § 1620.9(a) (1993) ....................................................................36

## Rules

Fed.R.Civ.P. Rule 23..........................................................................................53
Fed.R.Evid. Rule 406..........................................................................................3

## Treatises

B. Lindemann & P. Grossman, *Employment Discrimination Law*
 Ch. 18.II.B.3 (4th Ed. 2007)Ch. 18.II.B.3 (4th Ed. 2007) ..............................................37

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **PAMALON ROLLINS; SHEMEDREA JOHNSON, RENODA THOMAS, TAMARA WARD, individually and on behalf of the class they seek to represent,** | ) ) ) ) ) | **CIVIL ACTION NO.: 2:09-cv-636-WHA** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **ALABAMA COMMUNITY COLLEGE SYSTEM;** *et al.*, | ) ) ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
OF A COLLECTIVE ACTION UNDER THE EQUAL PAY ACT**

**COME NOW** the Defendants in the above-styled case, and submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Conditional Certification of a Collective Action under the Equal Pay Act.[1] *See* (Doc. Nos. 72, 73).

## I. INTRODUCTION

This employment discrimination matter comes before the Court on Plaintiffs' Motion for Conditional Certification and Authorization to Send Notice Pursuant to the Equal Pay Act ("EPA"). (Doc. No. 72). Plaintiffs, who are female employees employed solely by H. Councill Trenholm State Technical College, and who seek to represent the putative class of female employees employed by 27 member colleges or entities of the Alabama Community College System

---

[1]   Although each Defendant institution has the right to submit a separate brief in opposition to Plaintiffs' certification motion, Defendants jointly submit this opposition brief for the Court's convenience to avoid duplication of effort. Nevertheless, as set forth in detail herein, the Defendant colleges do not concede Plaintiffs' allegation that the colleges within the ACCS are a single entity that employs uniform practices and procedures.

1

("ACCS"), allege that Defendants engage in unlawful polices and practices "to employ, pay and increase men at a higher rate than they employ, pay and increase women for the same or similar work."  (Doc. No. 72) at 1 and ¶¶ 2-3 (describing proposed class as all females employed with Defendants throughout the State of Alabama within three years of the Court's Order); *see also* (Doc. No. 73) at ¶ 2 (stating that collective action is on behalf of all female employees paid pursuant to salary schedules C, D and E.  Plaintiffs further allege that Defendants have failed to pay them equal wages as compared to similarly situated males in violation of the EPA, and additional females have filed Consent to Join forms stating that they were subjected to the same discriminatory pay practices by Defendants.   (Doc. No. 72) at ¶ 4.    Additionally, Plaintiffs claim that females are not compensated for performance of extra duties while men are paid stipends and bonuses, and that Defendants manipulate the salary schedule to provide males with higher salaries and more benefits for comparable work.   (Doc. No. 73) at ¶¶ 21-22.   Plaintiffs seek an Order of conditional certification of a collective action and authorization of notice to ***all female individuals who are/were employed with the Defendants at all of their 2-year colleges in the State of Alabama within three (3) years of the Court's Order***.  *Id.* at 8 (emphasis added).

For the following reasons, the Court should deny Plaintiffs' motion for a conditional certification because they are not a similarly situated group of employees.

## II.        STATEMENT OF THE LAW

### A.    THE EQUAL PAY ACT.

To establish a *prima facie* case under the Equal Pay Act ("EPA")[2], an employee must show that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under

---

[2] The Equal Pay Act of 1963 ("EPA") allows for private enforcement through the procedural framework of the Fair Labor Standards Act § 216(b).  *See* 29 U.S.C. § 206(d) (2000) (amending FLSA and allowing private enforcement through FLSA procedures).

similar working conditions.' " *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir.1989).  A plaintiff must demonstrate that the skill, effort and responsibility required in the performance of the jobs are "***substantially equal***."  29 U.S.C. § 206(d)(1) (emphasis added); *Corning Glass Works*, 417 U.S. at 204.  Although formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content.  *See Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir.1992) ("[O]nly the skills and qualifications actually needed to perform the jobs are considered.").

Once the employee presents a *prima facie* case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) ... any other factor other than sex."  29 U.S.C. § 206(d)(1).   The employer may consider factors such as the "unique characteristics of the same job; ... an individual's experience, training or ability; or ... special exigent circumstances connected with the business." *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) (quoting *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)). Factors such as experience and education operate as a defense to liability rather than as part of a plaintiff's *prima facie* case under the Act.  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d at 1533, n 18.  An employer's evidence of its routine practices is relevant to prove that its conduct at a particular time conformed to its routine practices. FED. R. EVID. 406.   Once the employer's burden is met, the employee "must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Irby*, 44 F.3d at 954.

B.    STANDARDS FOR § 216(b) COLLECTIVE ACTIONS.

Section 216(b) of the Fair Labor Standards Act ("FLSA") provides, in pertinent part:

> Any employer who violates [the minimum wage or maximum hours provisions of this title] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.  Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees *for and in behalf of himself or themselves and other employees similarly situated*.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added).

Collective action treatment under § 216(b) reflects a policy in favor of judicial economy by which "the judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."  *See Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989).  Accordingly, the Eleventh Circuit has held that a district court should make certain determinations before allowing an individual plaintiff to give notice to other potential members of a collective action under the FLSA.  The key to the ignition of the collective action motor is a showing that there is a similarly situated group of employees.  *See Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233 (11th Cir. 2008) (citing *Anderson v. Cagle's, Inc,* 488 F.3d 945, 953 (11th Cir. 2007); *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1217 (11th Cir. 2001)).  Before facilitating notice, a "district court should satisfy itself that there are other employees ... who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Dybach v. State of Florida Department of Corrections,* 942 F.2d 1562, 1567-68 (11th Cir. 1991).

1.   **Two-Stage Procedure for Determining Certification in Some Collective Actions.**

In *Hipp,* the Eleventh Circuit recommended that district courts generally employ the following two-tiered procedure in certifying collective actions under § 216(b):

> The first determination is made at the so-called 'notice stage.' At the notice stage, the district court makes a decision-usually based only on the pleadings and any affidavits which have been submitted-whether notice of the action should be given to potential class members.
>
> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class. If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.' The action proceeds as a representative action throughout discovery.
>
> The second determination is typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives-*i.e.* the original plaintiffs-proceed to trial on their individual claims.

*Hipp,* 252 F.3d at 1218 (quoting *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213-14 (5th Cir.1995)).  The Eleventh Circuit has cautioned, however, that ***"[b]ased on [its] review of the case law, no representative class has ever survived the second stage of review*.*"  Id.* (emphasis added).

Therefore, the stage one determination is typically "made using a fairly lenient standard" because "the court has minimal evidence." *Cameron-Grant v. Maxim Healthcare Services, Inc.,* 347 F.3d 1240, 1243 (11th Cir. 2003).  It is not until after discovery has been conducted, "when the court has much more information on which to base its decision," that the court makes a factual determination on the similarly situated question.  *Id.*  A plaintiff has the burden of

showing a "reasonable basis" for her claim that there are other similarly situated employees.  *See Anderson,* 488 F.3d at 952; *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir. 1996).  There must be more than "only counsel's unsupported assertions that FLSA violations [are] widespread and that additional plaintiffs would come from other stores."  *Haynes v. Singer Co.,* 696 F.2d 884, 887 (11th Cir. 1983).  During the second stage, the district court has a more substantial record than it had at the notice stage, and can therefore make a more informed factual determination of similarity.  *Anderson,* 488 F.3d at 953.  This second stage is less lenient, and the plaintiff bears a heavier burden.  *Id.*  (citing *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1103 (10th Cir.2001)).

> **2.   THE STANDARD FOR THE NOTICE STAGE IS MODIFIED IN THIS CASE BECAUSE THE PARTIES ALREADY HAVE COMPLETED EXTENSIVE DISCOVERY.**

Plaintiffs in this case advocate that the Court apply the "lenient" standard that is typical at the notice stage to its motion for conditional certification.  *See* (Doc. No. 72) at ¶¶ 7-8 n. 2; (Doc. No. 73) at ¶ 5.  However, the district courts in Alabama have applied a more rigorous standard during this conditional certification stage for cases similar to the one at bar when the parties have conducted substantial discovery.  For example, in *White v. Osmose, Inc.,* 204 F.Supp.2d 1309, 1313 n. 2 (M.D. Ala. 2002) (Albritton, C.J.)*,* this Court considered the submissions of both parties because the plaintiff had conducted extensive discovery with respect to the defendant's policies.  The Court reasoned:

> White has had extensive discovery with respect to Osmose's policies regarding the pay provisions of employees in the utilities division. Accordingly, the court deems it necessary to carefully consider the submissions of the parties with respect to the class allegations, rather than merely relying on the handful of affidavits that support White's position.

*White,* 204 F.Supp.2d at 1313 n. 2 (citations omitted); *see also Brooks v. BellSouth*

*Telecommunications, Inc.,* 164 F.R.D. 561, 566 (N.D. Ala. 1995) (Blackburn, J.) (analyzing motion for conditional class certification in light of extensive discovery by plaintiff).

Similarly, in *Davis v. Charoen Pokphand (USA), Inc.,* 303 F. Supp. 2d 1272 (M.D. Ala. 2004) (Thompson, J.), Judge Thompson, citing this Court's decision in *White*, applied this "more searching standard of review", stating as follows:

> This case is in a slightly different posture than that envisioned in *Hipp* as the first stage, or "notice stage," 252 F.3d at 1218, and thus ***a more searching standard of review is appropriate***. The rationale for the "fairly lenient standard" is that at the early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best evidence. *See id.* This rationale disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures. *White v. Osmose, Inc.,* 204 F.Supp.2d 1309, 1313 n. 2 (M.D. Ala. 2002) (Albritton, C.J.).

*Davis,* 303 F. Supp. 2d at 1276 (emphasis added). Judge Thompson noted that the plaintiffs had an opportunity to conduct discovery and had filed supplemental evidence in support of their motion to facilitate class notification. Consequently, the court applied a more rigorous standard than *Hipp*. *Id.* (declining to certify a collective action because it would undermine, rather than promote, the purpose of judicial efficiency). The court further noted that "FLSA has a broad remedial purpose, but, as the *Brooks* court noted, '***courts, as well as practicing attorneys, have a responsibility to avoid the "stirring up" of litigation through unwarranted solicitation***.' " *Id.* (citing *Holt v. Rite Aid Corp.,* 333 F.Supp.2d 1265, 1275 (M.D. Ala. 2004) (Albritton, C.J.)) (citations omitted) (emphasis added)).

The rationale for considering evidence at this stage in the proceedings was explained by this Court in *Holt:*

> The court emphasizes that it is not weighing evidence, or accepting the substance of the Declarations submitted by the Defendant over the substance of any testimony submitted by the Plaintiffs. Because the issues

7

> in this case revolve around whether the day-to-day tasks of Store
> Managers and Assistant Managers are consistent with their designation as
> exempt, this court must necessarily examine evidence of the job duties
> actually performed by all of the Store Managers and Assistant Managers.
> The court concludes in this case, therefore, that rather than rely merely on
> the evidence presented by the Plaintiffs, it is appropriate to examine all of
> the relevant evidence.

*Holt,* 333 F.Supp.2d at 1274.  *See also Tyler v. Payless Shoe Source, Inc.*, 2005 WL 3133763

(M.D. Ala. 2005) (Fuller, C.J.) (after considering all of the evidence presented at the "notice"

stage, in the form of affidavits submitted by both plaintiff and defendant on the issue of whether

putative class members were similarly situated, the court concluded that all of the Store

Managers employed by Payless, even within the region that included Alabama, were NOT

similarly situated and held that plaintiff failed to meet the standard requirements necessary to

certify a collective action); *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498

(D.N.J. 2000) (applying a stricter standard where discovery had been conducted);

### 3.      STANDARD FOR "SIMILARLY SITUATED."

The first and dispositive question is whether Plaintiffs and the potential opt-in plaintiffs

are similarly situated.  *See Dybach,* 942 F.2d at 1567.  The plaintiff bears the burden of

establishing that she and the class she wishes to represent are similarly situated.  *See Grayson v.*

*K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir. 1996).  "[A] plaintiff must make some rudimentary

showing of commonality between the basis for his claims and that of the potential claims of the

proposed class, beyond the mere facts of job duties and pay provisions."  *Holt,* 333 F. Supp.2d at

1270 (M.D. Ala. 2004) (citing *Marsh v. Butler Co. Sch. Sys.,* 242 F. Supp.2d 1086, 1093 (M.D.

Ala. 2003); *White,* 204 F. Supp.2d at 1314 (M.D. Ala. 2002)).  "Without such a requirement, it is

doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly

present a ready opportunity for abuse."  *Id.*  These principles are cogently illustrated in *Anderson*

*v. Cagle's, Inc*, 488 F.3d 945, 953 (11th Cir. 2007).

In *Anderson,* the Eleventh Circuit explained that as more legally significant differences appear amongst the opt-in plaintiffs, the less likely it is that the group of employees is similarly situated. *Id*. at 953.  In order to overcome the defendant's evidence, a plaintiff must rely on more than just "allegations and affidavits." *Id.* The Court approvingly quoted the Tenth Circuit's decision in *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095 (10th Cir.2001), wherein that court identified a number of factors courts should consider when determining whether putative opt-in plaintiffs are similarly situated, such as: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations[.]" *Anderson,* 488 F.3d at 953 (quoting with approval *Thiessen,* 267 F.3d at 1103); *see also Mooney,* 54 F.3d at 1213 n. 7, 1215-16.  The similarities necessary to maintain a collective action under § 216(b) must extend beyond the "mere facts of job duties and pay provisions" and encompass the defenses to some extent. *Anderson,* 488 F.3d at 953 (citation and quotation marks omitted).  For example, the district court must consider whether the defenses that apply to the opt-in plaintiffs' claims are similar to one another or whether they vary significantly. *Id.* at 954 n. 8 (noting that all named plaintiffs were unionized, but some opt-in plaintiffs were not, making the collective bargaining agreement defense applicable to some but not all plaintiffs).

Additionally, Plaintiffs can show that they are similarly situated by proving a common scheme, plan or policy to discriminate. *See Grayson,* 79 F.3d at 1096-99 (there was a considerable amount of evidence supporting the inference that the defendant had instituted a discriminatory plan to rid itself of older managers); *see also Hoffmann v. Sbarro, Inc.,* 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (holding that plaintiffs met the similarly situated requirement

by pointing to an express, company-wide employment policy allegedly in violation of the FLSA).

Other courts have determined that members of a proposed class were not similarly situated where the supposedly unlawful activities of the employer were not shown to be pursuant to a common scheme, plan, or policy.  *See, e.g., Brooks v. BellSouth Telecommunications, Inc.,* 164 F.R.D. 561, 569 (N.D. Ala. 1995) ("it is clear that any claims of the proposed opt-in plaintiffs would present disparate factual and employment settings"); *Tucker v. Labor Leasing, Inc.,* 872 F. Supp. 941, 947-49 (M.D. Fla. 1994) (same); *Hoffmann v. Sbarro, Inc.,* 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (holding that plaintiffs met the similarly situated requirement by pointing to an express, company-wide employment policy allegedly in violation of the FLSA). Once again, Judge Thompson provides some guidance in *Davis*.

In *Davis,* 303 F. Supp. 2d at 1278, Judge Thompson considered the approaches of several courts in determining whether putative plaintiffs were similarly situated:

> The cases from the district courts show a variety of approaches to applying the "similarly situated" requirement.  Some cases have focused on the similarity between job responsibilities and pay provisions of plaintiffs and those of the proposed class.  *See, e.g., Bradford v. Bed Bath & Beyond, Inc.,* 184 F. Supp.2d 1342, 1345 (N.D. Ga. 2002) (Story, J.) ("The only determinative issue is whether Plaintiffs' job duties were similar."); *Tucker,* 872 F. Supp. at 948. Other decisions, most notably a series of opinions authored by Chief Judge Albritton of this court, have looked more closely for evidence of a factual or legal nexus between plaintiffs' claims and the claims of the proposed class.  *See, e.g., Barron,* 242 F. Supp.2d at 1103.   Finally, one court has employed a multi-factor approach.  *See Stone,* 203 F.R.D. at 542-43.

Judge Thompson was skeptical as to whether the *Davis* plaintiffs could meet their burden of establishing that the proposed class was similarly situated for two reasons.  First, the plaintiffs articulated almost no limit to the definition of their proposed class, including "all 'similarly situated' employees (current and former) of Defendant who were subject to the uniform policy of

not paying overtime compensation." The court reasoned that such a broad class "almost inevitably would include employees with very different job titles and responsibilities, both of which are relevant factors in making the 'similarly situated' determination. *Id.   See also Mackenzie v. Kindred Hosps. East, L.L.C.,* 276 F.Supp.2d 1211, 1221 (M.D. Fla. 2003) (Merryday, J.) (identifying "the overbroad class of individuals identified by plaintiff as comprising the potential class action" as a factor in denying conditional class certification). Second, the court had little information about the job titles or duties of the employees whom plaintiffs urged as potential class members.   Since the *Davis* Plaintiffs sought approval of class notice without any evidence of the ways in which their and the proposed class members' jobs were similar, Judge Thompson denied their motion for conditional certification. *Davis,* 303 F. Supp. 2d at 1278.

In sum, Plaintiffs face a rigorous standard and bear the burden of proving that they are similarly situated to the class of employees they purport to represent.

## III.   ARGUMENT

**A.   THE LENIENT STANDARD ADVOCATED BY PLAINTIFFS IS NOT APPLICABLE TO THIS CASE BECAUSE THE PARTIES HAVE ENGAGED IN EXTENSIVE DISCOVERY.**

After applying a more rigorous standard than that normally used in the first stage of a collective action, this Court should not grant Plaintiffs' motion for conditional certification.   To this date, the parties have conducted the following discovery:

- Extensive Written discovery;[3]

---

[3]  The written discovery conducted so far consists of the following:

- Plf. Requests to Admit to Def. Trenholm
- Plf. Requests to Admit to Def. Postsecondary Education, Chancellor and AL Community College System
- Plf. Ward's First Supplemental Combined Set of INT and RFP to Def. Trenholm
- Plf. Ward's First Supplemental Combined Set of INT and RFP to Def. Postsecondary Education, Chancellor and AL Community College System
- Plf. Ward's First Combined Set of INT and RFP to Def. Trenholm

- Production of Plaintiffs' and Defendants' expert reports;
- Deposition of Plaintiffs' and Defendants' experts;[4]
- Depositions of the Defendants' 30(b)(6) representatives;
- Depositions of the comparators identified by Plaintiffs;
- Depositions of 3 of the 4 named Plaintiffs.[5]

*See also* (Doc. No. 72) at Ex. C (Plaintiffs' Expert Report); (Doc. No. 73) at ¶¶ 7-8 (outlining the findings of Plaintiffs' expert report and statistical analyses).

In light of the extensive discovery conducted by the parties, the Court should apply a more searching and rigorous review to avoid stirring up litigation by sending out notices to potential plaintiffs when the Plaintiffs have not made a showing that they are similarly situated.

**B.    THE NAMED PLAINTIFFS' INDIVIDUAL CLAIMS ARE NOT SIMILARLY SITUATED TO THE PROPOSED CLASS, AND THE OPT-IN PLAINTIFFS HAVE NOT MADE ANY SHOWING THAT THEIR CLAIMS ARE SIMILARLY SITUATED TO THE NAMED PLAINTIFFS OR EACH OTHER.**

In the present case, Plaintiffs move the Court to conditionally certify a collective action and send notice to "***all female individuals who are/were employed with the Defendants at all of their 2-year colleges in the State of Alabama within three (3) years of the Court's Order***."  (Doc. No. 72) at 1, 8 (emphasis added).  Plaintiffs, however, have failed to meet their burden of showing

---

- Plf. Ward's First Combined Set of INT and RFP to Def. Postsecondary Education, Chancellor and AL Community College System
- Plf. Rollins' First Supplemental Combined Set of INT and RFP to Def. Trenholm
- Plf. Rollins' First Supplemental Combined Set of INT and RFP to Def. Postsecondary Education, Chancellor and AL Community College System
- Plf. Rollins' First Combined Set of INT and RFP to Def. Trenholm
- Plf. Rollins' First Combined Set of INT and RFP to Def. Postsecondary Education, Chancellor and AL Community College System
- Plf. Johnson's First Combined Set of INT and RFP to Def. Trenholm
- Def. Trenholm's Answers to Plf. Thomas' First Combined Set of INT and RFP
- Def. Trenholm's Answers to Rollins First Combined Set of INT and RFP
- Def. Trenholm's Answers to Ward's First Combined Set of INT and RFP
- Def. Trenholm's Answers to Plf. Johnson's First Supplemental Combined Set of INT and RFP
- Def. Trenholm's Answers to Plf. Ward's First Supplemental Combined Set of INT and RFP
- Def. AL Dept. of Postsecondary Eds. Answers to Rollins First Combined Set of INT and RFP

[4]  Defendants' expert will be deposed on Aug. 23, 2010, and will be completed for any hearing on the issues presented herein.
[5]  Although Plaintiff Tamara Ward was scheduled to be deposed during the week of August 9, 2010, she fell ill and was required to undergo emergency surgery, to be followed by a lengthy convalescence period.

that their claims are similarly situated to each other, much less that they are similar to the overbroad putative class they have proposed.

### 1.     THE NAMED PLAINTIFFS.

Since the compensation, and promotion decisions at issue were made by dozens of different presidents at 27 different colleges implementing different C-3 salary schedule policies, even if the named plaintiffs established that they were, individually, subjected to intentional discrimination, they cannot necessarily establish that other class members suffered from the same discrimination.   The four Plaintiffs are employed full-time in a variety of jobs at a single ACCS institution -- Defendant H. Councill Trenholm State Technical College (hereinafter, "Trenholm") -- and are compensated from the C-3 salary schedule (Plaintiffs Johnson and Rollins), the D-1 salary schedule (Plaintiff Ward), and the E salary schedules (Plaintiff Thomas). The specific facts alleged by the named Plaintiffs are as follows:

- **PLAINTIFF PAMALON ROLLINS**

Plaintiff Rollins was hired by Trenholm in 2004 as an Administrative Services Manager and was placed on the C-3 salary schedule.   Fourth Amend. Comp. (Doc. No. 63) at ¶ 24.   The position was later reorganized and re-titled as Director of Human Resources.   *Id.*  Rollins holds a BA in Criminal Justice from Alabama State University and a Masters Degree in Human Resources Management from Troy University.   *Id.* at ¶ 25.   According to Rollins, she requested that Trenholm President, Defendant Samuel Munnerlyn, reclassify her to a higher pay schedule as a result of an increase in her duties and responsibilities.   *Id*.   President Munnerlyn ultimately recommended to Defendant Bradley Byrne, the former Chancellor of the Alabama Department of Post-Secondary Education, that he increase Rollins pay based on her additional duties.   *Id.* Chancellor Byrne ultimately declined the recommendation.   *Id.*   Rollins subsequently filed a

Charge of Discrimination with the EEOC and a retaliation charge, alleging multiple acts of retaliation through the removal of her duties and responsibilities. *Id.* at ¶ 26. Plaintiff Rollins currently earns an annual salary of $56,560.00. *Id.* at ¶29.

- **PLAINTIFF SHEMEDREA JOHNSON**

Plaintiff Johnson was hired by Defendant Trenholm in 2001 as the Director of Restricted Programs and was placed on the C-3 salary schedule. *Id.* at ¶ 27. Johnson holds a BA in Finance from Alabama State University and a Masters of Business Administration Degree from Troy University. *Id.* Johnson contends that she is responsible for the direction and oversight of all grants and contracts. *Id.* Johnson further contends that in January 2007, she was assigned without additional pay the additional duties of the Director of Accounting and the Administrative Assistant to the Dean of Finance when they resigned. *Id.* Johnson contends that in 2007, she requested that she be elevated to the C-2 salary schedule and that Defendant President Munnerlyn recommended reorganization of the position of Director of Restricted Programs to be placed on the C-2 salary schedule. *Id.* at 28. Chancellor Byrne, however, declined the recommendation allegedly because the decision would be more appropriately made by the permanent president of Trenholm, rather than President Munnerlyn, who was acting as an interim President.[6] Munnerlyn was later confirmed as President of Trenholm in January 2008. Plaintiff Johnson then again asked President Munnerlyn to elevate her to the C-2 salary schedule, which both Munnerlyn and Chancellor Byrne declined to do. *Id.* Johnson claims that she did not receive additional pay for the additional duties she was performing despite the fact that the monies had been allocated in the annual college budget. Johnson subsequently filed a Charge of Discrimination with the EEOC and further alleged unspecified acts of retaliation. *Id.* Plaintiff

---

[6] Munnerlyn was appointed interim President of Trenholm after the former President, Anthony Molina, passed away.

Johnson currently earns an annual salary of $66,691.00.  *Id*. at ¶ 29.

- **PLAINTIFF RENODA THOMAS**

Plaintiff Renoda Thomas' claim is ***distinctly different*** from the claims of Plaintiffs Rollins and Johnson.  Thomas was hired by Defendant Trenholm in August 2002 as an Accounts Receivable Clerk and was placed on the E salary schedule, *i.e*., technical and support personnel not included in other schedules.  *Id.* at ¶ 34.  The Dean of Finance later reclassified Thomas' position in the Fall of 2004 to Payroll and Personnel Accountant.  *Id.*  Thomas contends that in August of 2008, she was offered the position of Operations Accountant, and that she was informed by President Munnerlyn and her supervisor that the pay for the position was budgeted for $54,000.00.  *Id.*  Thomas alleges that she declined the offer because the salary was lower than her total pay (including overtime) she was earning as a Payroll and Personnel Accountant.  *Id.*  According to Thomas, Dr. Munnerlyn ultimately hired William Merrill for the position, which only required an Associate's Degree, and placed him on the C-3 salary schedule at $70,000.00, much more than she was told the position would pay.  *Id.*  Thomas contends that Merrill is the only accountant compensated under the C-3 salary schedule; that she and other accountants are paid on the E salary schedule.  *Id.*  Importantly, Thomas was never assigned to the C-3 salary schedule and, therefore, she was not included in the analysis of Plaintiffs' expert, Dr. Bradley.  Thomas filed an EEOC Charge of Discrimination on April 23, 2009 alleging gender pay discrimination under Title VII and the EPA.  She also alleges unspecific ongoing retaliation.  *Id.* at ¶ 36.

- **PLAINTIFF TAMARA WARD**

Plaintiff Tamara Ward was hired by Defendant Trenholm in May 2004 as an Instructor of Cosmetology.  *Id*. at ¶37.  After working part-time as an Adjunct Instructor for approximately 8

years, Ward was hired as a full time Instructor on August 16, 2004 on the D1 salary schedule, Grade 1A. *Id*. at ¶ 37. Ward claims that for at least 2 years of the time she was employed as an adjunct instructor, she was working full time to fill in for an instructor who was ill and for an instructor who resigned. *Id.* Ward is licensed through the Alabama Board of Cosmetology, both as a certified Cosmetology Instructor and a Managing Cosmetologist. *Id.* Prior to her employment at Trenholm, Ward worked as a Salon Inspector for the Alabama Board of Cosmetology. *Id.*

According to Ward, she sought a pay grade level increase on the D-1 Salary Schedule after she obtained her Master's degree. *Id.* Ward claims that President Munnerlyn advised her that she first would have to take and pass the NOCTI Cosmetology Exam; which she passed in December 2008 and subsequently provided the necessary documentation to Defendants on March 5, 2009, but Defendants declined her request for a pay grade level increase.[7] Although she does not identify any specific male employees, Ward claims that male employees at Trenholm are awarded pay grade level increases without having to follow the same requirements as females and that they are paid at higher salary levels, higher salary schedules and higher pay grade levels than equally or better qualified female employees. *Id.* As with Plaintiff Thomas, Ward has ***never*** been assigned to the C-3 salary schedule and, therefore was not included in the analysis of Plaintiffs' expert, Dr. Bradley. Ward contends that the alleged pay discrimination is ongoing and that throughout her employment at Trenholm, she has been discriminated against on the basis of her gender in the terms and conditions of her employment and held to a higher standard of performance than her similarly situated male counterparts. Ward filed her EEOC charge on July 2, 2009. *Id.* at ¶ 38. Ward further claims that she has been subject to various acts

---

[7]  The facts will show that, although Ward obtained her Master's Degree in March 2009, Dr. Munnerlyn advised her that her salary increase would be effective at the beginning of the new academic year.

of retaliation. *Id.* 37.

Collectively, the named plaintiffs do not have claims that are similar to each other:

- Only 2 of the 4 named Plaintiffs (Rollins and Johnson) have been assigned to the C-3 Salary Schedule, *i.e.,* the only salary schedule made the basis of Plaintiffs' expert report. Furthermore, their claims relate solely to the denial of a requested pay increase by the President of Trenholm Technical College.

- Plaintiffs Thomas and Ward are assigned to the E and D-1 Salary Schedules, respectively and, therefore, were not included in the analyses prepared by Plaintiffs' expert and otherwise have no claims similar to members of the putative class who might have pay claims relating to the C-3 Salary Schedule.

- All named Plaintiffs assert claims ***solely*** against Trenholm Technical College. None of the Plaintiffs have claims similar to possible members of the putative class who might have claims against the other 26 ACCS institutions, many of which have different C-3 salary policies.

- Plaintiffs represent only 2 of the 132 unique job titles within the C-3 Salary Schedule; job titles which have different job duties and responsibilities;

- One Plaintiff, Thomas, makes an allegation concerning a promotion, and that claim is based on a unique and isolated set of facts limited to Ms. Thomas, as established by the absence of any statistical evidence or expert testimony establishing gender-based disparate impact regarding the promotion of women to job classifications within the C-3 salary schedule.

These significant differences in the claims of the named Plaintiffs themselves, much less the proposed collective action of all females who are/were employed with the Defendants, clearly fail to support a finding that they are similarly situated.

### 2.    THE OPT-IN PLAINTIFFS.

Although Defendants concede that Plaintiffs have submitted an adequate number of notices of consent to opt-in, Plaintiffs have not shown that there are putative plaintiffs from more than a sampling of the community colleges throughout Alabama's system. Additionally, the consent forms contain no substantive information that would allow the Court to ascertain whether their claims are similar to other putative plaintiffs. Other than a name and identifying

the ACCS Institution where each opt-in Plaintiff was employed along with employment dates, they present no evidence concerning how they are similarly situated to the named Plaintiffs or the proposed class.

### NAMED PLAINTIFFS AND OPT-IN PLAINTIFFS

| NAME OF PLAINTIFF | DATE OF CONSENT FORM | NAME OF ACCS INSTITUTION | DATES EMPLOYED BY ACCS |
|---|---|---|---|
| Pamalon Rollins | N/A Named Plaintiff | H. Trenholm Technical College | 2004 to present |
| Shemedrea Johnson | N/A Named Plaintiff | H. Trenholm Technical College | 2001 to present |
| Renoda Thomas | N/A Named Plaintiff | H. Trenholm Technical College | 2002 to present |
| Tamara Ward | N//A Named Plaintiff | H. Trenholm Technical College | 2004 to present |
| Melissa Rice | 7/29/10 | Sneed State Community College | July 1992 to present |
| Erma Hughes | 7/6/10 | Jefferson State Community College | June 30, 1989 (form does not state if she is still employed) |
| Daphne Matthews | 7/7/10 | Trenholm State Technical College | August 2005 to present |
| Sheria Mitchell | 7/7/10 | Bishop State | March 2, 2005 to present |
| Verlindsey Stewart | 7/2/10 | Drake State Technical College | September 1996 to present |
| Anudrece D. Wheeler-Dunner | 7/7/10 | Bishop State Community College | February 6, 2006 to present |

**3.    ALLEGED COMPARATORS**

Plaintiffs have identified the following four comparators:  Charles Harris, Gerald Horn, Michael Evans, and Milton Perry as comparators for Pamalon Rollins and Shemedrea Johnson and William Merrill as comparator for Renoda Thomas.  Fourth Amended Comp.  (Doc. No. 63 at ¶ 29-33); (Doc. No. 73) at ¶¶ 15-19.  Although Plaintiff Ward claims that she was treated differently than her male counterparts, she does not identify any specific comparators.  Fourth Amended Complaint (Doc. No. 63) at ¶¶ 37-38; (Doc. No. 73) at ¶ 20.  Additionally, although ¶ 35 of the fourth Amended Complaint discusses the salary of William Merrill in comparison to all four named Plaintiffs, it is unclear whether all four Plaintiffs identify him as a comparator.

The following table set forth in Defendants' Expert Report summarizes the titles of each named Plaintiff and their comparators from their most recent job description:

| NAME | POSITION TITLE |
|---|---|
| **Pamalon Rollins** | Director of Human Resources |
| **Shemedrea Johnson** | Director of Restricted Programs |
| Michael Evans | Public Information Officer and Admissions/Retention Advisor |
| Charles Harris | Assistant Dean for Information Technology & Campus Safety |
| Gerald Horn | Project Director, DOL Automotive Manufacturing Training Project |
| Milton Perry | Project Director—Health Services |
| **Renoda Thomas** | Accountant – Payroll & Personnel |
| William Merrill | Operations Accountant |
| **Tamara Ward** | Instructor—Cosmetology |

ERS Report, Ex. B at 24.

None of the job titles or specific job duties of the comparators are remotely similar to the named Plaintiffs' job titles or specific duties of the jobs. Moreover, as established in Defendants' Expert Report, a review of the Plaintiffs' and comparators' personnel files, including job descriptions as discussed above, reveals dissimilarities in current job duties, education level, and prior experience. ERS Report, Ex. B at 24 and Appendix C thereto. For example, while Ms. Rollins and three of her four comparators possess master's degrees, the three comparators had all received their degrees ***prior*** to employment at Trenholm. *Id.* at 25. Ms. Rollins' and Ms. Johnson's named comparators have diverse backgrounds such as an industrial engineer working in manufacturing and a nurse practitioner, among others. *Id.* One of their comparators, Mr. Perry was hired by Trenholm in 2008 after receiving his master's degree in nursing and a license as a family practice nurse in 1999 and was offered the salary earned by his female predecessor.[8] *Id.* Another comparator, Mr. Harris, is an Assistant Dean for Information

---

[8] Mr. Perry's duties include implementation and operations of a grant from the U.S. Department of Labor to expand and enhance Trenholm's allied health division (*i.e.*, school of nursing, paramedics, medical/nursing assisting program), which has had approximately 900 participants since 2007. Deposition of Danny Perry ("Perry Dep."), Ex. D at 25-26.

Technology and Campus Safety, and is not paid under Schedule C-3 and, therefore, is not part of Dr. Bradley's analysis.[9]  *Id.*

Ms. Thomas' named comparator, William Merrill, came to Trenholm as a CPA with an MBA and several years of experience as an Operations, Staff, and Corporate Accountant.  *Id.* Moreover, at his job prior to Trenholm, Merrill served as a Senior Accountant with auditing duties for businesses, not-for-profits, governments, and employee benefit plans.  *Id.*; Deposition of William Merrill ("W. Merrill Dep."), Ex. C at 57-58.  In contrast, Ms. Thomas holds an associate's degree in accounting.  Additionally, Mr. Merrill earned a salary at his prior employer comparable to that which he was offered.  W. Merrill Dep., Ex. C at 80.  Full comparison tables are contained in Appendix C to ERS Report.  Ex. B.

No testimony better illustrates the lack of evidence supporting Plaintiffs' claims that they are similarly situated to the identified comparators than the deposition testimony Plaintiff Shemedrea Johnson regarding comparator Michael Evans – Trenholm's Public Information Officer:

> **BY: MS. BIGGS**
>
> Q.      How do you job duties relate to Michael Evans' job duties? How are they similar?
>
> A.      Our jobs are similar because the Alabama Community College System placed us on Salary Schedule C-3.  That makes us similar.  We have –

Deposition of Shemedrea Johnson ("S. Johnson Dep."), Ex. F at 100-01.  Furthermore, when again asked how her job duties and responsibilities as the Director of Restricted Programs were

---

[9]  Even if Harris was a proper C-3 comparator, the record establishes that prior to his employment at Trenholm, he managed numerous facilities and multiple supervisory roles in military as a line Air Traffic Controller, Supervisor and Facility Manager.  Deposition of Charles Harris ("C. Harris Dep."), Ex. E at 7, 9, 11, 14-15, 17.  He also served as a Network Technician, Network Administrator, and as a Coordinator for the Alabama Department of Postsecondary Education before accepting a position with Trenholm.  *Id.* at 37-41.

similar to those of Mr. Evans as the Trenholm's Public Information Officer, Johnson dodged the question, twice stating that her job was more complex, *i.e.*, "important", than Mr. Evans' job:

> **BY: MS. BIGGS**
>
> Q.      I'm sorry.  I mean job duties and responsibilities.  What about your job duties are similar to the job duties of Michael Evans?
>
> A.      It is my belief that my job responsibilities and duties are more complex that Michael Evans'.
>
> Q.      And how do your job duties – I keep asking the same question over and over again.  I'm waiting for your answer.  How are your job duties similar to that of Michel Evans?
>
> A.      And I have answered the question.  My job duties far exceed Michael Evans'.  I don't see how the Alabama Community College System and Trenholm State Technical College approved to pay Michael Evans the salary that he is earning based on what he does.  So it is my testimony that my duties far exceed Michael Evans', yet we are similar because of the operation of the Alabama Community College System and the way that it subjects women to being placed on Salary Schedule C-3.

*Id.* at 101-02.  In other words, she offers no evidence other than the fact that she believes her job is more important that Evans' job and that they are on the same C-3 salary schedule.

The evidence establishes that none of the alleged comparators are suitable comparators for any named plaintiff for purposes of the EPA because they are not similarly situated and/or because they are not performing substantially equal work requiring equal skills, efforts and responsibilities.

**C.      PLAINTIFFS ARE NOT SIMILARLY SITUATED WITH RESPECT TO THEIR EMPLOYMENT SETTINGS, JOB REQUIREMENTS AND PAY PROVISIONS.**

**1.      THE INDIVIDUAL PLAINTIFFS ARE NOT SIMILARLY SITUATED BECAUSE OF THEIR DISPARATE FACTUAL AND EMPLOYMENT SETTINGS.**

One of the factors that the court should consider when determining whether putative opt-in plaintiffs are similarly situated is the disparate factual and employment settings of the

individual plaintiffs.  *Anderson,* 488 F.3d at 953 (quoting with approval *Thiessen,* 267 F.3d at 1103).

> ### a.   THE ALABAMA COMMUNITY COLLEGE SYSTEM.

The structure of The Alabama Community College System ("ACCS") and its member institutions is complex.  The ACCS is governed by The State Board of Education and consists of 25 comprehensive community colleges and four technical colleges; Athens State College; and extensive workforce development initiatives, including the Alabama Industrial Development Training ("AIDT") and Alabama Technology Network ("ATN") (collectively, the "ACCS institutions").[10]  The ACCS institutions employ approximately 10,500 employees who, in turn, annually serve approximately 300,000 Alabamians.  Deposition of Joan Davis ("J. Davis Dep."), Ex. H at 109.  The current Chancellor of the ACCS is a woman, Dr. Frieda Hill, as are the Presidents of 10 of the 27 ACCS institutions.  *See* List of ACCS Presidents, Ex. G.

These ACCS colleges are located throughout the state and serve distinct, diverse populations and often through classes offered at multiple campuses in different geographic areas. For example, Lawson State Community College is a comprehensive, public, two-year, multi-campus college, which seeks to provide accessible quality educational opportunities, promote economic growth and enhance the quality of life for people in metropolitan Birmingham;[11] whereas Alabama Southern is a comprehensive two-year college serving Southwest Alabama with campuses in Monroeville, Thomasville, Gilbertown, and Jackson, *i.e.*, rural Alabama.[12]

> ### b.   ACCS INSTITUTIONS AND LEADERSHIP.

Although The State Board of Education, upon recommendation of the Chancellor, develops general policies for the governance of the ACCS, the member institutions are

---

[10]  Plaintiffs' expert did not analyze data from ATN or AIDT.

[11]  *See* http://www.lawsonstate.edu/Welcome/mission_goals.html.

[12]  *See* http://www.ascc.edu/Default.asp?PN="&DivisionID=638.

decentralized and predominantly autonomous.  Each ACCS institution is a separate legal entity and employer with its own President, budget, faculty, staff, location(s), work hour rules, and policies and procedures regarding employment issues such as hiring, promotions, discipline, evaluations and compensation, and each ACCS institution is separately licensed and accredited. J. Davis Dep., Ex. H at 27, 210-212.  In sum, each ACCS institutions operates autonomously *vis-à-vis* other ACCS institutions.  *Id*. at 212; *see also* Affidavit of Dr. James M. Mitchell ("Mitchell Aff."), Ex. I at ¶ 9; Affidavit of Dr. Helen McAlpine ("McAlpine Aff."), Ex. J at ¶ 8; Affidavit of Dr. Nancy Chandler ("Chandler Aff."), Ex. K at ¶ 6; Affidavit of Dr. Laurel Blackwell ("Blackwell Aff."), Ex. L at ¶ 10; Affidavit of Dr. David Campbell ("Campbell Aff."), Ex. M at ¶ 9.

Each ACCS school is operated by its respective president.  The State Board of Education provides each president substantial discretion in the day-to-day operations of the school, including the appointment of employees, the assignment of duties and the determination of salaries.  Each college president is responsible for developing local policies governing the institution in accordance with established State Board of Education policies, Chancellor's regulations, federal and state statutes, and appropriate judicial directions.  *See* 210.01: Policies, Ex. N.  Each college president is also responsible for the day-to-day operation of the institution, including the appointment of the faculty and staff according to qualifications approved by The State Board of Education as well as other policies adopted by The State Board of Education and for the assignments of faculty and staff at the local level.  *See* 102.04: Chancellor: Decision-making Authority; 203.02: President: Line of Authority, Ex. N; 204.01: Appointment of Local Administrative Staff, Ex. N.  The Chancellor of the ACCS has limited authority to reverse the President's appointments or assignments of personnel and, specifically, can only reverse

decisions contrary to law or policies adopted by The State Board of Education.  *See* 602.01:

Appointment and Assignment of Personnel, Ex. N.

### c.     COMPENSATION POLICIES -- THE C-3 SALARY SCHEDULE

Employees of the ACCS colleges/institutions are compensated in accordance with the

ACCS Uniform Guidelines and the ACCS salary schedules adopted by The State Board of

Education.  Individual schedules have been set for the following classifications of employees:

> 1.1.    President: Salary Schedule A
>
> 1.2.    Deans and Business Officers: Salary Schedule B
>
> 1.3.    Professional personnel not included in other schedules: Salary Schedule C
>
> 1.4.    Instructors, librarians, and counselors: Salary Schedule D; Teachers: Salary Schedule D-3
>
> 1.5.    Technical and support personnel not included in other schedules: Salary Schedule E
>
> 1.6.    Support personnel working twenty (20) or more but less than forty (40) hours per week: Salary Schedule H[13]

*See* 606.01: Compensation for Alabama Community College System Personnel, Ex. N.  Each

person paid from approved salary schedules must qualify for appropriate salary ranks according

to standards established by The State Board of Education.  *See* 606.02: Instructor Qualifications

for Salary Ranks, Ex. N.  Additionally, there are provisions for Extra Duty Pay, providing a

salary supplement ranging from $400 per month to $2,000 per year.  606.05: Extra Duty Pay, Ex.

N.  All ACCS salary schedules, ***except the C-3 schedule***, establish salary either on years of

relevant service and/or education level.

---

[13]  Temporary personnel, support personnel, and adjunct instructors working less than twenty (20) hours per week may be compensated from local salary schedules.

With respect to the facts of the instant case, the C salary schedule is designated for "Professional Personnel" and consists of the C-1 schedule, with pay steps 0 through 27; the C-2 schedule, with pay steps 0 through 27, and the C-3, consisting of a maximum salary of $80,663 for fiscal years 2007-2008 and 2008-2009.[14]   The ACCS provides the presidents of each institution substantial discretion in decisions, subject only to a general pay structure.  Although appointments must generally comply with all Board requirements, the differences in management structures, working environments, and criteria for C-3 salary decision vary substantially among the Defendant colleges.  As will be established herein, different ACCS colleges assign different weights to qualifications in making their employment decisions, and Presidents have the discretion to utilize a wide range of processes and procedures when making C-3 compensation decisions.  In particular, it is undisputed that individual ACCS Presidents may apply their own criteria (subjective and objective) in determining an employee's initial placement on the C-3 salary schedule and in recommending subsequent pay increases.  *See, e.g.*, ERS Report, Ex. B at 4-8 (discussing various C-3 salary criteria used by ACCS colleges).  Neither the Chancellor of the ACCS nor the State Board of Education have established mandatory pay steps for the C-3 salary schedule; rather, the Board has established only a maximum salary that can be paid under the C-3 salary schedule.  As discussed below, however, at least 10 ACCS colleges, including the named Plaintiffs' employer, Trenholm, have adopted their own C-3 salary schedule with pay steps.  J. Davis Dep., Ex. E at 143-44, 147-47.  In addition, several ACCS colleges have adopted local standards and criteria (including subjective and objective criteria) used by the president when determining an employee's initial placement

---

[14]  Even the maximum C-3 salary varies to some extent by college.  *See* ERS Report, Ex. B at 7 ("The C-3 salary schedule minimum and maximum salaries also vary by institution.")  For example, at Gadsden State Community College the salary for step 27 is $85,495 for those who were hired prior to July 1, 2003.  *Id.*  Furthermore, cost of living increases enacted by the Legislature have increased the maximum salaries available for jobs within the C-3 salary schedule.

on the C-3 salary schedule.  The ACCS has implemented various training programs for school presidents to promote compliance with all EEO policies and anti-discrimination laws, including training regarding prohibitions against consideration of race and gender in establishing compensation.  J. Davis. Dep., Ex. E at 178-79.  The affidavits of several ACCS college presidents confirm their receipt of EEO training regarding compensation decisions.  *See* Mitchell Aff., Ex. I at ¶ 9; McAlpine Aff., Ex. J at ¶ 8; Chandler Aff., Ex. K at ¶ 6; Blackwell Aff., Ex. L at ¶ 10; Campbell Aff., Ex. M at ¶ 9.

The president of each institution also has the authority to determine whether a particular job title should be assigned to the C-3 salary schedule or any other schedule (A, B, D or E); approval by the Chancellor is not required.[15]  J. Davis Dep., Ex. H at 31-32, 203-04.  Moreover, each president has the authority to determine the content of job descriptions.  *Id.* at 31, 89.  The Chancellor may review job descriptions, but generally does not approve or disapprove them.  *Id.* at 31, 68-69.  Moreover, available jobs can be posted without the Chancellor's approval.[16]  *Id*. at 70.  The president of each ACCS institution has hiring and firing authority, and a decision to hire/appoint may only be reversed by the Chancellor if the appointment is illegal, *i.e.*, it violates state statutes or State School Board policies.[17]  *Id*. at 72-74.  Furthermore, although the Chancellor may ask a president to terminate an employee, the president has **sole** authority to terminate an employee of the college.[18]  *Id.* at 75.  Notes and documents prepared by the hiring committees during the selection process are also maintained locally by the institution.  *Id.* at 101-

---

[15]  For example, the president has the authority to place an HR Director on the higher level C-1 salary schedule rather than the C-3 salary schedule based on the level of complexity of the position, responsibilities and duties and the number of employees being supervised.  J. Davis Dep., Ex. H at 64-65.

[16]  Although predecessor Chancellor Bradley Byrne approved all job postings, that practice was eliminated when Dr. Hill was appointed the new Chancellor of the ACCS.  J. Davis Dep., Ex. H at 70-71.  Furthermore, Chancellor Byrne rarely disapproved job postings.  *Id.*

[17]  According to Joan Davis, ACCS General Counsel and Vice Chancellor for Legal and Human Resources, the Chancellor has not reversed any appointments based on illegality.  J. Davis Dep., Ex. H at 74.

[18]  The Chancellor has recommended termination of several employees as a result of violations of the ACCS's anti-nepotism policy.  J. Davis Dep., Ex. H at 75-76, 78.

02.

The President of each ACCS institution is granted the discretion to negotiate the salaries of C-3 professional employees within the confines of the maximum salary, *i.e.*, $80,663. J. Davis Dep., Ex. H at 155-56.  Although the ACCS Chancellor (currently Dr. Freida Hill) ultimately approves the ACCS presidents' recommendations regarding initial placement on the C-3 salary schedule, *see id*. at 95, the actual decision-making process, *e.g.*, interviews, review of education and employment history, etc., occurs at the local level.  *Id.* at 155-56, 163-64. Furthermore, the Chancellor generally approves all initial placement recommendations unless there is a problem concerning the initial placement.  *Id.* at 71-72, 155-56, 163-64, 168-69.  All subsequent decisions regarding reorganization of a position or pay increases for C-3 employees are recommended by the president of the respective institution and are approved on a case-by-case basis by the Chancellor.  *Id*. at 163-64, 168-69, 197-98, 202-03.  Moreover, C-3 professional employees may be paid a supplement (recommended by the president and approved by the Chancellor) based on their level of responsibility and the assignment of additional duties. *Id.* at 168-69, 114-15.[19]  Many ACCS institutions, however, have adopted local guidelines or criteria used in the determination of initial placement on the C-3 salary schedule.

### d.    THERE ARE NO UNIFORM C-3 SALARY CRITERIA.

The member institutions of the ACCS have not adopted a single, uniform, wholly subjective standard for determining the C-3 professional salaries; rather, they have adopted a myriad of standards (including subjective and objective criteria) for determining initial placement on the C-3 salary schedule.[20]  In particular, as set forth in Table 1 of Defendants'

---

[19]   The Chancellor approves all job reorganizations and pay increases recommended by the school presidents. J. Davis Dep., Ex. H at 168-69.

[20]   Dr. Bradley's disparate impact analyses are limited solely to the C-3 salary schedule and are based, in part, on his incorrect understanding that ACCS institutions apply a uniform and wholly subjective standard for establishing C-3

Expert Report, 10 of the 27 ACCS colleges utilize pay steps in the C-3 salary schedule while others do not.[21]

**Table 1—Indication if Alabama Community Colleges Utilize Steps for C-3 Positions**

| College | Utilized Steps |
|---|---|
| Alabama Southern | Yes |
| Athens State University | Yes |
| Bessemer/Lawson | No* |
| Bevill State | No |
| Bishop State | No |
| Calhoun | Yes |
| Central Alabama | No |
| Chattahoochee Valley | No |
| Drake State Tech | No |
| Enterprise | No |
| Faulkner State | Yes |
| Gadsden State | Yes |
| Ingram State | No |
| Jefferson Davis | No |
| Jefferson State | Yes |
| L. B. Wallace | No** |
| Marion Military | No |
| Northeast Alabama | No |
| Northwest – Shoals | Yes |
| Reid State | Yes |
| Shelton State | No |
| Snead State | No |
| Southern Union | No |
| Trenholm State Tech | Yes |
| Wallace – Dothan | Yes |
| Wallace – Hanceville | -- |
| Wallace – Selma | No |
| *Steps eliminated when Lawson State merged with Bessemer Tech in 2005. **Steps eliminated during the 2004-2005 academic year per the instructions of Chancellor Johnson. Source:  DPSE Discovery Interrogatory Exhibit 9, 1-2. | |

ERS Report, Ex. B at 4-5.

Moreover, there are variations by institution with respect to colleges that have adopted pay steps for C-3 professional salaries.  For example, for the 2009-2010 academic year, the

---

salaries, *i.e.*, negotiation between the individual and the president for salary determination, subject only to the maximum salary cap for C-3 schedule and an additional $2,000 if the employee holds an earned doctorate.  *See* Bradley 06/04/2010 Expert Report, Ex. B at 4-5. According to Dr. Bradley, "[t]here are no rules that require either years of service or education level, or any other factor, to be used to set an employee's salary when using Salary Schedule C-3." *Id.* at 5.  Although Defendants produced numerous documents to the contrary, Dr. Bradley was unaware of variations by ACCA institutions *vis-à-vis* local, institution-specific C-3 salary policies.

[21]   Joan Davis, General Counsel and Vice Chancellor of Legal and Human Resources, Alabama Department of Postsecondary Education, confirmed that approximately 10 ACCS institutions received approval to implement a different C-3 schedule, one having pay steps.  J. Davis Dep., Ex. H at 143-44, 147-48.

salary for step 0 at Athens State University is $34,449, compared to $57,990 at Calhoun Community College, and $56,256 at Gadsden State Community College.[22]  *Id.* at 6.  Initial step placement in C-3 at Athens State University is determined by negotiation with consideration of related work experience and education, wherein at this institution one step is generally awarded "for every three years of like full-time service."[23]  *Id.*  The Athens State Salary Schedule C-3 Policy further provides as follows:

> The range between Step 27 and the maximum C3 salary is discretionary.  Advancement beyond Step 27 is typically based on a number of factors.  Factors to be considered for each employee may include the following:  (1) Breadth of responsibility in job classification, (2) Number of year's experience of current classification, (3) Education appropriate to job classification, and (4) Supervisory responsibility.

C-3 Salary Schedule Policy for Athens State, Ex. P.  In other words, as established on its face, Athens State has adopted both subjective **_and_** objective criteria used by its President to establish C-3 professional salaries.

Calhoun Community College likewise has adopted and employed separate criteria for determining initial placement on the C-3 salary schedule.  ERS Report, Ex. B at 4-5.  In particular, personnel are provided credit for prior teaching experience at the K-12 level as well as at any public college in Alabama.[24]  *Id.*

> Personnel who are paid on salary schedule A, B, or C are entitled to receive credit for prior teaching experience at the K-12 level as well as at any public college in Alabama.  For purposes of determining the appropriate amount of credit for prior education experience, one year's teaching experience, including librarian or counseling experience, will count as one year's credit toward a step on the salary schedule.  For purposes of this determination, a year shall mean the equivalent of at least nine months of full-time

---

[22]   Department of Post Secondary Education ("DPSE") Discovery Interrog., Ex. O at Ex. 9, at pp. 6, 8, and 14 (for "grandfathered" employees placed on the salary schedule prior to July 1, 2003).
[23]   DPSE Discovery Interrog., Ex. O at Ex. 9, p. 7.
[24]   DPSE Discovery Interrog., Ex. O at Ex. 9, p. 9.

teaching during the same twelve-month academic period.

*See* Calhoun Community College Salary Schedule and Benefits, Ex. Q. George C. Wallace Community College has two sets of values for each step to distinguish those who have a bachelor's degree from those with a master's degree.[25]  *Id*.

Furthermore, after placement on the C-3 salary schedule, salary increase steps are awarded based on years completed in the position, but the amount of the increase ***varies by institution***. For example, at Alabama Southern Community College, each step is equal to the sum of one-half the amount of the step raise on salary schedule C plus one-half the amount of the step raise on salary schedule E, with double the amount at steps 15, 20, and 25.[26]  *Id*.  At Gadsden State Community College and at Trenholm State Technical College, employees receive set increases of $1,200 at steps 0-6, 8, and 10; $3,250 at steps 15, 20, and 25; and $1,083 at step 27.[27]  *Id*. at 6-7.  Additionally, Trenholm's local policy allows the President to modify the salary for a Schedule C-3 employee where the employee is assigned additional duties and responsibilities:  "The President maintains the ability to adjust salaries if employee is assigned additional duties and responsibilities."  Trenholm State Technical College C-3 Salary Guidelines, Ex. R.[28]  At Jefferson State Community College, employees receive a flat 2% increase each year

---

[25]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 20.

[26]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 5.  Trenholm did not utilize steps during the entire time period examined.  J. Davis Dep., Ex. H at 147.

[27]  DPSE Discovery Interrog., Ex. O at Ex. 9, pp. 15 and 19.

[28]  Thus, Plaintiffs' claim that negotiation with the President of Trenholm (as well as other ACCS institutions) is the "*only criterion*" for establishing C-3 salaries, *see* Defs.' Mot. for Class Cert. (Doc. No. 76) at ¶¶ 4, 6, 8, is demonstrably false.  Plaintiffs cite the deposition testimony of Joan Davis, ACCS General Counsel and Vice Chancellor for Legal and Human Resources, wherein she specifically testified that the president of the respective ACCS institutions have the discretion to set C-3 salaries.  Pls. Mot. for Class Cert. (Doc. 76) at ¶ 8.  While it is true that each president has that discretion, as established herein, many ACCS institutions have adopted pay steps and/or other criterion for establishing C-3 salaries, including objective criterion.  Furthermore, the testimony cited by Plaintiff concerned the presidents' discretion to determine what salary schedule to place the employee on based on the needs of the institution, not the specific criterion for establishing salary.  J. Davis Dep., Ex. H at 64-65, 188-89.  Even so, Ms. Davis later testified that the decision regarding assignment of an employee to a particular salary schedule was based on the complexity of the job and the number of persons being supervised by the employee.  *Id.* at 169-70.

until the maximum salary for their level is reached.[29]  ERS Report, Ex. B at 7.  Thus, the salary schedules vary from institution to institution even when considering those that utilized steps.  *Id.*

Moreover, the C-3 salary schedule minimum and maximum salaries vary by institution. *Id.* at 7.  In some, such as Trenholm, starting salary is determined by negotiation with no stated minimum salary[30] while others, such as those noted above, have a specific step 0 amount.  *Id.* Although Plaintiffs' expert assumed for purposes of his statistical models that the maximum C-3 salary was $80,663, at Gadsden State Community College the salary for step 27 is $85,495 for those who were hired prior to July 1, 2003.[31]  *Id.*  In contrast, the maximum step 27 salaries for 2009 are lower than $80,663 at George C. Wallace Community College.[32]  *Id.*

Other colleges have different structures beyond the use of steps.  For example, Jefferson State Community College places employees into six levels, with maximum salaries ranging from $58,583.57 to $80,663.  *Id.*  The level is "commensurate with the education, skills, and abilities required for the position."[33]  *Id.*  Northwest Shoals utilizes eight levels, C-3-A through C-3-6, and then distinguishes by step within each level.  *Id.*  Thus, at this institution there are ***104 different placement categories***.[34]  *Id.*  Reid State, on the other hand, utilizes the step structure of the C-2 salary schedule for its C-3 employees.[35]  *Id.*

In sum, there are no uniform C-3 salary criteria used by the 27 ACCS institutions to establish C-3 professional salaries, but rather a myriad of different policies, containing objective and/or subjective criteria, implemented by individual college presidents based on the specific needs of the institution and the individual employee's characteristics such as their educational

---

[29]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 16.
[30]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 19.
[31]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 14.
[32]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 20.
[33]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 16.
[34]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 17.
[35]  DPSE Discovery Interrog., Ex. O at Ex. 9, p. 18.

backgrounds, experiences, work achievements, and performance in interviews, level of responsibilities and supervisory authority, *i.e.*, factors that, by and large, are unique to each Plaintiff in question. As conceded by Plaintiffs' expert, Dr. Bradley, "Like I said before, ***there could be twenty-seven different ball games going on out there, and there may well be.***" Bradley Dep., Ex. A at 117; *see also id* at 32-33, 117. (emphasis added).

      **e.**    **DIVERSITY OF JOBS AND SALARIES WITHIN THE C-3 SALARY SCHEDULE.**

Although the C-3 salary schedule generally includes professional personnel not included in other schedules, the 100-plus jobs (or position titles) within the C-3 salary schedule are numerous and diverse. For example, although Plaintiffs' expert has attempted to group C-3 jobs into three job title groups, during the 2007-2008 academic year, there were 132 different and diverse position titles among the group of approximately 600 employees analyzed by Plaintiffs' expert. ERS Report, Ex. B at 8. There are similar numbers of position titles in the other years. *Id*. Moreover, these position titles are quite different in terms of their potential skills, duties and requirements. *Id*. Even without reviewing those actual job descriptions, the list of 132 job titles with the C-3 salary schedule for the 2007-2008 academic year establishes the diversity of the positions and their potential skills, duties and requirements within the C-3 salary schedule. *See Id*. at Appendix. B. For example, the education and skills required for the most populated job – Counselor – are likely to be different from that of a Director of Federal Programs, or an Instructor, or a Human Resources Management Director. *Id*. at 9. A review of the job titles of Schedule C3 employees at Trenholm during the 2007-2008 academic year set forth in Defendants' Expert Report, Ex. B at 10, compellingly illustrate this fact:

| Job Title | Number of Employees | Percent of Total |
|---|---|---|
| Federal Programs—Director | 6 | 25.00% |
| Admissions—Coordinator | 2 | 8.33% |
| Federal Programs—Coordinator | 2 | 8.33% |

| Industrial Training—Coordinator | 2 | 8.33% |
|---|---|---|
| Extended Day Programs—Director | 1 | 4.17% |
| Extension Programs—Director | 1 | 4.17% |
| Human Resources Management—Director | 1 | 4.17% |
| Institutional Research & Planning—Director | 1 | 4.17% |
| Instructor | 1 | 4.17% |
| Learning Resources Center—Director | 1 | 4.17% |
| Maintenance—Supervisor | 1 | 4.17% |
| Management Information Services—Coordinator | 1 | 4.17% |
| Purchasing Agent | 1 | 4.17% |
| Recruiter | 1 | 4.17% |
| Student Activities—Coordinator | 1 | 4.17% |
| Student Financial Services—Director | 1 | 4.17% |

Each of these jobs required different knowledge, skills and abilities and require the performance of different duties and responsibilities. *See* ERS Report, Ex. B at 10-13 (setting forth some examples of the differences in the jobs at Trenholm from job descriptions that were available to Dr. Bradley). Thus, in 2007-2008, Trenholm employed C-3 salary schedule employees in 16 different and diverse job titles. *Id.*

Additionally, the workforces within the different ACCS institutions are strikingly different. Not every C-3 job title position exists in every institution, and in some institutions the job responsibilities for a given position differ greatly from the responsibilities for the same position in another college. ERS Report, Ex. B at 9. In fact, the most populous C-3 job title of Counselor does not exist at Trenholm, the named Plaintiffs' employer, and six (or 50%) of the most populous position titles at ACCS institutions were not present at Trenholm during the 2007-2008 academic year. *Id.* at 9-10. Moreover, even where institutions may have some of the same C-3 job titles, such as Director of Human Resources, the job duties and responsibilities for a position differ greatly due to the size of the institution and the differences in specific responsibilities and supervisory authority. *Id.* at 14-15, 17; J. Davis Dep., Ex. H at 64-65. Positions may also correspond to different pay-grade ranges within different institutions. ERS Report, Ex. B at 15 (noting that, "there are some positions that Dr. Bradley analyzes as part of

the C-3 schedule within some colleges that are actually part of other salary schedules and, thus, could influence his results.").

In addition, as established by Defendants' expert, there are substantial differences in the average pay by position, regardless of gender.  *Id.* at 10.  Those substantial pay differences are illustrated by Table 4 of Defendants' Expert Report, which provides the position titles of the three lowest and highest average salaries among the C-3 employees across all 27 institutions in 2007-2008.

| Position | Average Salary | Number or Employees | Number of Female Employees | Percent Female |
|---|---|---|---|---|
| Technical Programs—Assistant Director | $26,250 | 1 | 0 | 0.0% |
| Maintenance Employee | $32,559 | 1 | 0 | 0.0% |
| Student Financial Services—Coordinator | $37,450 | 1 | 1 | 100.0% |
| University-Parallel Programs—Director | $76,247 | 1 | 1 | 100.0% |
| Developmental Studies—Assistant Director | $77,000 | 1 | 1 | 100.0% |
| Purchasing Agent | $87,148 | 1 | 1 | 100.0% |

This diversity of positions and salaries is even more pronounced at Trenholm, the employer of the putative class representatives.  In particular, as illustrated by Table 5 in Defendants' Expert Report, for the 2007-2008 academic year, there were 24 C-3 salary schedule employees employed in 16 difference position titles with a salary range between $25,514 and $87,148.[36]  ERS Report, Ex. B at 12.

| Position | Average Salary | Number or Employees | Number of Female Employees | Percent Female |
|---|---|---|---|---|
| Extended Day Programs—Director | $25,514 | 1 | 0 | 0.00% |
| Recruiter | $45,370 | 1 | 0 | 0.00% |
| Human Resources Management—Director | $51,360 | 1 | 1 | 100.00% |
| Student Activities—Coordinator | $53,589 | 1 | 1 | 100.00% |
| Federal Programs—Coordinator | $58,111 | 2 | 1 | 50.00% |
| Management Information Services—Coordinator | $59,937 | 1 | 0 | 0.00% |

---

[36]  As set forth in Defendants' Expert Report, a review of the job descriptions regarding many of these positions demonstrates the variation in the responsibilities, duties, and skills required of each Trenholm C-3 employee.  ERS Report, Ex. B at 12-14.

| Position | Average Salary | Number or Employees | Number of Female Employees | Percent Female |
|---|---|---|---|---|
| Industrial Training—Coordinator | $60,006 | 2 | 0 | 0.00% |
| Admissions—Coordinator | $60,310 | 2 | 1 | 50.00% |
| Student Financial Services—Director | $61,872 | 1 | 1 | 100.00% |
| Learning Resources Center—Director | $64,307 | 1 | 1 | 100.00% |
| Federal Programs—Director | $67,353 | 6 | 4 | 66.67% |
| Institutional Research & Planning—Director | $71,455 | 1 | 1 | 100.00% |
| Instructor | $80,000 | 1 | 0 | 0.00% |
| Extension Programs—Director | $80,250 | 1 | 1 | 100.00% |
| Maintenance—Supervisor | $82,156 | 1 | 0 | 0.00% |
| Purchasing Agent | $87,148 | 1 | 1 | 100.00% |
| Total | | 24 | 13 | 54.17% |

Furthermore, even when comparing the salaries of employees occupying the same position (job title) at the various ACCS institutions, there is substantial variation in pay. For example, as set forth in Table 6 of Defendants' expert report, with respect to Plaintiff Rollins' position as a HR Director, an examination of the salaries of employees in HR positions across all colleges in 2007-2008 reveals a pay range of $46,165 and $92,223. *Id.* at 14-15. The highest paid HR Director was Ms. Vergie B. Spears, and the one male HR Director, Brian Gann, was one of the lower paid HR Directors. *Id.* Fourteen of the fifteen HR Directors are female, nine of which earned a higher salary than Mr. Gann. *Id.*

**Table 2—Salaries of C-3 Employees in Human Resources Related Job Titles in Academic Year 2007-2008**

| Name | College | Position | Contract Salary |
|---|---|---|---|
| Spears, Vergie B | Lawson | HR Management—Director | $92,224 |
| Gattman, Pamela R | Northwest - Shoals | HR Management—Director | $77,723 |
| Russell, Ruby L | Jefferson State | HR Management—Director | $77,015 |
| Roberts, Betty J | Wallace Dothan | HR Management—Director | $73,926 |
| Kilpatrick, Barbara L | Snead | HR Management—Assistant Director | $70,370 |
| Sims, Suzanne B | Athens University | Coordinator Human Resources | $65,890 |
| Hunter, April D | Central Alabama | HR Management—Director | $63,008 |
| Turner, Erica P | Ingram | HR Management—Coordinator | $60,880 |
| Clement, D Payton | Jefferson State | HR Management—Director | $60,000 |
| *Gann, Brian W* | *Bevill* | *HR Management—Director* | *$60,000* |
| Boone, Deborah L | Chattahoochee | HR Management—Director | $57,578 |
| Kinard, K L | Shelton | HR Management—Assistant Director | $55,000 |

| Rollins, Pamalon C | Trenholm | HR Management—Director | $51,360 |
| Lynk, Angel C | Enterprise | HR Management—Coordinator | $47,000 |
| Bassett, E.F. | Southern Union | HR Management—Director | $46,165 |

ERS Report, Ex. B at 14-15.

In addition to impact of the duties, responsibilities, and background of these employees, the size of the institution affects salaries. As stated by Joan Davis, ACCS General Counsel and Vice Chancellor for Legal and Human Resources, "an HR director at a larger institution may have more responsibilities. It just varies from institution to institution." J. Davis Dep., Ex. H at 111-12. Even salary schedule C employees holding the same title may be placed at different levels in the schedule, *e.g.*, C-1, C-2 or C-3, based on the size of the school, the level, type and complexity of the employee's duties and responsibilities, and the number of people reporting to the employee. *Id*. at 64-65.

In sum, the C-3 salary schedule includes over 130 diverse position titles, which vary in responsibilities, duties and skills, and which have a broad range of salaries across institutions.

## 2.   THE 27 ACCS INSTITUTIONS ARE NOT A SINGLE ESTABLISHMENT UNDER THE EPA.

The evidence does not establish the level of centralization necessary to justify treating all of the ACCS institutions as a single establishment under the EPA. The EPA ordinarily treats each physically separate place of business as a separate establishment. In particular, the term "establishment" is defined by the Secretary of Labor as "a distinct physical place of business rather than ... an entire business or 'enterprise' which may include several separate places of business." 29 C.F.R. § 1620.9(a) (1993).[37] In *Mullhall v. Advance Security, Inc.*, 19 F.3d 586 (11th Cir. 1993), the Eleventh Circuit adopted the Fifth Circuit's approach in *Brennan v. Goose*

---

[37]   "[U]nusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions. Barring unusual circumstances, however, the term "establishment" will be applied as described in paragraph (a) of this section." 29 C.F.R. § 1620.9.

*Creek Consolidated Indep. Sch. Dist.*, 519 F.2d 53 (5th Cir. 1975) in determining whether to treat multiple locations as a single enterprise for purposes of the EPA:

> *Goose Creek* set a widely followed standard recognizing that central control and administration of disparate job sites can support a finding of a single establishment for purposes of the EPA.  The hallmarks of this standard are centralized control of job descriptions, salary administration, and job assignments or functions.  *Brownlee v. Gay and Taylor, Inc.*, 642 F. Supp. 347, 352 (D. Kan. 1986).

19 F.3d at 591.  Thus, factors relevant to the determination as to whether multiple locations constitute a single establishment include: the degree of centralized management of (i) job descriptions, (ii) salary administration, and (iii) job assignments; the degree to which physically separate places of business interact; the interchange of work locations; and the degree to which employees at separate locations perform the same functions.  B. Lindemann & P. Grossman, 1 *Employment Discrimination Law*, Ch. 18.II.B.3 (4th Ed. 2007).  *See also Meeks v. Computer Associates Intern.*, 15 F.3d 1013 (11th Cir. 1994) ("[W]e presume that multiple offices are not a "single establishment" unless unusual circumstances are demonstrated.").[38]

Other courts similarly have looked to factors such as the independence of the management, the different operational needs, the different functions served, and the existence of separate budgets, as well as the extent of physical separation – all of which undisputedly exist in

---

[38]  In *Meeks*, the Eleventh Circuit found that the Defendant employer's separate locations did not constitute a single establishment for EPA purposes merely because there were common policies applicable to its different locations and that, therefore, the female plaintiff could not use male comparators from other locations to establish her gender pay claim:

> Although Computer Associates centrally sets broad salary ranges, the specific salary to be offered a job applicant is determined by the local supervisor.  Although personnel records are maintained centrally, job applicants are interviewed by local officials and hired upon their recommendation.  The evidence proffered by Computer Associates does not demonstrate the level of centralization necessary to justify treating all of the company's technical writers as working at a single establishment.

15 F.3d at 1017.

the instant case.  *See Foster v. Arcata Assoc., Inc.*, 772 F.2d 1453, 1465 (9th Cir. 1986), *cert. denied*, 475 U.S. 1048 (1986), *overruled on other grounds by, Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262 (9th Cir.1991).  In fact, the Eleventh Circuit generally considers a single business with multiple locations to be separate establishments for purpose of the EPA.  *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1017 (11th Cir. 1994) (in limiting comparison to employees at same office location, rather than nationwide, court found that defendant had not shown requisite degree of centralization to justify comparative evidence from other company offices, because hiring and salary decisions were made at local office).  These principles are cogently illustrated in the decision of *Meeks v. Computer Associate, Int'l*, 15 F.3d 1013 (11th Cir. 1994).

In *Meeks*, an employee sued her employer, Computer Associates, Int'l, ("CA") for gender pay discrimination and retaliation under the EPA and Title VII.  The district court entered judgment in favor of the employee on the EPA claim and CA appealed.  *Id.* at 1014.  On appeal, CA argued that the trial court erred in limiting the evidence of comparators' salaries to those of the plaintiff's colleagues in the specific office where she worked; that the trial court should have treated CA offices as a single "establishment" under the EPA, thus allowing CA to show that there was no overall gender pay disparity regarding the plaintiff's position.  *Id.* at 1014, 1017.  The Eleventh Circuit rejected CA's argument, finding that there was insufficient evidence of the type of centralization that would allow treatment of CA's multiple locations as a single establishment for purposes of the EPA.  *Id.* at 1017.  Particularly relevant to this case is the court's finding that recommendations regarding hiring and salaries were based on the recommendation of local CA officials:

> Computer Associates argues that "establishment" should be interpreted functionally, and that therefore the appropriate

"establishment" for purposes of determining whether Meeks suffered gender-based discrimination is not Computer Associates' Maitland, Florida, facility but the company as a whole, *i.e.*, all Computer Associates' technical writers throughout the nation. This is so, according to Computer Associates, because the company "retains the centralized control of personnel functions, salary administration and identity of work among the technical writers regardless of location." ***Job applicants are screened and interviewed by local supervisors who then recommend the applicants and a suggested salary to the central personnel office, which gives final approval.*** Computer Associates argues that, had the court permitted, it would have introduced evidence to establish that as of March 1, 1989, Computer Associates employed 116 technical writers, 36 men and 80 women. It further would have shown that the median salary for male technical writers was $36,375 and for female technical writers was $36,210. Computer Associates maintains that by limiting the comparison to the four writers at Maitland, the salary differences were exaggerated and the jury was prejudiced.

\* \* \* \*

Although Computer Associates centrally sets broad salary ranges, the specific salary to be offered a job applicant is determined by the local supervisor. Although personnel records are maintained centrally, job applicants are interviewed by local officials and hired upon their recommendation. The evidence proffered by Computer Associates does not demonstrate the level of centralization necessary to justify treating all of the company's technical writer as working at a single establishment.

*Id.* (emphasis added). In other words, the fact that CA's central office retained ultimate authority to approve hiring and salary recommendations was an insufficient evidentiary basis for treating all of its locations as a single establishment under the EPA where the job interviews and hiring and salary recommendations are made at the local level.[39]

---

[39] *See also Alexander v. University of Michigan-Flint*, 509 F. Supp. 627 (E.D. Mich. 1980) (holding that, for purposes of identifying male comparators, the fact that the University of Michigan had a number of university-wide policies and procedures, such as one salary plan and evaluation program, one set of policies and benefits for non-union personnel and one set of job descriptions, including one, university-wide method of obtaining job classification changes, was insufficient for treating the entire UM system as a single establishment where decisions made as to jobs and salaries, although within guidelines set by the University, are discretionary on the part of the management personnel at each campus; rather, the plaintiff was limited to comparators employed at her location at the University of Michigan at Flint).

In stark contrast, the Fifth Circuit's decision in *Goose Creek Consolidated Independent Sch. Dist.*, 519 F.2d 53 (5th Cir. 1975) illustrates the type of centralized control in a school system that would justify treating the entire school system as a single establishment under the EPA.  In *Goose Creek*, the Secretary of Labor sued the Goose Creek Consolidated Independent School District for pay discrimination against female janitors employed by the school district.  The school district, which included 13 elementary schools in the Houston, Texas area, argued that each elementary school should be treated as a separate establishment under the FSLA for determining whether the 40 female janitors at issue were discriminated against on the basis of pay.  The district court disagreed, finding that the level of centralized control by the school district justified treating the 13 district elementary schools as a single establishment.  The school district appealed, and the Fifth Circuit affirmed.

The Fifth Circuit's analysis of the school district's centralized control over the janitorial employees presents a stark contrast to the facts of the instant case.  In particular, the court found that the school district's argument that each of the 11 elementary schools was a separate establishment did not square with the evidence:

> The school district's contention does not square with the facts of this case.  The record reveals that the central administration of the school district (not the principals of the schools) hired the janitors, determined their wages, assigned them to the school building in which they were to work, and sometimes switched their assignments from one building to another.  Finally, the record discloses that the work schedule and the janitors' daily duties controlled to a large extent by the central administrators do not differ from building to building.

*Id.* at 56.  In other words, the school district, and not the local principals, controlled all relevant aspects of the janitors' daily duties and terms of employment.

In the instant case, although the Chancellor may have final approval authority regarding C-3 salaries recommended by an ACCS president, as set forth above, the respective president of each ACCS institution is the primary decision-maker regarding an employee's initial placement on the salary schedule and increases in pay, and each Defendant institution adopts and administers its own C-3 salary policy, policies which have many variations.  J. Davis Dep., Ex. H at 28-32; s*ee also* Mitchell Aff., Ex. I at ¶ 9; McAlpine Aff., Ex. J at ¶ 8; Chandler Aff., Ex. K at ¶ 6; Blackwell Aff., Ex. L at ¶ 10; Campbell Aff., Ex. M at ¶ 9.  Furthermore, if there are more than 10 applicants for a position, they are interviewed by a ***local search committee*** (comprised of 50% female and 40% African-American members), which recommends three applicants to the president who, in turn, makes a selection and recommends initial placement on the C-3 salary schedule.  J. Davis Dep., Ex. H at 88-89, 101-02.

Moreover, each college has separately developed and managed budgets, separate academic calendars, separate administrations, separate staff and faculty, separate hiring, firing and evaluation authority and processes, separate (and often multiple) campuses, separate personnel department and no centralized job assignments or job descriptions.[40]  *Id.* at 27-28, 68, 183-84.[41]   Although Plaintiffs maintain that the relationship between each school and the Chancellor and the Board of Education makes them one establishment, the evidence regarding centralized administration shows centralization, as in *Meeks*, at only the most general level.  Moreover, although the State Board of Education promulgates general policies, Plaintiffs do not

---

[40]  Even if the job descriptions were uniform, it would not be relevant because employees at different ACCS schools often perform different types and levels of work due to the variation in school size.  J. Davis Dep., Ex. H at 64-65, 111-12; ERS Report, Ex. B at 14-15, 17.  *See, e.g.*, *Gerbush v. Hunt Real Estate Corp.*, 79 F. Supp. 260, 263 (W.D.N.Y. 1999) (finding uniform job descriptions irrelevant because job responsibilities of other managers at other locations were substantially more significant than plaintiff's), *aff'd*, 234 F.3d 1261 (2nd Cir. 2000).

[41]   Although the respective president of each ACCS institution is the primary decision-maker regarding an employees initial placement on the salary schedule and increases in pay, the Chancellor of the ACCS has the authority to accept or reject the president's recommendations regarding those matters.  J. Davis Dep., Ex. H at 28-32.

dispute that each ACCS college has independent management with hiring processes that are completely separate and require the independent judgment of those in the respective institution – including the independent judgment of 10 female presidents.

In sum, each ACCS institution is operated by independent management with independent decision-making authority over their staff.  At best, ACCS institutions share some things in common, *e.g.*, common policies as to general matters of each school.  But under the functionality test adopted by many courts, such an arrangement is insufficient to create a single establishment under the EPA.  *See, e.g., Winther v. City of Portland*, 21 F.3d 1119 (9th Cir. 1994) (holding that centralized control only as to general matters does not create a single establishment under the EPA).

### 3.     THE ACCS DEFENDANT INSTITUTIONS ARE LEGALLY AND FUNCTIONALLY SEPARATE ENTITIES THAT HAVE DIFFERENT AND DIVERSE C-3 SALARY POLICIES.

As previously established, *supra* at 29-33, the 27 ACCS colleges are legally and functionally separate entities that have different and diverse C-3 salary policies.  In particular,

- 10 of the 27 ACCS colleges utilize pay steps in the C-3 salary schedule similar to the other C salary schedules, whereas others do not, and even those step allocations can vary depending on the institution;

- After placement on the C-3 salary schedule, salary increases are awarded based on years completed in the position, but the amount of the increase varies by institution;

- The C-3 salary schedule minimum and maximum salaries vary by institution; and

- Many ACCS colleges have different structures beyond the use of pay steps, *e.g.*, Jefferson State Community College's use of six levels, placing the employee in the level "commensurate with the education, skills, and abilities required for the position", and Northwest Shoals utilization of 104 different placement categories.

ERS Report, Ex. B at 4-8.  In sum, the institutions within ACCS are separate and distinct establishments with diverse salary policies.  For this additional reason, Plaintiffs cannot show that they are similarly situated for purposes of class-wide violations under the EPA.

**D.     PLAINTIFFS CANNOT SHOW THAT THEY ARE SIMILARLY SITUATED BECAUSE OF THE MANY AFFIRMATIVE DEFENSES AVAILABLE TO DEFENDANT UNDER THE EPA.**

As stated above, in *Anderson,* the Eleventh Circuit explained that as more legally significant differences appear amongst the opt-in plaintiffs, the less likely it is that the group of employees is similarly situated.  488 F.3d at 953.  Another factor to consider when determining whether putative opt-in plaintiffs are similarly situated is whether the various defenses available to defendants appear to be individual to each plaintiff.  *Anderson,* 488 F.3d at 953.  The district court must consider whether the defenses that apply to the opt-in plaintiffs' claims are similar to one another or whether they vary significantly.  *Id.* at 954 n. 8 (noting that all named plaintiffs were unionized but some opt-in plaintiffs were not, making the collective bargaining agreement defense applicable to some but not all plaintiffs).

Under the EPA, an employee demonstrates a *prima facie* case by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require " 'equal skill, effort, and responsibility, and which are performed under similar working conditions.' "  *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) and 29 U.S.C. § 206(d)(1)).  Once the employee presents a *prima facie* case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) ... any other factor other than sex."  29 U.S.C. § 206(d)(1).  *Steger v. General Elec. Co*., 318 F.3d 1066, 1078 (11th Cir. 2003); *Mullhall v. Advance Sec., Inc*., 19 F.3d 586, 590 (11th Cir. 1994).  The "factors other

than sex" exception " 'also applies when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business.' " *Mullhall*, 19 F.3d at 595 (quoting *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)). "Credibility and the weight to be given such 'explanations' are traditionally matters left to the consideration of the fact finders." *Id*. "Further, the employer must show that none of the decision-makers, whether in middle or upper management, were influenced by gender bias." *Steger*, 318 F.3d at 1078. "Once the employer's burden is met, the employee "must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Id*. (*citing Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995).

In the present case, Defendants will assert diverse affirmative defenses for every Plaintiff and comparator because of the individualized nature of their positions.  Defendants will be able to show that any alleged disparity in the salaries for females and males is a result of the unique characteristics of the job or from an individual's experience, training, or ability, or from special exigent circumstances connected with the business.  For example, Plaintiff Renoda Thomas contends that she declined an offer of appointment to the position of Operations Accountant based on her understanding that the position was budgeted at a lower salary than her current compensation; that after she declined the offer, Defendant Trenholm offered the position at a much higher salary to a male employee, William Merrill.  (Doc. No. 63) at ¶¶ 34-35.  Defendant Trenholm will certainly be entitled to offer evidence that it modified the salary for the position based on factors "other than sex" and, in particular, based on the fact that Mr. Merrill was a licensed Certified Public Accountant with extensive prior experience as a Senior Staff Accountant at Aldridge, Borden & Co., and had performed audits for businesses, nonprofits,

government and employee benefit plans.  W. Merrill Dep., Ex. C at 57-58.  Furthermore, Merrill is certified as a Forensic Financial Analyst, a specialty he has used in assisting the Trenholm Comptroller in implementing policies and procedures in reviewing and improving internal controls.  *Id*. at 9-10.  Moreover, Defendants will offer compelling evidence establishing that the alleged comparators identified by Plaintiffs are not performing equal work for jobs requiring equal skills, efforts, and responsibilities and under similar working conditions, as required by the EPA.  *See McCray v. Wal-Mart Stores, Inc.*, 2010 WL 1784247 (11th Cir., May 5, 2010); *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998); *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995).

In sum, because consideration of affirmative defenses under the EPA by definition require individual determination and are not susceptible to class determination, Plaintiffs cannot show that they are similarly situated for purposes of conditional certification.

**E.**     **PLAINTIFFS CANNOT SHOW THAT THEY ARE SIMILARLY SITUATED BECAUSE UNDER THE EPA REGULATIONS, THE ANALYSIS OF WHETHER THE JOBS ARE EQUAL IN SKILL, EFFORT AND RESPONSIBILITY IS NECESSARILY FACT SPECIFIC AND INDIVIDUALIZED.**

As stated above, to establish a *prima facie* case under the EPA, an employee must show that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works*, 417 U.S. at 195.  A plaintiff must prove that the skill, effort and responsibility required in the performance of the jobs are "substantially equal."  29 U.S.C. § 206(d)(1); *Corning Glass Works*, 417 U.S. at 204.  Although formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content.  *See Miranda*, 975 F.2d at 1533.

The EPA regulations provide specific guidance when comparing the wages between different genders as to whether the work is equal, whether the job requires equal skill, effort and responsibility, and whether the work is performed under similar working conditions. The following excerpts from the EPA regulations show the individualized nature of the inquiry into gender pay discrimination:

### § 1620.13   "Equal Work"—What it means.

(a) In general. The EPA prohibits discrimination by employers on the basis of sex in the wages paid for "equal work on jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions * * *." The word "requires" does not connote that an employer must formally assign the equal work to the employee; the EPA applies if the employer knowingly allows the employee to perform the equal work. *The equal work standard does not require that compared jobs be identical, only that they be substantially equal.*

### § 1620.14   Testing equality of jobs.

(c) Determining equality of job content in general. *In determining whether employees are performing equal work within the meaning of the EPA, the amounts of time which employees spend in the performance of different duties are not the sole criteria. It is also necessary to consider the degree of difference in terms of skill, effort, and responsibility. These factors are related in such a manner that a general standard to determine equality of jobs cannot be set up solely on the basis of a percentage of time.* Consequently, a finding that one job requires employees to expend greater effort for a certain percentage of their working time than employees performing another job, would not in itself establish that the two jobs do not constitute equal work. Similarly, the performance of jobs on different machines or equipment would not necessarily result in a determination that the work so performed is unequal within the meaning of the statute if the equal pay provisions otherwise apply. If the difference in skill or effort required for the operation of such equipment is inconsequential, payment of a higher wage rate to employees of one sex because of a difference in machines or equipment would constitute a prohibited wage rate differential. Where greater skill or effort is required from the lower paid sex, the fact that the machines or equipment used to perform substantially equal work are different

does not defeat a finding that the EPA has been violated. Likewise, the fact that jobs are performed in different departments or locations within the establishment would not necessarily be sufficient to demonstrate that unequal work is involved where the equal pay standard otherwise applies. This is particularly true in the case of retail establishments, and unless a showing can be made by the employer that the sale of one article requires such higher degree of skill or effort than the sale of another article as to render the equal pay standard inapplicable, it will be assumed that the salesmen and saleswomen concerned are performing equal work. *Although the equal pay provisions apply on an establishment basis and the jobs to be compared are those in the particular establishment, all relevant evidence that may demonstrate whether the skill, effort, and responsibility required in the jobs in the particular establishment are equal should be considered, whether this relates to the performance of like jobs in other establishments or not.*

### § 1620.15   Jobs requiring equal skill in performance.

(a) In general.   The jobs to which the equal pay standard is applicable are jobs requiring equal skill in their performance. Where the amount or degree of skill required to perform one job is substantially greater than that required to perform another job, the equal pay standard cannot apply even though the jobs may be equal in all other respects. *Skill includes consideration of such factors as experience, training, education, and ability. It must be measured in terms of the performance requirements of the job.*

### § 1620.16   Jobs requiring equal effort in performance.

(a) In general.   The jobs to which the equal pay standard is applicable are jobs that require equal effort to perform. *Where substantial differences exist in the amount or degree of effort required to be expended in the performance of jobs, the equal pay standard cannot apply even though the jobs may be equal in all other respects. Effort is concerned with the measurement of the physical or mental exertion needed for the performance of a job. Job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, are to be considered in determining the effort required by the job. "Effort" encompasses the total requirements of a job.*

### § 1620.17   Jobs requiring equal responsibility in performance.

47

(a) In general.   The equal pay standard applies to jobs the performance of which requires equal responsibility. Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation.  ***Differences in the degree of responsibility required in the performance of otherwise equal jobs cover a wide variety of situations.  The following illustrations in subsection (b), while by no means exhaustive, may suggest the nature or degree of differences in responsibility which will constitute unequal work.***

(b) Comparing responsibility requirements of jobs.

(1) There are many situations where one employee of a group performing jobs which are equal in other respects is required from time to time to assume supervisory duties for reasons such as the absence of the regular supervisor.  Suppose, for instance, that it is the employer's practice to pay a higher wage rate to such a "relief" supervisor with the understanding that during the intervals in which the employee performs supervisory duties the employee is in training for a supervisory position.  ***In such a situation, payment of the higher rate to the employee might well be based solely on the additional responsibility required to perform the job and the equal pay provisions would not require the same rates to be paid to an employee of the opposite sex in the group who does not have an equal responsibility.***  There would clearly be no question concerning such a wage rate differential if the employer pays the higher rate to both men and women who are called upon from time to time to assume such supervisory responsibilities.

(2) ***Other differences in responsibilities of employees in generally similar jobs may require similar conclusions. Sales clerks, for example, who are engaged primarily in selling identical or similar merchandise may be given different responsibilities.***  Suppose that one employee of such a group (who may be either a man or a woman) is authorized and required to determine whether to accept payment for purchases by personal checks of customers.  The person having this authority to accept personal checks may have a considerable, additional degree of responsibility which may materially affect the business operations of the employer.  In this situation, payment of a higher wage rate to this employee would be permissible.

## § 1620.18   Jobs performed under similar working conditions.

(a) In general.   In order for the equal pay standard to apply, the jobs are required to be performed under similar working

conditions.  It should be noted that the EPA adopts the flexible standard of similarity as a basis for testing this requirement. In determining whether the requirement is met, a practical judgment is required in light of whether the differences in working conditions are the kind customarily taken into consideration in setting wage levels.  The mere fact that jobs are in different departments of an establishment will not necessarily mean that the jobs are performed under dissimilar working conditions.  This may or may not be the case.  *The term "similar working conditions" encompasses two subfactors: "surroundings" and "hazards." "Surroundings" measure the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency.  "Hazards" take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause.*  The phrase "working conditions" does not encompass shift differentials.

(b) Determining similarity of working conditions.  Generally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions.  However, in situations where some employees performing work meeting these standards have working conditions substantially different from those required for the performance of other jobs, the equal pay principle would not apply. On the other hand, slight or inconsequential differences in working conditions which are not usually taken into consideration by employers or in collective bargaining in setting wage rates would not justify a differential in pay.

29 C.F.R. §§ 1620.13-1620.18 (excerpts contain relevant portions and are not reproduced in their

entirety) (emphasis added).

As illustrated by the individualized nature of the many factors considered to determine

whether a position requires equal work, skill, effort, responsibility, and similar working

conditions, all of which are necessary in showing gender discrimination in pay under the EPA,

most, if not all, of Plaintiffs' claims would rise or fall on the resolution of highly case-specific

factual issues.  For each Plaintiff and comparator, the court would have to consider the time

spent in the performance of certain duties; the employees' and comparators' experience, training,

education, and ability; the amount or degree of effort expended; the amount of physical or mental

exertion and stress; differences in the degree of responsibility; the jobs' surroundings and physical hazards, among other things. *See id.*

There is significant diversity as to the putative class members and their respective employers since the putative class members have significantly different skills, backgrounds and duties both among themselves as well as the alleged comparators. They work in multiple job classifications (over 130) at 27 different ACCS colleges geographically dispersed throughout Alabama. Furthermore, as previously established, these Defendant institutions have different minimum and maximum C-3 salaries, as well as varied policies *vis-à-vis* initial placement on the C-3 salary schedule and subsequent salary increases.

Additionally, individual determinations on liability and damages would be necessary for each plaintiff to succeed, requiring highly fact-specific inquiries concerning each plaintiff, *e.g.*, whether each plaintiff was assigned to the salary schedule at a salary lower than a similarly situated male employee or whether the retaliatory acts alleged by each plaintiff are, in fact, adverse employment actions proximately related to each plaintiff's engagement in a protected activity. Defendants, in turn, would be entitled to show that their respective compensation decisions were based on factors other than sex, *e.g.*, education and experience, level of supervisory authority and other responsibilities, the assignment of additional duties, etc.

In sum, Plaintiffs cannot show that they are similarly situated since there is no shortcut by which Plaintiffs can establish liability and damages, and the analysis of whether the jobs are equal in skill, effort and responsibility is necessarily fact specific and individualized.

**F.    PLAINTIFFS' HAVE NOT MET THEIR BURDEN OF PROVING THAT DEFENDANTS ENGAGE IN A COMMON SCHEME, PLAN OR POLICY.**

Plaintiffs allege that Defendants engage in unlawful polices and practices "to employ, pay and increase men at a higher rate than they employ, pay and increase women for the same or

similar work."  (Doc. No. 72) at ¶ 3; *see also* (Doc. No. 73) at ¶ 9 (alleging that Defendants use a subjective personnel practice that discriminates in pay against all female employees).[42] However, Plaintiffs have failed to meet their burden of proving that Defendants engage in a common scheme, plan or policy.  While a unified policy is not required in all cases, it may be needed in a particular case to serve the policy of judicial economy.  *Barron v. Henry County School System*, 242 F.Supp.2d 1096, 1102 (M.D. Ala. 2003) (Albritton, C.J.).  The Supreme Court has opined that "the judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Hoffmann-La Roche,* 493 U.S. at 170.

Several courts have determined that members of a proposed class were not similarly situated where the supposedly unlawful activities of the employer were not shown to be pursuant to a common scheme, plan, or policy.  *See, e.g., Brooks v. BellSouth Telecommunications, Inc.,* 164 F.R.D. 561, 569 (N.D. Ala. 1995) ("it is clear that any claims of the proposed opt-in plaintiffs would present disparate factual and employment settings"), *aff'd without op.,* 114 F.3d 1202 (11th Cir. 1997); *Tucker v. Labor Leasing, Inc.,* 872 F. Supp. 941, 947-49 (M.D. Fla. 1994) (requiring a common policy).  In fact, the Fifth Circuit case from which the Eleventh Circuit derived the two-step ad hoc approach for determining whether persons are similarly situated, noted that courts at the notice stage appear to require substantial allegations that the putative

---

[42]  Plaintiffs appear to suggest that the use of subjective criteria in making salary determinations in somehow a talisman of systemic, company-wide policy of intentional discrimination.  The Supreme Court, however, has made it clear that subjective decision-making by itself is not a discriminatory practice and provides no inference of a discriminatory practice.  As stated by the Court in *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 988, 990 (1988), a promotions discrimination case, "leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise ***no inference*** of discriminatory conduct" because "[i]t is self evident that many jobs … required personal qualities that have never been considered amenable to standardized testing."  (emphasis added). *See also Abram v. UPS of N. America, Inc.*, 200 F.R.D. 424 (E.D. Wis. 2001) (a decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by some managers in a discriminatory manner, is not tantamount to a systemic, company-wide policy of intentional discrimination).  In other words, "vulnerability" to sex discrimination in and of itself is not sex discrimination.

class members were together victims of a single decision, policy, or plan infected by discrimination. *Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1214 n. 8 (5th Cir. 1995); *see also Briggs v. U.S.,* 54 Fed. Cl. 205 (2002) (requiring evidence of a common plan or scheme); *Sheffield v. Orius Corp.,* 211 F.R.D. 411, 416 (D. Or. 2002) (while a unified policy, plan, or scheme of discrimination may not be required, some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency); *Hoffmann v. Sbarro, Inc.,* 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (holding that plaintiffs met the similarly situated requirement by pointing to an express, company-wide employment policy allegedly in violation of the FLSA).

Other than naked allegations and a flawed expert report, Plaintiffs have not shown that Defendants engaged in a common policy, plan or scheme.

### 1. PLAINTIFFS' STATISTICAL EVIDENCE DOES NOT ESTABLISH A COMMON SCHEME, PLAN OR POLICY.

In the instant case, the employment histories of the named plaintiffs, and the ways in which they claimed to have experienced discrimination, cannot be fairly compared with the history or individual experiences of absent class members. Nor do the claims of the class members share such common features that rulings could be fashioned to fairly adjudicate the claims as a group. Since the compensation and promotion decisions at issue were made by different college presidents applying different salary criteria, even if the named plaintiffs established that they were individually subjected to intentional discrimination, they cannot necessarily establish that other class members suffered from the same discrimination.

Plaintiffs can prove that discrimination was the standard operating procedure "through a combination of statistics and anecdotes." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286-87 (11th Cir. 2000); *Cooper v. Southern Co.*, 390 F.3d 685, 720 (11th Cir. 2004), *overruled on*

*other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).[43]  When conducting such an analysis, the Court may study the statistical evidence and analyses presented by both sets of experts and determine whether certain of the analyses performed by Plaintiffs' experts are appropriately structured, relevant, reliable and probative to class certification issues.  *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619 (N.D. Ga. 2003); *see also, Stastny v. Southern Bell Tel. & Tel. Co.*, 628 F.2d 267, 278-79 (4th Cir. 1980) (rejecting statistical evidence because the statistics showed only overall disparities and were not probative of separate facilities); *Webb v. Merck & Co., Inc.*, 206 F.R.D. 399, 408 n.2 (E.D. Pa. 2002) (rejecting the plaintiff's statistical evidence because it was neither instructive nor determinative in that it failed to account for non-discriminatory variables).

> **a.    PLAINTIFFS' STATISTICAL REPORT CONTAINS SIGNIFICANT AND SUBSTANTIVE ANALYTICAL DEFICIENCIES SUCH THAT THE ANALYSES FAIL TO ESTABLISH THAT DISCRIMINATION IS THE ACCS'S STANDARD OPERATING PROCEDURE.**

In support of their motion for conditional certification of a collective action, Plaintiffs submit the statistical report of Dr. Edwin Bradley.  In his report, Dr. Bradley sets forth the following opinions:

- Female employees of ACCS who are paid under salary schedule C-3 average more years of service at their respective colleges than male employees of ACCS who are paid under salary schedule C-3.

- Female employees of ACCS who are paid under salary schedule C-3 average more years of education than male employees of ACCS who are paid under salary schedule C-3.

- The average adjusted salary of female employees of ACCS who are paid under salary schedule C-3 is less than that of their male counterparts.  These results are statistically significantly

---

[43]  Although these cases and others cited in this section involve class certification under Rule 23, FED. R. CIV. P., they are instructive on the issue of showing whether Defendants' alleged discriminatory practices are part of a common scheme, plan or policy.

> related to gender and show statistically significant adverse
> disparities in pay for female employees of ACCS who are paid
> under salary schedule C-3.   These statistically significant
> differences have been adjusted for years of service, level of
> education and college of employment of the ACCS employees.
> These statistically significant differences remain even when a
> further adjustment for position title is made.

Bradley Report, (Doc. No. 75-1) at 2-3.   Bradley's Report, however, contains substantial

analytical deficiencies such that his analyses fail to establish "that discrimination is the

company's standard operating procedure." *Cooper*, 390 F.3d at 724 (citing *Joe's Stone Crab,*

*Inc.*, 220 F.3d at 1274) (citations omitted)).

    As previously set forth, the named Plaintiffs have significantly different skills, backgrounds

and duties both among themselves as well as to their alleged comparators.   The proposed class of

Plaintiffs work in multiple positions/job classifications (132 in all) at 27 different ACCS institutions

of various sizes disbursed throughout Alabama.   Furthermore, these Defendant institutions have

different minimum and maximum salaries, as well as different criteria *vis-à-vis* initial placement on

the salary schedules and subsequent salary increases.

    In his report, Dr. Bradley prepared two models analyzing the salaries of ACCS

employees who were paid on the C-3 schedule.   Regardless of the model, he combined all 907 C-

3 employees who were present at some point between 2004 and the present (the proposed class

period) into a single model across years, colleges and positions.   ERS Report, Ex. B at 4, 19; *see*

*also* Bradley Dep., Ex. A at 150-53.   Dr. Bradley's first model (Bradley Table 5) controlled for

salary step, an educational grouping created by Dr. Bradley, the college of employment, and the

academic year.   ERS Report, Ex. B at 4; *see also* Bradley Dep., Ex. A at 119-120.   Dr. Bradley's

second model (Bradley Table 6) is identical to Table 5 but is limited to the 572 employees whom

Dr. Bradley grouped according to whether their position title included the term "Director,"

"Assistant/Associate Director," or "Coordinator."   ERS Report, Ex. B at 4; *see also* Bradley

Dep., Ex. A at 200.   The model also includes a control for these broad position title groupings

constructed by Dr. Bradley.   Finally, in footnote 14 of his report, Dr. Bradley summarizes the

results of his modified second analysis (Table 6 model) to incorporate corrections to a few

employee education levels and title groupings.   ERS Report, Ex. B at 4; *see also* Bradley Dep.,

Ex. A at 72-76.

> **b.**   **DR. BRADLEY'S MODELS COMBINED THE 907 SCHEDULE C-3 EMPLOYEES REGARDLESS OF COLLEGE, POSITION OR YEAR BASED ON THE INCORRECT ASSUMPTION THAT THE DEFENDANT ACCS COLLEGES EMPLOYED UNIFORM, WHOLLY SUBJECTIVE CRITERIA IN THE ASSIGNMENT OF EMPLOYEES TO THE C-3 SALARY SCHEDULE AND THE SUBSEQUENT DETERMINATION OF PAY INCREASES.**

At the outset, the most significant deficiency in his analyses is that Dr. Bradley's models

combined the 907 schedule C-3 employees regardless of college, position title or year based on

the incorrect assumption that all 27 Defendant ACCS colleges employed a uniform and wholly

subjective compensation policy in the assignment of employees to the C-3 salary schedule and

for determining subsequent pay increases.   *See* Bradley Report (Doc. No. 75-1); ERS Report, Ex.

B at 19.   Contrary to Dr. Bradley's assumption, and as previously set forth in the Statement of

Facts, in Defendants' expert report, and in the affidavits of five different ACCS college

presidents, s*ee* Mitchell Aff., Ex. I at ¶ 9; McAlpine Aff., Ex. J at ¶ 8; Chandler Aff., Ex. K at

¶ 6; Blackwell Aff., Ex. L at ¶ 10; Campbell Aff.), Ex. M at ¶ 9, the Defendant colleges had no

uniform criteria for assigning employees to the C-3 salary schedule or for determining

subsequent pay increases.   Rather, C-3 salary criteria (which includes both objective and

subjective factors) used by the ACCS varied (and continue to vary) from college to college.   For

example, some colleges utilized steps in the C-3 salary schedule while others did not; step

allocations varied depending on the institution; salary increase steps are awarded based on years completed in the position, but the amount of the increase varied by institution; C-3 salary schedule minimum and maximum salaries varied by institution; and some colleges had different structures beyond the use of steps.  ERS Report, Ex. B at 4-8.  In fact, during his deposition, Dr. Bradley was compelled to concede the possible use of different C-3 salary criteria: "Like I said before, ***there could be twenty-seven different ball games going on out there, and there may well be.***"  Bradley Dep., Ex. A at 117, 32-33.

Thus, rather than acknowledging the institutional differences in C-3 criteria, examining and determining which Defendant colleges were statistically significantly more favorable to male C-3 employees or were favorable to female C-3 employees, Dr. Bradley used his assumption of commonality as the primary basis of his models.  Regardless of the model, he combined all 907 C-3 employees who were present at some point between 2004 and the present (the class period) into a single model across years, colleges and positions/job classifications (132 different position titles).  ERS Report, Ex. B at 3.  Furthermore, other than his understanding that each ACCS President had the authority to negotiate C-3 salaries, Dr. Bradley cites no evidentiary basis for his breathtakingly naked assertion that "[a]ssignment of a salary using Salary Schedule C-3 is totally subjective in that only an overall maximum amount that can be paid to an individual in an academic year is specified."  Bradley Report, (Doc. No. 75-1) at 4.  In fact, when confronted with specific evidence of the various C-3 salary criteria adopted by specific ACCS colleges, Dr. Bradley conceded that some schools had, in fact, considered objective factors in making C-3 salary decisions – a fact directly contrary to the assumptions of his analyses.  Bradley Dep., Ex. A at 163-67.

In combining all 907 C-3 employees who were present at some point during the class period into a single model across years, colleges and positions, however, Dr. Bradley failed to account for differences among the ACCS colleges, *e.g.*, differences in the C-3 salary schedule minimum and maximum salaries, which vary by institution, or the fact that some colleges determined starting salary by negotiation with no stated minimum salary while others had a specific step 0 amount.  *See* ERS Report, Ex. B at 4; *see also generally id.* 1-19.  Moreover, Dr. Bradley failed to examine the named Plaintiffs and their skills, backgrounds, and duties in relation to their named comparators.  *Id.*  Furthermore, regardless of the salary model used, Dr. Bradley incorrectly assumed that pay steps were utilized across ***all*** 27 colleges, ignoring the undisputed fact that 10 ACCS colleges do not use pay steps; step allocations varied depending on the institution where they were used; and that some colleges had different structures beyond the use of steps such as levels.[44]  *Id.* at 4-8.  These undisputed facts clearly undermine the reliability of Dr. Bradley's analyses because, in effect, he combined different schools and position titles over six years to drive his result and to create the impression of a pattern of institution-wide discrimination, a pattern that immediately evaporates when differences in C-3 salary criteria, colleges, and job titles are factored into the mix.

       **c.**     **DR. BRADLEY FAILED TO SUFFICIENTLY CONTROL FOR THE DIFFERENT POSITIONS/JOB TITLES THAT EXIST AT THE 27 ACCS INSTITUTIONS, THEREBY OVERLOOKING SIGNIFICANT DIFFERENCES IN THE SKILLS, DUTIES, AND RESPONSIBILITIES PRESENT AMONG THE 130-PLUS DIFFERENT C-3 POSITIONS.**

In addition, Dr. Bradley did not tailor his analyses to incorporate known variables that would allow for the comparison of similarly situated C-3 salary schedule employees.   In particular, he failed to adequately control for the specific positions/job titles, thus ignoring

---

[44] Dr. Bradley has not asked to supplement his Report to address the deficiencies in his analyses identified by Dr. Thornton.

significant differences in the skills, duties, and responsibilities among the different C-3 positions. As established in the Statement of Facts, over the course of the putative class period, there were 132 diverse positions occupied by the C-3 employees included in Dr. Bradley's analyses. ERS Report, Ex. B at 8. These position titles are quite different in terms of their potential skills, duties and requirements. *Id.* For example, the education and skills required for the most populated job during the 2007-2008 academic year – Counselor – are different from that of a Director of Federal Programs, or an Instructor, or a Human Resources Management Director. *Id.* at 9.[45]

Additionally, Dr. Bradley failed to tailor his analysis to the location of each job, *i.e.*, the college employer, despite the evidence which establishes that the workforces within the different ACCS colleges are strikingly different. As in *Cooper*, not every C-3 job title position exists in every institution, and in some colleges the job responsibilities for a given position differ greatly from the responsibilities for the same position at other colleges. *Id.* at 9. In fact, the most populous C-3 job title of Counselor does not exist at Trenholm (the named Plaintiffs' employer), and six (or 50%) of the most populous position titles at ACCS colleges were not present at Trenholm during the 2007-2008 academic year. *Id.* at 9-10.

The wide-ranging and highly diverse nature of the 132 C-3 jobs, as well as the diverse nature of Defendants' 27 colleges, also requires employee comparisons take these distinctions into account in order to insure that male and female C-3 employees being compared are similarly situated. A report that fails to account for distinctions among jobs and job locations merely results in a meaningless bottom-line analysis of pay disparity in the workforce rather than a meaningful analysis of disparate impact with respect to specific positions and colleges. *See*

---

[45]   A review of the job titles of Schedule C-3 employees at Trenholm during the 2007-2008 academic year set forth in Defendants' Expert Report, *see* ERS Report, Ex. B at 10, compellingly illustrate the significant and substantive differences in the diverse collection of job titles within the C-3 Salary Schedule.

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-57, 109 S.Ct. 2115, 2124-25, 104 L.Ed.2d 733 (1989) ("[A] Title VII plaintiff does not make a case of disparate impact simply by showing that, 'at the bottom line,' there is racial imbalance in the work force."); *Cooper*, 390 F.3d at 717 (rejecting the plaintiff's statistical analysis for failing to properly tailor her analysis to specific job types, positions, job locations or departmental and organizational structures at issue); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir.1991) ("Statistics ... without a [proper] analytic foundation [ ] are virtually meaningless."); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 319 (7th Cir.2003) ("The Supreme Court has emphasized the importance of looking to the proper base 'group' when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves.").

Furthermore, in his second analysis, Dr. Bradley grouped the diverse C-3 job titles into three job title categories -- "Director," "Assistant/Associate Director," or "Coordinator." Bradley conceded, however, that he had no scientific basis for his groupings other than the fact that the named Plaintiffs' positions included the terms "Director," "Assistant/Associate Director," or "Coordinator" in the title and his belief that employees within each group were in the same administrative level of responsibility (which he fails to define).[46]  Bradley Dep., Ex. A at 199-200, 205.  Although his decision to group C-3 job into these three groups may initially have some logical appeal, it is fundamentally misleading because it implies that the C-3 jobs sorted into each group are similar and, thus, are appropriately combined for purposes of statistical analysis when, in fact, Dr. Bradley conceded that the employees in his three groups

---

[46]  The value of Dr. Bradley's second analysis is further diminished by the fact that it excludes 335 of his original pool of 907 C-3 employees (or 37%) who he could not categorize into any of his three position title groups, thereby possibly biasing his results.  Bradley Dep., Ex. A at 200-05.  ERS Report, Ex. B at 3-4 (noting that Dr. Bradley's second model was limited to 572 of the 907 C-3 employees included in his first model).

were not performing the same job and that he did not know one way or another whether the employees he grouped had the same skills, knowledge and abilities or were performing substantially equal work. *Id.* at 197-200, 209-10. For example, Dr. Bradley conceded that positions such as Assistant Director of Athletics, Assistant Director of Financial Services, and Assistant Director of Student Services have different responsibilities and require a different skill set. Bradley Dep., Ex. A at 209-13. Consequently, by combining all 132 C-3 job titles into one of three meaningless groups, Dr. Bradley's analyses ignore the specific skills, duties and responsibilities of the overwhelmingly different positions represented in the putative class.

In addition, as established by Defendants' expert, Dr. Thornton, and as illustrated by Table 4 of her report, there are substantial differences in the average pay by position, regardless of gender. ERS Report, Ex. B at 10 and Table 4 thereto. This diversity of positions and salaries is even more pronounced at Trenholm, the employer of the named plaintiffs, where for the 2007-2008 academic year, there were 24 C-3 salary schedule employees employed in 16 different position titles with a salary range from $25,514 to $87,148.

The undisputed evidence further establishes that the size of the institution affects salaries, a factor which Dr. Bradley fails to consider in his analyses. For example, even when comparing the salaries of employees occupying the same position at different ACCS colleges, there is substantial variation in pay. As stated by Joan Davis, ACCS General Counsel and Vice Chancellor for Legal and Human Resources, "an HR director at a larger institution may have more responsibilities. It just varies from institution to institution." J. Davis Dep., Ex. H at 111-12. Thus, C-3 salary schedule employees holding the same title may be placed at different levels in the salary schedule based on the size of the school, the level, type and complexity of the

employee's duties and responsibilities, and the number of people reporting to the employee.  *Id.* at 64-65.

The facts regarding Plaintiff Rollins' position compellingly illustrate these facts.  As shown in Table 6 of Dr. Thornton's expert report, with respect to Plaintiff Rollins' position as a HR Director, an examination of the salaries of employees in HR positions across all colleges in 2007-2008 reveals a pay range from $46,165 to $92,223.  ERS Report, Ex. B at 14-15.  The highest paid HR Director was Ms. Vergie B. Spears, and the one male HR Director, Brian Gann, was one of the lower paid HR Directors.  *Id.*  Fourteen of the fifteen HR Directors were female, nine of which earned a higher salary than Mr. Gann.  *Id.*  Dr. Bradley's analyses, however, conceal these significant and relevant facts, however, through the averaging effect he creates by combining all C-3 employees in his analyses into one of three essentially meaningless groups irrespective of their actual job titles.

In sum, whether aggregating all C-3 position into a single or three groups, Dr. Bradley's analyses ignore and conceal the wide variation of jobs within the C-3 salary schedule with respect to responsibilities, duties and skills, and which have a broad range of salaries across colleges.

      **d.**    **DR. BRADLEY UTILIZED OVERBROAD EDUCATION CATEGORIES THAT FAIL TO SUFFICIENTLY DELINEATE EMPLOYEES BY EDUCATION LEVEL.**

Dr. Bradley also utilized overbroad education categories that fail to delineate sufficiently employees by education level.  ERS Report, Ex. B at 16-17.  In particular, he included education in his model by constructing and assigning each C-3 employee to one of seven levels:  high school, certificate, associate, bachelor, master, specialist, and doctorate.  *Id.*  In doing so, however, Dr. Bradley combined degree levels that may have different market rates of pay.  *Id.*

For example, among those in his doctorate category, Dr. Bradley included employees with an education doctorate (Ed.D.) with those who had a law doctorate (LL.D.) or a Ph.D.   *Id.* Likewise, among employees with a master's degree, he combined those with an MBA with employees who had a master's degree in education, library science, or science.   *Id.*   Yet, these degrees are likely to have different market rates of pay and may account for some of the pay differences among these positions.   *Id.*   In contrast, Dr. Thornton prepared alternative analyses that distinguished, for example, those with a law doctorate from those with a doctorate in education or a Ph.D., and that further distinguished employees with education beyond a master's degree but who had not yet completed their degree.

Dr. Bradley further conceded that his education group variable did not account for the C-3 employee's specific field of study and whether it related to the employee's job classification and affected the determination of their salaries, *see* Bradley Dep., Ex. A at 112-13, despite his concession that some ACCS colleges may have considered these factors in their compensation decisions.   *Id.* at 112-17.   In fact, the evidence establishes that some ACCS Defendants do consider field of study and its relevance to the job title when making pay decisions.   *See* Mitchell Aff. Ex. I at ¶ 4 ("I consider the applicants' education and experience within their job title. …"). Importantly, in *Cooper*, the Eleventh Circuit specifically rejected the plaintiffs' statistical expert's analysis because her " 'education component' failed to take into account the field of study, the relevance of that field of study, or the quality of the educational institutions involved, factors which may be important in some managers' employment decisions.").   390 F.3d at 717.

In sum, the validity of Dr. Bradley's analyses is further undermined by his failure to sufficiently delineate employees by education level.

e.   **D**R. **B**RADLEY DID NOT ASCERTAIN THE EFFECT OF BEING FEMALE
BY INSTITUTION, STEP, YEAR, AND EDUCATION LEVEL.

Finally, as noted above, Dr. Bradley's analyses do not determine whether there is a pattern of adverse gender differences with respect to the pay of C-3 employees by year and institution.  ERS Report, Ex. B at 21.  Thus, if there are differences by gender, Dr. Bradley's analysis does not specifically identify which years and/or colleges.[47]  However, Defendants' expert, Dr. Thornton, performs an alternative analysis that is more tailored, valid and reliable than Dr. Bradley's, and which establishes that there are no statistically significant differences in pay across the years and the 27 ACCS colleges.  *Id*. at 19-23.[48]  In particular, as illustrated in Table 9 of Dr. Thornton's Expert Report, with respect to Defendant Trenholm, in some years the average effect of being female *is positive* and in other years it is negative.  *Id.* at 21-22.

Table 3—Examination of *Trenholm* C-3 Employee Salaries by Year

| Academic Year | Number of Employees | Number of Female Employees | Effect of Being Female |
|---|---|---|---|
| 2004-2005 | 23 | 14 | $5,639 |
| 2005-2006 | 21 | 14 | $3,741 |
| 2006-2007 | 23 | 15 | -$1,859 |
| 2007-2008 | 24 | 13 | $1,887 |
| 2008-2009 | 21 | 11 | -$5,246 |
| 2009-2010 | 20 | 10 | -$5,757 |
| Based on Dr. Bradley's Model 5 specification. | | | |

ERS Report, Ex. B at 21.  Again, by reporting the overall average effect of gender on pay, Dr. Bradley conceals the fact that female C-3 employees may experience an advantage in some years at their ACCS employer.

---

[47]  Depending on the year and the institution, the number of employees varies from 5 to 78, and, therefore, in many instances an inferential analysis may not be possible or informative because small numbers raise statistical issues concerning the accuracy, and thus usefulness, of the data.  ERS Report, Ex. B at 22.

[48]  *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) (holding in Article VII case a defendant can challenge the plaintiffs' statistical proof in support of their disparate impact and disparate treatment pattern or practice claims by producing evidence that no statistically significant disparity exists or that the defendant's alternative statistical analysis is more accurate, valid or reliable than the plaintiff's evidence).

In fact, in determining whether there was a pattern of negative and/or positive differences in salaries by year and school, Dr. Thornton, after controlling for the job held by the employees and slightly refining the education categories and substituting seniority for step, found that there were no statistically significant differences in pay across the years and 27 colleges.[49]  *Id.* at 22-23.  Dr. Thornton further found that, while her analysis did not provide information regarding the differences in pay by gender for each college and year, a descriptive examination revealed that there was not a pattern of consistent and adverse pay differences with respect to gender.  *Id*. at 23.

Finally, and particularly important with respect to the named Plaintiffs' claims, Dr. Bradley admitted that when he examined Trenholm separately and included his broad position title measure, the effect of being female on salaries was *not* statistically significant.  Bradley Dep., Ex. A at 138.  In other words, even using Dr. Bradley's flawed model, he found that the pay differences regarding the named plaintiffs were neutral with respect to gender at Trenholm. *Id.*  Clearly, if the absent class members are claiming to be victims of an institution-wide discriminatory pay policy, the four named plaintiffs face a significant obstacle in establishing that they are similarly situated given that their own statistical expert's analysis fails to support their claim of gender pay discrimination.

Thus, by failing to ascertain the effect of being female by institution, step, year, and education level, Dr. Bradley's analyses conceals the affect on pay of factors unrelated to gender. When the analyses are performed by examining C-3 salaries by year and school, however, there

---

[49]   Dr. Thornton defined the following 13 educational level categories:  High school diploma, Associates degree, Certificate, Bachelors degree, Masters in Education, Masters Degree, MBA, Masters degree plus 30 or 60 hours, Other Professional degree beyond the Masters and below Ph.D., Education Specialist degree, Law Doctorate, Education Doctorate, and Ph.D. ERS Report, Ex. B at 17 n. 37.

is no pattern of adverse gender differences with respect to the pay of C-3 employees.   ERS Report, Ex. B at 20-23.

In sum, Dr. Bradley's analyses fail to establish evidence of a pattern or practice of discrimination or a generalized policy of discrimination.   His lack of meaningfully tailored analyses, as well as the other analytical deficiencies in his report,[50] undermine the report's substantive value and render Dr. Bradley's analyses insufficient to support a conclusion that intentional gender discrimination in pay or promotions with respect to female employees was Defendants' standard operating procedure.   Consequently, Plaintiffs' anecdotal and statistical evidence fails to establish a common scheme, plan or policy of discrimination by Defendants.

## IV.   CONCLUSION

The Court should apply a rigorous standard to Plaintiffs' motion for conditional certification of a collective action, and deny Plaintiffs' motion because they cannot show that they are similarly situated.   In particular, Plaintiffs are not similarly situated for purposes of an EPA collective action because:

- The 27 ACCS colleges, which have different and diverse C-3 salary policies, are legally and functionally separate entities that lack the degree of centralization necessary to justify treating all ACCS institutions as a single establishment under Title VII.

- The putative class representatives do not possess the same interest and have not suffered the same injury as the class members they seek to represent.

- The Plaintiffs have failed to identify a discriminatory common plan, scheme or policy of general application to the putative class.

---

[50]   For example, Dr. Bradley removed 114 C-3 employees from his analyses because he lacked sufficient education data, the hire date or both.   ERS Report, Ex. B at 3.   However, a disproportionate number (66 or 58%) of the 114 employees were male.   *Id.*   Therefore, Dr. Bradley may have potentially biased his results by removing a higher percentage of male employees relative to the percentage among those included in his analysis.   *Id.*

- Plaintiffs' statistical expert found that disparities in pay for female C-3 employees of Trenholm Technical College, which would include the named Plaintiffs, were not statistically significantly related to gender.

- The Defendant colleges do not employ a uniform procedure for establishing salaries for employees and, in fact, the criteria considered in compensation decisions varies from college to college and is dictated in large measure by the specific needs of the college.

- Plaintiffs' statistical evidence fails to establish that discrimination is the ACCS's standard operating procedure because it is rife with substantive analytical deficiencies and is insufficiently tailored to produce a relevant and meaningful result.

- The members of the putative class are dissimilar from one another and from the named Plaintiffs and opt-in Plaintiffs because they are employed by 27 different colleges dispersed throughout Alabama and because they hold many different job titles, which have different skills, duties, and responsibilities.

- There are significant structural differences among ACCS colleges, because each college has a different president decision-maker, and because the challenged decision-making process is decentralized.

- The claims of the proposed class representatives and putative class members are distinctly individualized in nature.

In sum, the members of the putative class have little in common other than their gender and this lawsuit.  For these reasons, the Court should deny Plaintiffs' motion for conditional certification of a collective action.

Respectfully submitted this the 23rd day of August, 2010.

/s/ Christopher W. Weller, Sr.

Christopher W. Weller (WEL020)
Robert T. Meadows, III (MEA012)
Terrie S. Biggs (BIG006)
Capell & Howard, P.C.
105 South Perry Street
Montgomery, AL  36102-2069
Telephone:  (334) 241-8000
Facsimile:  (334) 323-8888
Email:  cww@chlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 23rd day of August, 2010, I served a copy of the above and foregoing viá email, and/or have placed the same in the United States mail, postage prepaid and properly addressed upon the following:

| | |
|---|---|
| William F. Patty<br>James H. Anderson<br>Beers, Anderson, Jackson, Patty & Fawal, P.C.<br>250 Commerce Street, Suite 100<br>Montgomery, AL  36102-1988 | Monica L. Arrington<br>Arrington and Arrington<br>P.O. Box 250091<br>Montgomery, AL  36125-0091 |
| Theron Stokes<br>Nancy Perry<br>Alabama Education Association<br>P.O. Box 4177<br>Montgomery, AL  36103-4177 | Candis McGowan<br>Wiggins, Childs, Quinn & Pantazis, LLC<br>The Kress Building<br>301 19th Street North<br>Birmingham, AL  35203 |

/s/Christopher W. Weller
OF COUNSEL