**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **PAMALON ROLLINS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:09-cv-636-WHA** |
| | ) | |
| **ALABAMA COMMUNITY COLLEGE** | ) | |
| **SYSTEM; *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFF PAMALON ROLLINS**

---

**COME NOW** Defendants in the above-styled case and submit this Memorandum of Law in support of Defendants' Motion for Summary Judgment on the Claims of Plaintiff Pamalon Rollins, filed contemporaneously herewith.

## I.        INTRODUCTION

This lawsuit is one of four remaining individual actions following the Court's denial of Plaintiffs' motions for class certification and collective action.  *See* Mem. Op. & Order (Doc. No. 107).  Plaintiff Pamalon Rollins, the current Human Resources Director at H. Councill Trenholm State Technical College ("Trenholm"), asserts claims of gender-based discrimination in compensation, promotions, and terms and conditions of her employment under Title VII, violations of § 1983; retaliation; violations of the Equal Pay Act, and pattern and practice or disparate impact discrimination.  The crux of her complaint concerns two separate occasions on which Bradley Byrne, former Chancellor of the Alabama Department of Postsecondary Education, denied her requests for reorganization, wherein she sought pay increases and to be

advanced from the C-3 salary schedule to the higher-paying C-2 salary schedule.  Her remaining claims concern allegations of disparate treatment regarding various terms and conditions of her employment, as well as a dozen alleged acts of retaliation.

As will be set out herein, Defendants are entitled to summary judgment on Rollins' gender-based pay discrimination under Title VII and § 1983 because she has failed to

- establish that Defendants treated similarly situated male employees more favorably;

- identify a valid male comparator; or

- show by a preponderance of the evidence that the Defendants' proffered explanations were a pretext for gender discrimination.

Rollins also alleges disparate treatment claims under Title VII and § 1983 regarding the terms and conditions of her employment in that she was required to obtain a degree in Human Resources Management as a condition of her continued employment and that male employee were treated more favorably than females with respect to part-time employment opportunities and the payment of stipends, bonuses and supplements.  These claims fail as a matter of law, however, because,

- she accepted a conditional offer of employment voluntarily without reservation;

- she failed to show that Trenholm treated similarly situated male employees more favorably as to the additional degree requirement, part-time employment opportunities, or the payment of stipends, bonuses or supplements; and/or

- the additional degree requirement was a minimum qualification for the Administrative Services Manager position and therefore constitutes a legitimate, nondiscriminatory basis for the requirement; and

- the claims are untimely and thus time-barred.

Rollins' Equal Pay Act claim, which is based on the same facts as her gender-based pay discrimination under Title VII and § 1983, fails as a matter of law because (1) she has failed to identify any similarly-situated male employees who were paid higher compensation than her, *i.e.*, male employees holding jobs requiring equal skill, effort, and responsibility, and which are performed under similar working conditions; (2) Defendants established legitimate, non-discriminatory reasons for any alleged pay differentials; and (3) Rollins has offered no evidence of pretext.

Defendants also are entitled to summary judgment on Rollins' retaliation claims because (1) there is no evidentiary basis for the claims; (2) the alleged acts are not materially adverse to a reasonable person and would not deter a reasonable employee from making or supporting a charge of discrimination; (3) the alleged retaliatory acts pre-date the protected activity, *i.e.*, the filing of her March 2008 grievance or her August 2008 EEOC charges of discrimination; and/or (4) the length of time between her complaints of discrimination and the alleged retaliatory acts is too remote to permit an inference of causation.

Finally, Defendants are entitled to summary judgment on Rollins' pattern and practice and disparate impact claims because, as previously found by this Court, the statistical proof offered by her expert fails to establish the statistically significant difference in pay among male and female Trenholm employees required to prove a pattern and practice of discrimination.

In sum, there are no genuine issues as to any material fact on any of Rollins' claims and, therefore, Defendants are entitled to summary judgment as a matter of law.

## II.   STATEMENT OF RELEVANT FACTS

**A.   PLAINTIFF PAMALON ROLLINS**

### 1.   EMPLOYMENT HISTORY

Plaintiff Rollins graduated from Baldwin High School in 1984 and subsequently obtained a B.A. in Criminal Justice in 1988 from Alabama State University.  Deposition of Pamalon Rollins ("Rollins Dep."), Ex. 1 at 225-26.  Prior to her employment at Trenholm, Rollins did not have a degree in Human Resources Management, business administration or any business-related field.  She worked as a junior collection control counselor and a budgetary counselor at Navy Federal Credit Union from 1989-1996.  Rollins Dep., Ex. 1 at 228-229.  She later relocated to Alabama and from 1997 through 2004 worked at Auburn University at Montgomery (AUM) as a contract coordinator coordinating all training contracts, overseeing accounts payable and receivable, supervising clerical and maintenance staff and she was responsible for payroll and recruiting new employees.  Her human resources duties at AUM included selection, recruitment and hiring of employees, workshops and training.  *Id.* at 230-232.  Rollins worked at AUM until June 2004, when she was laid off.  *Id.* at 233-234.  Her salary at that time was in the mid-$30,000 range.  *Id.*

### 2.   INITIAL HIRING AT TRENHOLM

In 2004, Rollins applied for the Administrative Services Manager position at Trenholm. Rollins Dep., Ex. 1 at 11-12.  At the time she was hired, Rollins was placed on the C-3 salary schedule.  *Id.*; *see also* Fourth Amend. Comp. (Doc. No. 63) at ¶ 24.  Her position was later reorganized at the recommendation of President Samuel Munnerlyn and retitled as the Director of Human Resources, *i.e.*, the position she currently holds at Trenholm.[1]  Rollins Dep., Ex. 1 at

---

[1]  According to Rollins, President Munnerlyn changed her job title to Director of Human Resources because she was performing 85% of the human resources duties.  Rollins Dep., Ex. 1 at 29-30.

16, 33-34.  At the time of her application, the position required "a Bachelor Degree in Human Resources Management, Business Administration or Business related field," with a preference for a Master's degree.  *See* Job Description for Administrative Services Manager, Ex. 15. Rollins does not dispute this requirement.[2]  Rollins Dep., Ex. 1 at 13, 38.  Rollins, however, lacked the required degree, having only a B.A. in Criminal Justice.  *Id.* at 13, 18, 225-26. Consequently, former Trenholm President, Anthony Molina (now deceased), extended a conditional offer of employment to Rollins on October 19, 2004, requiring her to obtain a Master's degree in Human Resources Management within three years of her hiring date as a condition of her continued employment.  *See* 10/19/2004 Appointment Letter and Addendum, Ex. 16.  *See also* Rollins Dep., Ex. 1 at 21.  Rollins admits that she knowingly and voluntarily accepted the conditional offer of employment.[3]  *Id.* at 11-12.  *See also* 10/19/2004 Appointment Letter and Addendum, Ex. 16.  Rollins further admits that, prior to the filing of this lawsuit, she did not object to the additional degree requirement.  Rollins Dep., Ex. 1 at 23, 26-27.  At the time she was hired, Rollins' annual salary was $40,000.  *Id.* at 32-33.  Rollins subsequently received legislative pay increases for academic years 2005/2006, 2006/2007 and 2007/2008, increasing her salary to $51,360.  *Id.* at 35, 42-43, 47-48.  Thus, Rollins agrees that her salary increased over $11,000 in a three-year period (a 28.4% increase).[4]  *Id.* at 47-48.

---

[2]  As will be discussed herein, Rollins believes that a BA in Criminal Justice somehow satisfies the business-related degree requirement.  Rollins Dep., Ex. 1 at 13-14, 15-16.  It clearly does not.
[3]  Rollins initially claimed that she accepted the offer of employment requiring her to obtain a Master's degree in Human Resources Management because she understood that to be the "usual practice."  Rollins Dep., Ex. 1 at 20. During deposition, however, she admitted she had no basis for that belief, other than the fact that October 19, 2004 Addendum to her Offer Letter included the degree requirement.  *Id.*
[4]  The Trenholm Human Resources Department includes Rollins and her assistant, Ann Gordon.  Munnerlyn Dep., Ex. 6 at 154-55.

**B.      REQUESTED PAY INCREASES**

**1.      2006 PAY INCREASE REQUEST.**

In 2006, Rollins requested a reorganization of her position as H.R. Director and, in particular, that her position be advanced from the C-3 salary schedule to the higher-paying C-2 salary schedule.  *Id.* at 43-44.  She presented her request to former Trenholm President Anthony Molina (now deceased).  *Id.*  As set forth in his July 10, 2006 declining Rollins' request, hits decision was budgetary based:

> Dear Ms. Rollins:
>
> I am in receipt of your letter dated June 7, 2006, requesting a salary increase and a promotion to the C2 pay schedule. Regrettably, ***due to decrease in student enrollments, I have recently had to severely cut our operating budge for the fiscal year '06-'07, discontinue several part-time personnel, and not fill certain vacancies, and reassign certain full-time personnel***. Consequently, a salary increase and promotion to the C2 pay schedule is not possible at this time.  I will gladly meet with you to discuss this situation further and to discuss the possibility of other options.

06/10/2006 Molina Letter, Ex. 4 (emphasis added)).   Although Rollins testified that she disagreed with Molina's statement regarding budgetary constraints, she offers no evidence to the contrary and, in fact, concedes that Dr. Molina reduced personnel that year.  Rollins Dep., Ex. 1 at 45-46.

**2.      2007 REORGANIZATION REQUEST AND SALARY INCREASE.**

Rollins eventually obtained her Master's degree in Human Resources Management in May 2007.  *Id.* at 47-48, 225-26.  Rollins concedes, however, that she was not promised, and her contract did not provide for, a pay increase merely for completing her degree requirement; that her continued employment as H.R. Director was subject to her completion of the degree.  *Id.* at 47-48.  In mid-2007, Rollins requested a reorganization of her position and an attendant pay

increase.[5]  Rollins Dep., Ex. 1 at 50-51.  Chancellor Byrne initially declined Rollins' request

based on his conclusion that her compensation was fair.  *Id.* at 51.  Byrne subsequently agreed to

meet with Rollins in November 2007 to discuss her request, and he agreed to look into the

matter.  *Id*. at 51-52.  During her subsequent meeting with Chancellor Byrne, Rollins complained

about President Munnerlyn and that her salary was insufficient based on the duties she was

performing.  She did not, however, complain of gender-based pay discrimination.  Chancellor

Byrne described the conversation as follows:

> **BY MS. MCGOWAN:**
>
> Q.    Any females complaining about what they felt was unfair pay?
>
> A.    Yes.  But not based on gender.
>
> Q.    What was it based on?
>
> A.    It wasn't based on anything.  They just felt like they ought to be paid more money.
>
> Q.    What females told you that?
>
> A.    One of the plaintiffs in this case, Ms. Rollins, came to see me.
>
> Q.    What did she tell you?
>
> A.    She was very unhappy with the interim president at Trenholm who was a relative of hers.  She thought that in general he was not doing a good job.  And she said that she complained to him about a number of things at the college and that she didn't feel like he was doing anything about them.  And there was a lot of discussion about family matters in there that I don't remember the details of.  And then at the end of the conversation, she said she felt like she should be paid more.  After she gave me the substance of what she had, I told her, all right; I'm going to follow up on

---

[5]  Prior to September 1, 2008, employees placed on the C-3 salary schedule could only obtain pay increases legislatively or through an approved reorganization of their position.  In contrast, other salary schedules provided for pay increases based on years of service.  Munnerlyn Dep., Ex. 6 at 142-43.

this.  If there's anything else I need to know, any other concern you've got, my door is always open; come see me. At no point in that conversation did she say anything about gender.

Q.    Did she give you examples of people who were making more money than she was making?

A.    Not that I recall.

Q.    Did she give you reasons why she thought she should be paid more?

A.    Oh, yeah.

Q.    What were those reasons?

A.    She thought that she was performing duties at a level that would justify her making more money.  I don't know the specifics of what she told me, but she described what she was doing and she said I feel like I should be making more money based upon what I'm doing, and I've talked to Mr. Munnerlyn about it on several occasions; he won't do anything about it.

Q.    Did she tell you what other employees were making in this conversation --

A.    Not that I recall.

Q.    -- that had similar duties?

A.    Not that I recall.

Q.    When Ms. Rollins came to you to complain about her working situation, ***did she say that she felt like her job included more duties and responsibilities than the pay grade level she was on?***

A.    ***No***.

Q.    She just felt like she deserved more pay?

A.    Yes.

Q.    Did she tell you why she felt that?  What factors?

A.      She gave me some basis, and I can't remember exactly what it was today.  It didn't include that.  It mainly had to do with she didn't feel like President Munnerlyn was treating her right.  It wasn't as specific as I wanted it to be.  But whatever she gave me, I made sure I repeated more or less immediately to my staff so they knew what I was told.

****

Q.      Well, I thought your testimony was *that Ms. Rollins didn't complain to you about discrimination*.  She came to complain to you about what she thought the president wasn't doing at the university.

A.      That's right.

Q.      And so then she said she thought she deserved a pay raise, *and you didn't think that was a complaint about pay discrimination*.

A.      That's right.

****

Q.      Did you think that there may be a gender discrimination claim there?

A.      No.  She never made any mention of that.

Q.      *Did you think there might be a race discrimination claim there?*

A.      *No.  She made no mention of that.*

Q.      She just said she thought she deserved more pay?

A.      Yes.

Byrne Dep., Ex. 7 at 96-97, 146-47, 149-50.  (emphasis added).  Chancellor Byrne's testimony regarding his conversation with Rollins stands unrebutted.

As a result of the meeting, Byrne instructed Latonya Dupree, H.R. Director of the Department of Postsecondary Education, to review H.R. Director salaries at comparable sized

schools in the ACCS system.[6]   *Id.* at 98; *see also* List of HR Positions and Salaries at Comparable Schools, Ex. 20; 12/13/2007 Memo From LaTonya Dupree to Joan Davis, Ex. 14 Dupree conducted her review and, based on her findings and recommendation, Chancellor Byrne agreed in December 2007 to increase Rollins' annual salary from $51,360 to $55,360 (or 8%). *Id.* at 98-99; *see also* 12/18/2007 Byrne Letter Approving Rollins' Salary Increase, Ex. 26; Rollins Dep., Ex. 1 at 51-52; Deposition of Joan Davis ("Davis Dep.") (Doc. No. 82-5) at 41-44, 78-79.

It is undisputed that Chancellor Byrne relied on the recommendation of Ms. Dupree; that he did not conduct an independent investigation of H.R. Director salaries across the ACCS system.  Byrne Dep., Ex. 7 at 135-36; Davis Dep. (Doc. No. 82-5) at 78-79.  Although Rollins contends that the H.R. Director salary survey was flawed – in that there were salary errors and several employees included in the survey were lower level H.R. employees, rather than H.R. Directors – the undisputed evidence establishes that Chancellor Byrne was unaware of any flaws in the salary review; that he did not conduct an independent investigation of ACCS H.R. Director salaries; and that he relied solely on the review and recommendation of Ms. Dupree.[7]  *Id.* at 135-36, 140, 142-45.  President Munnerlyn likewise testified that he had no basis to challenge the validity of the salary survey conducted by the Chancellor's office and assumed that the information was correct.  Deposition of Samuel Munnerlyn ("Munnerlyn Dep."), Ex. 6 at 152-53.  Rollins submits no evidence rebutting Byrne's testimony that he relied in good-faith on Dupree's salary review and recommendation.  Moreover, during the relevant 2007-2008 time

---

[6]  Joan Davis, the former General Counsel and Vice-Chancellor for Legal and Human Resources in the Alabama Department of Postsecondary Education, testified that the review of the salaries included in the survey prepared by LaTonya Dupree was based on the hiring dates, duties of the employees, and the size of the college.  Davis Dep. (Doc. No. 82-5) at 41-42, 110-12.

[7]  Although the salary survey included a few staff level employees, the overwhelming majority of the salaries surveyed were H.R. Directors or Coordinators.  *See* List of HR Positions and Salaries at Comparable Schools, Ex. 20.

period, 14 of the 15 H.R. Directors within the ACCS system were female; and the top nine salaried H.R. Directors were women.[8]  ERS Report (Doc. No. 82-2) at 15.  In sum, Chancellor Byrne approved an 8% pay increase for Rollins in December 2007, from $51,360 to $55,360 based on the information made available to him.[9]

## C.   MARCH 2008 GRIEVANCES REGARDING DEAN GRIGGS.

Rollins filed two grievances on March 5, 2008 and April 15, 2008, respectively, complaining for the first time that she was a victim of gender-based pay discrimination.  Rollins Dep., Ex. 1 at 63-64, 67-69; Munnerlyn Dep., Ex. 6 at 181-83; March and April 2008 Grievances, Ex. 27.  She further complained that she was harassed by her female supervisor, Deborah Griggs, the Dean of Finance, and that she was required to obtain an H.R. degree whereas male employees had no such requirement.  Rollins Dep., Ex. 1 at 70, 84-86; Munnerlyn Dep., Ex. 6 at 181-84.  Rollins also sent a letter to President Munnerlyn on March 17, 2008, complaining of racial and gender discrimination and violations of the Equal Pay Act.  *Id.* at 186; *see also* March 17, 2008 Letter from Rollins to Munnerlyn, Ex. 10.

According to Rollins, she filed a second grievance in April of 2008 because the harassment by Griggs was continuing and because Griggs was talking negatively about her in an email insinuating that she had a bad attitude and had become a "know-it-all" since she obtained

---

[8]  In fact, for the 2009-10 academic year, 27 of the 28 Human Resources personnel employed within the ACCS system were female, and the top eight salaried employees were female.  *See* Human Resources Personnel Academic Year 2009-10 (Doc. No. 84-2).  Defendants do not concede that H.R. Directors at different ACCS institutions are adequate comparators because of the significant differences of the different schools, *e.g.*, the size of the H.R. office and staff, the duties being performed, the location of the schools (urban versus rural), etc.  *See* Davis Dep. (Doc. No. 82-5) at 64-65, 111-12.  Instead, Defendants offer evidence regarding the salaries of other ACCS H.R. Directors to illustrate both the dominance of the women in the position and the wide variations in their salaries.

[9]  Although Chancellor Byrne approved a 2007 pay increase for Rollins, she claims that the only reason Byrne increased her salary was to hide the fact that she was being paid less than H.R. Directors at other ACCS schools and because there was a pending discrimination claim from another Trenholm employee.  As established by Defendants' previously filed expert report, Rollins' claim has no basis in fact.  *See* ERS Report, (Doc. No. 82-2) at 15.  Furthermore, she certainly had the freedom to decline the salary increase.

her H.R. degree.[10]  Rollins, Dep., Ex. 1 at 86-88.[11]  Rollins concedes, however, that Dean Griggs "***harasses everyone just about***", including male employees and even the grievance officer, *see id.* at 93-95; that none of Griggs' alleged negative comments concerned Rollins' gender; that the alleged harassment by Griggs started ***before*** Rollins filed her EEOC charges of discrimination; and that President Munnerlyn took measures to address Rollins' complaint by changing her immediate supervisor from Dean Griggs to Dean Wilford Holt.  Rollins Dep., Ex. 1 at 71, 84-88. While President Munnerlyn considered Rollins' complaints about Griggs to be legitimate, *see* Munnerlyn Dep., Ex. 6 at 186-87, he testified that he received similar complaints from other employees (male and female) regarding Griggs.  Munnerlyn Dep., Ex. 6 at 188-89.

Rollins' grievance was addressed by a hearing officer (Jackie Peterson); Griggs agreed to stop harassing her; and Rollins accepted the results of the grievance process without objection. Rollins Dep., Ex. 1 at 93-95.  President Munnerlyn also changed Rollins' supervisor to Dean Holt to resolve the ongoing personality conflict.[12]  Munnerlyn Dep., Ex. 6 at 186-87, 200-01. Although Dean Griggs was terminated[13] and later re-hired, *see* Munnerlyn Dep., Ex. 6 at 193-94, Munnerlyn substantially reduced her contact with Rollins and his staff by assigning her to work at the Patterson campus four days per week and by instructing her to avoid contact with Rollins and other persons in his office.  *Id.* at 244-47.

---

[10]  Rollins conceded during her deposition that she became aware of Griggs' negative email ***after*** she filed her April 2008 grievance.  Thus, the email was not a basis for her grievance.  Rollins Dep., Ex. 1 at 90-91.

[11]  Rollins complained in her grievance about an email sent from Dean Griggs to President Munnerlyn stating that Rollins thought she knew everything since she received her Masters degree in Human Resources Management and that she had an attitude that was also an issue in her prior job.  Rollins Dep., Ex. 1 at 194-96.  Even assuming this email statement was made, there is no evidence whatsoever that it was motivated by gender discrimination, particularly because the author of the statement was the female Dean of Finance.

[12]  Rollins also alleged that Griggs taunted her about her tenure.  Rollins Dep. at 359-61.  When pressed, however, she conceded that the alleged taunting began in 2007, ***before*** filing her grievance and EEOC Charges.  *Id.* at 361-62.

[13]   President Munnerlyn testified that the termination of Dean Griggs' employment was unrelated to Rollins' complaints of harassment.  Munnerlyn Dep., Ex. 6 at 68-69.  According to Munnerlyn, Griggs was capable of performing her job, but she did not know how to manage people.  *Id.* at 229-30.  Consequently, he hired Catherine Wright as the Comptroller to manage the day-to-day operations of the school.  *Id.*

**D.**    **2008 REORGANIZATION REQUEST AND SALARY INCREASE.**

In approximately June, 2008, Rollins again requested a pay increase and reorganization of her H.R. Director position and, specifically, that her position be moved from the C-3 to the C-2 salary schedule based on her belief that her performance of additional duties justified reorganization of her position, including performing duties as the EEO officer for the college, working on litigation, spending time at the Patterson campus and overseeing the leave process and the EDP (employment data record process).  *Id.* at 58-61.  Rollins requested her December 2007 salary be increased from $55,360 to $77,000, a whopping 39% increase.  Rollins Dep., Ex. 1 at 51-53.  Rollins agrees that President Munnerlyn recommended initially approval of her request and that she has no complaint regarding President Munnerlyn's recommendation.[14]  *Id.* at 56.  *See also* President Munnerlyn 07/21/2008 Recommendation Letter, Ex. 8; Munnerlyn Dep., Ex. 6 at 141-42.  Chancellor Byrne further testified that Munnerlyn spoke well of Rollins. Deposition of Bradley Byrne ("Byrne Dep."), Ex. 7 at 188.

On August 5, 2008, Chancellor Byrne denied Rollins' reorganization request based on the fact that she recently had received a salary increase in December 2007 and based on his judgment that the additional duties cited as justification for the reorganization and pay increase were not additional duties, but rather were H.R. Director duties:

> As established in your request, Ms. Rollins is a valuable employee
> to Trenholm State Technical College and her contributions are
> greatly appreciated.  However, we recently approved a salary
> adjustment for Ms. Rollins to bring her salary in line with similarly
> situated human resources directors in the Alabama Community
> College System.  After careful consideration, since this most recent
> request for reorganization does not include a significant increase in

---

[14]  Given Rollins' admission that President Munnerlyn recommended that Chancellor Byrne move her from the C-3 to the higher-paying C-2 salary schedule, *see* Rollins Dep., Ex. 1 at 215-16, 220-21, it is clear that she cannot prove discriminatory intent required to state a claim against him under Title VII § 1983.  *See, e.g.*, *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1442-43 (11th Cir. 1998) (an inference of non-discriminatory motive arises when the individual responsible for hiring or promoting an employee also participated in or made the ultimate decision to fire that employee).

> responsibilities outside the realm of a human resources director, I
> must deny the request.[15]

Chancellor Byrne 08/05/2008 Letter, Ex. 9.  During his deposition, Chancellor Byrne confirmed

the reasons for the decisions set forth in his letter.  Byrne Dep., Ex. 7 at 139; *see also* Davis Dep.

(Doc. No. 82-5) at 100 (testifying that Chancellor Byrne's decision was based on his conclusion

"[t]hat he didn't think that the change in duties was substantial enough for a reorganization to be

warranted.").   Additionally, as previously established, when Byrne met with Rollins in

November 2007, she never mentioned the performance of additional duties as a basis of her

requested pay increase, but rather expressed her opinion that she merely deserved higher pay.  *Id.*

at 146-47.

Chancellor Byrne further testified that he disapproved the pay increase recommendation

based on the results of the review by the Postsecondary Education H.R. Department, which were

set forth in his August 5, 2008 letter:

**BY. MS. MCGOWAN:**

Q.   Why did you reject the reorganization request for Ms.
Rollins?

A.   As I recall, the request came in by writing from Mr.
Munnerlyn.  I took it or it went directly to HR.  HR
reviewed it and determined that there wasn't sufficient
basis, and they prepared a letter for me to sign to the
president that basically stated that.

Byrne Dep., Ex. 7 at 134-35; *see also id.* at 139, 141-43.  President Munnerlyn likewise testified

that Byrne denied the reorganization of Rollins' position because of the lack of significant

additional duties.  Munnerlyn Dep., Ex. 6 at 145-46.

---

[15]   According to Chancellor Byrne, because Rollins had just received a salary increase in December 2007, she was
not eligible for a salary increase unless it could be shown that she had a significant increase in responsibility outside
her duties as an H.R. Director.  Byrne Dep., Ex. 7 at 139, 141.

Although Rollins admits that President Munnerlyn's recommendation letter to Byrne was sufficient, she contends that Munnerlyn should have urged Byrne to change his decision. Rollins Dep., Ex. 1 at 219-223. However, Rollins could not identify any information missing from Munnerlyn's recommendation letter or that he could have brought to Byrne's attention. *Id.* More importantly, after Byrne made his decision, Munnerlyn reconsidered his original endorsement of Rollins' request, finding himself in agreement with Byrne's conclusion that Rollins was being fairly compensated and that the additional duties cited were, in fact, duties typical for an H.R. Director. *Id.* at 153-58.

Finally, Rollins claims that the salary survey conducted by the Postsecondary H.R. Department that served, in part, as the basis of Chancellor Byrne's decision was flawed because it included some erroneous salary information and the salaries of employees who were merely staff and not H.R. Directors. Rollins Dep., Ex. 1 at 244-45. Assuming for summary judgment purposes that her allegations are true, it is undisputed that Byrne's decision to reject Rollins' reorganization request was based ***solely*** on his good faith review of the recommendation of the Postsecondary H.R. Director, Latonya Dupree; that he conducted no independent evaluation or investigation of ACCS-wide H.R. Director salaries; that he was not aware of any errors in the salary survey at the time he made the decision to decline Rollins' reorganization request.[16] Byrne Dep., Ex. 7 at 135-36, 140, 142-45, 151.

Rollins offers no evidence during her deposition, beyond mere opinion, to support her claim that Byrne's decision to deny her reorganization was gender based. In fact, Rollins concedes that Chancellor Byrne approved the placement of another female employee, Ruby Lawson, as H.R. Director for Lawson State, on the C-2 salary schedule, a female employee

---

[16] Byrne further testified that if he had known the survey was flawed, he would have directed his staff to correct it. Byrne Dep., Ex. 7 at 142-43.

Rollins considers to be similarly situated to her.  Rollins Dep., Ex. 1 at 57-58, 62-63.

E.    **EEOC CHARGES**

On August 27, 2008, Rollins filed separate EEOC Charges, alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963 ("EPA") and retaliation in violation of the anti-retaliation provisions of § 704(a) of Title VII.  *See* 08/27/2008 EEOC Charges of Discrimination, collectively, Ex. 11.  The crux of Rollins' claims is gender-based discrimination in terms of pay and the terms and conditions of her employment, as well as retaliation.  Defendants denied the allegations.  On March 5, 2009, Plaintiff Rollins received her Right-to-Sue letter from the EEOC.  *See* 03/05/09 Right to Sue Letter (Doc. No. 63) at Ex. 1.

F.    **THE FOURTH AMENDED COMPLAINT**

Plaintiff Rollins, along with Plaintiffs Johnson and Thomas, originally filed their Complaint in this case in the Circuit Court of Montgomery County, Alabama on May 29, 2009, alleging that they, and the class they sought to represent, had been discriminated against on the basis of their gender in violation of Title VII of the Civil Rights Act of 1964, as amended; the Equal Pay Act; the Fourteenth Amendment; the Alabama Constitution, and 29 U.S.C. § 206(d).  The Defendants removed the case to this Court.  Plaintiffs subsequently filed amended complaints, including the Fourth Amended Complaint, which added Plaintiff Ward.  (Doc. No. 63).

The named Defendants in this action are as follows:  The State Board of Education, the Department of Postsecondary Education, the Alabama College System, H. Councill Trenholm State Technical College, a two-year educational institution in Montgomery, and Bradley Byrne ("Byrne") has been sued in his individual capacity as the former Chancellor of the Alabama

Department of Postsecondary Education, Samuel Munnerlyn, in his individual and official capacity as President of H. Councill Trenholm State Technical College, Freida Hill, in her official capacity as the current Chancellor of the Alabama Department of Postsecondary Education, Governor Bob Riley, Randy McKinney, Betty Peters, Stephanie W. Bell, Dr. Ethel H. Hall, Ella B. Bell, David F. Byers Jr., Gary Warren, and Dr. Mary Jane Caylor, sued in their official capacities as officers or members of the State Board of Education (collectively, the "Defendants").

The Fourth Amended Complaint asserts a claim in Count I entitled "Class Action-Title VII" on behalf of Plaintiff Rollins, Johnson, and Thomas, and unnamed class members, for violation of the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983, Title VII, and the Equal Pay Act.  Count II entitled "Title VII Violations Gender-Disparate Treatment" alleges violations of Title VII on behalf of Rollins, Johnson, Thomas, and unnamed class members.  Count III is a claim for disparate impact, again asserted on behalf of Rollins, Johnson, Thomas, and unnamed class members.  Count IV is a claim by Rollins, Johnson, and Thomas entitled "Claims for Nominal, Compensatory and Punitive Damages Pursuant to 23(b)(3)."  Count V is a claim for violations of the Equal Pay Act on behalf of all Plaintiffs and unnamed class members.  Count VI is a § 1983 claim against individual Defendants for violation of the Equal Protection Clause.  Counts VII and VIII are Title VII and § 1983 retaliation claims, respectively, asserted on behalf of Plaintiff Rollins.  Counts IX through XIV are claims asserted on behalf of the other named individual Plaintiffs.  Count XV is a claim for violation of policy and statutes.

On October 25, 2010, the Court dismissed Plaintiffs' class and collective action claims. *See* Mem. Op. & Order (Doc. No. 107).  The Court subsequently denied Plaintiffs' Motion to

Alter, Amend or Vacate the order.  *See* 11/10/2010 Order (Doc. No. 114).  Only the claims of the individually named Plaintiffs survive.  Thus, for purposes of Defendants' summary judgment motion, Plaintiff Rollins has asserted gender-based discrimination and/or retaliation in violation of Title VII, § 1983, the Equal Pay Act; and pattern and practice and disparate impact claims under Title VII.  Plaintiff Rollins seeks backpay, interest, benefits, damages, a pay raise with backpay in the amount she would have earned but for the unlawful and discriminatory conduct, compensatory damages, including an award for mental anguish and emotional distress, costs and expenses, including an award of reasonable attorney's fees, and, such other relief as may be appropriate.  Fourth Amend. Compl.  (Doc. No. 63) at 48.

### III.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Jameson v. Arrow Co*., 75 F.3d 1528 (11th Cir. 1996).  The party asking for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.' " *Id.* at 324. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff must meet her burden by doing more than "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.   ARGUMENT

### A.   <u>TITLE VII & § 1983</u> – DISPARATE TREATMENT

In Count VII of the Fourth Amended Complaint, Plaintiff alleges the following disparate treatment claims in violation of Title VII and § 1983.

- She was denied promotional advance in pay grade or salary, while males with less qualification and experience were paid more and/or advanced to higher pay grade levels;

- She was held to a higher standard of performance than similarly situated male employees;

- She was assigned additional duties without an increase in pay and/or an increase in classification;

- Males who had less seniority and fewer qualifications received higher salaries than her;

- She was not paid equally for equal work that requires, at the very least, equal skill, effort, and responsibility and has continued to suffer such pay inequities;

- Trenholm discriminated against her on the basis of gender in her pay, in its applications of policies regarding placement on salary schedules, in its handling of salary supplements and work loads and other terms, conditions, and privileges of her employment; and

- Defendants retaliated against her for complaining about gender discrimination.

Fourth Amend. Comp. (Doc. No. 63) at ¶ 148, A-K.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  As explained by the Eleventh Circuit in *Arrington v. Cobb County*, 139 F.3d 865, 873 (11th Cir. 1998):

> For Title VII and § 1983 gender discrimination claims, the order and allocation of proof are well established.  First, the plaintiff must prove a *prima facie* case of discrimination by a preponderance of the evidence.  Second, if the plaintiff makes out a *prima facie* case, the defendant must produce a legitimate, non-discriminatory reason to explain the challenged action.  Third, should the defendant carry this burden, the plaintiff must show by a preponderance of the evidence that the defendant's proffered explanation was a pretext for discrimination.  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).[17]

Because Rollins admits she has no direct evidence that Defendants harbored an illegal motive for refusing her request for promotions or pay increases, *see* Rollins Dep., Ex. 1 at 210-11, she must rely on the test set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) to establish her *prima facie* case of discrimination through circumstantial evidence.  *See McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) ("Where ... there is no direct evidence of discrimination, a plaintiff may prove discrimination through circumstantial evidence, using the burden-shifting framework established in *McDonnell Douglas* ...").

As noted above, in the instant case, Rollins has alleged multiple acts of disparate treatment in violation of Title VII.  Accordingly, Defendants will address those claims *ad seriatim*.

---

[17]   The *McDonnell-Douglas* framework also applies to any evaluation of the merits of Rollins' § 1983 claim.  *See Arrington v. Cobb County*, 139 F.3d 865, 873 n. 15 (11th Cir. 1988).

1.   <u>DISPARATE TREATMENT - COMPENSATION</u> – ROLLINS' TITLE VII AND § 1983 PAY/PROMOTION CLAIMS FAIL AS A MATTER OF LAW BECAUSE SHE FAILED TO ESTABLISH THAT DEFENDANTS TREATED SIMILARLY SITUATED MALE EMPLOYEES MORE FAVORABLY.

As set out in the Statement of Facts, the primary basis of Rollins' § 1983 and Title VII disparate treatment claims concerns the denial of her separate requests in 2007 and 2008 to increase her salary and reorganize her position as Human Resources Director by moving her position from the C-3 to the C-2 salary schedule.[18]   Rollins claims that Byrne (and/or Defendants collectively) discriminated against her on the basis of gender (1) by only partially approving her 2007 request, increasing her pay from $51,360 to $55,360, and (2) by denying her subsequent request in 2008 to increase her salary from $55,360 to $77,000 and to reorganize her position from the C-3 to the C-2 salary schedule.   In essence, Rollins claims that she was not paid at the proper level for her H.R. Director position, whereas male Trenholm employees with less education or experience were paid at the high end of the salary schedule their positions.   Fourth Amend. Compl. (Doc. No. 63) at ¶¶22, 33, 37, *et. seq.*   Rollins concedes, however, that she has no direct evidence of gender bias regarding her pay, but rather contends that it is 'implied' from the alleged salary differences between male and female Trenholm employees.   Rollins Dep., Ex. 1 at 210-11.

Pursuant to the burden-shifting framework established in *McDonnell Douglas*, to establish a *prima facie* case of intentional discrimination in compensation under both Title VII and § 1983, Rollins must establish that (1) she belongs to a protected class; (2) she received low wages; (3) similarly situated male comparators received higher compensation; and (4) she was

---

[18]   Although Rollins originally denominated her claim as a promotion and/or pay claim, she conceded that she is not asserting a promotion claim, but rather that she wanted her current position as H.R. Director to be reorganized and moved from the C-3 to the C-2 salary schedule so that she would become eligible for an immediate pay increase and future pay increases based on longevity.  Rollins Dep., Ex. 1 at 293-94.

qualified to receive the higher wage.[19]  *See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992) (compensation discrimination by gender); *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991) (compensation discrimination by age).  The comparator must perform a job similar to the plaintiff; thus, the plaintiff must show that, in her job, she "shared the same type of tasks" as the comparator.  *B&B Cash Grocery*, 975 F.2d at 1529.  Finally, "the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.' "  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

As will be shown herein, Rollins has failed to establish her *prima facie* case for gender pay discrimination under Title VII because she offers no evidence to establish the fourth element of her *prima facie* case -- that Trenholm treated similarly situated male employees more favorably than her in terms of pay.  Second, even if Rollins could establish her *prima facie* case, Defendants have presented unrebutted proof that reorganization and pay decisions regarding Rollins were based on legitimate, nondiscriminatory reasons which she cannot show were a pretext for discrimination.

### a.  ROLLINS HAS FAILED TO IDENTIFY A VALID COMPARATOR.

For purposes of argument, Defendants concede that Rollins can establish the first three elements of her *prima facie* case for disparate treatment, gender-based pay discrimination under Title VII and § 1983.  Nevertheless, she has failed to establish the fourth and critical element of her *prima facie* case -- that Trenholm compensated similarly situated male employees more favorably.  In support of her claim, Rollins argues that she was treated less favorably in terms of pay and promotions than similarly situated male Trenholm employees Michael Evans, Dennis

---

[19]  Whether Rollins asserts her pay claim under Title VII, § 1981 or § 1983, the analytical framework is the same because the claims have the same proof requirements.  *See Bryant v. Jones*, 575 F.3d 1281, 1296, n. 20 (11th Cir. 2009) (both § 1981 and Title VII "are subject to the same standards of proof and employ the same analytical framework."); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.").

Moore, Freddie Williams, Billy Merrill, Gerald Horn and Larry Achord.  Rollins Dep., Ex. 1 at 192-93.  *See also* Fourth Amended Comp. (Doc. No. 63) at ¶ 29-33.  Accordingly, the Court must first determine whether these alleged comparators are similarly situated.

### i.  THE ALLEGED COMPARATORS ARE NOT SIMILARLY SITUATED TO ROLLINS IN ALL RESPECTS AND ARE NOT NEARLY IDENTICAL TO HER.

A plaintiff fails to establish a *prima facie* disparate treatment case if she fails to show that she was treated less favorably than a similarly-situated person outside her protected class. *Alansari v. Tropic Star Seafood Inc.*, Case No. 09-12714, 2010 WL 2853652, *1 (11th Cir., July 22, 2010); *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008).  In determining whether a comparator is "similarly situated", the Eleventh Circuit has adopted the "nearly identical" standard:  "A plaintiff must show that a possible comparator is 'similarly situated in all relevant respects' and is 'nearly identical to the plaintiff.' "  *Johnson v. England*, 350 Fed. Appx. 314, 317, 2009 WL 2514099, *3 (11th Cir., Aug. 19, 2009) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)).  *See also Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1273 (11th Cir. 2004) ("[The individuals must be similarly situated in all relevant respects besides [sex].").  *See also MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 n. 16 (11th Cir. 1991) ("In a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him.").  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004).  *See also Muhammad v. Audio Visual Services Group*, 380 Fed. Appx. 864, 871, 2010 WL 2089634, *7 (11th Cir., May 26, 2010).  Application of the "nearly identical"

standard is cogently illustrated by the Eleventh Circuit's decision in *Johnson v. England*, 350 Fed. Appx. 314, 317, 2009 WL 2514099, *3 (11th Cir., Aug. 19. 2009).

In *Johnson*, the plaintiff alleged, *inter alia*, that she was doing the same work as her higher paid, similarly situated, white coworkers who, unlike her, were promoted and received IT pay.  *Johnson*, 350 Fed. Appx. at 315, 2009 WL 2514099, *1.  The Court rejected the plaintiff's argument, however, finding that she failed to identify a proper comparator, as required to establish a *prima facie* case of disparate treatment.  The Court reasoned:

> Johnson also failed to establish a *prima facie* claim of disparate treatment because she did not show that she was paid less than a similarly situated employee or that she was denied IT pay for 11 months based on racial discrimination.  First, Johnson presented no evidence that she was paid less than a similarly situated employee.  The record shows that Johnson was the only employee in her type of position.  The record also shows that Johnson was in a "stand alone" position with a GS-9 pay grade.  Her coworkers, however, were in career ladder positions with GS-11 or GS-12 pay grades.  Because Johnson was not in the same type of position and did not have the same pay grade as her coworkers, she was not similarly situated to any of them with regards to their pay.

*Johnson*, 350 Fed. Appx. at 317-18, 2009 WL 2514099, *3.  Furthermore, Johnson's job description did not originally include IT principals and concepts.  *Johnson*, 350 Fed. Appx. at 318, 2009 WL 2514099, *4.  Thus, she was not similarly situated to the alleged comparators whose tasks involved IT duties.  *Id.*

*Johnson* is particularly instructive because in the instant case, Rollins concedes that she is the *only* Trenholm employee in her type of position – H.R. Director.  Rollins Dep., Ex. 1 at 197.  Likewise, the alleged comparators she names are not in the same type of position.  In fact, none of the alleged comparators occupy jobs that are "virtually identical" or perform duties that are even remotely similar or are performed under similar working conditions; or occupy jobs that require substantially identical skills, education, training or ability.  In fact, the comparators' jobs

are so dissimilar to Rollins' job that it is akin to a comparison of apples to elephants.

The following table set forth in Defendants' Expert Report summarizes the titles of each comparator identified by Rollins as well as their most recent job description:

| NAME | POSITION TITLE |
|------|----------------|
| **Pamalon Rollins** | Director of Human Resources |
| COMPARATOR | COMPARATOR TITLE |
| Michael Evans | Public Information Officer and Admissions/Retention Advisor |
| Charles Harris | Assistant Dean for Information Technology & Campus Safety |
| Gerald Horn | Project Director, DOL Automotive Manufacturing Training Project |
| Milton Perry | Project Director—Health Services |
| William Merrill | Operations Accountant |
| Dennis Monroe | Director of Physical Plant |

ERS Report (Doc. No. 82-2) at 24. Appendix C to Defendants' expert report contains a detailed description of Rollins' H.R. Director position, her education and work experience as well as the same information for each of the six alleged comparators. Even a cursory review of the alleged comparators' job titles compellingly illustrates the diversity of positions at issue and, in particular, the fact that the comparators' jobs are completely different than Rollins' position as H.R. Director. Although job titles, strictly speaking, are not always dispositive of the issue of comparator similarity, they are still relevant, *see, e.g.*, *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999), and the job descriptions referenced above and the testimony of the comparators clearly establish the dissimilarity of the job-related characteristics of the comparators. Indeed, the material differences in their respective job responsibilities are overwhelming.

For example, Charles Harris is the Assistant Dean of Information Technology and oversees all functions related to IT, and he performs additional duties regarding campus safety and security. Rollins Dep., Ex. 1 at 199-200. Freddie Williams is the college recruiter. *Id*. at 200; *see also id*. at 202-04. In other words, none of the alleged comparators are performing duties even remotely similar to Rollins' duties as H.R. Director. Furthermore, as in *Johnson*,

Rollins concedes that there are no other H.R. Directors at Trenholm whom she can use as comparators; that she occupies a stand-alone position, which is the highest level position in the H.R. Department.  *Id*. at 197.

In addition, the alleged comparators possess different levels of education and prior experience than Rollins.  In particular, while Rollins and three of her four comparators possess master's degrees, each of the three comparators received their degrees ***prior*** to employment at Trenholm, whereas Rollins obtained her master's degree ***after*** being employed at Trenholm and as a condition of her continued employment.  ERS Report (Doc. No. 82-2) at 25.  Rollins' named comparators also have diverse backgrounds such as an industrial engineer working in manufacturing and a nurse practitioner, among others.  *Id*.  One of the comparators, Milton. Perry, was hired by Trenholm in 2008 after receiving his master's degree in nursing and a license as a family practice nurse in 1999, and he was offered the same salary as his female predecessor.[20]  *Id*.  Another comparator, Charles Harris, is an Assistant Dean for Information Technology and Campus Safety, and is not paid under Schedule C-3.[21]  *Id.*  As established in Defendants' Expert Report, a review of Rollins' and comparators' personnel files, including job descriptions as discussed above, reveals the significant dissimilarities in current job duties, education level, and prior experience of Rollins and each alleged comparator, such that a valid compensation comparison is not possible.  ERS Report, (Doc. No. 82-2) at 24 and Appx. C.  *See Beard v. 84 Lumber Co*., 206 Fed.Appx. 852, 2006 WL 2946883, *5 (11th Cir. 2006) (persons in

---

[20] Milton Perry's duties include implementation and operation of a grant from the U.S. Department of Labor to expand and enhance Trenholm's allied health division (*i.e.*, school of nursing, paramedics, medical/nursing assisting program), which has had approximately 900 participants since 2007.  Deposition of Danny Perry ("Perry Dep."), Ex. 17 at 25-26.

[21] Even if Charles Harris was a proper C-3 comparator, the record establishes that prior to his employment at Trenholm, he managed numerous facilities and had multiple supervisory roles in the military as a line Air Traffic Controller, Supervisor and Facility Manager.  Deposition of Charles Harris ("C. Harris Dep."), Ex. 3 at 7, 9, 11, 14-15, 17.  He also served as a Network Technician, Network Administrator, and as a Coordinator for the Alabama Department of Postsecondary Education before accepting a position with Trenholm.  *Id.* at 37-41.

different job classifications than plaintiff are not similarly situated comparators for purposes of Title VII).

For example, alleged comparator Dennis Monroe, a 36 year Trenholm/Patterson employee, is Trenholm's Director of Physical Plant and oversees maintenance at the Trenholm and Patterson campuses.   Deposition of Dennis Monroe ("Monroe Dep."), Ex. 12 at 42-43. Monroe was originally hired in ***1974*** by Patterson as a maintenance crew member.  *Id.* at 29-30. He worked his way up through the ranks until he was appointed as Director of Physical Plant in 1984 and was placed on the C-3 salary schedule over 25 years ago, earning a salary of approximately $40,000.[22]  *Id.*  29-43, 53-54.  Patterson and Trenholm eventually merged in 2000. Munnerlyn Dep., Ex. 6 at 294.  Now, 25 years later, Monroe earns a salary of $82,000.  *Id.* at 53-54.  As the Director, Monroe is responsible for the grounds (90 acres of land), maintenance of streets and curbs, landscaping and horticulture, electrical, sewage and water systems, gas lines, roofs, all building equipment-HVAC, fans, motors, and educational equipment for both the Trenholm and Patterson campuses.  *Id*. at 44-47.  He also manages plumbing & electrical for all buildings and building maintenance and is responsible for contracting out maintenance work, including pricing, quotes, and associated paper work.  *Id*.  Additionally, Monroe manages all renovation projects, including most construction projects.  *Id*.  He serves as the OSHA, EPA and recycling manager.  *Id*.  He receives no overtime pay, no stipends or supplements, no travel pay or 'comp' time and is on call 24 hours a week.  *Id.* at 49, 90-91.  None of Monroe's primary duties and responsibilities is even remotely similar in type and scope to Rollins' duties as H.R.

---

[22]  The fact that Monroe was placed on the C-3 salary schedule in 1984 by a completely different college president and Chancellor of Postsecondary Education precludes him from being considered as a comparator *vis-à-vis* Rollins' pay claim because their placement on the C-3 salary schedule and their respective salaries were determined by different decision-makers.  The Eleventh Circuit consistently has emphasized that the district court is required to consider the identity of the decision-maker in determining whether employees are similarly situated.  *See e.g., Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312, n. 7 (11th Cir. 1998).

Director.

Furthermore, unlike Rollins, Monroe has prepared and managed a budget for 25 years and he currently manages a $2 million dollar operational budget, as well as student renewal fees of $1 to $3 million dollars, depending on student enrollment. *Id.* at 45-47, 49-50. He also is managing an $8 million building acquisition and renovation project. *Id.* at 49-51. From the time he was appointed as Assistant Director of Maintenance in 1975 through the present, Monroe has supervised either directly (or indirectly through other subordinate supervisors) one to two dozen maintenance employees. *Id.* at 39-40, 49-50, 90, 102. In contrast, Rollins has a single administrative assistant, and does not manage a budget. Rollins Dep., Ex. 1 at 204-05. In sum, Monroe is not a valid comparator "similarly situated in all respects" and "nearly identical to the plaintiff." *Johnson*, 350 Fed. Appx. at 317, 2009 WL 2514099, *3.

More importantly, even if Monroe could be considered "nearly identical" to Rollins in terms of duties and responsibilities, the undisputed evidence establishes that, after the Patterson and Trenholm campuses were merged in 2001 and Monroe was carried over to the Trenholm C-3 salary schedule, all of his subsequent salary increases – from his 2001 salary of $61,489 to his current salary of $82,156, were the result of regular cost of living adjustments, *see* Monroe Dep., Ex. 12 at 72-77. He has ***never*** requested or received a reorganization of his position as Director of Maintenance. *Id.* at 68.

Comparator William Merrill was hired in 2008 as the Trenholm Operation Accountant. Deposition of William Merrill ("Merrill Dep."), Ex. 13 at 6-7. Merrill, came to Trenholm as a CPA with a B.S. in Accounting from the University of Alabama and an M.B.A. from Auburn University. *Id*. at 7-8. Prior to his employment at Trenholm, Merrill served for several years as an Operations, Staff, and Corporate Accountant with the accounting firm of Aldridge, Borden &

Co., P.C. and the Goff Group, Inc.  *Id*. at 55-56.  Moreover, at his job prior to Trenholm, Merrill served as a Senior Accountant with auditing duties for businesses, not-for-profits, governments, and employee benefit plans.  *Id*. at 57-58.  As the Trenholm Operations Accountant, Merrill's primary duties include the following: providing daily assistance to the Comptroller in the preparation of reports, *e.g*., reports requiring accounting information, expenditure information or budget comparisons, and vendor payment history/accounts payable; preparing monthly journal entries that are approved by the comptroller and other operational entries that may be required throughout the transactions of a month; overseeing accounts payable transactions (which are the most voluminous area of the college – purchasing and paying of those bills); preparing sales tax reports and anything affecting the unrestricted funds as it affects the general ledger .  *Id.* at 11-18.  *See also* Merrill Current Job Description at ERS Report (Doc. No.82-2) at Appx. C.  As with Dennis Monroe, there is no basis for a valid comparison of Monroe's and Rollins' compensation because there is no substantial, or even marginal, identity of job functions required to make a valid comparison.   In fact, the only commonality between Merrill and Rollins is their employment at Trenholm and their placement on the C-3 salary schedule.

### ii.   ROLLINS CONCEDES THAT HER JOB DUTIES ARE DIFFERENT THAN THOSE OF THE ALLEGED COMPARATORS.

In addition, Rollins readily admits that all of her job duties are different than the duties of alleged comparators she identifies.  Instead, she argues that their positions are similar merely because the comparators allegedly are directors on the same C-3 salary schedule.

**BY MS. BIGGS:**

Q.   All right.  Tell me what job duties Michael Evans has that you share?

A.   Michael Evans?

Q.      I'm sorry.  Let me interrupt.  What does Michael Evans do?

A.      Michael Evans is a retention advisor/public relations officer.

Q.      What job duties do you have that are the same as Michael Evans?

A.      ***Our duties are not exactly alike.  All of our duties are different, but the job complexity*** –

Q.      Okay.  All of your – did you say all of your job duties are different?

A.      ***Of course, all of them, because we have different titles***, but –

Q.      Right.

**A.**      -- ***we're directors, and we're placed on the C salary schedule, which make us similar.***

Q.      All the job duties are different.  But you're just alleging since he's also a director that he's similarly situated?

A.      ***He's similarly situated because he's on the C salary schedule.  All of those men are***.

Q.      Dennis Monroe.  What is his job title?

A.      The same – same response for all of those men.  We all have different duties, but our titles are the same, we're on the same salary schedule.

Q.      Your titles are not the same, or are they the same?

A.      That we're directors.  When I say the same, we're directors.

Q.      Do you share job duties – the same job duties as any of these men that you have just named?

> A.    ***No, but we, again, we're directors on the same salary schedule.  As a matter of fact, my duties are more complex.***  And President Munnerlyn knows that, because he's told me that my duties are complex, and that's why he moved me – made steps to try to move me to Salary C2.[23]

Rollins Dep. Ex. 1 at 194-95.

Furthermore, the evidence does not support the basis of Rollins' comparison argument, i.e., that a comparison of salaries is valid because they are all directors on her same salary schedule.  Contrary to her claim, Rollins conceded that Charles Harris, Freddie Williams and Bill Merrill were not directors.[24]  *Id.* at 195-96.  Moreover, Charles Harris was not on the same salary schedule; rather, he was hired at a completely different pay grade as the Assistant Dean for Information Technology & Campus Safety, was placed on the C-2 salary schedule, and was later moved to the C-1 salary schedule.  *See* ERS Report (Doc. No. 82-2) at 25 and Appx. C.  *See, e.g.*, *Johnson v. England*, Case No. 08-16338 (11th Cir., August 19, 2009) (holding that the plaintiff was not in the same type of position and did not have the same pay grade as her coworkers and therefore was not similarly situated to any of them with regards to their pay).

At best, Rollins offers a comparable worth argument, *i.e.*, that the Court should consider her pay claims on the basis of a comparison of the intrinsic worth or difficulty of her job with those of the alleged comparators.  *See County of Washington v. Gunther*, 452 U.S. 161, 166, 101 S.Ct. 2242, 2246, 68 L.Ed.2d 751 (1981) (Comparable worth means "increased compensation on

---

[23]   Because Rollins concedes that her job duties are different than the duties of all of the alleged comparators, Defendants have elected not to provide a detailed review of every comparator named by Rollins.  However, that evidence is set forth in Appendix C to Defendants' Expert Report, previously submitted to the Court in support of its class certification opposition brief.  *See* ERS Expert Report (Doc. No. 82-2) at Appx. C.  Therefore, to the extent that Rollins' admission of dissimilarity is insufficient, Defendants hereby incorporate Appendix C of the ERS Report as additional evidence in support of their summary judgment arguments regarding Rollins pay claims.

[24]   Defendants contend that the fact that employees may be on the same C-3 salary schedule is insufficient to establish the level of identity necessary to conduct a valid comparison of compensation.  As established in Defendants' brief opposing class certification, the C-3 salary schedule contains over 130 very diverse job classifications requiring significantly different skills, efforts, training and responsibilities and which have a broad range of salaries.

the basis of a comparison of the intrinsic worth or difficulty of their job with that of other jobs in the same organization or community.").  In fact, she specifically claims that her duties are "more complex" than the jobs of the comparators.  Rollins Dep., Ex. 1 at 194-95.  "Whatever its merits as a theory may be, courts have held that comparable worth claims are not cognizable under either Equal Pay Act or Title VII."  *Alexander v. Chattahoochee Valley Community College*, 325 F. Supp.2d 1274, 1294 (M.D. Ala. 2004) (citing *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 801 (11th Cir. 1992); *Int'l Union, UAW v. Michigan*, 886 F.2d 766, 768-69 (6th Cir. 1989); *American Nurses' Ass'n v. Illinois*, 783 F.2d 716 (7th Cir. 1986); *AFSCME v. Washington*, 770 F.2d 1401 (9th Cir. 1985) (Kennedy, J.); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127 (5th Cir. 1983).  Instead, the plaintiff must show that the alleged comparators are "similarly situated in all relevant respects" and are "nearly identical to the plaintiff."  *Johnson*, 350 Fed. Appx. at 317, 2009 WL 2514099, *3 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)).[25]  Rollins, however, has failed to satisfy this critical element of her *prima facie* case.

In sum, Rollins has failed to present a valid male comparator as required to establish her *prima facie* case of gender-based pay discrimination.  Accordingly, Defendants are entitled to summary judgment on Rollins' gender-based pay claim under Title VII and § 1983.

**b.    D**EFENDANTS HAVE ESTABLISHED LEGITIMATE, NONDISCRIMINATORY **REASONS FOR BOTH COMPENSATION DECISIONS.**

Even assuming, *arguendo*, that Rollins could establish a *prima facie* case regarding her pay discrimination claims, Defendants have offered a legitimate, non-discriminatory basis for the 2007 and 2008 decisions, and Rollins has offered no evidence whatsoever of pretext, much less a

---

[25]  Although Rollins also asserts that male employees occupying "lower" positions were paid more generously, she has not established that the proposed comparators had similar levels of experience or education, nor has she established the comparators' job responsibilities with any particularity.  Rollins' claim that these individuals were "lower" employees is offered in a wholly conclusory manner, based on her own subjective belief.  Consequently, her argument fails.  *See Cooper v. Southern Co.*, 390 F.3d 695, 745 (11th Cir. 2004), *rev'd on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989); *see also Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (collecting cases).

preponderance of evidence.  *See Burdine*, 450 U.S. at 252-53.  As previously noted, once a plaintiff has established her *prima facie* case and the employer has proffered a legitimate and nondiscriminatory reason for the adverse employment action, to avoid summary judgment, a plaintiff may establish pretext by undermining the credibility of the defendant's proffered explanations.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997); *Burdine* 450 U.S. at 256 (plaintiff can establish that she was the victim of intentional discrimination by "showing that the employer's proffered explanation is unworthy of credence.").  Sufficient evidence that the employer's justification is false can, in appropriate circumstances, allow the trier of fact to reasonably infer that the employer unlawfully discriminated.  *Reeves v. Sanderson Plumbing Products, Inc.,* 120 S.Ct. 2097, 2108 (2000).  Furthermore, "[t]he law of this circuit is that a plaintiff must make an evidentiary showing creating a genuine issue of fact as to pretext ***for each of the defendant's proffered reasons***, not merely for some or most of them."  *See Ash v. Tyson*, 392 Fed.Appx. 817. 2010 WL 3244920, *7. --- F.3d --- (11th Cir., August 17, 2010) (emphasis added).

In the instant case, and as described above, Rollins alleges two acts of gender-based discrimination regarding her compensation -- that Defendants discriminated against her by denying in whole or in part her 2007 and 2008 requests for pay increases and for reorganization of her position.  Therefore, the Court must look to Defendants' bases for these two decisions.

### i.    THE 2007 PAY INCREASE DECISION

With respect to the 2007 reorganization request, Chancellor Byrne initially declined Rollins' request based on his conclusion that her compensation was fair.  *Id.* at 51.  Byrne subsequently met with Rollins at her request, during which Rollins complained that she was performing duties at a level that justified a higher salary.  Byrne Dep., Ex. 7 at 96-97, 146-47,

149-50.  She did not, however, allege gender-based pay discrimination, but rather, merely claimed that her job merited a higher salary.  *Id*. at 146-47.  In response Chancellor instructed Latonya Dupree, H.R. Director of the Department of Postsecondary Education, to review H.R. Director salaries at comparable schools within the ACCS system.  *Id.* at 98.  Dupree conducted her review and, based on her findings and recommendation, Chancellor Byrne agreed in December 2007 to increase Rollins' annual salary from $51,360 to $55,360 (or 8%).  *Id*. at 98-99, 74-75, 244-45; *see also* Rollins Dep., Ex. 1 at 48-49.[26]

It is further undisputed that Byrne based his decision regarding Rollins' reorganization and pay increase request based **solely** on the recommendation of the Postsecondary H.R. Director, Ms. Dupree; that he did not conduct an independent, system-wide investigation of H.R. Director salaries.  Byrne Dep., Ex. 7 at 135-36.  Furthermore, even assuming the truth of Rollins' allegation that the salary review conducted by Ms. Dupree was flawed because some of the salaries included the compensation of a few lower-level employees, *see* Rollins Dep., Ex. 1 at 244-45, Chancellor Byrne's undisputed testimony is that he relied on the recommendation of the Postsecondary H.R. Department and, in particular, his staff's comparison of Rollins' present job description and the proposed job description; that he was unaware of any alleged flaws in the survey; and that he did not conduct an independent investigation of H.R. Director salaries across the ACCS system.[27]  Byrne Dep., Ex. 7 at 135-36, 140, 142-45.  President Munnerlyn likewise testified that he had no basis to challenge the validity of the salary survey conducted by the Chancellor's office and assumed that the information was correct.  Munnerlyn Dep., Ex. 6 at 152-53.  Rollins submits no evidence to the contrary, particularly evidence that Byrne lacked a

---

[26]  Although Byrne approved an 8% raise for Rollins in December 2007, he did not approve her request to move her position to the C-2 salary schedule.

[27]  Chancellor Byrne also testified that, if he had known there was a flaw with the salary survey information, he would have directed his staff to correct the error.  Bradley Dep. (Doc. No. 82-4) at 142-43.

good-faith belief regarding the basis of Dupree's salary recommendation.

Because a disparate treatment claim required proof of discriminatory intent, the fact that an employer's decision was based on information later determined to be erroneous or incorrect, does not support a claim for discrimination under Title VII.  *See, e.g.*, *Cooper v. Southern Co.*, 390 F.3d 695, 730 (11th Cir. 2004) (noting that the court's only concern is the honesty of the employer's explanation, even if the employer was mistaken about the facts underlying those reasons), *rev'd on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's belief, and to be blunt about it, not on reality as it exists outside of the decision maker's head.").  In sum, there is no evidence that Chancellor Byrne's decision was motivated by Rollins' gender.

### ii.    THE 2008 PAY INCREASE DECISION

With respect to Rollins' June 2008 reorganization request, the facts set out in detail above establish that Rollins requested a 39% pay increase -- from $55,360 to $77,000 -- based on her contention that her performance of additional duties justified the huge increase, and despite the fact that she had just received an 8% pay increase six months earlier (December 2007).  Rollins Dep., Ex. 1 at 51-53, 51-61.  It is undisputed that President Munnerlyn initially supported Rollins' request and formally recommended to Chancellor Byrne that her position be reorganized and moved from the C-3 to the C-2 salary schedule and her salary be increased to $77,400.  *Id.* at 56.  *See also* Pres. Munnerlyn 07/21/2008 Recommendation Letter, Ex. 8; Munnerlyn Dep., Ex. 6 at 141-42.  Moreover, Rollins admits that President Munnerlyn's recommendation letter to Byrne was adequate.  Rollins Dep., Ex. 1 at 220-21.  Chancellor Byrne also testified that Munnerlyn spoke well of Rollins.  Byrne Dep., Ex. 7 at 188.

It is further undisputed that Byrne denied Rollins' reorganization request on August 8, 2008 based on the fact that she recently had received a salary increase in December 2007 and based on his conclusion that the additional duties cited as justification for the reorganization and pay increase were not additional duties, but rather were duties typical of an H.R. Director.  *See* Chancellor Byrne 08/05/2008 Letter, Ex. 9; Byrne Dep., Ex. 7 at 139.  Byrne further testified that he disapproved the pay increase recommendation based on the results of the review by the Postsecondary Education H.R. Department discussed above.  Byrne Dep., Ex. 7 at 134-35; *see also id.* at 139, 141-43.  President Munnerlyn corroborated Byrne's testimony, stating that Byrne denied the reorganization of Rollins' position because of the lack of significant additional duties. Munnerlyn Dep., Ex. 6 at 145-46.  Although Rollins contends that President Munnerlyn should have followed up with Byrne after the denial and attempt to convince him to change his decision, Munnerlyn's undisputed testimony establishes that he reconsidered his original endorsement of Rollin's request based on his review of Chancellor Byrne's August 5, 2008 letter and found himself in agreement with Byrne's conclusion.  Munnerlyn Dep., Ex. 6 at 153-58.

In sum, Defendants have provided honest, legitimate, nondiscriminatory reasons for both decisions regarding Rollins' requests for a pay increase and the reorganization of her position.

### iii.   ROLLINS HAS FAILED TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANTS' PROFFERED EXPLANATIONS WERE A PRETEXT FOR DISCRIMINATION.

Because Defendants have submitted undisputed evidence of legitimate, nondiscriminatory reasons regarding the two decisions in question, Rollins must show by a preponderance of the evidence that Defendants' proffered explanations were a pretext for discrimination.  *See Arrington v. Cobb County*, 139 F.3d 865, 873 (11th Cir. 1998).  Rather than relying on conclusory allegations of discrimination, Rollins must present evidence demonstrating

"such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs,* 106 F.3d at 1538. *See St. Mary's*, 509 U.S. at 515 ("[A] reason cannot be proved to be 'a pretext for discrimination ' unless it is shown both that the reason was false, and that discrimination was the real reason."); *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)(noting that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions" and that the key inquiry is "whether the employer gave an honest explanation of its behavior") (citations and internal quotations omitted); *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000) (A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason).

In the case at bar, however, Rollins has failed to offer any evidence of pretext and, in fact, many concessions made during her deposition support Defendants' claim and rebut any alleged claim of gender-based pay discrimination.  Other than her unsupported assertion that gender-based discrimination in pay is evidenced by an alleged difference in the pay of male and female Trenholm employees, Rollins offers no evidence that any decision regarding her requests for reorganization and for salary increases were related to her gender or any other impermissible factor.  Rollins Dep., Ex. 1 at 209-211.  Rather, Rollins' allegation of gender-based pay discrimination is based solely on her ***subjective belief*** and assertion denial of her requests constitutes *ipso facto* gender discrimination:

**Rollins Dep., Ex. 1 at 211-14**

**BY MS. BIGGS:**

Q.      Have you heard any words uttered by President Munnerlyn or Bradley Byrne to the effect that I needed to set this salary higher because the employee is male?

A.      I have not heard them say the word sex, but their actions – Bradley Byrne approved and -- disapproved my request for an increase in my salary back from the reorganization request.  He denied Ms. Johnson's reorganization request as well.  ***And I believe that was due to my sex***.

* * * *

Q.      What specifically did President Munnerlyn do with regard to your salary based on sex?

A.      He refused to move me to a position, at a title – not a title – but at a salary rate that is comparable to my position and my title.  All of the males are placed at the top of the salary schedule while I'm being placed at the bottom.

**Rollins Dep., Ex. 1 at 364-68**

**BY MS. BIGGS:**

Q.      . …I'm just going to ask you one last time to make sure I haven't misunderstood anything.  Has anything happened or been said to you by any of the Defendants that indicate any decisions they made toward you or anyone else at the college was based on gender?

        MR. STOKES:   In addition to what she's previously testified to?

        MS. Biggs:  Right.  Well, she hasn't testified that any – that she's heard anything yet.

Q.      (BY MS. BIGGS)  Have you heard any words at the college by President Munnerlyn or Dean Holt or anyone else – of your supervisors that decisions have been made based on gender?

A.      I haven't heard them say the words gender or sex, but the implications are there.

Q.      Sure.   You've made that clear.   Have there been any comments by the Chancellor or anyone in the Postsecondary office that decisions made with regard to you or any of the other Plaintiffs were based on gender?

A.      Their decisions, President Munnerlyn's, Chancellor Byrne's decision to deny a request – a reorganization request to place me on the salary schedule, based on my sex, was made by the mere fact that they were legally liable for placing me on a salary schedule where I am not placed with men who are similarly situated with me.   It was their obligation to ensure that gender discrimination is not happening at the school, and they did nothing about it.   Not only at Trenholm, but across the board within the system.

Q.      Okay.   But it is your testimony though, that you've never heard any words to that effect?

A.      I haven't heard words, but, of course, again, the implications are there and their actions are there.

Q.      Have you ever heard words from any of the State School Board members, Governor Riley, or Bradley Byrne that they made decisions based on sex?

A.      They're – not words, but their decision, their actions.

                                    * * * *

Q.      Have you talked to anyone in the Postsecondary system that says they have heard words expressed by any superiors, president, chancellor, Board members, or governor that they make decisions based on gender?

A.      Not in words, no.

In addition to the lack of any affirmative, overt evidence of gender-based discrimination, Rollins' deposition testimony contradicts her claims and, in fact, shows that reorganization requests of other female employees were granted whereas that reorganization requests by several male employees were denied.   For, example, Rollins admits that Chancellor Byrne approved the

reorganization recommendation for female employees Arlinda Knight (Trenholm's Title III-B Director and Continuing Education and Minority Business Director), Mimi Johnson (Director of Institutional Research and Effectiveness), and Ruby Russell (H.R. Director of Lawson State), moving all three employees from the C-3 to the C-2 salary schedule.   Rollins Dep., Ex. 1 at 61-62, 317-20, 380-81.   The fact that Byrne, as the decision-maker, approved reorganization requests of three female employees and moved them from the C-3 to the higher-paying C-2 salary schedule refutes Rollins' allegation the she and other female employees are treated differently.   As illustrated by her opposition to the reorganization of the positions of female employees Arlinda Knight and Mimi Johnson, Rollins true complaint is not about gender discrimination, but rather the fact that ***her position*** was not reorganized:

        **BY MS. BIGGS:**

        Q.     Was Arlinda Knight's reorganization approved?

        A.     Yes it was.

        Q.     Arlinda Knight's –

        A.     Actually, it was denied.   And then President Munnerlyn talked with them, and the request went back a second time and got approved the second time.

        Q.     Okay.   Arlinda Knight is a female?

        A.     Yes.

        Q.     And Mimi Johnson – what was Mimi's placement on the salary schedule?

        A.     She was placed on C-2, Step 20, I believe.

        Q.     And what is Mimi Johnson's position at Trenholm?

        A.     She is the Director of Institutional Research and Effectiveness.

Q.     And –

A.     This is both of these – ***these two women, this is their third reorg request that was approved by the Department of Postsecondary.***   And they, Dr. Johnson, the last request that went down, she was approved for the same exact additional duties that she had been approved for on the prior reorganization.   And also, some duties that was (sic) listed are duties that belong to Michael Evans, the retention advisor, who is a man.   So duties were moved from a male to a female.

Q.     ***So you object to the fact that Arlinda Knight was reorged and Mimi Johnson reorged – was reorged, but you weren't?***

A.     ***That's right.***

Rollins Dep., Ex. 1 at 382.   (emphasis added).   Thus, Rollins' real complaint is not that Trenholm is denying the requests of women for salary increases and reorganizations, but rather that Trenholm denied her request; that she is not, in her opinion, being compensated at the level she contends is appropriate for her position and title.   *Id.* at 213-14.

Rollins' claim of gender-based discrimination is further undermined by her admission that Chancellor Byrne rejected the reorganization requests of two male Trenholm employees – Charles Harris and Wilford Holt.[28]   *Id.* at 241-43.   Moreover, the two male comparators Rollins cites to support her claim that Byrne was approving the reorganization requests of men and not women are not valid comparators.   In particular, Louis Campbell and Donald Holmes did not hold even remotely similar jobs and were not on the same salary schedule.   Rollins admits that Campbell, who was the Coordinator of Maintenance and Prison Workers, and Holmes, a web developer, were on the E salary schedule rather than the C-3 salary schedule and were merely

---

[28]   In no way do Defendants concede that male Trenholm employees Wilford Holt or Charles Harris are valid comparators *vis-à-vis* Rollins.   Rather, Defendants offer evidence regarding the rejection of their reorganization requests as rebuttal to Rollins' allegation that Defendants routinely approved reorganization requests of male Trenholm employees, while denying the reorganization requests of female employees.

moved to a higher level on the E salary schedule after being assigned additional job duties.  *Id.* at 216-19, 247-48, 383-86.[29]

Even Rollins' statistical expert, Dr. Edwin Bradley, conceded (albeit using a statistical model this Court found to be flawed) that the effect of being female on salaries of Trenholm C-3 salary schedule employees was *not* statistically significant, *i.e.*, that the pay differences regarding the named plaintiffs, including Rollins, were ___**neutral**___ with respect to gender at Trenholm.[30] Bradley Dep. (Doc. No. 82-4) at 138.  *See also* Bradley Expert Report (Doc. No. 75-1) at 8, n.11 (noting the pay disparity, but not opining that it was statistically significant); ERS Report (Doc. No. 82-2) at 4.  The lack of discriminatory intent by the Department of Postsecondary Education is further illustrated by the fact that, during the relevant 2007-2008 time period, 14 of the 15 H.R. Directors within the ACCS system were female; and the top nine salaried H.R. Directors were women.[31]  ERS Report (Doc. No. 82-2) at 15.  Furthermore, when provided the opportunity, Rollins could not identify a single female Trenholm employee who had the same job title and/or was performing the same job duties as a male counterpart, but who was being paid less than the male employee.  Rollins Dep., Ex. 1 at 257-260.

Rollins offers no evidence that denial of her reorganization requests was related to her gender.  Instead, she merely disagrees with the decision, which clearly is insufficient to establish

---

[29]  Rollins also admitted that President Munnerlyn recommended approval of her reorganization request at the same time he recommended approval of the reorganization of Campbell's position.  Rollins Dep., Ex. 1 at 219-20.

[30]  Defendants do not accept the statistical models adopted by Dr. Bradley because, among other things, they merely offer a bottom-line analysis of salaries of male and female employees rather than an analysis of salaries based on job titles or positions that have the same primary duties.  *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1276 (11th Cir. 2000) (rejecting the use of "bottom-line" statistical analysis because "holding employers liable for statistical imbalances per se is inconsistent with Title VII's plain language and statutory purpose.").  For the same reason, Rollins' unsupported, general assertion that male Trenholm employees are paid more than their female counterparts should likewise be rejected.  For example, Rollins claimed that male recruiter Freddie Williams was paid a higher salary than the prior female recruiter, Katara Smith.  But she was forced to concede that Mr. Williams had a Masters Degree in Counseling, whereas Ms. Smith merely had a B.S.  Rollins Dep., Ex. 1 at 264-65.

[31]  In fact, for the 2009-10 academic year, 27 of the 28 Human Resources personnel employed within the ACCS system were female, and the top eight salaried employees are female.  *See* Human Resources Personnel Academic Year 2009-10, (Doc. No. 84-2).

a claim for gender-based pay discrimination under either Title VII or § 1983.  As consistently held by the Eleventh Circuit, "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions"; rather, the key inquiry is "whether the employer gave an honest explanation of its behavior."  *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  *See also Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (" '[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.' ") (*quoting Elrod*, 939 F.2d at 1470).  "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Smith v. CRH North America, Inc.*, 2010 WL 447044 (M.D. Ala. 2010) (citing *Chapman*, 229 F.3d at 1030); *see also Santini v. Cytec Industries, Inc.*, 537 F. Supp.2d 1230, 41 (S.D. Ala. 2008).  In sum, Rollins has failed to establish such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendants' proffered legitimate reasons for its actions such that a reasonable fact finder could find them unworthy of credence.  *See Combs,* 106 F.3d at 1538.

For these additional reasons, Defendants are entitled to summary judgment on Rollins' gender-based pay claim under Title VII and § 1983.

      **2.**        **D**ISPARATE **T**REATMENT –**T**ERMS **& C**ONDITIONS OF **E**MPLOYMENT – **R**OLLINS' **T**ITLE **VII** AND **§ 1983** CLAIMS REGARDING OTHER TERMS AND CONDITIONS OF HER EMPLOYMENT FAIL AS A MATTER OF LAW BECAUSE SHE FAILED TO ESTABLISH THAT DEFENDANTS TREATED SIMILARLY SITUATED MALE EMPLOYEES MORE FAVORABLY.

In addition to her gender-based pay claim, Rollins asserts several disparate treatment claims under Title VII and § 1983 regarding other terms and conditions of her employment.  In particular,

Rollins alleges that, Defendants discriminated against her on the basis of gender in that Trenholm

- required Rollins to obtain an advanced degree in Human Resources Management as a condition of her continues employment, but did not require male employees to obtain similar degrees, *see* EEOC Charge No. 420-2008-03394, Ex. 11; Fourth Amend. Compl. (Doc. No. 63) at ¶25; Rollins Dep., Ex. 1 at 67-69, 283-84, 290;

- allowed male employees to receive extra pay, stipends, bonuses or supplements for additional duties, while females, including Rollins, were not paid additional amounts.   Fourth Amend. Compl. (Doc. No. 63) at ¶¶ 22, 39; Rollins Dep., Ex. 1 at 247-52, 389-92; and

- allowed male employees to earn higher compensation by permitting them to work part-time as adjunct instructors, while denying female employees part-time job opportunities.   Rollins Dep., Ex. 1 at 254-55.

In order to establish a *prima facie* case of discrimination in the terms, conditions, and privileges of her employment, the plaintiff must prove (1) she belongs to a protected class; (2) she was subjected to an adverse job action; (3) the employer treated similarly situated employees outside her classification (males) more favorably; and (4) she was qualified to do the job.  *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (outlining elements of a *prima facie* case of disparate treatment).  As previously noted, "the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.' "  *See St. Mary's*, 509 U.S. at 511.  In the instant case, Rollins fails to establish either the second or third element of her claim.  Defendants will address the three claims *ad seriatim*.

    **a.**    <u>ADDITIONAL DEGREE REQUIREMENT</u> – ROLLINS HAS FAILED TO ESTABLISH THAT SHE WAS TREATED LESS FAVORABLY THAN SIMILARLY SITUATED MALE EMPLOYEES MERELY BECAUSE SHE WAS REQUIRED TO OBTAIN A MASTERS DEGREE IN HUMAN RESOURCES MANAGEMENT AS A CONDITION OF HER CONTINUED EMPLOYMENT.

Rollins claims disparate treatment in the terms and conditions of her employment in that she was required to obtain a Master's degree in Human Resources Management as a condition of her continued employment as the Administrative Services Manager (later re-titled as H.R. Director), whereas male employees had no such requirement. *See* EEOC Charge No. 420-2008-03394, Ex. 11; *see also* Fourth Amend. Compl. (Doc. No. 63) at ¶¶ 25, 29, 149; Rollins Dep., Ex. 1 at 17-27, 67-69, 283-84, 290. Rollins' claim is due to be dismissed, however, because (1) she admits that she accepted her conditional offer of employment voluntarily without reservation; (2) she has failed to identify a similarly situated male employee who was treated more favorably than her; (3) Trenholm required the additional degree for a legitimate, nondiscriminatory reason, *i.e.*, that it was one of the minimum qualifications for the position; and (4) even assuming that Rollins was treated less favorably than a similarly situated male, her claim, whether asserted as a disparate treatment claim under Title VII or § 1983, is untimely and thus time-barred.

    **i.**    ROLLINS ACCEPTED A CONDITIONAL OFFER OF EMPLOYMENT VOLUNTARILY WITHOUT RESERVATION.

As previously established, Rollins concedes that when she was initially hired by Trenholm as the Administrative Services Manager, the minimum qualifications for the position required a "Bachelor Degree in Human Resources Management, Business Administration or Business related field", with a preference for a Master's degree. *See* Job Description for Administrative Services Mgr., Ex. 15. Rollins does not dispute this requirement. Rollins Dep., Ex. 1 at 13, 38. Rollins, however lacked the required degree, having only a B.A. in Criminal Justice. *Id.* at 225-26. Although Rollins contends that she met the degree requirement, that

contention is based solely on her subjective opinion that a degree in criminal justice is somehow

'related' to a human resources degree:

**BY MS. BIGGS:**

> Q.    Okay. Will you please tell the Court how criminal justice
>        qualifies as a business related degree?

> A.    It is not a business related degree.  It's related to human
>        resources.

> Q.    And how is it related to human resources?

> A.    Because we all know that criminal justice is studying
>        various laws, various rules and regulations.  Also, it
>        includes different OSHA regulations as well.  And there are
>        some business courses that I did take as well that's
>        required.

> Q.    How else does criminal justice relate to the human resource
>        field?

> A.    Just as I stated.

*Id.* at 23.[32]  In other words, other than her personal opinion, there is no objective evidence that

Rollins met the clear, unambiguous degree requirement set forth in the job description for the

Administrative Service Manager position.  Even so, former Trenholm President Molina (now

deceased) was willing to appoint Rollins to the H.R. Director position as long as she agreed to

obtain a Master's degree in Human Resources Management.  Consequently, Molina extended a

conditional offer of employment to Rollins on October 19, 2004.   10/19/2004 Appointment

Letter and Addendum to Appointment Letter, Ex. 16.

---

[32]  Rollins' testimony regarding the additional degree requirement was conflicting at best.  In one breath she testified
that the job description required the H.R. degree, *see* Rollins Dep., Ex. 1 at 13, and that she satisfied the requirement
because her degree in criminal justice was 'related' to human resources management.  *Id.* at 23.  Yet, she later
testified that the job description did not require the additional degree.  *See id.* at 290.  As previously established, the
job description undisputedly required a Bachelors' degree in human resources management, business administration
or a business-related field.  *See* Job Description for Administrative Services Mgr., Ex. 15.

Rollins agreed to the conditional offer of employment, which was presented to her in an Addendum with her October 19, 2004 Appointment Letter, both documents which she executed on October 19, 2004.  *Id*; *see also* Rollins Dep., Ex. 1 at 21.  The Addendum provides as follows:

> I agree to continue my education and to obtain a masters degree in Human Resource Management within three (3) years from the date of this agreement.  Each year I will create and complete a professional development plan in order to document my progress in completing the required credit hours.  I understand and accept this contract with full knowledge that in the event that I fail to obtain the credit hours as provided above, my employment at H. Councill Trenholm State Technical College will terminate.

*See* 10/19/2004 Appointment Letter and Addendum, Ex. 16.  Rollins admits that her offer of employment was contingent on her agreement to pursue and obtain a Master's degree in Human Resources Management, thus knowingly and voluntarily accepting a conditional offer of employment.  *Id.* at 14.  Rollins further concedes that, prior to the filing of this lawsuit, ***she did not object*** to the additional degree requirement or otherwise refuse to perform the job because of the requirement.  *Id.* at 23, 26-27.  It is also undisputed that President Molina adjusted Rollins' work schedule so that she could attend the required classes, *id.* at 36-37, 311-13; that Rollins began working on her Master's degree approximately one-year after she was hired, *id.* at 17; and that she obtained her degree in May 2007.  *Id.* at 27, 47-48.

Now, years after the fact, Rollins claims that she only accepted the conditional offer of employment based on her understanding that it was a 'common practice' at Trenholm to require employees to obtain additional degrees.  *Id.* at 20.  However, she offered no evidence whatsoever to support her claim.  In fact, Rollins concedes that no one ever told her that the additional degree requirement was a 'common practice' at Trenholm; rather, she assumed it was a common practice based solely on the fact that additional degree requirement was included in the Addendum to her Letter of Appointment:

**BY MS. BIGGS:**

Q.    Okay.  But you did accept the position on the condition that you would receive your Master's degree in business – in human resources management?

A.    Yes, I did.

Q.    Okay.  Did you object to that requirement at the time you were hired?

A.    No, I did not object to that requirement at the time, because I thought it was standard operating procedure to require additional degrees among employees.

* * * *

Q.    And contemplating enough to agree to receive your Master's degree in human resources management?

A.    I agreed to accept what was attached to my contract, because I was under the understanding that that was common practice at Trenholm, to request or require employees to obtain additional degrees.

Q.    And who told you that was a common practice at Trenholm?

A.    ***No one told me it was common practice***.  I found out that it was not common practice after I was employed for about a week.

Q.    You said it was your impression that that was required; correct?

A.    Yes.

Q.    Where did you get that impression?

A.    Dr. Molina.

Q.    And how did you get that impression from Dr. Molina?

A.    By him – by putting that on my addendum to the contract.

*Id*. at 14-15, 20-21.  (emphasis added).  Furthermore, even assuming the truth of her allegation,

Rollins admits that she learned within a week or two of accepting her conditional offer of employment, that the additional degree requirement was not a 'common practice' at Trenholm. *Id.* at 20, 25.  Yet, she did not object to the requirement, allege gender discrimination or otherwise refuse to perform the job because of the requirement.  *Id.* at 23, 26-27.  In fact, the first time she complained about the additional degree requirement was in March of 2008 when she filed her grievance, that is, over ***three years after*** she learned that the requirement was not a common practice.  *Id.* at 67-69.  She subsequently asserted the claim in her August 28, 2008 EEOC charge of discrimination.  *See* EEOC Charge No. 420-2008-03394, Ex. 11.

In sum, President Molina was incredibly generous to Rollins.  He hired her despite the fact that she did not meet the minimum qualification, and he allowed her to satisfy the educational requirement of the job while she remained employed in the position.[33]  Rollins voluntarily accepted her conditional offer of employment and ultimately fulfilled the condition.

### ii.  ROLLINS HAS FAILED TO SHOW THAT TRENHOLM TREATED SIMILARLY SITUATED MALE EMPLOYEES MORE FAVORABLY.

Second, Defendants are entitled to summary judgment regarding Rollins' disparate treatment claim *vis-à-vis* the additional degree requirement because she has failed to establish that Trenholm treated similarly situated male employees more favorably.  *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (citing *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006)); *see also Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas,* 411 U.S. at 802).  Given her specific allegation, Rollins must establish that Trenholm appointed a male employee to the Administrative Services Manager/H.R. Director position despite the fact that he did not meet the educational degree

---

[33]   In fact, Rollins concedes that she was allowed to keep her job as a result of obtaining her Master's degree. Rollins Dep., Ex. 1 at 47.  As noted by former ambassador, congresswoman, actress, writer and socialite Clare Boothe Luce, "No good deed goes unpunished."

requirement, but that, unlike Rollins, the male employee was allowed to continue his employment in that position without having to obtain the required degree.

Rollins, however, fails to identify any such similarly situated male Administrative Service Manager/H.R. Director.  In fact, her only allegation is that male employees generally were not required to obtain additional degrees.  *See* EEOC Charge No. 420-2008-03394, Ex. 11. Even then, she identifies no specific male comparator.  Disregarding the relevance of title or position, even if Rollins could identify a male employee outside the Administrative Services Manager/H.R. Director position, at a minimum, she would have to show that the comparator was hired for a position for which he did not meet the minimum educational requirements and that Trenholm did not require him to obtain the required degree as a condition of his continued employment.   Here, Rollins offers no such evidence.   Again, she offers only general, unsupported assertions that women are required to obtain additional degrees, whereas men are not.  *See* EEOC Charge No. 420-2008-03394, Ex. 11; *see also* Rollins Dep., Ex. 1 at 67-69, 283-84, 290.  Such general allegations unsupported by any specific evidence are not sufficient to satisfy Rollin's burden on summary judgment or, more particularly, the critical element of proof for her *prima facie* case – proof that Trenholm treated similarly situated male employees more favorably than her with respect to the additional degree requirement.

### iii.   TRENHOLM REQUIRED ROLLINS TO OBTAIN A MASTER'S DEGREE IN HUMAN RESOURCES BECAUSE IT WAS A MINIMUM QUALIFICATION FOR THE POSITION, *I.E.*, A LEGITIMATE, NONDISCRIMINATORY REASON.

Third, even if Rollins could establish her *prima facie* case, Trenholm imposed the additional H.R. management degree requirement for a legitimate nondiscriminatory reason – it was a minimum qualification for the Administrative Services Manager position.  As noted above, the job description for the position included the requirement that the applicant possess a "Bachelor Degree

in Human Resources Management, Business Administration or Business related field", with a preference for a Master's degree.  *See* Job Description for Administrative Services Mgr., Ex. 15. Rollins does not dispute this requirement.  Rollins Dep., Ex. 1 at 13, 38.  Second, notwithstanding her self-serving and subjective opinion that her criminal justice degree satisfied the educational requirements, Rollins lacked the necessary degree at the time of her initial appointment in October 2004.  Third, Rollins has offered no evidence whatsoever of pretext, much less a preponderance of evidence, that gender-based discrimination was the real reason Trenholm required her to obtain a Master's degree in Human Resources Management.  *See Burdine*, 450 U.S. at 252-53.  Instead, she offers only an unsupported claim that she was treated differently than other, unnamed, male Trenholm employees.  Rather than relying on conclusory allegations of discrimination, however, the plaintiff must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence."  *Combs,* 106 F.3d at 1538.  *See St. Mary's*, 509 U.S. at 515 ("[A] reason cannot be proved to be 'a pretext for discrimination ' unless it is shown both that the reason was false, and that discrimination was the real reason.").  In sum, even assuming that Rollins can establish her *prima facie* case, Trenholm has offered a legitimate, nondiscriminatory reason for requiring her to obtain a Master's degree in Human Resources Management, and she has offered no evidence of pretext in rebuttal.

#### IV.   ROLLINS' CLAIM REGARDING THE ADDITIONAL DEGREE REQUIREMENT IS TIME-BARRED.

Finally, Rollins' claim regarding the additional degree requirement is time-barred.  Rollins admitted during her deposition that she became aware that she allegedly was being treated differently and less favorably with respect to the additional degree requirement within a week or two after accepting employment with Trenholm:

**BY MS. BIGGS:**

Q.     And who told you that was a common practice at Trenholm?

A.     No one told me it was common practice.  *I found out that it was not common practice after I was employed for about a week.*

\* \* \* \*

Q.     Okay.  Did you state a few minutes ago that you found out within a couple of weeks or soon after you were hired that [the additional degree requirement] was not a common practice?

A.     *I discovered within a few weeks of my employment that that was not common practice to hire someone who met the minimum qualifications*, who, once they were hired and they was called in to do – or sign the appointment letter, to say now you need to go and get additional education.[34]

Rollins Dep., Ex. 1 at 20, 25.  (emphasis added).  In other words, it is undisputed that Rollins became aware that she allegedly was being treated differently in late October/early November of 2004.  Additionally, her March 17, 2008 letter to President Munnerlyn regarding her pending grievance, further establishes that Rollins had been complaining about these racial and gender discrimination issues since June of 2005:  "For the record, please be aware that I have made numerous attempts since June 27, 2005 to resolve my complaint of Trenholm's violation of the Equal Pay Act, disparate treatment, racial and gender discrimination with Dean Griggs, and have been complaining about it on a regular basis."  03/17/08 Letter from Rollins to Munnerlyn, Ex. 10. It is undisputed, however, that Rollins did not complain about the additional degree requirement until she filed her grievance in March 2008, over three years after she became aware of the alleged disparate treatment and even after she completed her degree requirements.  Rollins Dep., Ex. 1 at

---

[34]  Rollins response incorrectly assumes that she met the minimum educational requirements for the position, which she did not.  Rollins Dep., Ex. 1 at 23.

67-69.  It is further undisputed that Rollins did not submit her EEOC charge of discrimination alleging disparate treatment regarding the additional degree requirement until August 28, 2008 and did not file the instant lawsuit until May 29, 2009.  *See* EEOC Charge No. 420-2008-03394, Ex. 11; Complaint (Doc. No. 1).

With respect to her Title VII-based disparate treatment claim, Rollins had 180 days from the time that she became aware of the alleged act of disparate treatment to file a charge of discrimination with the EEOC.  42 U.S.C. § 2000e-5(e)(1) (stating plaintiff must file Title VII charge within 180 days after the alleged unlawful employment practice); *see also National R.R. v. Morgan*, 536 U.S. 101 (2002); *Wilkerson v. Grinnel Corp*., 270 F.3d 1314, 1317 (11th Cir. 2001) (In order to bring a viable claim in court under Title VII, a plaintiff must first exhaust administrative remedies).  She did not do that.  Rather, she filed her first EEOC charge alleging that the additional degree requirement was discriminatory on August 28, 2008, almost ***four years*** after she admittedly became aware of the alleged disparate treatment.  In fact, Rollins specifically alleges in her March 17, 2008 letter to President Munnerlyn that she had made "numerous attempts ***since June 27, 2005*** to resolve [her] complaint of Trenholm's violation of the Equal Pay Act, ***disparate treatment***, racial and gender discrimination with Dean Griggs, and ha[s] been complaining about it on a regular basis."  (emphasis added).  *See* 03/17/08 Letter from Rollins to Munnerlyn, Ex. 10.  Therefore, Rollins' claim under Title VII is barred as a matter of law.  *See Ross v. Buckeye Cellulose Corp*., 980 F.2d 648, 662 (11th Cir. 1993) (holding that the failure to file a timely charge bars a subsequent Title VII claim).  Similarly, with respect to her parallel § 1983 claim, the statute of limitation is two years from the date the plaintiff becomes aware of the alleged discriminatory act.  *See Lufkin v. McCallum*, 956 F.2d 1104 (11th Cir. 1992) (holding that Alabama's two year statute of limitation applies to § 1983 claims); *Pettaway v. Alabama Bd. of Pardon and Parole Members*, 2010 WL

4647439, *4 (M.D. Ala., Oct. 20, 2010). Therefore, any disparate treatment claim arising out of this discrete act is likewise time-barred under § 1983 because she did not file her lawsuit until May 29, 2009, over four years after she became aware of the alleged disparate treatment.

For all of these reasons, Defendants are entitled to summary judgment on Rollins' disparate treatment claim regarding the additional degree requirement.

> **b.**    **S**TIPENDS, **B**ONUSES AND **S**UPPLEMENTS -- **R**OLLINS HAS FAILED TO PRESENT ANY EVIDENCE THAT SIMILARLY SITUATED MALE EMPLOYEES WERE TREATED MORE FAVORABLY THAN FEMALE EMPLOYEES WITH RESPECT TO THE PAYMENT OF STIPENDS, BONUSES AND SUPPLEMENTS.

Rollins next claims disparate treatment regarding the terms and conditions of her employment in that "Defendants have caused and/or allowed male employees to receive extra pay or stipends or supplements for additional duties while females, including Plaintiffs, are not paid additional amounts or stipends." Fourth Amend. Compl. (Doc. No. 63) at ¶¶ 22, 39. Rollins Dep., Ex. 1 at 389. Again, plaintiff has failed to establish her *prima facie* case. First, the only evidence in the record regarding a stipend for Rollins is a letter that President Munnerlyn prepared, but pulled back, requesting a $600 stipend in August 2007 for Rollins' performance of duties associated with college legal matters.[35]   *See* 08/16/2007 Munnerlyn Letter Regarding Rollins Stipend, Ex. 5. Rollins, however, identifies no similarly situated male comparator who performed similar additional duties, but who was paid a stipend for performing those duties. In fact, the only male she identifies by name is Maurice Goode. Rollins Dep., Ex. 1 at 249-50. As established by her deposition testimony, however, Goode is not similarly situated because he was a buildings and grounds employee who allegedly received a stipend for performing an entirely different additional duty than Rollins – supervising prison workers. *Id.* In fact, Rollins admitted that she did not know any female employee, much less herself, who performed the same prisoner supervisor duties as Goode

---

[35] Although Rollins did not receive a $600 stipend in the Fall of 2006, it is undisputed that she received an 8% pay raise (from $51,360 to $55,360) in December of 2007. Rollins Dep., Ex. 1 at 49-51.

but was not paid a stipend.  *Id.* at 255.  In sum, the differences between the positions and duties of Rollins and Goode are too great to allow an inference of discrimination.  Moreover, when given the opportunity, Rollins admitted that she could provide no other examples of male comparators to support her claim.  *Id.* at 389.

Finally, the lack of discriminatory intent is further established by Rollins' admission that President Munnerlyn, in his capacity as both interim and permanent President of Trenholm, removed and awarded stipends to male and female employees alike:

> **BY. MS. BIGGS:**
>
> Q.    When President Munnerlyn became President, did he remove stipends from – or – did he take any stipends away when he became President?
>
> A.    I believe he did, but I can't recall who, but he also gave them again after he became president.
>
> Q.    Did he take stipends away from females?
>
> A.    I believe there was some faculty members that were females that stipends were removed?
>
> Q.    Did he – President Munnerlyn take stipends away from males?
>
> A.    At that time – when he first went in as interim president, yes. But after he became president, he gave stipends to males.
>
> Q.    Okay.  And did he give stipends to females?
>
> A.    Yes, he did.

Rollins Dep. Ex. 1 at 392.[36]  Rollins has failed to submit any contrary evidence of gender-based discrimination regarding the payment of stipends, bonuses or supplemental pay, or any statistical evidence of disparate impact regarding such payments at Trenholm.

In sum, Rollins has failed to establish her *prima facie* case because she cannot identify a similarly-situated male Trenholm employee who was treated more favorably than her regarding the payment of stipends, bonuses, or supplemental pay.  In fact, her testimony establishes that President Munnerlyn withdrew and recommended approval of stipends for employees without regard to gender.  For these reasons, Defendants are entitled to summary judgment on Rollins' disparate treatment claim to the extent that it is based on the alleged discriminatory payment of stipends, bonuses or supplemental pay.[37]

> ### c.    PART-TIME EMPLOYMENT OPPORTUNITIES -- ROLLINS HAS FAILED TO PRESENT ANY EVIDENCE THAT SIMILARLY SITUATED MALE EMPLOYEES WERE TREATED MORE FAVORABLY THAN FEMALE EMPLOYEES WITH RESPECT TO PART-TIME EMPLOYMENT OPPORTUNITIES.

Finally, Rollins claims that, unlike women, male Trenholm employees are permitted to work part-time as adjunct instructors in addition to their full time duties and are paid through contractual services agreements (like consultants) to circumvent the normal hiring process for part-time employees.  Rollins Dep., Ex. 1 at 247-57.  For example, Rollins complains that Louis Campbell was permitted to teach evening classes on refrigeration and electrical systems as an adjunct instructor despite his alleged lack of teaching experience.  Rollins Dep., Ex. 1 at 216-18, 222-25. She further claims that Arnold Stringer and Maurice Goode were allowed to earn additional compensation while working part-time as adjunct instructors.  *Id.* at 249-52.

---

[36]  For example, Rollins concedes that President Munnerlyn recommended approval of a stipend for Ms. Fatima Jones, who was performing the duties of the Director of Student Support Services.  Rollins Dep., Ex. 1 at 255-57. Although there were some processing issues, Jones ultimately received the stipend.  *Id.*

[37]  Notwithstanding her allegation, Rollins offered no evidence that similarly-situated male Trenholm employees (or any male Trenholm employees) received bonuses that were not otherwise provided to female employees.

Even assuming the truth of her allegations, Rollins is not similarly situated to any of these employees because she makes no allegation that she either sought or otherwise was denied an opportunity to teach courses for additional pay as an adjunct instructor.  In fact, there is no evidence whatsoever that she was subject to the adverse job action claimed, specifically, that she requested part-time employment from Trenholm as an adjunct instructor (or any part-time position) to supplement her income.  *See Knight*, 330 F.3d at 1316 (outlining elements of a *prima facie* case of disparate treatment, including requirement that plaintiff establish an adverse job action).  Moreover, the male employees she identifies occupy completely different positions and are on different salary schedules than Rollins.  For example, Campbell is the Coordinator of Maintenance and Prison Workers and is on the E salary schedule.  *Id.* at 218-19; Munnerlyn Dep., Ex. 6 at 169-71.  Maurice Goode is a building and grounds employee, and Arnold Stringer is employed as Tutor Coordinator and Tutor.  Rollins Dep. at 249-50.  In essence, Rollins is not complaining that she was treated differently regarding additional payments for adjunct instructors; rather, she is asserting in effect that there is "discrimination is in the air" based on her unsupported allegation that women, in general, are treated differently by Trenholm when it comes to earning additional pay as part-time instructors.  *Id.* at 200-202.  Merely alleging that another employee may have been treated differently does not support a claim for disparate treatment.  Rather, the plaintiff must allege that she is the victim of the conduct and was treated differently than a similarly situated male employee performing similar jobs.  *See Knight*, 330 F.3d at 1316 (holding that the *prima facie* case requires the plaintiff to establish that the employer treated similarly situated employees outside her classification more favorably).

**B.**     **EQUAL PAY ACT** -- Rollins has failed to establish her *prima facie* case under the Equal Pay Act.

Plaintiff Rollins also asserts a gender-based discrimination claim under the Equal Pay Act of 1963, as amended, 29 U.S.C. §206(d), and pursuant to §216(b) of the Fair Labor Standards Act. Fourth Amended Complaint (Doc. No. 63) at ¶1, 109-12.  The Equal Pay Act provides, in part:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C.A. § 206(d)(1) (emphasis added).  *See also Meeks v. Computer Associates, Int'l*, 15 F.3d 1013, 1016-17 (11th Cir. 1994).  A female employee demonstrates a *prima facie* case of an Equal Pay Act violation by showing that her employer paid male employees different wages for equal work for jobs which require " 'equal skill, effort, and responsibility, and which are performed under similar working conditions.' "  *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) and 29 U.S.C. § 206(d)(1)).  *See also Prewett v. Alabama Dept. of Veterans Affairs*, 533 F. Supp.2d 1160, 166 (M.D. Ala. 2007).

This Court previously set out the standard for establishing a *prima facie* case under the Equal Pay Act:

> To establish a *prima facie* case under the Equal Pay Act, an employee must show that the employer pays different wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). Although formal job titles may be considered, a court must determine whether two jobs are "substantially equal" by examining the skills and qualifications needed to perform the jobs. *Miranda v. B & B Cash Grocery Store*, 975 F.2d 1518, 1533 (11th Cir. 1992).

10/25/2010 Mem. Order & Op. (Doc. No. 107) at 22. *See also* 29 U.S.C. § 206(d)(1) (requiring that the jobs being compared are "substantially equal"); *Meeks*, 15 F.3d at 1018; *McCray v. Wal-Mart Stores, Inc.*, 2010 WL 1784247 (11th Cir., May 5, 2010); *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998); *Irby*, 44 F.3d at 954.

Once the employee presents a *prima facie* case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) ... any other factor other than sex." 29 U.S.C. § 206(d)(1). The employer may consider factors such as the "unique characteristics of the same job; ... an individual's experience, training or ability; or ... special exigent circumstances connected with the business." *Irby*, 44 F.3d at 955 (quoting *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)). Factors such as experience and education operate as a defense to liability rather than as part of a plaintiff's *prima facie* case under the Act. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d at 1533, n. 18. Once the employer's burden is met, the employee "must rebut the explanation by showing with affirmative evidence that

it is pretextual or offered as a post-event justification for a gender-based differential."[38]   *Irby*, 44 F.3d at 954.

In the instant case, for the same reasons set forth above in the comparator section of Defendants' Title VII disparate treatment argument, *see supra* at 21-34, Rollins has failed to identify any similarly-situated male comparators who received greater compensation than her and, specifically, male employees who are performing equal work on jobs requiring equal skill, effort, and responsibility, and which are performed under similar working conditions.

The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high.  *Waters v. Turner, Wood, & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989); *Prewett v. Alabama Dept. of Veterans Affairs*, 533 F. Supp.2d 1160, 1166 (M.D. Ala. 2007).  In fact, Rollins' burden of proving her position is equivalent to the positions of the alleged comparators is a more difficult burden than the comparison necessary to support her Title VII claim.  *Miranda*, 975 F.2d at 1528; *Prewett*, 533 F. Supp.2d 1160, 1166.  When

---

[38]  The burdens of proof for a gender-based pay claim under Title VII and the EPA are different.  The Eleventh Circuit explained the different standards in *Meeks v. Computer Associates, Int'l*:

> In contrast to Title VII, the EPA establishes a form of "strict liability":
>
> > Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a "factor other than sex" is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant.
>
> *Miranda*, 975 F.2d at 1533; *accord Fallon v. Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989).  Thus, there is a significant difference between Title VII and the EPA as to both elements and burdens of proof.  Under the EPA, the onus is on the employer to establish that the pay differential was premised on a factor other than sex.  Under Title VII, however, the plaintiff must prove that the employer had a discriminatory intent.  If the evidence is in equipoise on the issue of whether a salary differential is based on a "factor other than sex," the plaintiff is entitled to judgment on her EPA claim.  However, the employer prevails on the Title VII claim.  Under Title VII, the risk of nonpersuasion always remains with the plaintiff.  *See Hicks*, 509 U.S. at ---, 113 S. Ct. at 2747 (quoting Fed.R.Evid. 301).

15 F.3d 1013, 1019 (11th Cir. 1994).

Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other." *Byrd v. Auburn Univ. at Montgomery*, 2007 WL 1140424, *5-6 (M.D. Ala. 2007); *see also* Prewett, 533 F. Supp.2d at 1166, n.11. The restrictions in the Act were meant "to apply only to jobs that are substantially identical or equal." *Id*. (citing *Brennan v. City Stores, Inc.*, 479 F.2d 235, 358 (5th Cir. 1973) (footnote omitted)). Similarly, in *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256 (5th Cir. 1972), the court stated "[b]y substituting the term 'equal work' for 'comparable work,' which was originally suggested, Congress manifested its intent to narrow the applicability of the Act." *Id.* (citing *Brennan*, 479 F.2d at 1258). Congress intended to permit employers wide discretion in evaluating work for pay purposes. *Id.* Thus, although employees do not have to prove jobs are identical, they have the heavy burden of proving "substantial identity of job functions." *Id.* (citing *Brennan*, 479 F.2d at 1258). Moreover, while formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content. *See Miranda*, 975 F.2d at 1533 ([O]nly the skills and qualifications actually needed to perform the jobs are considered."); *Waters*, 874 F.2d at 799. Consequently, the court must compare each alleged comparator's position to Rollins' position to determine whether they are "virtually identical, that is, ... very much alike or closely related to each other."[39] *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994). These principles are cogently illustrated in Judge Thompson's 2004 decision in *Alexander v. Chattahoochee Valley Comm. College*, 325 F. Supp.2d 1274 (M.D. Ala. 2004), *overruled on other grounds*, *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003).

---

[39] "In Equal Pay Act cases, [the court] compare[s] the jobs, not the individual employees holding those jobs." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994). *See also White v. Thyssenkrupp Steel U.S., LLC*, --- F. Supp.2d ---, 2010 WL 4021811 (S.D. Ala. 2010).

In *Alexander*, the plaintiff, a black female clerk in the admissions office of Chattahoochee Valley Community College, sued the college president, alleging among other things, a failure to provide equal pay.  Because the relevant facts and arguments are substantially similar to the case at bar, Defendants quote at length from Judge Thompson's decision:

> Thus, in order to establish her prima-facie case, Alexander must identify a male comparator whose job is substantially similar to hers.  She points to two men who are directors at the community college: James Davis, the Director of Auxiliary Services, and John McCoy, the Director of Institutional Advancement.  As an Admissions Clerk, Alexander is on a schedule E salary scale, which covers technical and support personnel. Both McCoy and Davis are on a schedule C salary scale, which covers professional personnel other than presidents, deans, and business officers. Employees on schedule E make less than employees on schedule C.

> However, Alexander cannot show that her job is substantially similar to either McCoy's or Davis's.  She essentially concedes this in her brief when she states that "there is no comparator at the college who performs a job that is identical" to hers.  However, she asserts that she can still make out a prima-facie case because the duties she performs "require[ ] a substantially equal amount of skill, effort and responsibility as those of McCoy ... and Davis." She continues, "McCoy's primary job responsibilities include research, planning, and raising revenue for the college....  Alexander's primary responsibilities include the development, maintenance and safe storage of student records....  Davis' primary responsibilities ... [are] to maintain the grounds, inventory, campus communication and security."

> Clearly, Alexander's job is not substantially similar to either Davis's or McCoy's.  The three jobs involve quite different tasks and different skills.  Alexander's argument that her job requires a substantially similar amount of skill, effort, and responsibility is essentially a "comparable worth" claim, or a claim that her job has the same "intrinsic worth or difficulty" as Davis's or McCoy's even though it involves doing different work.  *County of Washington v. Gunther*, 452 U.S. 161, 166 and n. 6, 101 S.Ct. 2242, 2246, 68 L.Ed.2d 751 (1981).  Comparable worth theory posits that pervasive sex discrimination and sex segregation in the workplace has led to workers doing traditionally "women's work" being paid less than workers doing traditionally "men's work," even though the jobs might actually require the same level of skill or difficulty.  Whatever

its merits as a theory may be, courts have held that comparable worth claims are not cognizable under either Equal Pay Act or Title VII. *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 801 (11th Cir. 1992); *Int'l Union, UAW v. Michigan*, 886 F.2d 766, 768-69 (6th Cir. 1989); *American Nurses' Ass'n v. Illinois*, 783 F.2d 716 (7th Cir. 1986); *AFSCME v. Washington*, 770 F.2d 1401 (9th Cir.1985) (Kennedy, J.); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127 (5th Cir.1983).

*Alexander*, 325 F. Supp.2d at 1293-94.  In sum, it is not enough to show that positions may have the same intrinsic worth or difficulty; rather the positions must have a substantial identity of job functions and content.

### 1.   ROLLINS HAS FAILED TO ESTABLISH THAT HER POSITION IS SUBSTANTIALLY SIMILAR TO THE POSITIONS OF THE ALLEGED MALE COMPARATORS.

As previously established, Rollins argues that she was treated less favorably in terms of pay than similarly situated male Trenholm employees Michael Evans, Dennis Moore, Freddie Williams, Billy Merrill, Gerald Horn and Larry Achord.  Rollins Dep., Ex. 1 at 192-93; *See also* Fourth Amended Comp. (Doc. No. 63) at ¶ 29-33.  For the same reasons set out above in Defendants' Title VII disparate treatment argument, in particular, the lack of substantial identity of job functions and content, *see supra*, at 21-34, Defendants are entitled to summary judgment on Rollins' EPA claim.

As in *Alexander*, Rollins cannot show that her job is substantially similar to any of the alleged comparators, a fact she essentially conceded in her deposition when she testified that (1) there were no comparators at the college performing substantially the same job, and (2) that the specifically identified comparators did not perform the same duties as she did.  Rollins Dep., Ex A at 194-95, 197.  Also like *Alexander*, Rollins essentially offers a "comparable worth" argument, claiming that, although there are no male Trenholm employees performing the same job, the comparators' positions are sufficiently similar because they have the same level of

complexity and responsibility merely because they all are 'directors' on the C-3 salary schedule. Rollins Dep., Ex. 1 at 194-95, 197 (claiming that her job is more complex than the comparators' positions).  Her criticism of President Munnerlyn's alleged refusal to move her to the C-2 salary schedule compellingly illustrates the point, as she claimed that Munnerlyn "refused to move me . . . at a salary rate that is comparable to my position and my title."  Rollins Dep., Ex. 1 at 213-14. Even assuming the efficacy of Rollins' argument, the facts do not support her allegation that all the alleged male comparators are directors on the C-3 salary schedule.  as previously established, Rollins was compelled to concede that, contrary to her claim, alleged comparators Charlie Harris, Freddie Williams and Billy Merrill are not directors.  Rollins Dep., Ex. 1 at 195-96. Moreover, Charlie Harris is not on the same salary schedule.  *See* ERS Report (Doc. No. 82-2) at 25 and Appx. C.  *See, e.g.*, *Johnson v. England*, Case No. 08-16338 (11th Cir., August 19, 2009) (holding that the plaintiff was not in the same type of position and did not have the same pay grade as her coworkers and therefore was not similarly situated to any of them with regards to their pay).

For the same reasons cited by Judge Thompson in *Alexander*, the Court should reject Rollins' comparable worth argument.  In particular, as previously established, none of the male comparators are performing jobs requiring equal skills, efforts and responsibilities.  *See supra*, at 21-34.  As set out above and in Defendants' expert report, jobs of the comparators involve ***very different*** tasks and skills.  *Id.*  In fact, when asked to compare her job duties with those of the alleged comparators, Rollins testified that "***all of our duties are different***. …"  Rollins Dep., Ex. 1 at 194-95.  Thus, there is no basis for a valid comparison of the salaries of Rollins' and the alleged male comparators because there is no evidence that they hold positions requiring equal skills, efforts, and responsibilities or that the jobs are performed under similar working

conditions.  *See Prewett*, 533 F. Supp.2d at 1166 ("[T]he controlling factor is the court's assessment of whether two jobs are substantially equal must be the ***actual job content***.") (citing *Miranda v. B&B Cash Grocery Store, Inc*., 975 F.2d 1518, 1533 (11th Cir. 1992) and *Arrington v. Cobb Cty*., 139 F.3d 865, 876 (11th Cir. 1998))  Merely offering a bottom-line comparison of dissimilar male and female employees just because they allegedly are on the same salary schedule or are directors is not sufficient to establish an EPA claim.  *See Byrd v. Auburn University at Montgomery*, 2007 WL 1140424, *5-6 (M.D. Ala. 2007) (holding that general similarities are insufficient).  If Rollins' argument were correct, then the Equal Pay Act would require that every female C-3 director employee be paid the same as every male C-3 director employee without regard to the specific jobs, skills or tasks at issue and irrespective of the undisputed fact that there are 130 different job titles within the C-3 salary schedule.  Obviously, that absurd result is not what Congress intended.  For this reason alone, Defendants are entitled to summary judgment on Rollins' EPA claim.

### 2.   THERE ARE LEGITIMATE, NON-DISCRIMINATORY REASONS FOR THE ALLEGED PAY DIFFERENTIALS.

In addition, even assuming *arguendo* that Rollins' could establish her *prima facie* case, there are numerous legitimate, non-discriminatory reasons for any alleged pay differentials, that is, Trenholm satisfies the general EPA exception of "factors other than sex."  *Irby*, 44 F.3d at 955 (holding that "[a]ny other factor other than sex" is a general exception to application of the EPA.) (citing *Glenn v. General Motors Corp*., 841 F.2d 1567, 1571 (11th Cir.), *cert. denied*, 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988) (interpreting legislative history)).  For example, as set out in Defendants' Title VII disparate treatment argument,

- Unlike Rollins, three of her four comparators possess master's degrees ***prior*** to employment at Trenholm;

- Comparator Milton Perry, was offered the same salary as his female predecessor;

- Unlike Rollins, comparators Louis Campbell, Donald Holmes and Charles Harris were not on the C-3 salary schedule, but rather were on the E or C-2 salary schedules;

- Comparator Dennis Monroe has been employed at Trenholm for 36 years and worked his way up through the ranks until he was appointed as Director of Physical Plant in 1984 and was placed on the C-3 salary schedule (over 25 years ago).

- Comparator William Merrill, the Trenholm Operation Accountant, came to Trenholm as a CPA with a B.S. in Accounting, an M.B.A., and several years of service as operations, staff, and corporate accountant.

These differences in experience, education, seniority, etc., which are set out in greater detail in Defendants' Title VII disparate treatment argument and in their Expert Report, *see supra*, at 21-34 and ERS Report (Doc. No. 82-2) at 24-26 and Appx. C, clearly constitute factors other than sex under 29 U.S.C. § 206(d)(1).[40]  *See Irby,* 44 F.3d at 955 ("In the past, we have found that such factors include "unique characteristics of the same job; ... an individual's experience, training or ability; or ... special exigent circumstances connected with the business."); *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988) (holding that an "individual's experience, training, or ability" are justifications for pay differentials).

Furthermore, although Rollins argues that she is entitled to higher compensation because her position has the same or greater intrinsic worth as the positions of the alleged comparators, her personal opinion and disagreement with the wisdom of Trenholm's proffered reasons for any alleged gender-based differential are insufficient to create a triable issue of fact. *See Chapman v.*

---

[40]   Although Defendants submit this evidence to support their affirmative defenses to Rollins' EPA claim, they contend that Rollins has not established sufficient facts that require Defendants to proffer evidence to support their affirmative defenses because Rollins failed to establish the specific salaries of the alleged comparators or their primary job duties.  Instead, she relied solely on her argument that she was performing a job with the same or greater level of complexity and responsibility as the comparators' jobs.  Rollins Dep., Ex. 1 at 194-95, 197

*AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (holding that "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."); *Alexander v. Fulton County, Ga*., 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").   Finally, Rollins offers no evidence that Defendants' explanation for any alleged pay disparity is pretextual or offered as a post-event justification for a gender-based differential.   Thus, Rollins' failure to create an inference of pretext, *see Irby*, 44 F.3d at 954, is the final blow to her EPA claim.

For these reasons, as well as those set forth in Defendants' Title VII disparate treatment argument, Defendants are entitled to summary judgment on Rollins' EPA claim.

**C.      RETALIATION -- ROLLINS' RETALIATION CLAIMS FAIL AS A MATTER OF LAW.**

In addition to her gender-pay claims, Plaintiff Rollins asserts numerous acts of retaliation in violation of the anti-retaliation provisions of § 704(a) of Title VII.   Title VII prohibits retaliation by an employer against an employee or applicants for employment because the applicant has opposed an unlawful employment practice "or because he has made a charge ... under this subchapter."   42 U.S.C. § 2000e-3(a).   A plaintiff establishes a *prima facie* case of retaliation under Title VII by showing that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was some causal relation between the two events.   *Cooper v. Southern Co.,* 390 F.3d 695, 740 (11th Cir. 2004) (citing *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1021 (11th Cir. 1994)), *rev'd on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1155 (11th Cir. 2002); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Once the plaintiff establishes a *prima facie* case of retaliation, "the burden of production then

shifts to the defendant to establish non-retaliatory reasons for the employment actions." *E.E.O.C. v. Reichold Chems., Inc.*, 988 F.2d 1564, 1572 (11th Cir. 1993). If the defendant establishes a non-retaliatory reason for the action, the burden then shifts back to the plaintiff to refute these reasons by proving that they are pretextual. *Id.* at 1572.

In the instant case, as set forth in Plaintiffs' Fourth Amended Complaint, *see* (Doc. No. 63) at ¶¶ 26, Rollins asserts almost a dozen separate retaliatory acts by Trenholm, Trenholm President Munnerlyn and Chancellor Byrne following the filing of her March 2008 grievances and her August 2008 EEOC charges. Defendants will address each claim *ad seriatim*. As will be established herein, Rollins fails to establish a *prima facie* case either because (1) there is no evidentiary basis for the claim; (2) the alleged acts are not materially adverse to a reasonable person and would not deter a reasonable employee from making or supporting a charge of discrimination, (3) the length of time between her complaints of discrimination and the alleged retaliatory acts are too remote in time to permit an inference of causation; and/or (4) the alleged retaliatory acts pre-date Rollins' 2008 grievances and EEOC charges of discrimination, *i.e.*, the statutorily protected expression.[41]

### 1. PLACING LOCKS ON THE PROMOTIONAL SUPPLY CABINET.

Rollins first contends that Trenholm retaliated against her by placing locks on the school cabinet holding promotional items, *e.g.*, cups, pens, folders, stationery, etc., and that doing so somehow "implied" wrongdoing by her. Rollins Dep. Ex. 1 at 95-96. Rollins admits, however, that she was told the locks were installed because materials were disappearing from the cabinet; *id.* at 139; that no one ever accused her of wrongdoing *vis-à-vis* promotions supplies; *id.* at 95-98, and that, after locks were installed, she was never denied access to the cabinet or to any

---

[41] Defendants concede that Rollins engaged in statutorily protected expression when she filed her March 2008 grievances and her August 2008 EEOC charges of discrimination.

materials she needed.[42]  *Id.* at 97-98.

Second, Rollins testified to several different bases (other than gender-based retaliation) for the installation of the locks.  On the one hand, she testified that she believed Dean Griggs installed the cabinet lock because of their ongoing disagreement.  *Id.* at 139.  On the other hand, Rollins wrote an email to President Munnerlyn and Dean Griggs alleging that limiting access to the promotional supplies cabinet was motivated by racism; that the installation of locks implied that black employees steal and cannot be trusted:

> … .  I just think it was rude and offensive to place locks on cabinets that the HR/President's office had been sharing.  ***I interpreted those actions as the only two African American employees can't be trusted or that we steal.***  I personally do not want anything else to do with the kitchen area and do not feel comfortable with any keys other than what is assigned to me. Thanks.[43]

01/07/2009 Rollins Email to Dean Griggs, Ex. 21; *see also* Rollins Dep., Ex. 1 at 141-42. (emphasis added).  Notably absent are any allegations that the installation of locks was gender-based discrimination or were acts of retaliation because of her complaints about gender discrimination.  Moreover, when she addressed the issue in a separate email to President Munnerlyn, Munnerlyn responded that he would provide Rollins a key.  *Id.* at 137-38; *see also* 12/10/2008 Email Exchange Between Munnerlyn and Rollins, Ex. 22.  In sum, other than a naked allegation, Rollins offers no evidence, let alone significantly probative evidence, that installation of the locks was retaliatory or even directed at her.

Third, at best, Rollins' complaint concerns a petty slight or minor annoyance, rather than an actionable claim for retaliation.  As explained by the Supreme Court in the seminal retaliation decision of *Burlington Northern & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006),

---

[42]  Rollins concedes that Dean Griggs even offered to provide her a box of Trenholm letterhead.
[43]   Although Rollins claimed that installation of the cabinet locks was racially discriminatory, it is undisputed that President Munnerlyn is African-American.

retaliatory acts must be materially adverse to a ***reasonable*** employee and dissuade a reasonable

worker from making or supporting a charge of discrimination:

> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See* 1 B. LINDEMANN & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson*, 519 U.S., at 346, 117 S.Ct. 843. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid*. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *See* 2 EEOC 1998 Manual § 8, p. 8-13.

548 U.S. at 68. In sum, Rollins' claim of retaliation concerning the installation of supply cabinet

locks is not objectively reasonable and, therefore, not actionable under the anti-retaliation

provisions of § 704(a) of Title VII. *See Miller-Goodwin v. City of Panama City Beach, Fla.*, 385

Fed. Appx. 966, 2010 WL 2689589 (11th Cir. 2010) (holding that the employee's subjective

view of the significance and adversity of the employer's action is not controlling; the

employment action must be materially adverse as viewed by a reasonable person in the

circumstances."); *see also Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir.

2001)).

　　For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation

claim to the extent that is it is based on the installation of supply cabinet locks.

### 2.　ADMINISTRATIVE COUNCIL APPOINTMENTS

　　Next, Rollins claims that President Munnerlyn retaliated against her by not reappointing

her to the Administrative Council in 2008. *Id.* at 98-99. The Administrative Council is a

college-wide council that allows input in the governance of the college by student representatives and employees at all levels.  *Id.* At 107-08.  According to Rollins, former President Molina (now deceased) appointed her to the Council in 2005, 2006 and 2007 because of her position as H.R. Director, but that his successor, President Munnerlyn, did not reappoint her.  *Id.* at 98-99, 108-09.  Rollins 'believes' that President Munnerlyn's decision not to reappoint her to the Council was in retaliation for the filing of her EEOC charge.  *Id.*

The Council is comprised of two types of members: (1) cabinet members who are appointed by the President, and (2) members who are elected to serve on an annual basis by peers on their salary schedule, including 3 members selected from the C-3 salary schedule.  *Id.* at 100, 102.  *See also* 12/05/2008 Memo Re: Administrative Council Elections, Ex. 23.  Rollins admits that, although President Munnerlyn did not choose to appoint her to the Council in 2008 (because she was not a cabinet member), her name was included on the list of salary schedule C employees eligible for election to the Council by her peers.  *Id.* at 104-05.  *See also* Administrative Council Elections 2008-2009 Academic Year Salary Schedule C, Ex. 24.  In other words, Rollins remained eligible for election to the Council; she simply was not selected by her peers.  Other than her subjective belief regarding Munnerlyn's motives, Rollins offers no significantly probative evidence that President Munnerlyn's decision was retaliatory.  *Id*. at 109.  As pronounced by the Eleventh Circuit, "[t]he inquiry into pretext centers on the employer's beliefs, ***not the employee's belief***, and to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (emphasis added).  Rollins' claim, which is based solely on speculation, does not establish a disputed issue of material fact for purposes of summary judgment.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("unsupported speculation ... does not meet a party's

burden of producing some defense to a summary judgment motion.  Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citing *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995)); *Leigh v. Warner Bros., Inc*., 212 F.3d 1210, 1217 (11th Cir. 2000) ("conclusory allegations without specific supporting facts have no probative value") (internal citation omitted); *Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997) (conclusory allegations, without more, are insufficient to withstand summary judgment).

Additionally, as with the locked promotional cabinet claims, the fact that Rollins was not reappointed to the Council is petty or trivial at best and does not rise to the level necessary to establish an act that is materially adverse to a ***reasonable*** employee.  Consequently, Rollins' lack of reappointment is not an actionable claim under Title VII's anti-retaliation provision.  *See Burlington Northern*, 548 U.S. at 68.  For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation claim to the extent that is it is based on her failure to be reappointed to the Administrative Council.

### 3.   COMPUTER AND EMAIL PROBLEMS

Rollins claims that President Munnerlyn allowed the Trenholm IT department (Charlie Harris, Assistant Dean of Information Technology & Campus Security) to increase monitoring of her computer; that her computer was not working properly because she constantly was receiving "access denied" messages; and that email messages were removed from her email account.  *Id*. at 100-02, 128.   When Rollins experienced computer problems and, in particular problems accessing the network, she accused Dean Harris of intentionally interfering with her ability to access her computer.  *Id.* at 129-30.  Although Rollins testified that she 'believed' that Harris intentionally created her computer problems, *see* Rollins Dep., Ex. 1 at 128-29, other than

opinion and speculation, neither of which are sufficient to create a disputed issue of material fact for purposes of summary judgment, she has produced no significantly probative evidence to support her naked allegation.  *See Cordoba*, 419 F.3d at 1181; *Leigh*, 212 F.3d at 1217; *Holifield*, 115 F.3d at 1564 n. 6.  More importantly, Rollins concedes that, after she expressed her concerns in a meeting with President Munnerlyn and Dean Harris, the problem was eventually resolved.  Rollins Dep., Ex. 1 at 149-51.

Furthermore, as explained by President Munnerlyn to Rollins, other employees, including Munnerlyn, were experiencing similar computer and email problems:

> Ms. Rollins:
>
> Please keep in mind that I, along with others, are experiencing some of the same problems with e-mail.  I have reported it to IT also.  They have worked on my system several times but the problem is not fixed.  I am losing e-mails after I have read them.  I don't think your issues are unique.  I will make it a point to have additional dialog with Dean Harris to see if we can get some resolution concerning email and AS 400 functions.

10/21/2009 Munnerlyn Email to Rollins, Ex. 25.  Rollins concedes this fact and admits that President Munnerlyn took steps to address the problem.  Rollins Dep., Ex. 1 at 159-61.  In other words, Rollins was not singled out and was not victim of some sinister conspiracy hatched by the IT Department in retaliation for her gender discrimination claims.

In sum, as with many computer networks, problems were recurrent and adversely affected other Trenholm employees, including the President.  Rollins offered no evidence that any Trenholm employee removed her emails, monitored her computer, or denied her access to computer databases or the network in retaliation for the filing of her EEOC charge of discrimination.  For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation claim to the extent that is it is based on alleged computer and email problems.

4.    EXCLUSION FROM MEETINGS AND NEGATIVE STATEMENTS

Rollins further claims that she was excluded from office meetings in retaliation for the filing of her EEOC charge.  During her deposition, however, Rollins identified two meetings from which she allegedly was excluded.  The first meeting was between President Munnerlyn, Plaintiff Renoda Thomas and Sherease Gibson.  Rollins Dep., Ex. 1 at 161-62.  Rollins concedes, however, that she did not know the subject matter of the meeting, only that it occurred during the pendency of this lawsuit, *see id.*, and there is no testimony or evidence that the meeting from which Rollins allegedly was excluded was the type of meeting in which she appropriately should have been included.

The second alleged meeting occurred between President Munnerlyn and Plaintiff Shemedrea Johnson.  According to Rollins, Munnerlyn allegedly made negative statements about her during the meeting.  But the only negative statement made – which Rollins admittedly did not hear – was an alleged comment by President Munnerlyn that he had to be cautious about the statements he made because he was receiving letters from the Plaintiffs' counsel.  *Id.*  There is no evidence that Rollins name was ever mentioned during the meeting.  Even assuming *arguendo* that Munnerlyn made the alleged statement, it did not disparage Rollins, but rather reflects President Munnerlyn's wise decision to be circumspect about statements made during the midst of ongoing litigation.[44]  Furthermore, as with the first meeting, Rollins admits that she does not know the subject of the meeting.  *Id.*  In sum, there is a lack of significantly probative evidence establishing that President Munnerlyn made the alleged statement.  *See Clark v. Coates & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted) (emphasis added) ("To avoid summary judgment, Plaintiff must introduce "***significantly probative evidence***.").

---

[44]   Rollins' allegations about negative statements made by President Munnerlyn about her are equally void of specifics and based on hearsay statements by Plaintiff Shemedrea Johnson.  Rollins Dep., Ex. 1 at 161-63.

Additionally, even assuming, *arguendo*, that Munnerlyn made the statement alleged, Rollins' belief that the statement, which was not directed at her, was retaliatory and materially adverse, or that it somehow would deter an employee from reporting or supporting a claim of retaliation, is not objectively reasonable. *See Burlington Northern*, 548 U.S. at 68 (noting that the anti-retaliation provision of Title VII does not protect against petty slights, minor annoyances, snubbing, simple lack of good manners, etc.). Again, at most, this statement concerns a petty slight or minor annoyance, and does not rise to the level necessary to establish an act that is materially adverse to a ***reasonable*** employee.

For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation claim to the extent that it is based on her alleged exclusion from meetings or alleged statements made therein.

## 5. STATEMENTS BY PRESIDENT MUNNERLYN

Next, Rollins alleges multiple statements made by President Munnerlyn, who is her Uncle, *see* Rollins Dep. Ex. 1 at 124-45, that she contends are retaliatory. As demonstrated herein, either (1) Rollins has failed to present admissible evidence that the alleged statements were ever made, or (2) the alleged statements are not materially adverse to a reasonable employee.

### a. STATEMENT REGARDING CATHERINE WRIGHT

Rollins first claims that President Munnerlyn made statements to the effect that she was destroying Trenholm and that this lawsuit was responsible for holding back pay increases for female employees, and particularly Comptroller Catherine Wright's request to move from the C-2 to the C-1 salary schedule. *Id.* at 166-67. As with many statements attributed to President Munnerlyn, Rollins concedes that she did not hear Munnerlyn make the statement; that it merely

was repeated hearsay (and potentially double hearsay) by Plaintiffs Renoda Thomas and Shemedrea Johnson; and that Ms. Wright never told Rollins that her actions were blocking her movement from the C-2 to the C-1 salary schedule:

> **BY MS. BIGGS:**
>
> Q.   Okay.  As part of your retaliation claim, you're claiming that President Munnerlyn said that you were trying to destroy Trenholm and that females couldn't receive raises because of you?
>
> A.   Yes, that's right.
>
> Q.   Did you hear President make that statement?
>
> A.   *I didn't hear him make the statement, but someone told me he made the statement*?
>
> Q.   Who told you that?
>
> A.   *Ms. Johnson told me one of the statements, and Ms. Thomas told me the other*.
>
> Q.   What did Ms. Johnson tell you?
>
> A.   That [Munnerlyn] had told Ms. Wright that I had blocked her from moving from C2 to C1.
>
> Q.   Did Ms. Johnson personally hear President Munnerlyn make that statement?
>
> A.   *I don't know*.
>
> Q.   So you know that someone heard – to your knowledge, someone heard – allegedly heard President Munnerlyn say that Ms. Wright couldn't move from C2 to C1 because of you?
>
> A.   Someone – *I was told that President Munnerlyn told Mrs. Wright that I was stopping or blocking her from moving from C2 to C1.*
>
> Q.   Did Mrs. Wright ever tell you that?

> A.    *No.  Mrs. Wright never told me that*.
>
> Q.    Did President Munnerlyn ever accuse you of keeping Mrs. Wright from moving from C2 to C1 because of you?
>
> A.    *No, he did not, but it doesn't mean he didn't say it*.
>
> Q.    Right.  But you never heard it personally?
>
> A.    *No, I didn't hear it personally come out of his mouth, no*.
>
> Q.    Okay.  Do you know that Mrs. Wright said that that was why she didn't get the move or that President Munnerlyn said that's why she didn't get the move?
>
> A.    *I was told Mrs. Wright said that's what President said – President Munnerlyn told her*.

Rollins Dep., Ex. 1 at 166-68.  (emphasis added).  In other words, the basis of Rollins' claim is unsubstantiated, double hearsay that cannot be considered for purposes of summary judgment.[45] *See Dixon v. Odwalla, Inc*., Slip Copy, 2010 WL 4110682 (11th Cir., Oct. 14, 2010) ("Inadmissible hearsay cannot be considered on a motion for summary judgment.") (citing *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (internal quotations omitted)); *Green v. Pittsburgh Plate & Glass Co*., 224 F. Supp.2d 1348, 1358-59 (N.D. Ala. 2002) (testimony not premised on firsthand information was inadmissible hearsay in employment discrimination action).[46]  Rollins also admits that she had no personal knowledge of whether Catherine Wright sought a reorganization from the C-2 to the C-1 salary schedule, and she never asked President Munnerlyn whether he made the alleged statements regarding Wright.  *Id.* at 170-71.  Additionally, President Munnerlyn denies that he ever made the statements attributed to him, and

---

[45]   Although hostile statements made outside the presence of a plaintiff may be admissible to support a hostile environment claim, that is not the case here because there is no proof that the underlying statements were ever made.

[46]   Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  FED.R.EVID. 801(c). Generally, hearsay is not admissible.  FED.R.EVID. 802.

that testimony stands unrebutted.[47]  Munnerlyn Aff., Ex. 2 at ¶3.

In sum, the alleged retaliatory statements are unsubstantiated assertions that are wholly inadequate to satisfy the nonmovant's burden on summary judgment.  *See Cordoba*, 419 F.3d at 1181; *Leigh*, 212 F.3d at 1217; *Holifield*, 115 F.3d at 1564 n. 6.

### b.   STATEMENTS REGARDING AEA REPRESENTATION

Rollins also claims retaliation based on alleged statements by President Munnerlyn that employees were "free to complain to their AEA representative" and that Rollins "wanted Munnerlyn to fail as the President of Trenholm."  Rollins Dep., Ex. 1 at 170-73.  With respect to the comment regarding AEA representation, the context of the discussion clearly establishes that the statement was not directed at Rollins.  Rather, Munnerlyn advised a group of employees in an in-service meeting that he would prefer that complaints first be presented to the school for resolution, but that employees were certainly free to go to their Alabama Education Association ("AEA") representative:

> **BY MS. BIGGS:**
>
> Q.    Okay.  Another allegation of retaliation was that President Munnerlyn told employees that they could go to AEA when they wanted, correct?
>
> A.    Correct.
>
> Q.    Are there any problems with allowing employees to know what their rights are as far as filing grievances or meeting with AEA?
>
> A.    Well, in this meeting, also, he told us before filing a complaint, he would – before he made that statement, that he would expect them to come to him and give him a chance first before going, ***but if we wanted to go, we could go to our AEA rep.***

---

[47]  Even if President Munnerlyn had made the alleged statements, the statements themselves are not retaliatory.  At best, it might be indirect evidence of a propensity to retaliate, but not free-standing acts of retaliation.

Rollins Dep., Ex. 1 at 172-73.  (emphasis added).

The sole basis of Rollins' retaliation claim regarding the AEA representation statement was Munnerlyn's alleged tone when he made the statement.  Rollins Dep., Ex. 1 at 173-74.  Yet, she concedes that the statement was not directed at her (or any other specific person), and that Munnerlyn's request -- that employees should allow the school to address concerns before resorting to an AEA representative or the EEOC -- was reasonable.[48]  *Id*. at 173-74.  In sum, Rollins' claim that Munnerlyn's statement was somehow retaliatory is not objectively reasonable or materially adverse to a reasonable employee.  *See Burlington Northern* 548 U.S. at 68 (2006).

### c.   FAILURE OF MUNNERLYN AND TRENHOLM

Rollins claims retaliation resulting from an alleged statement by President Munnerlyn that he believed Rollins wanted him to fail as President of Trenholm.  During her deposition Rollins concedes, however, that she did not hear the alleged statement; that it was related to her by another employee (Plaintiff Renoda Thomas) who allegedly heard it third-hand from yet another party.  *Id*. at 169-71.  When pressed further, Rollins admitted that it actually was President Munnerlyn who had reported to her that other employees were telling him that she was trying to make him fail:

**BY MS. BIGGS:**

Q.     Well, you said that Ms. Johnson heard something negative
and Ms. Thomas heard something negative.

A.     I can't think of it right now.  I'd have to come back to that.
Oh, I was trying to make –

Q.     I'm sorry?

A.     I was trying – I heard from Ms. Thomas that President

---

[48]  Rollins' claim that the grievance process essentially was a waste of time is contradicted by her experience and, in particular, the fact that she accepted Jackie Peterson's resolution of her grievance against Deborah Griggs.  *Id*. at 93-95.

Munnerlyn was telling people that I was trying to make him fail and make the school fail.

Q.    Ms. Thomas heard President Munnerlyn make that statement or she heard –

A.    I don't –

Q.    -- that he made the statement?

A.    **She heard that he had made that statement**.

Q.    Okay.  Did you ever ask President Munnerlyn whether he told Mrs. Wright she couldn't move from C2 to C1 because of you?

A.    No, I did not.

Q.    Did you ask – ever ask President Munnerlyn if he told someone that you were trying to destroy Trenholm college?

A.    **No, I did not, because he actually told me himself on one occasion that people were telling him that I was trying to make him fail as well**, when he first became president, which was to my total surprise.

Q.    When he first became President?

A.    Yes.  He told me that he was hurt because people were telling him that I was trying to make him fail.

Q.    And he made this statement to you before you ever filed a grievance; correct?

A.    I don't remember exactly the date, but it was during the time when he became permanent president?

Q.    Which was December two thousand –

A.    Eight.

Q.    -- seven?

A.    **Yeah, seven.  Dr. Molina passed in March of '07.**

Q.    And you didn't file your first grievance until March 2008;

correct?

    A.    ***That's correct***.

*Id.* at 169-71.  Thus, Rollins' allegation that President Munnerlyn ever made statements to third parties that Rollins wanted him and Trenholm to fail is based solely on inadmissible double hearsay, which is further contradicted by her admission that it was Munnerlyn who alerted her to the rumors **he was hearing**.  Even then, the fact that Munnerlyn advised Rollins of the rumors cannot, under the *Burlington Northern* standard, be considered materially adverse to a reasonable employee or be considered an act that would dissuade a reasonable worker from making or supporting a charge of discrimination.

    More importantly, Rollins admits that the alleged statement was made in December 2007, four-months ***before*** she engaged in her first protected activity, *i.e.*, the filing of her March 2008 grievance.  *Id.*  In other words, because the alleged statement by President Munnerlyn predates Rollins' protected activity in filing her March 2008 grievance, it cannot support a retaliation claim as a matter of law because there is no causal connection between the alleged comment and the subsequent filing of her grievance.

    For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation claim to the extent that it is based on alleged statements made by President Munnerlyn regarding Rollins' desire to see him fail as Trenholm's President.

    **d.**    **GENDER-BASED EPITHET**

    Rollins contends that President Munnerlyn (who is her uncle)[49] and other executive level administrators harassed her by referring to her and Plaintiff Shemedrea Johnson as "whining bitches."  *Id.* at 101-02.  At her deposition, however, Rollins conceded that she never heard President Munnerlyn call her a "whining bitch"; that she heard about the statement after the

---

[49]  President Munnerlyn is the brother of Plaintiff Rollins' father.  Rollins Dep., Ex. 1 at 124-25.

filing of her August 2008 EEOC charge from co-employees Tony Dager and Robert Brown, who likewise did not hear President Munnerlyn make the statement, but rather allegedly were told about the statement by Dean Charles Harris during an IT meeting.  *Id.* at 122-24, 125-26, 163-65. Furthermore, Rollins never confronted President Munnerlyn, filed a grievance, or otherwise complained to any school officials regarding the alleged epithet.  *Id.* at 124.  Munnerlyn also adamantly denies making the statement, *see* Munnerlyn Aff., Ex. 2 at ¶4, and Rollins admits that she has never heard President Munnerlyn call anyone a "bitch", despite having lived in his home for a period of time.  Rollins Dep., Ex. 1 at 163, 166, 359.  Thus, in addition to the fact that Rollins never heard President Munnerlyn use the offensive epithet, there is no evidence that Munnerlyn ever made the statement to anyone, let alone in reference to Rollins.  As previously established, an allegation based on hearsay (in this case, triple hearsay), cannot create an issue of fact for purposes of summary judgment.  *Dixon v. Odwalla, Inc*., Slip Copy, 2010 WL 4110682 (11th Cir., Oct. 14, 2010).

For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation claim to the extent that it is based on the unsubstantiated use of an epithet by President Munnerlyn.

### 6.    ASSIGNMENT OF PAYROLL DUTIES

Rollins next claims retaliation based on an allegation that President Munnerlyn assigned payroll duties (the EPD records) to her in March 2010 that she claims she could not perform without violating audit standards.  *Id*. at 174-79.  In particular, Rollins claims that Munnerlyn wanted her to perform payroll duties, while at the same time certifying payroll contracts.  *Id.* According to Rollins, having her perform both duties was a violation of audit procedures requiring separate persons to perform those functions to ensure proper checks and balances.  *Id*.

at 174-75.  Rollins contends that Munnerlyn ignored her concern that it would be improper for her to perform payroll duties (EPD records) certify the tax forms, create payroll contracts and pay the employees.  *Id.* at 177-78.  According to Rollins, the lack of internal control theoretically could allow her to create and pay a non-existent employee without any oversight.  *Id.*  Other than her opinion, however, Rollins offers no evidence that her performance of payroll duties violates payroll standards or was otherwise improper.

Furthermore, Rollins' testimony establishes that the true crux of her concern was her lack of training in maintaining the EPD records for the college, rather than ethical concerns:

> **BY MS. BIGGS**:
>
> Q.  Was it – I need to get a time line.  When were you assigned this duty of processing the payroll adjustments?
>
> A.  That was after March.  It was actually the end of March, beginning of April, because I was away on professional development, and when I came back, ***I had to process that step on employees for the first time without any training. And I expressed that I had no training***.
>
> Q.  Okay.  That was in March of 2009?
>
> A.  No, 2010.

Rollins Dep., Ex. 1 at 178-79.  (emphasis added).  Rollins expressed concern to President Munnerlyn regarding her lack of training, and Munnerlyn called a meeting to address the issue, resulting in Rollins receiving training from Alliance Group.  *Id.* at 179-81.  After receiving the training, Rollins performed her assigned payroll duties.  *Id.*

Even assuming, *arguendo*, that the assignment of payroll duties to Rollins was somehow improper, she offers no evidence that the assignment of these additional duties was undertaken in retaliation for the filing of her EEOC charges ***19-months earlier*** or that the assignment of payroll duties was materially adverse or would otherwise "deter victims of discrimination from

complaining to the EEOC." *Burlington Northern & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006).

Moreover, even if Rollins could establish the first two elements of her *prima facie* case for retaliation, she cannot establish the third element of causation because she cannot prove a causal connection between her protected activity (the filing of her August 2008 EEOC charges) and the assignment of additional payroll duties in March 2010. The Supreme Court has stated that "mere temporal proximity between ... knowledge of protected activity and an adverse ... action ... must be '***very close***.' " *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, (2001). (emphasis added); *see also Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Clark County*); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). In the instant case, however, Rollins' testimony clearly establishes that the assignment of her additional payroll duties occurred in March of 2010, over ***19 months after*** the filing of her EEOC charges of discrimination. *Id.* As established in numerous decisions by the Eleventh Circuit, absent additional evidence showing a causal link between the protected activity and the alleged adverse employment action, such large gaps of time between the protected activity and the alleged retaliatory act is insufficient as a matter of law to establish the required "close temporal proximity" between the decision-maker's awareness of the protected activity and the adverse employment action. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n. 3 (11th Cir. 2003) ("A plaintiff satisfies this element if [s]he provides sufficient evidence" of knowledge of the protected expression and "that there was a close temporal proximity between this awareness and the adverse ... action.") (quoting *Farley v. Nationwide Mut. Ins*. Co., 197 F.3d 1322, 1337 (11th Cir. 1999)). In fact, the Eleventh Circuit is approaching a "nearly contemporaneous" standard in accessing evidence of "close temporal proximity." *See, e.g., Freytes-Torres v. City of Sanford*,

270 Fed. Appx. 885 (11th Cir. Mar. 25, 2008) (one month insufficient to establish causation); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007) (three months held insufficient); *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (holding that three and one-half month period between employee's protected activity and her termination was, standing alone, insufficient to establish pretext).[50]   Here, the 19-month period of time between Rollins' complaint of discrimination and the adverse employment action is too lengthy to permit an inference of causation.

In sum, Rollins has failed to establish that the assignment of the payroll duties would be considered materially adverse by a reasonable employee or would otherwise deter a reasonable employee from making or supporting a charge of discrimination.  Furthermore, the assignment of payroll duties in March 2010 and the filing of her EEOC charges in August 2008 or her March 2008 grievances are not sufficiently related in time to permit an inference of causation.  For these reasons, the Court should grant summary judgment on Rollins' retaliation claim to the extent that it is based on the assignment of additional payroll duties in March 2010.

### 7.    TRENHOLM EMERGENCY ALERT SYSTEM

Rollins claims retaliation resulting from Trenholm's decision to provide her home telephone number to the company responsible for operating Trenholm's emergency alert system known as the "Trenholm Alert".  Rollins Dep., Ex. 1 at 101-02, 151-58.  In particular, in early 2009, as a part of its efforts to ensure the safety of students, faculty and staff, Trenholm implemented a new component to its campus emergency notification system.  *See* 03/23/2009 Email Regarding Trenholm Alert Enrollment Instructions, Ex. 18.  Pursuant to this emergency alert system, Trenholm students, faculty and staff can receive time sensitive emergency messages

---

[50]   *See also Webb-Edwards v. Orange County Sherriff's Office*, 525 F.3d 1013 (11th Cir. 2008) (six months held insufficient); *Richardson v. Alabama Pine Pulp Co., Inc.*, 277 Fed. Appx. 907 (11th Cir. May 13, 2008) (seven months held insufficient).

*viá* text and voice messages to cell phones and home phones, as well as existing avenues of email, Trenholm's web page, and news media.  *Id.*  The undisputed purpose of the system is to enable Trenholm to better inform the campus community of imminent danger.  *Id*.  Moreover, the system is not, and cannot be, used for any purpose other than emergencies.  *Id*.  Although participation in the Trenholm Alert system is not mandatory, it is strongly encouraged.  *Id.*

When Trenholm set up the alert system, it included home telephone numbers in the list of faculty and staff telephone numbers that would be contacted in the event of an emergency, including Ms. Rollins' home telephone number.  Harris Dep., Ex. 3 at 26-28; Rollins Dep., Ex. 1 at 151-57.  Although Rollins complained about the use of her telephone number (which later was removed at her request), she offers no evidence that her phone number was provided for any use other than for the Trenholm Alert emergency notification program.  In fact, she concedes that she has never received an emergency notification through her home telephone.  Rollins Dep., Ex. 1 at 158.  Thus, Rollins' belief that the act of sharing a telephone number with an emergency alert service constitutes a retaliatory act that would thwart others from exercising their rights to complain of discrimination is not objectively reasonable or materially adverse to a reasonable employee.  *See Burlington Northern* 548 U.S. at 68 (2006); *see also Alvarez*, 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs, ***not the employee's belief***, and to be blunt about it, not on reality as it exists outside of the decision maker's head.").

In addition, Rollins cannot establish the third element of her *prima facie* case because there is a lack of temporal proximity between the filing of her August 2008 EEOC charges (the protected activity) and the act of providing her telephone number in connection with the emergency alert system.  As previously established, Trenholm implemented the emergency alert system in March 2009, over seven (7) months after Rollins filed her August 2008 EEOC charges.

*See* 03/23/2009 Email Regarding Trenholm Alert Enrollment Instructions, Ex. 18.  Such a gap in time, without other evidence of a causal connection, fails to satisfy the Eleventh Circuit's "nearly contemporaneous" standard.  *See Freytes-Torres v. City of Sanford*, 270 Fed. Appx. 885 (11th Cir. Mar. 25, 2008) (one month insufficient)); *Summers v. Winter*, 303 Fed.Appx. 716, 2008 WL 5227192 (11th Cir., Dec. 16, 2008) (6 months insufficient); *Webb-Edwards v. Orange CountySheriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008) (six months insufficient); *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361 (11th Cir. 2007) (three months insufficient).  Thus, Rollins offers no evidence of any causal connection between the filing of her August 2008 EEOC charges of discrimination and the initial use of her home telephone number in conjunction with the emergency alert system.

In sum, Rollins has offered no evidence that this perceived trivial slight was undertaken by Trenholm in retaliation for the filing of her EEOC charge or that the use of her home phone number in connection with the emergency alert system was temporally related to her protected activity, *i.e*., the filing of her August 2008 EEOC charges.[51]  For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation claim to the extent that it concerns the use of her home telephone number for the school emergency notification system.

## 8.    CIVIL RIGHTS AUDIT

Rollins further claims retaliation in that she was not included in the Department of Postsecondary Civil Rights Compliance/On-Site Review in March 2009.  *Id.* at 109-10.  Rollins contends that she should have been selected by virtue of her position as H.R. Director.  *Id.* at 109-10, 181-82.  She further alleges President Munnerlyn selected clerical workers with little knowledge of civil rights for the compliance group.  *Id.*  During her deposition, however, Rollins

---

[51]  The absurdity of Rollins' claim is further illustrated by her unsupported belief that Dean Harris was using the Trenholm alert system to tap her phone because of her complaints about her computer based solely on her belief that he allegedly possessed the technical know-how.  Rollins Dep., Ex. 1 at 151-58.

admitted there was no historical involvement of the H.R. Director on the Civil Rights Audit Committee and that this was the first time Postsecondary had performed a civil rights audit. *Id.* at 183-84. She further admits that she was asked for her input on the audit and specifically was sent an email from the Civil Rights compliance group seeking her input and help with the compliance survey.[52] *Id.* at 182-83. *See also* 02/19/2009 Civil Rights Compliance/On-Site Review Email, Ex. 19.

Other than raw speculation, Rollins offered no evidence that President Munnerlyn excluded her from the Civil Rights Compliance Team to retaliate against her for engaging in protected activity. Speculation or conjecture, however, cannot create a genuine issue of material fact. *See Cordoba*, 419 F.3d at 1181; *Leigh*, 212 F.3d at 1217; *Holifield*, 115 F.3d at 1564 n. 6. It is further undisputed that the Civil Rights Compliance/On-Site Review occurred in March 2009, *i.e.*, seven months ***after*** she filed her EEOC charges of discrimination and retaliation. *See also* 02/19/2009 Civil Rights Compliance/On-Site Review Email, Ex. 19. (establishing the March 25-26, 2009 site visit schedule). As previously established, the Eleventh Circuit routinely has rejected as temporally remote periods of time beyond a month or two between the protected activity and the alleged retaliatory act. *See Freytes-Torres*, 270 Fed. Appx. 885 (one month insufficient to establish causation); *Thomas*, 506 F.3d 1361 (three months held insufficient). Finally, notwithstanding Rollins' personal disagreement with the wisdom of President Munnerlyn's decision, it is not the role of the courts to second-guess an employer's decisions absent proof that the decision is motivated by discrimination. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Damon*

---

[52] Rollins also testified that she was in the midst of her EEOC charges and this lawsuit when the civil rights audit was performed. Rollins Dep., Ex. 1 at 181-82.

*v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair.").

For these reasons, the Court should grant summary judgment on Rollins' retaliation claim to the extent that it is based on her alleged exclusion from the March 2009 Civil Rights Compliance/On-Site Review.

### 9.    REMOVAL OF ARCHIVED FILES

Rollins claims that archived employee records were removed while she was on leave in retaliation for filing this lawsuit.  Rollins Dep., Ex. 1 at 128, 184-88.  However, the evidence establishes that the archived files were former employee records; that they were not located in Rollins' office, but rather in a completely separate building – the health building; that the files were removed during the building renovation; and that Rollins was aware that the files were removed so that the renovation could be completed:

> **BY MS. BIGGS:**
>
> Q.    Okay.  And did you know of plans to move those archived records?
>
> A.    I heard there was going to be some renovations on the building, but Dean Griggs had given instructions not to move those files.
>
> Q.    Okay.   And have the renovations taken place on that building?
>
> A.    Yes.
>
> Q.    And it was – was it your understanding that the records were moved as other furniture, boxes, records, books, or whatever were moved from the building so that the building could be renovated?
>
> A.    That's correct.

Rollins Dep., Ex. 1 at 186.  Rollins asserts retaliation based merely on the *ipso facto* argument

that President Munnerlyn knew about the records, but allowed them to be removed anyway. Rollins Dep., Ex. 1 at 187.  However, she provides **no evidence** to support the claim beyond mere opinion and speculation, neither of which establish a disputed issue of material fact for purposes of summary judgment.  *See Cordoba*, 419 F.3d at 1181; *Leigh*, 212 F.3d at 1217; *Holifield*, 115 F.3d at 1564 n. 6.  Moreover, she concedes that the records were removed to accomplish the renovation and not undertaken in retaliation against her.  *Id*. at 186-88. Furthermore, while Rollins complains that lack of access to these archived records affects the performance of her job, including her ability to verify employment of a former Trenholm employee, she cannot identify any specific record she was denied access to in the performance of her duties.  *Id*. at 188.

Finally, Rollins testified that the archived records were moved over a year before her August 2010 deposition, which would place the time of the alleged retaliatory act in 2009, *i.e.*, between 4 and 12 months ***after*** she filed her August 2008 EEOC charges alleging discrimination and retaliation.  *Id.* at 188.  As previously noted, the Eleventh Circuit routinely has rejected as temporally remote periods of time beyond a month or two between the protected activity and the alleged retaliatory act.  *See Freytes-Torres*, 270 Fed. Appx. 885 (one month insufficient to establish causation); *Thomas*, 506 F.3d 1361 (three months held insufficient).  Thus, the removal of the archived records, even if objectively adverse to a reasonable employee, is too remote in time from the filing of Rollins' EEOC charge to permit an inference of causation and retaliatory motive.

For these reasons, the Court should grant summary judgment on Rollins' retaliation claim to the extent that it is based on the removal of archived personnel files from the health building.

10.     ACCESS TO H.R. BUDGET

Rollins contends that Defendants retaliated against her by removing the H.R. budget after she filed her grievances.  Rollins Dep., Ex. 1 at 1878-88.  When pressed during her deposition, however, Rollins conceded that that the separate H.R. budget was eliminated ***before*** she filed her March 2008 grievance; that there was ***no*** H.R. budget for fiscal year 2007-2008.  Therefore, the act of eliminating the H.R. budget cannot, as a matter of law, support a claim of retaliation because it predates Rollins' protected activity of filing her March 2008 grievance.

11.     PERFORMANCE EVALUATION

Rollins contends that Dean Griggs' act of withholding her 2007/2008 performance evaluation constitutes retaliation by Defendants.  Rollins Dep., Ex. 1 at 91-93, 370-72.  The facts, however, establish that President Munnerlyn responded to Rollins' complaint, and that her evaluation was completed as a result of Munnerlyn's intervention.  In particular, in December 2009, Rollins complained to President Munnerlyn that Dean Griggs had ignored her repeated requests to complete her annual evaluation for the 2007-2008 academic year.  *Id.*  Although Dean Griggs was no longer Rollins' direct supervisor, she had been her supervisor for the 2007-2008 academic year.

Defendants do not deny that Rollins had a legitimate complaint regarding Griggs' failure to complete her evaluation in a timely manner.  In response, Munnerlyn directed Griggs to complete Rollins' evaluation.  Munnerlyn Dep., Ex. 6 at 197-98, 200-201; Rollins Dep., Ex. 1 at 91-93, 370-72.  When Griggs failed to do so, Munnerlyn reassigned the evaluation to Rollins' current supervisor, Dean Holt.  Munnerlyn Dep., Ex. 6 at 197-98, 200-201; Rollins Dep., Ex. 1 at 91-93, 370-72.  Because he had supervised her for part of the evaluation period, Holt prepared the evaluation, but Rollins complained that the rating was lower than her prior evaluation.

Munnerlyn Dep., Ex. 6 at 197-98, 200-201.  In response, Munnerlyn agreed to withdraw Holt's evaluation and again directed Dean Griggs to prepare Rollins' evaluation.  *Id.*  Griggs complied, completed the evaluation, and Rollins received the same excellent evaluation score she received the previous year.  *Id.* at 197-99, 200; Rollins Dep., Ex. 1 at 371-72.  In sum, President Munnerlyn responded to Rollins' complaint and resolved the issue.

Additionally, as previously discussed, Rollins and Dean Griggs undisputedly had a personality conflict, as did Griggs with other Trenholm employee - male and female alike. Rollins has produced no evidence that Griggs' failure to complete her evaluation constituted gender discrimination or retaliation for her complaints about gender discrimination.  Such personality conflicts are not actionable under the anti-retaliation provisions of § 704(a) of Title VII.  *See* 1 B. Lindemann & P. Grossman, EMPLOYMENT DISCRIMINATION LAW 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a)) (quoted approvingly in *Burlington Northern*, 548 U.S. at 68).

Finally, as with many of Rollins' alleged acts of retaliation, the evaluation incident is temporally remote because it occurred in December 2009, approximately ***16 months after*** she filed her August 2008 EEOC charges which, as previously established, is too far removed from the protected activity to permit an inference of causation.  See *Thomas*, 506 F.3d 1361 (three months held insufficient); *Wascura*, 257 F.3d at 1244-45 (three and one-half month period insufficient to establish pretext).

For these reasons, the Court should grant summary judgment on Rollins' retaliation claim to the extent that it is based on the delay in the completion of her 2007-2008 performance evaluation.

### 12.    PARTICIPATION IN THE GRIEVANCE AND LITIGATION PROCESSES

Finally, Rollins claims retaliation in that she was removed from the grievance process and from the legal team involving litigation.  Rollins Dep., Ex. 1 at 98-99, 112.  It is undisputed, however, that at the time Rollins was removed from the grievance process and ongoing litigation, she had two pending grievances and a pending lawsuit against Trenholm.  *Id*. at 112.  Second, Rollins concedes that President Munnerlyn never told her that she would be excluded from helping in litigation because of her EEOC charge.  *Id*. at 121-22.   Again, the sole basis of Rollins' retaliation claim is her unsupported opinion and speculation, which cannot create a genuine issue of material fact.  *Cordoba*, 419 F.3d at 1181; *Leigh*, 212 F.3d at 1217; *Holifield*, 115 F.3d at 1564 n. 6.

Third, as established by President Munnerlyn's affidavit testimony, he made the decision to remove Rollins from grievance and litigation-related duties to avoid any potential conflict of interest and, in particular, to ensure that those processes remained objective and free of influence that might occur as a result of Rollins' participation in grievances and this lawsuit.  Munnerlyn Aff., Ex. 2 at ¶5.  Thus, the decision was based on maintaining the integrity of the grievance and litigation processes and not to punish or retaliate against Rollins.  Such decisions remain clearly within the discretion of the employer and cannot form the basis of a retaliation claim.  *See Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions" and that the key inquiry is "whether the employer gave an honest explanation of its behavior").  Furthermore, Rollins offers no evidence of pretext to rebut this good-faith, reasonable explanation of his decision to remove her grievance and litigation-related duties.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext

for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason); *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair."); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

Finally, Rollins specifically complained during the grievance process that she had been assigned additional legal duties without an increase in pay:  "Two main issues were discussed during the April 1, 2008 meeting.  1. …. Additional duties, including legal related issues, have continued to be added to her workload without a fair amount of compensation. …"  *See* 04/01/08 Grievance Report Form A, Ex. 28.  In other words, Rollins complained that it was unfair to assign her additional legal duties without extra compensation, but when those duties were removed, she alleged retaliation.  She cannot have it both ways.

For these reasons, Defendants are entitled to summary judgment on Rollins' retaliation claim to the extent that it is based on her alleged removal from the grievance and litigation

processes.[53]

**D.**    **PATTERN & PRACTICE - PLAINTIFF'S STATISTICAL EVIDENCE FAILS TO SHOW A PATTERN AND PRACTICE OF DISCRIMINATION OR DISPARATE IMPACT.**

Throughout the Fourth Amended Complaint, Rollins claims racial discrimination under three distinct Title VII theories: pattern and practice, disparate treatment, and disparate impact discrimination.  Fourth Amend. Compl. (Do. No. 63) at ¶¶48, 51, 52, 60, 62, *et seq.  See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263m 1273 (11th Cir. 2000); *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004).  The first two theories require proof of discriminatory intent; disparate impact does not.  *Id.*  Rollins also asserts claims under § 1981, which, unlike Title VII, only provides a cause of action for claims involving intentional discrimination.[54]  *Cooper*, 390 F.3d at 723; *see also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982).

The basic legal framework governing these theories is well-established.  In a disparate treatment case, the plaintiff bears the burden of proving that the employer intentionally discriminated against him because of his race.  *Cooper*, 390 F.3d at 723; *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).  The plaintiff can establish discriminatory intent through either direct or indirect evidence; to establish a *prima facie* case of intentional discrimination using

---

[53]   Rollins also claims that after she filed her EEOC charges, she no longer made presentations at professional development retreats, but rather was placed at a table in the back of the room.  Rollins Dep., Ex. 1 at 98-100, 110-11.  Other than speculation, she offers no evidence that the alleged acts are connected to the filing of her EEOC charge.  See *Cordoba*, 419 F.3d at 1181; *Leigh*, 212 F.3d at 1217.  Furthermore, even assuming that Rollins was "snubbed" at professional development retreats, the Supreme Court in *Burlington Northern* specifically noted that " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a))."  *Burlington Northern*, 548 U.S. at 68.

[54]   "Where defendants are state actors, plaintiff's § 1981 claims merge into his or her § 1983 claims, and courts treat the claims as 'a single claim.' "  *Taylor v. Alabama*, 95 F. Supp.2d 1297, 1309 (M.D. Ala. 2000); *Godby v. Montgomery Co. Bd. of Educ.*, 996 F. Supp. 1390, 1411 (M.D. Ala.1998); *see also Moore v. State of Alabama*, 989 F. Supp. 1412, 1420-21 (M.D. Ala. 1997), *aff'd*, 178 F.3d 1303 (11th Cir.1999).  As explained by the Eleventh Circuit, "[t]he Supreme Court has ruled that 'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.' "  *Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1278 n. 3 (11th Cir. 1992) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733, 109 S. Ct. 2702, 105 L.Ed.2d 598 (1989)).

circumstantial evidence, plaintiffs may use the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cooper*, 390 F.3d at 723.

In a "pattern and practice" disparate treatment case, "the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the company's 'standard operating procedure.' " *Cooper*, 390 F.3d at 716 (quoting *Joe's Stone Crab*, 220 F.3d at 1274) (citation omitted), *rev'd on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). Disparate impact on a class of women employees must be demonstrated with evidence of a statistically significant disparity between pay of men and women. *Id.* (also cited in Doc. No. 107 at 11). " 'To meet this burden of proof, a plaintiff must 'prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. It ha[s] to establish by a preponderance of the evidence that ... discrimination [is] ... the regular rather than unusual practice.' " *Cooper*, 390 F.3d at 724 (citing *Joe's Stone Crab*, 220 F.3d at 1286-87) (internal citations omitted).

To state a claim under a disparate impact theory, in contrast, a plaintiff need not establish that she suffered intentional discrimination. Rather, "disparate impact theory prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group."[55] *Id.* (citing *Joe's Stone Crab*, 220 F.3d at 1274). Thus, to state a *prima facie* case of disparate impact discrimination, a plaintiff must establish that (1) there is a significant statistical disparity among members of different racial groups; (2) there is a specific, facially-neutral employment policy or practice; and (3) there is a causal nexus between the specific policy or practice and the statistical disparity. *Id.* Moreover, in order to satisfy the third and critical element of causal nexus a plaintiff "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs

---

[55] The Eleventh Circuit has noted that the disparate impact theory is "a doctrinal surrogate for eliminating unprovable acts of intentional discrimination hidden innocuously behind facially-neutral policies or practices." *Cooper*, 390 F.3d at 724 (citing *Joe's Stone Crab*, 220 F.3d at 1274.

or promotions because of their membership in a protected group." *Id.* (citing *Joe's Stone Crab*, 220 F.3d at 1274-75) (citations and internal quotation marks omitted).

In the instant case, in contrast to her individual disparate treatment claims, Plaintiffs, including Rollins, previously have submitted the same body of statistical evidence in Dr. Bradley's report to support her alleged pattern and practice and disparate impact claims. Bradley Report (Doc. No. 75-1). However, this Court previously has found that Dr. Bradley's report was not sufficiently tailored to show any pattern and practice of gender discrimination. *See* (Doc. No. 107) at 14 ("Bradley does not, however, mention having controlled for difference in starting pay in evaluating the steps he applied. . . . without an accounting of any difference the change may have made the court is unable to conclude that Bradley's analysis is sufficiently tailored to establish commonality."). Specifically, Bradley's report failed to find any statistical significance in the difference in pay between men and women employed by Trenholm. *Id.* at 15. Accordingly, this Court ruled that "*a difference that is not statistically significant is not sufficient to prove a pattern and practice of discrimination under Title VII.*" *Id.* (emphasis added; citations omitted). In support of its conclusion, this Court reasoned:

> [C]onsistent with the analysis in *Cooper*, the court has attempted to discern whether the opinions offered by the Plaintiffs' expert are sufficiently tailored so as to establish that the identified policy of subjectivity in decision-making at the various ACCS institutions, subject to approval or disapproval by the Chancellor if in conflict with statutes or Board policy, can be proven to be a pattern and practice of discrimination, or to have a disparate impact. Given the variables discussed which were not considered by Bradley, and which have been supported with evidence by the Defendants as being relevant to the analysis, *the court cannot conclude that the Plaintiffs have sufficiently satisfied the Cooper standard in supplying statistical proof of a common pattern and practice or disparate impact.*

(Doc. No. 107) at 15-16 (emphasis added).

In short, this Court already has ruled that Bradley's conclusions were of very limited value because the data on which those calculations were based was not meaningfully tailored.  In sum, the analytical deficiencies of Dr. Bradley's report render it insufficient to support a conclusion that intentional discrimination was Defendants' standard operating procedure.  Even crediting as true Dr. Bradley's conclusions, Dr. Bradley admitted that when he examined Trenholm separately and included his broad position title measure, the effect of being female on salaries was not statistically significant.  Bradley Dep. (Doc. No. 82-4) at 138.  In other words, even using Dr. Bradley's flawed model, he found that the pay differences regarding the named plaintiffs were neutral with respect to gender at Trenholm.  *Id.  See also* ERS Report (Doc. No. 82-2) at 4.

For the same reasons, Defendants are entitled to summary judgment on Rollins' disparate impact claim.  She has failed to present any evidence of a gender-based pay disparity at Trenholm and, in fact, the analyses and testimony of her expert, Dr. Bradley, establish that, even using his flawed statistical model, there is no statistically significant difference in pay at Trenholm with respect to gender.  Bradley Dep. (Doc. No. 82-4) at 138; *See also* ERS Report (Doc. No. 82-2) at 4.

For these reasons, Defendants are entitled to summary judgment on the Plaintiff's pattern and practice and disparate impact claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted this 24th day of February, 2011.

/s/ Christopher W. Weller, Sr.
Christopher W. Weller (WEL020)
Robert T. Meadows, III (MEA012)
Terrie S. Biggs (BIG006)

OF COUNSEL:

Capell & Howard, P.C.
Skyway Professional Center
3120 Frederick Road, Suite B (36801)
Post Office Drawer 2268
Opelika, AL  36803
Telephone:  (334) 501-1540
Facsimile:  (334) 501-4512

Luther Strange, Attorney General
Office of Attorney General
11 S. Union Street
Montgomery, AL 36130-0152

Lynn Thrower, General Counsel
Alabama Department of Post Secondary Education
401 Adams Avenue, Suite 280
Montgomery, Alabama 36104

## CERTIFICATE OF SERVICE

I hereby certify that on this the 24th day of February, 2011, I served a copy of the above and foregoing *via* email, and/or have placed the same in the United States mail, postage prepaid and properly addressed upon the following:

| | |
|---|---|
| William F. Patty<br>James H. Anderson<br>Beers, Anderson, Jackson, Patty & Fawal, P.C.<br>250 Commerce Street, Suite 100<br>Montgomery, AL  36102-1988 | Monica L. Arrington<br>Arrington and Arrington<br>P.O. Box 250091<br>Montgomery, AL  36125-0091 |
| Theron Stokes<br>Nancy Perry<br>Alabama Education Association<br>P.O. Box 4177<br>Montgomery, AL  36103-4177 | Candis McGowan<br>Wiggins, Childs, Quinn & Pantazis, LLC<br>The Kress Building<br>301 19th Street North<br>Birmingham, AL  35203 |

*/s/Christopher W. Weller*
OF COUNSEL