IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PAMALON ROLLINS, SHEMEDREA )
JOHNSON, RENODA THOMAS, and )
TAMARA WARD, )
)
        Plaintiffs, )
)
v. )      Civil Action No.  2:09cv636-WHA
)          (wo)
ALABAMA COMMUNITY COLLEGE )
SYSTEM; et al., )
)
)
        Defendants. )

**MEMORANDUM OPINION**

**I. INTRODUCTION**

This case is before the court on Motions for Summary Judgment (Doc. ##117, 124, 130, 134, 137), filed by the Defendants on February 24, 2001.

Pamalon Rollins, Shemedrea Johnson, and Renoda Thomas originally filed a Complaint on May 29, 2009, in the Circuit Court for Montgomery County, against Alabama Community College System; H. Councill Trenholm State Technical College; Samuel Munnerlyn, individually and in his official capacity; Bradley Byrne, individually and in his official capacity; Alabama Department of Post-Secondary Education; State Board of Education; Governor Bob Riley, in his official capacity; Randy McKinney, in his official capacity; Betty Peters, in her official capacity; Stephanie W. Bell, in her official capacity; Dr. Ethel H. Hall, in her official capacity; Ella B. Bell, in her official capacity; David F. Byers, Jr., in his official capacity; Gary Warren, in his official capacity; and Dr. Mary Jane Caylor, in her official capacity.   The Complaint was asserted on behalf of the individual plaintiffs and a class they sought to represent.   The

Complaint alleged  violations of state law, but also violations of the Constitution and laws of the United States.  The case was removed on the basis of federal question jurisdiction, and supplemental jurisdiction over the state law claims.

The Plaintiffs subsequently amended their Complaint on several occasions.  The Fourth Amended Complaint (Doc. #63) was filed on June 16, 2010, and brought claims on behalf of the original Plaintiffs, but also added Tamara Ward as a Plaintiff.  Freida Hill, in her official capacity as Chancellor of the Alabama Department of Post-Secondary Education, was also substituted for Defendant Bradley Byrne in that capacity.

The Fourth Amended Complaint alleged a Class Action under Title VII of the Civil Rights Act of 1964, as amended (Count I); and brought claims for disparate treatment on the basis of gender in violation of Title VII (Count II); disparate impact on the basis of gender claims (Count III); class action damages (Count IV); violations of the Equal Pay Act (Count V); Equal Protection, pursuant to 42 U.S.C. § 1983 (Count VI); Title VII gender discrimination and § 1983 (Count VII); Title VII retaliation (Rollins) (Count VIII); Title VII and § 1983 gender discrimination (Johnson) (Count IX);  Title VII retaliation (Johnson) (Count X);  Title VII gender discrimination and § 1983 (Thomas) (Count XI); Title VII retaliation (Thomas) (Count XII); Title VII gender discrimination and § 1983 (Ward) (Count XIII);  Title VII and § 1983 retaliation (Ward) (Count XIV); and violation of policy and state statutes (Count XV).  Count VI is the only Count which includes claims against the individual defendants, and all of those were sued in their official capacities.  Only Munnerlyn and Byrne were also sued in their individual capacities. [1]

_____

[1]  The Fourth Amended Complaint, Doc. #63, and both the Plaintiffs' briefs, and the Defendants' briefs, have referenced 42 U.S.C. § 1981 at various points.  *See, e.g.*, Doc. #173 p. 35; Doc. #169 at p.1;  Doc. #194 at p. 21.  The Plaintiffs' gender claims, however, are not

The court subsequently denied a Motion for Class Certification by the Plaintiffs (Doc. #107).  The court also disposed of some aspects of the Motion for Partial Summary Judgment (Doc. #134), dismissing money damages claims against individual Defendants in their official capacity, and substituting Governor Robert Bentley for former Governor Bob Riley.  Doc. #189. This left money damages claims outstanding only against Munnerlyn and Byrne in their individual capacities.  The court also granted a Motion to Strike Evidentiary Materials in some respects, and denied that Motion in other respects.  *See* Doc. #185.

The Defendants have filed separate motions for summary judgment as to the claims of each Plaintiff.  While the filings are voluminous, and necessitate extensive discussion by the court as to each motion, because there is overlap in some of the claims, particularly regarding legal standards to be applied, the court has addressed all of the motions in one Memorandum Opinion and Order.

For the reasons to be discussed, the Defendants' motions are due to be GRANTED in part and DENIED in part, and the court will decline to exercise supplemental jurisdiction over the state law claims.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

cognizable under 42 U.S.C. § 1981, which provides protection only on the basis of race.  *See* 42 U.S.C. § 1981.  The Plaintiffs do not assert claims of race discrimination in this case. *See* Doc. #63.  To the extent that § 1981 gender claims purport to have been asserted, summary judgment is due to be GRANTED as those claims.

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The summary judgment rule is to be applied in employment discrimination cases as in

any other case. *Chapman v. A1 Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000)(*en banc*).

## III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the nonmovants:

All of the Plaintiffs are employees of H. Councill Trenholm State Technical College ("Trenholm").   The Defendants in this case include, in addition to Trenholm, the Alabama Community College System ("ACCS"), the Alabama Department of Post-Secondary Education, and the State Board of Education.   There are twenty-nine colleges within the ACCS, one of which is Trenholm.   The State Board of Education is the governing board for all of the ACCS colleges.   The Department of Post-Secondary Education is responsible to the State Board of Education for supervision of two-year community and technical colleges.   Other Defendants in this case include the President of Trenholm, Samuel Munnerlyn ("Munnerlyn") in his official and individual capacities; Bradley Byrne, in his individual capacity; and Randy McKinney, Betty Peters, Stephanie W. Bell, Dr. Ethel H. Hall, Ella B. Bell, David F. Byers, Jr., Gary Warren, and Dr. Mary Jane Caylor, in their official capacities as members of the State Board of Education. Robert Bentley has been sued in his official capacity as Governor.   Freida Hill has been sued in her official capacity as Chancellor.   Doc. #189.

All of the Plaintiffs have asserted claims based on the salaries they receive as compared to male employees at Trenholm.   The President determines the initial placement of employees on the salary schedules, and makes requests for salary increases, and submits the requests to the Chancellor and the Alabama Department of Post-Secondary Education.   During the events in question in this case, Trenholm was served by two different Presidents: Anthony Molina

("Molina"), who passed away in April 2007, and Samuel Munnerlyn ("Munnerlyn").  Bradley Byrne was the Chancellor during the relevant period.  The Chancellor has the authority to reject any salary request or request to reorganize an employee's job position.

Trenholm has the following classifications of employees: Salary Schedule A–President, Salary Schedule B–Deans and Business Officers, Salary Schedule C–professional personnel not included in other schedules, Salary Schedule D--teachers, Salary Schedule E–technical and support personnel not included in other schedules, and Salary Schedule H–support personnel working twenty or more but less than forty hours per week.

The C Salary Schedule has C-1, C-2, and C-3 classifications.  The C-1 and C-2 Salary Schedules, as well as the D and E Salary Schedules, provide for step increases.  At relevant points in this litigation, the C-3 classification did not provide for step increases, but as a result of settlement of separate litigation, *Carolyn Millender v. H. Councill Trenholm State Technical Coll., et al.*, 2:07-cv-00145 (M.D. Ala.), Trenholm implemented C-3 Salary Schedule Guidelines establishing pay steps for future salary increase.  When Trenholm implemented the C-3 Salary Schedule Guidelines, each existing C-3 employee was placed at a specific salary step based on length of service at Trenholm.  Doc. # 89-4.  The Plaintiffs contend that the failure of the new C-3 schedule to account for prior education experience is a violation of state law.

The Plaintiffs point out that African-American employees have previously brought litigation against various colleges which was resolved by consent decree in *Shuford v. Ala. State Bd. of Edu.*, 897 F. Supp. 1535 (M.D. Ala. 1994).  Some of the job duties of the Plaintiffs, and their proffered comparators, include compliance with that consent decree.

**Facts Specific to Plaintiff Thomas**

6

Thomas was hired by Trenholm in August 2002, while Molina was President, as the Accounts Receivables Clerk.  She was placed on the E3-03 Salary Schedule and was making $35, 953 at that time.  Two weeks after being hired as Accounts Receivables Clerk, Thomas also assumed the duties of the Accounts Payable position, but did not receive a pay increase.  In June 2003, the Payroll Clerk retired, and Thomas also assumed the duties of Payroll Clerk.

In August 2004, Thomas's job title was changed to Accountant/Payroll and Personnel. Thomas states that in her position she is responsible for compliance with state policies, she manages accounting of payroll and benefits, she prepares monthly internal and external reports, she provides staff with tax and benefit changes, she serves as backup to accounts payables, receivables, bookstores and human resources.  She assists external auditors and serves as a liaison. She reconciles payroll ledger on a monthly basis and prepares and reconciles quarterly reports.  She is also responsible for reconciling and preparing employee W-2s for disbursements and attends training and professional development workshops.  Pl. Ex. #86, ¶ 3.[2]

In February 2007, Thomas asked Molina to reorganize her position and advance her from the E-2 to the E-1 at step 17.  Molina passed away.  Thomas renewed her request with interim president Munnerlyn.  Munnerlyn declined her request because he was interim, and did not recommend the requested reorganization later when he became President.

In 2008, Thomas was approached by her supervisor, Catherine Wright, about an Operations Accountant position.  Thomas was told the position paid $54,830 and was at E1 01 on the Salary Schedule.   Thomas was not interested in the position.  Her supervisor asked the

---

[2] All of the Plaintiffs filed together a single evidentiary submission consisting of 121 exhibits, and located at document #172.

head of the department, Dean of Finance Debra Griggs ("Griggs"), to see if more money was available, but was told that $54,830.00 was budgeted for the position.

In December 2008, William Merrill was hired as the Operations Accountant at $70,000. When asked in his deposition why Merrill was paid $70.000, Munnerlyn stated that Munnerlyn was a CPA, had other certifications and "[w]e needed some other–a male would be nice to have in the business office."  Pl. Ex. #8, p. 277:11-16.

Thomas states that after she complained about gender discrimination verbally and in writing prior to 2007, and in February 2007, May 2007, September 2007, a March 2008 grievance which was later withdrawn, an April 22, 2009 EEOC charge, she has been subjected to retaliation in the terms and conditions of her employment.

### Facts Specific to Plaintiff Rollins

Pamalon Rollins ("Rollins") currently serves as the Human Resources Director at Trenholm.

In 2004, Rollins applied for and received the Administrative Services Manager position at Trenholm.  At that time she was placed on the C-3 Salary Schedule.  The C Salary Schedule is for Professional Personnel.   The President of Trenholm at the time of Rollins's hire was Molina. Molina attached conditions to the offer of employment to Rollins, requiring her to obtain a Master's degree in Human Resources Management within three years of her hiring date.  Rollins accepted the offer of employment with the condition.  At the time she was hired in 2004, Rollins earned a salary of $40,000.  Over time, Rollins received a change in pay from the Defendants on one occasion in 2007, noted below, and legislative pay raises.

Rollins states that she later discovered that men employed at Trenholm have not had to

comply with a condition of a Master's Degree for their employment.  She specifically points to Charles Harris, Dennis Monroe, Larry Achord, Gerald Horn, Michael Evans, and Quinton Ross.

In 2005, Rollins's position was re-titled Director of Human Resources.   Her position summary states that she is responsible for the daily operations of administrative services.

In 2006, Rollins requested a reorganization of her position and that her position be advanced from the C-3 Salary Schedule to the C-2 Salary Schedule.  Molina denied this request, citing budget concerns.

Rollins obtained her Master's degree in Human Resources Management in May 2007.  She did not receive a pay increase for completing this degree.  Rollins states that male employees have received pay increases when they have completed degrees.

In mid-2007, Rollins requested a reorganization of her position and pay increase.  Byrne met with Rollins and asked Latonya Dupree, Human Resource Director of the Department of Post-Secondary Education, to review Human Resource Director salaries and make a recommendation to him.   Rollins states that the salary survey conducted by Latonya Dupree was flawed in many ways.  After Byrne received the salary survey, Byrne agreed to increase Rollins's salary from $51,360 to $55,360.  Rollins states that she was underpaid by almost $20,000 because the salary survey was flawed.

In June of 2008, Rollins again requested a reorganization and pay increase, seeking to have her position moved from the C-3 schedule to the C-2 schedule.  She asked that her salary be increased from $55,360 to $77,000.  Munnerlyn was President of Trenholm at the time of this request.  Munnerlyn recommended her request.  On August 5, 2008, then-Chancellor of the Alabama Department of Post-Secondary Education, Byrne, denied the reorganization request.

9

On August 27, 2008 Rollins filled EEOC charges of gender discrimination.  Rollins states that Munnerlyn retaliated against Rollins for protected activities through various actions.

## Facts Specific to Plaintiff Tamara Ward

Tamara Ward ("Ward") worked as an Adjunct Instructor for approximately 8 years before she was made a full time Instructor at Trenholm.  She was made a full time instructor in May of 2004, and placed on the D-1 Salary Schedule at Grade 1A, Step 1 at a salary of $33,092.00.  Ward is licensed through the Alabama Board of Cosmetology as a certified Cosmetology Instructor and a Managing Cosmetologist.  Before being employed at Trenholm, Ward was a Salon Inspector for the Alabama Board of Cosmetology, in charge of inspecting salons in a 10 to thirteen-county region.

The D Salary Schedule applies to instructors, librarians, and counselors.  The D Salary Schedule has steps, and advancement in steps is based upon years completed.

In 2005, Ward was told that she would be entitled to advancement if she received her Master's degree.  Ward obtained a Master's degree in Management from Troy University.   She submitted a request for advancement on October 4, 2007.   Ward was informed by Munnerlyn that she had to take and pass an NOCTI occupational exam to receive an advancement in rank.  Ward contends that the NOCTI exam had never been required previously.  Ward passed the exam in December 2008 and provided the documentation to the Defendants on March 5, 2009.  The Defendants informed her that she had to wait for the following calendar year to receive her raise.

Ward filed an EEOC charge of gender discrimination on July 6, 2009.   The court granted a motion to add Ward as a Plaintiff in this case on April 8, 2010. *See* Doc. #56.  Ward alleges various actions have been taken against her in retaliation for protected activities.

**Facts Specific to Plaintiff Shemedrea Johnson**

Shemedrea Johnson ("Johnson") began working at Trenholm in 2001 as the Director of Restricted Programs. When Johnson applied, the job posting indicated that the position would be paid on the C-2 Salary Schedule. The C-2 schedule applies to jobs with a high level of administrative responsibilities. The C-2 schedule pays more than the C-3 schedule. After Johnson met with Molina for an interview, she was told that the position would be on the C-3 Salary Schedule.

As the Director of Restricted Programs, Johnson has oversight over all grants and contracts. In December 2006 or January 2007, Mary Ann Beck resigned her position as Director of Accounting. The business department was headed by the Griggs. Directly below Griggs were Beck, Rollins, and Dennis Monroe, Director of Physical Plant. Thomas and other employees reported to the Director of Accounting.

Johnson assumed Beck's duties. Administrative Assistant Daisy Taylor resigned, and Johnson also assumed her duties.

Around August 2007, Griggs was terminated. Johnson assumed those job duties and was given a $1,000 stipend. Griggs returned one month later.

On June 20, 2007, Johnson asked then-interim President Munnerlyn to be placed on the C-2 Salary Schedule. Munnerlyn agreed and requested the change. Byrne denied the request. Byrne stated that he felt the decision should be made by a permanent president. Munnerlyn told Johnson he would make a new request when he became President. Munnerlyn was confirmed as President in December 2007.

On January 16, 2008, Johnson asked Munnerlyn to place her on the C-2 Salary Schedule.

11

She made the same request on May 5, 2008.  She was not placed on the C-2 schedule.

When Trenholm implemented its C-3 Salary Schedule in 2008, Johnson was placed at step 7, based on one year of salary credit for each year of employment at Trenholm.

On July 30, 2008, Johnson filed an EEOC Charge of gender discrimination.   She alleges that various adverse acts taken against her in retaliation for her EEOC Charge and other complaints.

## IV. DISCUSSION

As indicated, the court will address each of the Plaintiffs' claims separately with respect to the statute pursuant to which they are asserted, but there are some issues which are common to all of the Plaintiffs.  The court first turns to a few of those preliminary issues which the Plaintiffs have in common.

### A.  Preliminary Issues

### 1.  Direct v. Circumstantial Evidence Analysis

All of the Plaintiffs have argued that they have a direct evidence case of discrimination in employment on the basis of their gender, and direct evidence of retaliation.   In large part, this argument is based on Munnerlyn's deposition testimony, noted above.   The cited testimony, and the question precipitating it, are as follows:

> Q.  Was that based on the fact that Mr. Billy–why was Mr. Billy Merrill paid $70,000?
> A.  I had three candidates to interview.  I interviewed all three candidates.  Billy Merrill came out on top because of his interview, because he's a certified CPA. He has several other certifications.  And I thought that he was someone we needed in our business office.  And you asked me earlier.  We needed some other–a male would be nice to have in the business office.

Munnerlyn Dep., Pl. #8, p. 277:4-16.  This testimony was given in connection with a

position for which Merrill was hired and for which Thomas argues she would have applied had she known that the salary would be $70,000, rather than the $54,000 figure represented to her.

The Defendants argue that this statement must be considered in the context of Munnerlyn's other deposition testimony, particularly because it is prefaced with "[a]nd you asked me earlier." *Id.* at 277:13-14.  The Defendants point out that Munnerlyn testified that he is aware of the need for diversity because Trenholm is a historically black college, but that he hires based on who can do the work.  *Id.* at 139–140.  They argue that taken in that context it is clear that Munnerlyn based his decision on qualification of the candidate and ability to do the job.  The Defendants go on to argue that even if the court does not consider Munnerlyn's statement in context, the statement does not rise to the level of direct evidence.

The Eleventh Circuit has held that "[d]irect evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Therefore, remarks by non-decision makers or remarks unrelated to the decision making process itself are not direct evidence of discrimination.*" Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted).  "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998).   If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.  *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004).

The Defendants point the court to *Harris v. Shelby County Bd. of Ed.*, 99 F.3d 1078, 1082-83 n.2(11th Cir. 1996).   In *Harris*, the personnel director was asked in her deposition

13

whether the decision maker had discussed the hiring of the plaintiff.  The personnel director answered that the decision maker said "that under the circumstances we did not need to employ a black at Thompson High School."  *Id.* at 1082-83 n.2.  The personnel director then went on to say that he could not say for a fact that that would eliminate the plaintiff from the position because the personnel director "did not know [the decision maker's] thinking."  *Id.*  The Eleventh Circuit concluded that this was circumstantial, but not direct evidence, of discrimination.

In this case, Munnerlyn was specifically asked why he set the salary for Billy Merrill at a certain level.   As set forth above, he answered that it was because Billy Merrill was the best qualified of three candidates, and that it would be nice to have a male in the business office.

First, clearly Munnerlyn's statement is not direct evidence of discrimination as to any claims by Rollins, Ward, or Johnson, who did not apply for the position for which Merrill was hired.  *Standard v. A.B.E.L. Services, Inc.*  161 F.3d 1318, 1330 -1331 (11th Cir. 1998) (stating that remarks by non-decision makers or remarks unrelated to the decision making process itself are not direct evidence of discrimination).  His statement is furthermore not evidence of retaliation as to any Plaintiff because it is not evidence of a retaliatory intent.  *Id.*

Thomas's claim for failure to promote presents a closer question.  The claim asserted by Thomas is not a traditional failure to promote claim. Thomas claims that Merrill was appointed to a position at a salary of $70,000 after she had been told that the position would pay $54,830. Thomas has explained that had she known what the position would pay, she would have applied for it.  She claims that the salary was increased because Merrill is a man.   To understand that Munnerlyn's statement relates to Thomas's theory, therefore, the court would have to infer that Thomas was told a different salary than the one ultimately offered because Munnerlyn wanted a

14

male in the business office.  The court concludes, therefore, that while Munnerlyn's statement constitutes some evidence of gender-based discriminatory intent, it is not direct evidence with respect to Thomas's claim.  *Wilson,*  376 F.3d at 1086.

Plaintiff Johnson, in addition to relying on Munnerlyn's statement, also notes that she was told by her supervisor, Griggs, that Trenholm discriminates against women and that Munnerlyn had no intention of raising her salary to correct her being underpaid compared to males.   The court has examined the evidentiary basis for this argument by Johnson.  In her deposition Johnson states that Griggs told her that Trenholm pays females lower than males and that Griggs felt she is being discriminated against because she is female.  Pl. Ex. #38 at p. 114: 3-12.  In her affidavit, Johnson states that Griggs said that Munnerlyn "is planning to not be truthful about telling you and Pam that he is moving you two to salary schedule C-2."  Pl. Ex. # 87 at ¶ 16.   Even if the court were to consider these statements, in the face of the Defendants' hearsay objections, neither one of these statements is by a decision maker about an employment decision. *See Standard*, 161 F.3d at 1330.  The statements may not even constitute stray remarks of discriminatory intent, but may in fact be more correctly characterized as an opinion by a person other than a decision maker.  In any event, the court cannot conclude that these statements establish "the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id.*

Plaintiff Johnson also points to an additional statement as direct evidence of retaliation. In her affidavit, Johnson states that her supervisor, Griggs, said that she would be glad when the lawsuits are over because it is wasting the school's money.  *See* Pl. Ex. #87 at ¶ 16.  That statement does not, however, meet the standard of direct evidence of retaliation.  *Id.*

15

Thomas also alludes to a statement by Munnerlyn, objected to by the Defendants as triple hearsay, that complainants were "whining." That statement, however, if admissible, also is not directly related to any employment decision and cannot be direct evidence. *Id.*

Having concluded that the evidence pointed to by the Plaintiffs as direct evidence of gender animus and retaliatory animus does not rise to the level of direct evidence, the court will analyze the Title VII and Equal Protection disparate treatment claims, *see Stallworth v. Schuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (Title VII disparate treatment and § 1983 claims are governed by the same legal analysis), and Title VII retaliation claims, *Watkins v. Bowden*, 105 F.3d 1344, 1344 (11th Cir. 1997), under the traditional *McDonnell Douglas* framework which applies to circumstantial evidence of discrimination and retaliation cases.

Under this framework, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

### 2.  Disparate Treatment Prima Facie Case Elements

Before the court addresses individual claims, there is a threshold issue which applies to the prima facie cases of the Title VII and Equal Protection disparate treatment claims; namely,

the degree of similarity which must be shown between a plaintiff and a comparator to establish a prima facie case of discrimination.

The parties have advanced extensive arguments regarding the prima facie case element calling for a comparison between the job duties of the complainant and the comparator.   The Defendants contend that the Plaintiffs must show that a comparator is nearly identical to the Plaintiff for all of the disparate treatment claims.   The Defendants cite, among other cases, *Johnson v. England*, 350 Fed. Appx. 314, 317 (11th Cir. 2009) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)).

The analysis of individual claims in this case already requires voluminous discussion, so the court is loath to engage in an involved discussion of this issue.   It appears, however, that a stricter standard of comparison has developed in two types of employment claims, Equal Pay Act claims and violation of work rules claims.

Under the Equal Pay Act, the Plaintiff must show that the employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions.  *See Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 795 (11th Cir. 1992).   The Equal Pay Act requires a plaintiff to meet a "fairly strict" burden of proving she did "substantially similar" work for less pay. *Id.* If she can do so, the burden shifts to the defendant to prove an affirmative defense. By contrast, Title VII requires a plaintiff to show a more "relaxed standard of similarity" between the jobs, but the burden never shifts to the defendant. *Id*.; *Alexander v. Chattahoochee Valley Community College*, 325 F. Supp. 2d 1274, 1293 (M.D. Ala. 2004).   The Eleventh Circuit has held that "Title VII incorporates a more relaxed standard of similarity between male and

female-occupied jobs, thus plaintiff is not required to meet the exacting standard of substantial

equality of positions set forth in the Equal Pay Act." *Miranda v. B & B Cash Grocery Store,*

*Inc.,* 975 F.2d 1518, 1529 (11th Cir. 1992). Under Eleventh Circuit law, therefore, the standard

for comparators for an Equal Pay Act claim is greater than that for a Title VII claim.  Because the

standard of review under the Equal Protection Clause is the same as that under Title VII, *Cross v.*

*State of Alabama*, 49 F.3d 1490, 1507-08 (11th Cir.1995), the Equal Pay Act claim comparator

standard is also greater than an Equal Protection comparator standard.

   The other line of case law with a more stringent comparator standard has developed in the

context of termination or disparate treatment based upon violation of work rules cases, wherein

the court must "evaluate 'whether the employees are involved in or accused of the same or

similar conduct and are disciplined in different ways.'"  *Burke-Fowler v. Orange County, Fla.,*

447 F.3d 1319, 1323 (11th Cir. 2006).

   The Eleventh Circuit's *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004)

seems to have created some confusion because it broadly stated that to prove disparate treatment,

a plaintiff must show that a possible comparator is similarly situated in all relevant respect and is

nearly identical to the plaintiff.  *Wilson*, 376 F.3d at 1087.  That statement was, however, made in

the context of evaluating a claim for termination where the employee had been terminated for

insubordination.  *Id.* at 1085; *see also White v. Thyssenkrupp Steel USA, LLC*, 743 F. Supp. 2d

1340, 1348 n.12 (S.D. Ala. 2010) (stating "*Wilson*, however, involved an employee terminated

for misconduct, . . . and the Eleventh Circuit has long used the 'nearly identical' test in that

narrow context.").   It is not at all clear, therefore, that *Wilson* intended to set a comparator

standard for other types of disparate treatment claims not involving violation of work rules.

18

Since *Wilson* was decided, however, as the Defendants have pointed out, there have been unpublished Eleventh Circuit cases which cite to the strict comparator standard in the context of other claims, such as pay claims.  *See, e.g.,   Hill v. Emory Univ.*, 346 Fed. Appx. 390 (11th Cir. 2009), *cert denied*, _ U.S. _, 130 S. Ct. 1737 (2010).  In addressing the various claims presented in this case, particularly the pay claims, the court will bear in mind the different formulations of the prima facie case.

The court also notes that under the *Wilson* formulation, if "a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present*."  *Wilson*, 376 F.3d at 1092 (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)) (emphasis in original).

### 3.  Statute of Limitations

At various points, the Plaintiffs have argued that a four-year statute of limitations governs their § 1983 claims.  The case cited by the Plaintiffs for this proposition, *Jones v. RR Donnelly & Sons Co.*, 541 U.S. 369, 371 (2004), held that a four year statute of limitations applies to a cause of action based solely on a post-1990 statute that establishes a new cause of action.  *Id.* at 383. The § 1983 claims in this case are for violations of the Equal Protection Clause, not a post-1990 statute. The Plaintiffs argued that their § 1983 claims have a four-year statute of limitations because they are § 1981 claims.  As noted above, however, while 42 U.S.C. § 1981 is referred to in the Fourth Amendment Complaint, and referred to by both parties at various points in their briefs, all of the claims asserted by the Plaintiffs are for gender discrimination or retaliation based on claims of gender discrimination.  *See* Doc. #63.  Only claims of race discrimination, and not claims of gender discrimination, are cognizable under § 1981.  *See, e.g., Runyon v. McCrary*, 427

U.S. 160, 167 (1976).  Therefore, the only § 1983 claims are gender discrimination claims under

the Equal Protection Clause, which have a two-year statute of limitations.  *See Baker v.*

*Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008);  *Jones v. Preuit & Mauldin,*

876 F.2d 1480, 1483 (11th Cir. 1989).

### 4. Qualified Immunity

Qualified immunity is a protection designed to allow government officials to avoid the

expense and disruption of trial. *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir.1991).  Once it

is established that a defendant was acting within his discretionary authority, the court must

determine whether "[t]aken in a light most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S.

194, 201 (2001).  "[I]f a constitutional right would have been violated under the plaintiff's

version of the facts," the court must then determine "whether the right was clearly established."

*Wood v. Kesler,* 323 F.3d 872, 878 (11th Cir. 2003).

Requiring that a constitutional right be clearly established means that liability only

attaches if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official

would understand that what he is doing violates that right." *United States v. Lanier*, 520 U.S.

259, 270 (1997).  In other words, a defendant is entitled to "fair warning" that his conduct

deprived his victim of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Defendants have asserted qualified immunity as a defense to the claims in Count VI

of the Fourth Amended Complaint against Munnerlyn and Byrne in their individual capacities.

### B.  Title VII disparate treatment and § 1983 Claims Equal Protection Claims

Each of the Plaintiffs have asserted Title VII disparate treatment and § 1983 Equal

Protection claims as to which the Defendants have moved for summary judgment.   The court
will address together each of the Plaintiffs' claims arranged by type of claim, beginning with
claims for failure to promote, then addressing pay claims, and then other terms and conditions
claims.

Before turning to the individual claims of the Plaintiffs, the court notes that the
characterization of the Plaintiffs' claims sometimes has posed difficulty.  This is particularly true
with respect to the Plaintiffs' failure to promote and wage claims because, with the exception of
Plaintiff Thomas, the Plaintiffs are not asserting traditional failure to promote to a different
position claims, but are instead contending that their positions should have been increased to a
higher wage level.  If the characterization makes a difference, for example in terms of limitations
period, the court has characterized the claims in the light most favorable to the non-movant.[3]  At
no point has the court intended to preclude any Plaintiff from proceeding on all theories timely
advanced.

### 1.  Failure to Promote

To establish a failure to promote claim, a plaintiff must show (1) that she belongs to a
protected class, (2) that she applied for and was qualified for a promotion, (3) that she was

---

[3]  For instance, as promotion claims, at least some of Ward's claims would be barred as
untimely.  The court has, therefore, analyzed her claims as pay claims.
    Thomas has also stated that she applied for and qualified for a promotion in February and
September of 2007 and has pointed to denials of promotions in 2002 and 2003.  At various points
these claims appear be referred to as pay and promotion claims.  The distinction between
compensation and promotion claims is significant, because as discussed above, discrete
employment actions which occurred more than 180 days prior to the filing of the EEOC charge
and more than two-years prior to the filing of the § 1983 complaint are time-barred, and only the
compensation practice claims are not time-barred.  42 U.S.C. § 2000e–5(e)(3)(A); *see also
Groesch v. City of Springfield*, 635 F.3d 1020 (7th Cir. 2011).  The Complaint in this case was
filed May 29, 2009, and Thomas's EEOC charge was filed in April 20009.

rejected despite her qualifications, (4) that other equally or less qualified persons outside of the class were promoted. *Brown v. Ala. Dep't. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). The comparators for the fourth prong must be "similarly situated in all relevant respects." *Id.* (*quoting Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)). The court turns now to each of the claims for failure to promote asserted pursuant to Title VII and the Equal Protection Clause. *See Abel v. Dubberly*, 210 F.3d 1334, 1338 (11th Cir. 2000) (applying the same analysis to Title VII and Equal Protection claims based on the same facts).

### a .  Thomas's Failure to Promote Claim

Thomas's claim is for failure to promote to the Operations Accountant position ultimately filled by Billy Merrill. Thomas has claimed that she was effectively denied a promotion because the Defendants misrepresented the salary which would be paid in an attempt to dissuade her from applying, and ultimately hired a man to perform the job at a much higher salary than that offered to Thomas. Thomas states in her brief that she was offered the Operations Accountant job at a salary of $54,830, but informed Munnerlyn that she did not want the position because the salary was lower than her current salary. She argues that Munnerlyn continued to represent to her that the pay would not be higher than $54,830, but then hired Merrill at $70,000.

The Defendants contend that they are entitled to summary judgment on Thomas's failure to promote claim because Thomas did not apply for the position and she was not qualified for the position which was ultimately filled. The Defendants' challenge to Thomas's ability to establish a prima facie case is based on two basic premises: one, that the evidence does not support the argument that Thomas was dissuaded from applying by the representation of the salary, and two, that the job ultimately filled by Merrill was not the same job initially offered to Thomas.

22

The Defendants state that according to her deposition, Thomas did not apply for the position because of the additional duties, not the salary.   The Defendants state that Thomas initially claimed that she turned down the position because the salary was lower, but then admitted in her deposition that she knew she would be able to earn overtime in the new position. The Defendants argue that when confronted with this information in her deposition, Thomas admitted that she did not apply for the position because of the duties.   The Defendants have urged the court to find that Thomas's contradictory affidavit testimony is a sham, and due to be stricken under *Van T. Junkins and Associates, Inc. v.  U.S. Indust., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

Even without considering Thomas's affidavit, the court finds that there is a question of fact, based solely on her deposition testimony, and the testimony of Munnerlyn, and a reasonable jury could conclude that Thomas chose not to apply for the Operations Accountant position because of the salary as represented by Munnerlyn.   Thomas states in her deposition that she wrote Griggs a letter when she heard that the Defendants were going to hire an operations accountant and told her that she would be a good fit for the position.   Pl. Ex. #51 at p. 74: 13-20. She states that initially the position was not advertised, but when it was advertised, she did not apply for it because she was assured that the position would not pay more than what her current salary was at the time. *Id.* at p.  77: 8-19.   When asked whether she had the opportunity to apply for the position once it was advertised as a C salary position, Thomas answered that she did have the opportunity to apply, but did not "[b]ecause of the salary." *Id.* at p. 83: 7.   Munnerlyn also stated that when the job was advertised on the C schedule, there was no indication of specific amount the job would pay.   Pl. Ex. # 8 at p. 276: 1-4.   He stated that prior to Merrill being hired

at $70,000, no one knew the position would pay more than $55,000.  *Id.* at p. 281: 9-14.  Thomas

states in her deposition that after the position was advertised as a C-3 salary position, she asked

Munnerlyn again how much the position paid and he "assured me that it was only going to pay

fifty-four eight thirty."  Pl. Ex. #51 at p. 72: 20-73:4.   Munnerlyn testified that Thomas told him

that she was not going to accept the position because she could make more in overtime.  Pl. Ex.

#8 at p. 272: 10-13.   He further stated that he understood that "she did not want the job at that

pay."  *Id.* at 273:  20-21.  Regardless of the factor that the possibility for overtime played a part in

her consideration, Thomas has presented sufficient evidence through deposition testimony to

create a question of fact as to whether she did not apply because of the salary represented to her

by Munnerlyn.

"The 'application' requirement is designed to prevent imposition of civil rights liability

on an employer for lacking sufficient clairvoyance and omniscience to divine an employee's

unarticulated desire for a vacant job.*" Garrison v. Travel Centers of America*, No. 4-429-WS,

2005 WL 1711884, at *11 (S.D. Ala. July 20, 2005).   There are circumstances, however, under

which the application requirement is not strictly applied.  For instance, if a position is not posted,

an employer has a duty to consider all those who reasonably might be interested in a promotion,

as well as those who heard of the opening and expressed an interest.  *Carmichael v. Birmingham

Saw Works*, 738 F.2d 1126, 1133-34 (11th Cir. 1984).   Clearly, Thomas met this burden with

respect to the original Operations Accountant position before it was advertised.

Under the circumstances of this case, the court concludes that there is at least a question

of fact which excuses Thomas's application requirement for the position even once it was

advertised.  *See Lockridge v. Board of Trustees of University of Arkansas*, 315 F.3d 1005, 1011

(8th Cir. 2003) (plaintiff who does not formally apply "must make every reasonable attempt to convey his or her interest in the job to the employer before he or she may prevail on a discrimination claim").  Thomas's testimony is that after the position was advertised, she inquired about the salary from Munnerlyn and was told that the salary would be at the level which he understood she did not find acceptable.   Munnerlyn has stated that he knew she did not want the position at that salary.   Pl. Ex. #8 at p. 273: 20-21.  The court concludes, therefore, that viewing the evidence in a light most favorable to the non-movant, Thomas adequately expressed interest in the position, but made it clear she was not interested in the position if it paid the salary which had been represented to her by Munnerlyn.  *See Stubblefield v. Trinity Industries, Inc.,* 961 F. Supp. 1553, 1558 (M.D. Ala. 1997) (stating "the Plaintiffs have at least created an issue of fact as to whether they were precluded from applying for positions by Trinity's actions.") (citing *Taylor v. Hudson Pulp and Paper Corp.* 788 F.2d 1455 (11th Cir.1986)).  Viewed in a light most favorable to the non-movant, the court concludes that the evidence creates sufficient issues of fact so that the fact that Thomas did not apply for the position does not defeat her prima facie case.

The Defendants also argue that the position ultimately given to Merrill was not the same position offered to Thomas because changes were made in the position over time, and a new advertisement was made, with new applications each time.   In response to the Defendants' argument that there was a change in the position, which appears to be an argument both that Thomas did not apply for the new position and that she was not qualified for the position, Thomas points to Munnerlyn's deposition testimony.

Munnerlyn testified that there was an Operations Accountant Position advertised on the E

Salary Schedule in 2004 and that that was the position Thomas held.  Pl. Ex. #8 at p. 265: 22-

268: 18.   Munnerlyn stated that he discussed the new Operations Accountant job with Thomas

and understood that she did not want the job with only a $5,000 increase.  *Id.* at p. 273: 14-21.

Munnerlyn further testified that the fact that the person hired, Merrill, had a CPA made him no

better qualified for the position than someone who did not have a CPA.  *Id.* at p. 279: 13-17.

When asked if he considered Thomas to be a person who could move up to be in a key position

at Trenholm, Munnerlyn answered, "Yes.  And she could apply for this job."  *Id.* at p. 281: 1-8.

He elaborated, stating that after they decided not to merely do a reorganization, but to fully

advertise the job, "the requirements for the job in terms of education are the same.  Renoda

Thomas could have applied for this job, also, but she didn't."  *Id.* at p. 283: 13-16.

 In *Alexander v. Chattahoochee Valley Cmty. Coll.*, 325 F. Supp. 2d 1274 (M.D. Ala.

2004), the defendants created a new position which included the job functions of the position the

plaintiff held.   The court reasoned, applying *Batey v. Stone*, 24 F.3d 1330 (11th Cir. 1994), that

evidence that the plaintiff performed many of the duties of the new position was sufficient to

establish a prima facie case.  *Alexander*, 325 F. Supp. 2d at 1282.

 In the instant case, the evidence before the court creates a question of fact as to whether,

even if the position was changed before being listed as a C-3 Salary Schedule position,

Munnerlyn considered Thomas to be qualified for that position.

 To the extent that there were differences in the position, the court cannot conclude that

such differences preclude Thomas from establishing a prima facie case.  Even assuming that the

strict *Wilson* comparator standard would apply to Thomas's claim, the Eleventh Circuit noted

that if "a plaintiff fails to show the existence of a similarly situated employee, summary judgment

is appropriate *where no other evidence of discrimination is present*."  *Wilson*, 376 F.3d at 1092

(emphasis in original) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).   In this

case, there is evidence of discriminatory intent in the form of Munnerlyn's statement that he set

Merrill's salary, after representing a different salary to Thomas, in part because "a male would be

nice to have in the business office." Pl. #8, p. 277: 4-16.

The court concludes, therefore, that there are sufficient questions of fact, which a

reasonable jury could resolve in Thomas's favor, so that a prima facie case of failure to promote

exists in this case.

The reasons articulated by the Defendants "for hiring Billy Merrill and setting his annual

salary at $70,000," Doc. #194, are that the decision was based on Merrill's qualifications "in

light of the needs of the college," *id.* at 29, and his status as a CPA.   The Defendants argue, and

present evidence from Munnerlyn's deposition, that he did not consider gender in making the

selection of Merrill.  The Defendants further argue that the fact that Munnerlyn initially

expressed a desire to keep the salary of the Operations Account position in the $55,000 range

does not prevent him from negotiating a higher salary when the duties of the position have been

modified significantly over time.  The Defendants argue that Thomas cannot disprove the

legitimate reasons articulated for Merrill's selection.

Munnerlyn's deposition testimony about his reason for setting Merrill's salary at $70,000

has been previously set out in full, but, as noted, includes a statement by him that "We needed

some other–a male would be nice to have in the business office."  Pl. Ex. #8, p. 277:4-16.  This

statement by Munnerlyn is circumstantial evidence of an intent to discriminate on the basis of

gender in the selection of the Operations Accountant position.  Furthermore, a reasonable jury

could interpret this testimony to mean that Munnerlyn's stated reliance on Merrill's CPA and interview qualifications were not the true qualifications relied upon, but that gender was a substantial motivation in Merrill's selection. *See Wilson*, 376 F.3d at 1089 (statements, including a statement which was circumstantial evidence of discriminatory intent, which undermined the stated reliance on relative qualifications was sufficient to establish pretext). Summary judgment is, therefore, due to be DENIED as to Thomas's failure to promote claims.

A remaining issue with respect to the § 1983 Equal Protection claim based on the failure to promote is the Defendants' Motion for Partial Summary Judgment on the basis of qualified immunity. (Doc. #134).

"Since at least 1979 it has been established that the Equal Protection Clause provides 'a constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment.'" *Snider v. Jefferson Cmty. College*, 344 F.3d 1325, 1331 (11th Cir.2003) (quoting *Cross v. Ala. Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995)). Having created questions of fact raised by Munnerlyn's deposition testimony as to whether there was intentional discrimination against Thomas on the basis of gender for purposes of her failure to promote claim, the Motion for Partial Summary Judgment on qualified immunity grounds is due to be DENIED as to Thomas's Equal Protection claim for failure to promote as against Munnerlyn.

A separate issue is raised by the qualified immunity defense on behalf of Byrne. The theory by which Byrne would be held individually liable for the failure to promote Thomas is so unclear to the court as to prevent the court from properly evaluating whether the law is clearly established as to a claim against Byrne. Accordingly, the court will reserve judgment on that

aspect of the Defendants' Motion for Partial Summary Judgment, (Doc. #134), and seek additional briefing.

### b.  Rollins's Failure to Promote Claim

Rollins states that she has a prima facie case of failure to promote because she applied for and was qualified for a C-2 Salary Schedule promotion on numerous occasions to compensate her for additional duties, but was denied the increased pay that she sought.  Rollins contends that she should have been promoted to a level which would have given her a salary of $75,000. Rollins's theory that she was denied promotions is based on a comparison to male employees whom she states have been given increased pay for additional duties.

At the outset, the court notes that Rollins's claim for failure to promote is difficult to analyze because it is not a claim that Rollins applied for promotion to a position and another person was promoted.  Instead, Rollins contends that she sought a reorganization of her position, with accompanying pay increase, because of additional job duties.  Rollins has cited the court to facts that the first pay increase she sought was in 2006, the second in 2007, and the third in 2008. At various points, the Defendants have argued that claims asserted based on actions taken in 2007 are time-barred, because they occurred more than 180-days before Rollins's EEOC charge and more than two-years before her § 1983 Complaint.  The same analysis applies to the extent that Rollins has sought relief for failure to promote under Title VII and the Equal Protection Clause, as opposed to a pay claim,[4] based on her reorganization requests in 2006, and under Title

---

[4]  Rollins's Title VII and Equal Protection wage claims, based on the salaries of the same comparators, is addressed below.

VII for her 2007 request.[5]

In terms of a prima facie case of failure to promote based on the reorganization requests which are not time-barred, the Defendants only dispute that other equally or less qualified persons outside of the class were promoted. They contend that the comparators pointed to by Rollins for the fourth prong are not "similarly situated in all relevant respects." *Brown v. Ala. Dep't. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).

Rollins points to Louis Campbell,[6] Charles Harris, Wilford Holt, Dennis Monroe, Arnold Stringer, Freddie Williams, and Larry Achord as men who were given extra pay through reorganization for extra duties.[7]

Rollins contends that these employees are all similarly situated to her because the process for reorganization at Trenholm is the same for all employees regardless of whether the employee is a director, coordinator, teacher, janitor, or IT specialist. Rollins contends that when additional duties are given to an employee, the proper way to receive a promotion is to submit a request to the President that the position be reorganized at a higher salary level, which then must be approved by the Chancellor.

---

[5] Rollins states that she received her Master's Degree in May 2007 and made a reorganization request in "mid-2007," *see* Doc. #170 at p.26, therefore, such claim is outside of 180 days before her August 2008 EEOC charge, but it may be within two-years of her May 29, 2009 Complaint.

[6] While Rollins makes some attempt to compare the circumstances of Campbell's reorganization as Coordinator of Maintenance and Prison Workers, her argument compares Campbell to a different Plaintiff, Shemedrea Johnson. *See* Doc. 170 p. 31.

[7] In the Motion for Summary Judgment, the Defendants analyze Michael Evans, Charles Harris, Gerald Horn, Milton Perry, William Merrill, and Dennis Monroe as comparators for Rollins. Rollins, however, has relied on Campbell, Harris, Holt, Stringer, Williams, and Achord in the section of her brief concerning pay and promotion claims.

In this case, when Rollins made her 2007 request for reorganization, she told Byrne of her additional duties, and Byrne asked Latonya Dupree ("Dupree"), Human Resource Director of the Department of Post-Secondary Education to make a recommendation to him.   After the review, Byrne increased Rollins's salary from $51,360 to $55,360.

Even accepting Rollins's comparator theory,[8] the court cannot conclude that Rollins has established an Equal Protection claim of failure to promote based on her 2007 request.   The court has not been provided evidence of the circumstances of those reorganizations, and has certainly not been provided with any evidence that reorganization decisions with respect to those employees were made after a salary survey.   There is no evidence before the court that men were treated differently.

Rollins argues, in an attempt to establish pretext, that the salary survey that Dupree provided to Byrne was flawed because it included some erroneous salary information.   There is no evidence, however, that the 2007 decision was not made in reliance on the salary survey. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).   Rollins admits that the survey may excuse an initial denial of the raise, *see* Doc. # 170 at p. 103, but states that a different decision should have been made once mistakes were revealed.   The Defendants dispute that Byrne was aware of any flaws.   In his deposition, Byrne stated that he had "no indication that the information was flawed."   Pl. Ex. #14 at p. 142: 20-21.   The court cannot conclude, therefore,

---

[8] A district court within this circuit has recently rejected a similar argument.   *See Cooper v. Southern Co.*, 260 F. Supp. 2d 1334 (N.D. Ga. 2003), *aff'd*, 390 F.3d 695 (11th Cir. 2004), *overruled on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).   In *Cooper*, the plaintiff argued that although her job duties, and the duties of comparators, were not the same, the employer used job title as a measure of pay.   The court reasoned that the plaintiff's argument went to whether there was a legitimate non-discriminatory reason for the pay, and did not excuse the plaintiff from showing that she performed the same type of job functions.   *Id.* at 1348.

even if there is a prima facie case, that Rollins has undermined the articulated reason, or demonstrated any gender animus on the part of the decision maker, Byrne.

Rollins also sought a pay increase/promotion/reorganization in June, 2008. She requested that her position be moved from the C-3 to the C-2 Salary Schedule based on her performance of additional duties, including duties as the Equal Employment Opportunity officer, working on litigation, overseeing the leave process and other job duties. She asked that her salary be raised from $55,360 to $77,000. Dupree reviewed the request. Pl. Ex. #85 p. 114:8-14. Byrne denied the reorganization request, giving as a reason that he recently approved a salary adjustment for Rollins to bring her salary in line with human resources directors in the ACCS and the most recent request did not identify a significant increase in responsibilities for the new position. Pl. Ex. #14 at p. 139: 13-21.

Rollins again apparently intends to rely on the idea that men who received reorganizations are similarly situated to her because they are governed by the same promotion process. Rollins does not, however, demonstrate that any men were treated differently from her, other than to say that men received higher salaries or reorganizations, while she did not. Furthermore, Rollins has not undermined the articulated reason. Rollins's disagreement with the wisdom of the reasons given is not sufficient. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (stressing that "federal courts do not sit to second-guess the business judgment of employers"). Summary judgment is, therefore, due to be GRANTED as to Rollins's failure to promote claims.

### c. Johnson's Failure to Promote Claims

Johnson has alleged separate claims for denial of a promotion, based on denied requests

for a reorganization of her job as a C-2 salary position, the first of which occurred in 2007.  The

sequence of events, as set out in the fact section above, was that Johnson submitted a request for

reorganization in June 2007, and asked that she be moved to the C-2 Salary Schedule.  Interim

President Munnerlyn approved the request and sent it Byrne, but Byrne denied the request.

Byrne agreed with the proposition in his deposition that the reason for the denial was it was

"more appropriate for a permanent president" to make the decision.  Def. Ex. #14 at p.179:17-

20.[9]

In 2008, after Munnerlyn because the permanent President, Johnson again asked for the

reorganization, but did not receive the promotion.  Munnerlyn stated that he did not want to make

any mid-budget year raises.  Def. Ex. #29 at p. 226: 1-4.  He further agreed in his deposition that

he "encouraged her to make her request before the next budget year."  *Id.* at 226 : 7-10.  Johnson

states that the next budget year, Munnerlyn created the Comptroller job and the Operations

Accountant position, and hired Merrill to perform some of the duties Johnson would have

performed.[10]   Johnson states in her affidavit that the money for the increase was in the budget for

the year of her request. Pl. Ex. #87 at ¶ 17.  The court has not been pointed to a reason for the

decision by Munnerlyn not to request the reorganization once he became the permanent

President, but notes that Munnerlyn simply states in his deposition that he reconsidered his

_____

[9]  References to Defendants' Exhibit numbers are consistent with the numbers assigned
by the Defendants which are specific to each Plaintiff.  For example, while there are several
documents labeled Defendants' Exhibit #14, the above reference is the Exhibit #14 filed with the
Motion for Summary Judgment as to Plaintiff's Johnson's claims.

[10] To be clear, it does not appear that Johnson contends that she should have been
considered for the position into which Merrill was hired, but instead that some of the job duties
which she would have performed as part of the reorganization she sought were instead put into a
new position into which Merrill was hired.

earlier decision to request Johnson's reorganization.  Def. Ex. #29 at p. 222: 22-23.

### i.  2007 Reorganization Denial

Even if the court were to assume that Johnson established a prima facie case of failure to promote, the court cannot conclude that Johnson has sufficiently established pretext as to this claim, in light of the articulated reason that Byrne wanted the permanent President to make the reorganization recommendation.  The ultimate decision maker for this claim is Byrne.  Any evidence Johnson has pointed to which purportedly reflects gender-based animus is on the part of Munnerlyn, not Byrne.  Johnson has not pointed to any evidence which undermines the truthfulness of Byrne's reason that he wanted a President, not an Interim President, to make the determination.  *See Burdine*, 450 U.S. at 256.  A plaintiff is not allowed to substitute her business judgment for that of the employer.  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

### ii.  2008 Reorganization Denials

The Defendants argue that there were no males who were reorganized from a C-3 to a C-2 position during Munnerlyn's tenure.  They state, therefore, that Johnson cannot establish a prima facie case of failure to promote.  As their articulated reason for the denial of Johnson's 2008 reorganization denial, the Defendants have offered Munnerlyn's testimony that he did not want to make a mid-year increase.

Although somewhat more attenuated than Thomas's, there is a connection between Johnson's claim and Munnerlyn's statement regarding Merrill's salary and a desire to have a man in the business office at Trenholm.   Johnson's theory is that Munnerlyn denied her request on the basis of it being mid-year, but rather than provide her with the reorganization and salary

increase she had requested in the new budget year, Munnerlyn decided to create new positions, assign duties Johnson would have performed to those positions, and hire Merrill, so that he would have a man in the business office.

The Defendants are, of course, correct that this court is not to sit as a super-personnel board and second-guess decisions by employers.  In this case, however, Munnerlyn testified in his deposition that he paid Merrill $70,000 for the newly created position in part because it would be nice to have a man in the business office.  This is evidence which, in the context of this claim, suffices to establish a prima facie case even in the absence of comparator evidence.  *See Wilson*, 376 F.3d at 1092.  Furthermore, while the court certainly agrees that Munnerlyn, as any employer, has the right to make staffing and organizational decisions, in this case, to reconsider a recommendation he had earlier made, an employer cannot be motivated by considerations of gender in making those determinations.  A reasonable jury could conclude that Munnerlyn determined not to go through with the reorganization he previously had authorized because he wanted to have a man in the business office.  A jury might also conclude otherwise, but that determination is one which must be left for trial.

Summary judgment is, therefore, due to be DENIED as to Johnson's failure to promote claim based on the 2008 reorganization request.

Because there is evidence of gender discrimination, the Motion for Partial Summary Judgment on grounds of qualified immunity is similarly due to be DENIED as to the claim asserted against Munnerlyn.  *See Snider v. Jefferson Cmty. College*, 344 F.3d 1325, 1331 (11th Cir. 2003).

As earlier noted, a separate issue is raised by the qualified immunity defense on behalf of

35

Byrne.  The theory by which Byrne would be held individually liable for the failure to promote

Johnson is so unclear to the court as to prevent the court from properly evaluating whether the

law is clearly established as to a claim against Byrne.  Accordingly, the court will reserve

judgment on that aspect of the Defendants' Motion for Partial Summary Judgment, (Doc. #134),

and seek additional briefing.

## 2. Title VII and Equal Protection Wage Claims

All of the Plaintiffs assert wage claims in this case.  As a preliminary matter, the court

notes that each Plaintiff contends that the Defendants have failed to move for summary judgment

as to their Title VII and § 1983 claims for difference in wages.   While there may have been some

difference in the characterization of the claims in the initial motions, the court concludes that the

Defendants sufficiently met their burden in moving for summary judgment by addressing the

bases of these claims either as promotion claims or Equal Pay Act claims.  *See, e.g.,* Doc. #155 p.

46; Doc. #153 at p.21.

A prima facie case of disparate treatment in wages claim is established if the plaintiff

demonstrates (1) she belongs to a protected class, (2) she received lower wages, (3) similarly

situated comparators outside of the class received higher compensation, and (4) she was qualified

to do the job.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

### a.  Thomas

Thomas states that Merrill is her comparator for her disparate treatment in pay claim just

as he was for the failure to promote.  The Defendants do not appear to dispute any element of the

prima facie case other than that Merrill and Thomas are similarly situated.   The court will first

examine the job duties of Thomas and Merrill, then apply Eleventh Circuit comparator analysis,

and finally discuss the alternative prima facie case formulation.

### i. Job Duties

Thomas states that she is paid $50,354 while Merrill is paid $70,000 as Operations

Accountant, even though each is  a paraprofessional accountant in the business office with

similar supervisory roles.  The job description for Operations Accountant lists seventeen essential

job functions, duties and responsibilities. Ex. 1 to P. Ex. #45 at p. 177.[11]  The job description for

---

[11] The responsibilities listed are as follows:

1.  Responsible for compliance with policies of the State Board of Education, the Department of Post-Secondary Education, the College and all pertinent state and federal laws.

2.  Assists in the management of operations relative to purchases and liabilities, Central Supply and bookstore inventories, college assets, and delivery of customer service both internal and external.

3.  Ensures proper approval of signatures for purchases and reviews the accuracy of invoices, travel claims, other check requests, purchase orders and other related documentation for completeness and compliance with financial policies, procedures, and contractual requirements.

4. Responsible for the preparation of monthly bank reconciliations.

5.  Assists in developing the fiscal year budget by working with program directors in analyzing expenditures and projecting program fiscal needs.

6. Assists in the preparation of the annual and interim Financial Statement.

7. Prepares external and internal reports as requested by the President, Dean of Finance and Administrative Services, and the Comptroller.

8. Routinely provides senior management with data/information/analysis to support monthly reports and budget expense inquiries.

9. Develops and conducts training as needed in the areas of purchasing, accounts payable, inventory control, asset control, customer service, and management.

10.   Assists external auditors by providing requested information in a timely manner.

11.   Develop documentation of procedures for the Central Business Office Accounting Reference and Procedure Manual.

12.   Reconciles the general ledger on a monthly basis in areas of responsibility such a cash, accounts payable, inventory, bookstore sales, outstanding purchase orders and requisitions, vendor statements, and recurring accounts payable.

13. Assists with the reconciliation of student financial aid disbursements.

14.  Fosters an environment that encourages suggestions on how to improve the college, student satisfaction, quality customer service-internal and external, and

Thomas's position, Accountant–Payroll & Personnel lists 20 essential job functions, duties, and

responsibilities.  Def. Ex. #22.[12]

_____

nurtures employees to grow through cross-training and professional development.
15.  Attends training and professional development workshops and conferences in
all related areas, some requiring overnight travel.
16.  Available to work non-standard hours as needed.
17.  Performs related work as assigned.

[12] The responsibilities are listed as follows:
1. Maintains employee payroll records.
2. Maintains employee leave files.
3. Prepares payrolls for Monthly, Part-time instructors and Work-study
employees.
4. Prepares internal reports that relate to employee payroll and attendance.
5. Reviews all computer generated reports to ensure the accuracy of each
employee's paycheck.
6. Transmits electronically payroll direct deposit information.
7. Processes Payroll Payables– timely payment of payroll taxes and employee
deductions.
8. Reviews and inputs changes regarding salaries, status change, benefits and
deductions.
9.  Produces and provides W-2's for employees and reports all W-2 information to
the Federal, State and Local entities.
10. Reconciles end-of-period information to produce appropriate reports to be
distributed.
11. Keep abreast of ever-changing federal, state and local rates and guidelines
mandated by the state and Post-Secondary required.
12. Keeps current with regard to changes in insurance, retirement and leave
policies, salary schedules, tax laws and reporting requirements for Federal and
State governments and the Department of Post-Secondary Education.
13. Assist Administrative Services Manager in preparation of employee contracts.
14. Assist Administrative Services Manager comply with the Shuford Consent
Decree procedures; typing job vacancies announcements, letters, requesting
applicant lists, coordinating interviews, employment correspondence, managing
personnel files.
15. Assist Administrative Services Manager in researching current and new
employee benefits, maintain stock of brochures on benefits Trenholm offers, and
new employee orientation.
16. Assist Administrative Services Manager with employment workshops,
personnel presentations, campus tours.
17. Attend training and professional development workshops and conferences in

Thomas states that the Payroll Accountant and Operations Accountant are listed as equals on the organizational chart.   In her affidavit, Thomas states that she is responsible for compliance with state policies, she manages accounting of payroll and benefits, she prepares monthly internal and external reports, she provides staff with tax and benefit changes, she serves as backup to accounts payables, receivables, bookstores and human resources.  She assists external auditors, she serves as a liaison. She reconciles payroll ledger on a monthly basis and prepares and reconciles quarterly reports.  She is also responsible for reconciling and preparing employee W-2s for disbursements and attends training and professional development workshops. Pl. Ex. #86, ¶ 3.

In her deposition, Thomas testified that she considers herself to be similarly situated to Merrill because they are both accountants, but that her duties are more complex than the operations accountant. Def. Ex. #1 at p. 132: 17-21.   When asked whether, other than "accountant" being both in the title of "Payroll and Personnel Accountant," and Mr. Merrill as the "Operations Accountant," are there any more aspects of your job or job titles that are the same?"  Thomas answered "no."  *Id.* at p. 134:21-135:4; *see Sumerlin v. AmSouth Bank*, 242 Fed. Appx. 687, 690 (11th Cir. 2007) (considering plaintiff's admission that comparator "had different duties").

---

all related areas.
18. Facilitate and participate in campus activities supporting college events as assigned.
19. Assists in other areas of Finance and Administrative Services Division, including the bookstore, as needed.
20.  Maintain absolute confidentiality in all records including payroll, personnel, and financial records.
Def. Ex. #22.

Furthermore, as discussed previously in connection with her failure to promote claim, it is Thomas's own testimony that substantial additional duties would have been required in the Operations Accountant position.   Def. Ex. # 1 at p. 205: 1-11.

### ii.  Comparator Analysis

In examining the relative job duties and responsibilities of Thomas and Merrill, the court must bear in mind that the Title VII standard of comparison is more lenient than that of the Equal Pay Act standard.   The court first notes that in addressing Thomas's failure to promote claim, the court concluded that there was evidence from which a reasonable jury could conclude that Thomas was considered by Munnerlyn to be qualified for the position which ultimately was offered to Merrill.  Such a conclusion does not necessarily mean, however, that Thomas's and Merrill's jobs were sufficiently similar positions for purposes of a pay claim.

As previously noted, the comparator standard in the Eleventh Circuit is somewhat in flux. Under *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004), a strict standard of comparison applies.  Clearly, Thomas and Merrill are not similarly situated under the *Wilson* nearly-identical standard.  *See, e.g., Hill v. Emory Univ.*, 346 Fed. Appx. 390 (11th Cir. 2009) (finding that comparator was not similarly situated where both employees shared a job title, reported to the same supervisor, established and managed a budget, served as technical experts to clients, oversaw the administration of data, and supervised staff, but comparator had different responsibilities and presented a competing offer of employment).

The Eleventh Circuit has previously given some guidance to courts in the evaluation of comparators under the more lenient Title VII standard, as compared to the EPA standard, which is the strictest standard of comparison applicable. *See Mulhall v. Advance Security, Inc.*, 19 F.3d

40

586 (11th Cir. 1994).  In *Mulhall*, the plaintiff was a Vice President, Administration of a

company.  She brought EPA and Title VII wage claims.  One of the comparators for these claims

was hired to head up an investigations division of the defendant corporations and served as the

President of that division.  For purposes of the EPA claim, the Eleventh Circuit reasoned that

both positions were corporate department heads, both positions reported to the president, job

functions such as responsibilities regarding EEO, affirmative action, and coordination with other

corporate entites were identical.  *Id.* at 593.  The court concluded that, drawing all inferences in

favor of the non-movant, it could not say that the administrative aspects of the positions were not

substantially similar.  *Id.* The court determined, however, that the investigative component of the

comparator's job meant that the similarity requirement of the EPA was not met. *Id.*  When the

court examined the Title VII wage claim, the court explained that under the more lenient

standard, a question of fact had been raised as to the similarity of positions because there was no

evidence in the record as to the amount of time and effort the comparator actually expended on

investigative supervision, and how much supervision entailed investigative experience, rather

than general supervisory experience.  *Id.* at 598.   In other words, additional evidence was needed

to demonstrate that the duties which were in addition to the duties in common sufficiently

exceeded those duties in common to render the comparator dissimilar.

 The Eleventh Circuit has also explained that in a comparator analysis, "the plaintiff is

matched with a person or persons who have very similar job-related characteristics and who are

in a similar situation to determine if the plaintiff has been treated differently than others who are

similar to him."  *MacPherson v. University of Montevallo*, 922 F2d 766, 775 n.16 (11th Cir.

1991).

This standard was applied in *Alexander v. Chattahoochee Valley Cmty Coll.*, 325 F. Supp. 2d 1274 (M.D. Ala. 2004), where the plaintiff acknowledged that no comparator performed a job that was identical, but argued that the comparator's primary job included research, planning, and raising revenue, and required an equal amount of skill effort and responsibility.  The court rejected this comparison for the EPA claim, but also concluded that it was not sufficient for the Title VII wage claim, reasoning that even though the standard for the Title VII claim is more relaxed, the plaintiff's "job is too different from the other director jobs to which she compares it for her to be able to show that the jobs are even substantially similar." *Id.* at 1295.

Under the more lenient standard of comparability, it appears that Thomas and Merrill share some similarities, particularly in terms of administrative responsibilities.  The comparison of job duties for purposes of a Title VII and Equal Protection claim, however, does not rest on the quantity of administrative job duties.  In fact, as discussed, in *Mulhall*, the court determined that the administrative duties were similar, and then examined the evidence of other types of duties.  Merrill's job duties, as reflected above, are not limited to personnel and payroll duties, but include preparing budgets, developing training for purchasing and management, reconciling student aid disbursements, and managing purchases, bookstore inventories, and college assets.  Also, as discussed in connection with her compensation claims, Merrill performs sales tax duties as part of his position.   The court concludes, therefore, that even under a more lenient comparator standard,  Thomas has not established that she and Merrill are similarly situated.

### iii. Alternative Prima Facie Case Formulation

The court also finds that its analysis under *Wilson* that comparator evidence is not

required, as applied in connection with Thomas's promotion claim, does not apply to this claim. As noted above, the Eleventh Circuit has excused a strict comparator standard when there is "other evidence of discrimination" in *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) . The *Wilson* court did not explain what was meant by the term "other evidence of discrimination", but in subsequent cases, the court has indicated that the discrimination referred to must relate to the plaintiff's own claim. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1277 (11th Cir. 2008) (listing eight categories of evidence of animus, each of which related directly to the plaintiff or personnel decisions involving the plaintiff); *Vega v. Invsco Group, Ltd.*, No. 10-11722, 2011 WL 2533755 at *4 (11th Cir. June 24, 2011) (plaintiff did not present other evidence of discrimination because she submitted "little, if any, evidence showing race or gender animus generally. She pointed to no such evidence involving herself personally); *Coar v. Pemco Aeroplex, Inc.*, 372 Fed. Appx. 1, 4 (11th Cir. 2010) (plaintiff failed to show that comparators were similarly situated or that the decision maker "acted with animus when he terminated [the plaintiff]"). In this case, Munnerlyn's answer, "We needed some other–a male would be nice to have in the business office," was in response to a question of why was Mr. Billy Merrill paid $70,000 when he was hired. Pl. Ex. #8, p. 277:4-16. It is not evidence of gender-based animus in the salary paid to Thomas in her current position. That is, Munnerlyn's statement is evidence that he was motivated by gender in setting Merrill's salary relative to what he told Thomas for purposes of the failure to promote claim, but it does not speak to the current salary Thomas receives in the position she now holds.

In sum, the court concludes that summary judgment is due to be GRANTED as to both the Title VII and Equal Protection wage claims brought by Thomas.

**b.  Rollins's Wage Claim**

Rollins states that she has established a prima facie case of disparate treatment because she is in a protected class, she was qualified for her position, and similarly situated males received higher salaries than she did.  *See Holified v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Rollins's job description as Director of Human Resources lists twenty-six essential job functions, duties, and responsibilities, which include being responsible for compliance with state policies and law and federal law; being responsible for supervision, training, and evaluation of the receptionist and mail clerk; administering human resource policies and programs; providing information to senior management; developing training materials; maintaining organizational charts; administering employee dispute resolution; administering wage and benefit programs; overseeing employee recruitment record for compliance with consent decree; providing customer service to applicants; creating and implementing a new employee orientation program; developing relationships with schools, community service organizations; and coordinating payroll functions, among other job duties.  *See* Ex. #26 to Pl. Ex. #50.

Rollins points to evidence that male employees, all of whom except one, are Directors and are paid on the C Salary Schedule: Quinton Ross, Achord, Miller, Evans, Horn, Perry, Monroe, Harris, and Merrill.  It is apparently undisputed that each of these men received or receives a higher salary than Rollins.  Rollins states that the Defendants have caused her to be similarly situated to these men by placing her on the C Salary Schedule.  Rollins further states that any differences in responsibility and administration are insignificant because only those placed on the C schedule have responsibility and administration as criteria.  When asked in her

deposition how she is similar to her comparators, she admitted that their "duties are not exactly alike.  All of our duties are different," Def. Ex. #1 at page 193: 19-20.  *See Sumerlin v. AmSouth Bank*, 242 Fed. Appx. 687, 690 (11th Cir. 2007) (considering plaintiff's admission that comparator "had different duties").   Rollins stated, however, that they are all Directors and are on the C Salary Schedule, so they are the same.

Rollins also sets forth the basis for her argument that each comparator is similarly situated to her based on the job descriptions.  Rollins's comparisons can be divided into two groups: comparators as to whom she contends she is similarly situated and comparators as to whom she contends she has more responsibility and duties.

### i.  Allegedly Similarly Situated Comparators

The comparators Rollins claims are similarly situated are Quinton Ross, Gerald Horn, Danny Perry, Dennis Monroe, and Charles Harris.

**Quinton Ross**–Rollins states that, as Director of Adult Education, Ross is a Director on the C Salary Schedule, although he is on the C-1 schedule while Rollins is on the C-3 schedule.[13] Rollins states that Ross is in charge of planning, implementing, and evaluating the adult education program.  Rollins says that she is like Ross in that she is in charge of planning meetings and special events for the human resources department and evaluating support staff. Rollins also states that she is like Ross in that Ross submits reports to the Alabama Post-Secondary Education Department, and she submits reports as requested by the college and state agencies.

---

[13] The distinction between C-1 and C-3 is not without significance because, as noted in the facts section, until the *Millender* litigation concluded, the C-3 Salary Schedule, unlike the C-1, did not provide for step increases.

The Defendants respond that Ross is not a Human Resources Director and that his job description contains essential job duties none of which are performed by Rollins.  The Trenholm Job Description for Director of Adult Education contains twenty-one essential job functions, duties and responsibilities which include identifying adult education needs of individuals, organizations, and business and organizing classes to meet those needs; recruiting instructors; recommending and administering a budget; supervising education instruction; planning and conducting training; submitting reports; maintaining inventory; supervising volunteer tutor training; conducting publicity; preparing semester schedule; planning and supervising a GED ceremony; traveling to class sites; maintaining a close liaison with GED test administrator to insure a testing program that meets the needs of the service area; developing, recommending, and implementing policies to provide effective program operation; identifying funding for adult education and preparing grant and contract proposals; coordinating program activities with advisory committee, volunteer tutor program, community agencies, business/industry, funding partners, and the college; and other duties and responsibilities.  *See* Doc. #133-16.

Clearly, Ross and Rollins are not similarly situated under the *Wilson* nearly-identical standard.  *See, e.g.,  Hill v. Emory Univ.*, 346 Fed. Appx. 390 (11th Cir. 2009) (finding that comparator was not similarly situated where both employees shared a job title, reported to the same supervisor, established and managed a budget, served as technical experts to clients, oversaw the administration of data, and supervised staff, but comparator had different responsibilities and presented a competing offer of employment).

Under a more lenient standard of comparability, it appears that Rollins and Ross share some similarities.  Both are Directors, although while titles may be considered, they alone do not

establish similarity for a pay claim.  *See Sumerlin*, 2007 WL 2209457 at *3 (finding that

comparator was not similarly situated even though plaintiff was also a payroll representative,

because the two employees performed different tasks).   Both positions involve some

supervision, reporting, and training, as well as outreach to the community.  Using  *Mulhall v.*

*Advance Security, Inc.*, 19 F.3d 586 (11th Cir. 1994)*,* as a guide, however, the court must also

determine whether there is a question of fact as to whether the job tasks which are in addition to

those administrative tasks are sufficiently similar.   Ross's duties involve identifying educational

needs of adults in the community, recruiting instructors and procuring funds to meet those needs.

Although this court, like the court in *Mulhall*, does not have evidence of the amount of time

spent on each task, in this case, unlike *Mulhall*, it is clear that Ross is required to perform a

significant amount of duties beyond similar administrative tasks.  The court concludes that in this

case, as in *Alexander*, the jobs of Rollins and Ross are too dissimilar to satisfy the Title VII

standard.

     **Gerald Horn** –Horn is the Project Director for Automotive Manufacturing Technology

Project.  He is a Director.  The evidence presented of the job description for Horn is that he is

responsible for providing management and leadership related to the Community Based Job

Training Grant, program development and evaluation and making recommendations to revise or

modify curriculum; designing and establishing instructional laboratory facilities related to

automotive production and assembly operations as outline in the grant proposal; insuring that

documents and files are prepared and submitted; coordinating student recruitment efforts for

credit and noncredit training; working with the automotive manufacturing business community;

overseeing development of materials for marketing and promotion; identifying and selecting

qualified applicants for key positions; evaluating project personnel and activities, and other duties.  Doc. #82-2, Appendix C.

Rollins and Horn both have some administrative and personnel duties, but Horn has several substantially different duties involving student recruitment, curriculum, and program development.   It is evident that Horn has to possess expertise in the automotive area beyond mere administration of the program. *Cf. Mulhall*, 19 F.3d at 593.  The court cannot conclude, therefore, that Rollins and Horn are similarly situated under any applicable Title VII and Equal Protection Clause standard.

**Danny Perry** –Perry is the Project Director for Health Services.   Perry's primary job duties include supervising the daily operations of the Health Workforce grant project; developing nursing curriculum; designing and establishing instructional laboratory facilities; working with healthcare community; and helping design and carry out details of the project's evaluation system.  Rollins states that Perry's job is to assess equipment and instructor needs for a federal grant and then insure compliance with the grant.   As examples of similarities, Rollins states that she developed training materials and recruited employees and Perry developed curriculum and recruited students.

While Rollins and Perry share some administrative tasks in common, the court cannot agree that developing employee training materials and developing curriculum are the same, nor that recruiting employees and recruiting students is the same.   The court concludes that Rollins has not established that Perry is a valid comparator.

**Dennis Monroe** –Monroe is the Director of the Physical Plant.  Monroe is responsible for the grounds, maintenance of electrical, sewage and water systems, all building

equipment-HVAC, and educational equipment. He also manages all renovation projects, including most construction projects.

The Defendants contend that none of Monroe's primary duties and responsibilities is even remotely similar in type and scope to Rollins's duties. The Defendants also state that Monroe has prepared and managed a budget for 25 years and he currently manages a $2 million dollar operational budget, as well as student renewal fees of 1 to 3 million dollars, depending on student enrollment. Pl. Ex. # 46 at p. 47:13-17. Monroe also manages from 20 to 25 employees. *Id.* at p. 47: 12.

The court agrees. The positions are simply too dissimilar for Monroe to serve as a comparator under the most lenient of the applicable standards.

**Charles Harris** –Harris is the Assistant Dean for IT and Campus Safety and Security. He serves as the college computing, networking, and telecommunications director. His position description lists twelve essential job functions, duties and responsibilities including: provide vision and leadership for information technology; provide technical services; supervise and coordinate activities of the technical staff and conduct performance appraisals; conduct research and provide information for institutional decision-making; support and train college personnel on computer and communications systems; direct professional development of technical staff; review procurement and maintenance of computers; maintain faculty, staff and student PC's; support institutional research analysts in reporting data; and act as an advisory resource. Ex. #1 to Pl. Ex. #43.

The Defendants state that Harris's duties are not remotely similar to Rollins's duties. The court agrees that Harris's information technology duties and expertise distinguish his position

from Rollins's position so that he does not serve as a valid comparator.

### ii.  Comparators Rollins Claims Have Fewer Job Responsibilities

Rollins contends that Larry Achord, Michael Miller, Michael Evans, and William Merrill actually have fewer job responsibilities than she does, so that the prima facie case is met even if their job duties are not similar.

Although Rollins has cited no legal authority in support of her theory, the court notes that in *Equal Employment Opportunity Commission v. Reichhold Chemicals*, 988 F.2d 1564 (11th Cir. 1993), the court addressed a somewhat similar argument.   In *Reichhold Chemicals*, the plaintiff's position was higher; she supervised employees, whereas the comparator had no supervision duties, and the plaintiff's appraisals were higher than the comparator's.   The question before the court in that case, however, was whether a claim was baseless, in analyzing whether an attorneys' fee was warranted.  The court concluded that the claim was not baseless, but did not hold that the evidence described was sufficient to establish a prima facie case of discrimination.  *Id.* at 1571.  This court also has had occasion to note "Defendant is certainly not arguing that Plaintiff's performance of duties requiring even more effort and responsibility entitles her to less pay."  *Passmore v. Kindercare Learning Centers, Inc.,* 979 F. Supp. 1413, 1420 (M.D. Ala. 1997).

Therefore, there is a recognition in the case law that performance of additional duties by a plaintiff should not defeat her prima facie case.  This concept, however, should not be interpreted as one of comparable worth where there is "increased compensation on the basis of a comparison of the intrinsic worth or difficulty of their jobs with that of other jobs in the same organization or community." *County of Washington v. Gunther*, 452 U.S. 161, 166 (1981).   Courts have held

that comparable worth claims are not cognizable under either Equal Pay Act or Title VII.

*Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 801 (11th Cir.1992).  The Defendants in this

case argue that Rollins's claim is one for comparable worth, which must be rejected.

**Larry Achord** –Achord is the Director of Technology Services.  He is on the C-3 Salary

Schedule, like Rollins.  Rollins argues that while she and Achord share some duties, Rollins's

duties are far more comprehensive than Achord's.   Rollins states that Achord  assists in duties

such as development and evaluation of technology, but reports to Charles Harris, whereas Rollins

is responsible for employment-related human resources and supervision and training of her

support staff.  Rollins argues that although there are differences in their jobs, she actually  has a

higher level of administrative responsibility than Achord, but still is paid less.

Achord's job description includes ten essential functions including, ensuring that

technology equipment is property inventoried, supervising and assisting with installation and

testing of all technology related equipment, ensuring that technology related equipment is

maintained in accordance with industry standards, ensuring repairs are made by developing and

implementing repair procedures, working with vendors and others to facilitate operation and

maintenance of equipment, assisting with short and long range planning, assisting in the

evaluation of technology for instruction and administrative services, providing technical support,

assisting faculty, and serving on and providing information to college committees.   Ex. #16 to Pl

Ex. #39.  In Achord's deposition, he describes his duties as maintaining cabling connections,

network switches, routes, fire walls, spam filters, computers, servers, and printers.  Pl. Ex. #39 at

p. 80.  Achord does all of the cabling projects and infrastructure, designing, installing, and

maintaining the infrastructure.  He maintains the network closet in every building on three large

campuses, and three smaller campuses.  *Id.* at p. 73.  He also says he manages the help desk by going through tickets submitted by users and assigning technicians and making sure they have the tools and equipment they need to do the job.  *Id.* at page 76.

The court notes that the fact that Achord is supervised by Charles Harris, the Assistant Dean for Information Technology & Campus Safety, who was paid on the C-2 Salary Schedule, and later moved to the C-1 Salary Schedule.  According to her position description, Rollins reports both to the Dean of Finance and the Dean of Administrative Services.

The court understands Rollins's argument to be that employees on the C-3 Salary Schedule should have the same level of administrative responsibility, and that the fact that Rollins and Achord are both on the C-3 means either that they are similarly situated because they have same administrative responsibility, or that Rollins has more administrative responsibility and so should be on the C-2 or C-1 schedule.   As earlier noted, the comparison of job duties for purposes of a Title VII and Equal Protection claim, however, does not rest on the quantity of administrative job duties.  *Cf.  Byrd v. Auburn University at Montgomery*, No. 2:05cv835-CSC, 2007 WL 1140424, at *9 (M.D. Ala. April 17, 2007) (Coody, M.J.) (noting "most if not all senior administrative jobs will include planning, policy making and budgeting responsibilities. Those duties do not define the job; rather, those duties are generally inherent in every administrative position.").  In this case, Achord had extensive responsibilities which were different from Rollins, so the court does not find that a comparison of administrative responsibilities means, for purposes of a Title VII or Equal Protection prima facie case, either that Rollins is similarly situated to Achord, or that Rollins had relatively greater responsibility entitling her to relief.

Rollins also has argued that the placement of Achord on the C-3 schedule was motivated by gender, citing Achord's deposition.  In his deposition, however, Achord explains that in 2001 Patterson State Technical College and Trenholm State Technical College merged and Achord was the Technology Director at Patterson, a woman was the Director at Trenholm, and a man was brought in to be the supervisor of both.  Pl. Ex. #39 at pages 31-2.  Achord states that he was "spearheading" the project of merging date and the two networks and putting in a new phone system.  *Id.* at p. 32: 14-18.  His supervisor told him that it was not right that Ms. Cobb, the former Director at Trenholm, was making $75,000 to $80,000 while Achord was making $36,000.  *Id.* at pages 32-3.  The supervisor sought a pay increase from the President, and Achord was placed on the C-3 Salary Schedule at $61,137.   The court cannot conclude that this is evidence of gender animus sufficient to establish a prima face case without comparator evidence. *See Wilson*, 376 F.3d at 1092.

**Michael Miller** –Miller is the Coordinator for Training for Business and Industry.  He is on the C-3 Salary Schedule.  Miller's job description lists twelve essential functions, including requiring him to identify commercial, industrial, business and health related firms including government agencies and identify types of skills employed; establish liaison with local businesses; perform training needs and assessments; coordinate curriculum and program development which includes negotiating and making agreements for training, hiring instructors, keeping records, ensuring correct billing is maintained; assist in the publicity and promotion of programs of the college; adhere to system guidelines for training; work independently with minimal supervision; represent the college at civic functions; evaluate courses to ensure competency of instructor and curriculum content; inform Associate Dean of Technical Education

53

and Industry Relations of prospective courses; submit month reports.  Ex. #1 to Pl. Ex. #74.

Rollins states in her brief that Miller testified in his deposition that he does not supervise anyone

directly, but in the pages cited Miller responded that he supervised instructors under particular

training programs.  Pl. Ex. #74 at p. 63: 18-64: 4.

With respect to Miller, as with Achold discussed above, Rollins concedes that her duties

and Miller's are different, but argues that she had greater administrative responsibilities.  As

stated above, even assuming that Rollins's characterization is true, the court cannot conclude that

a comparison of administrative responsibilities alone establishes a prima facie case.  Miller's

duties regarding identification of training needs in business communities and evaluating

instructors and curriculum content are greatly different than Rollins's job responsibilities.

**Michael Evans** –Evans is Public Information Officer and Admissions/Retentions

Advisor.  Evans is paid on the E Salary Schedule.  Rollins argues that Evans is one of the, if not

the, most egregious examples of a male with less responsibilities being paid more than Rollins.

Rollins contends that Evans's number one duty and function is to answer the phone, greet

visitors, answer questions and offer information to prospective students.

The job description for Evans lists twenty-two essential functions.   These function

include performing general duties for the Office of Student Services such as answering calls,

greeting visitors, answering questions, and offering information to prospective students;

preparing and maintaining admissions and academic records and assisting with the admissions,

orientation, and registration process and schedule adjustments; assisting with placement testing

by serving as test proctor, scoring tests, and interpreting test results for students; assisting with

implementation of policies for drop/add; assisting in implementing freshman advising activities;

maintaining knowledge of college policies, procedures, and programs; serving as freshman advisor; assisting with planning an implementing student activities program; assisting with calling prospective students; assisting in developing an advising plan; conducting follow-up activities with students who applied but did not enroll; assisting in orientation sessions; reviewing progress of at-risk students; preparing reports; maintaining records; monitoring student progress and investigate areas where additional support is indicated, referring students to appropriate resources and providing advisory services; serving as a mentor to students at high risk; assisting in tracking high-risk indicators for early warning intervention, and other duties.

Rollins has cited to Evans's deposition, but the court does not find any conflict between Evans's description of his duties and the listed responsibilities to create a question of fact as to whether he performs the duties listed.

The court agrees with the Defendants that Rollins's argument is essentially a comparable worth argument. That is, an argument that, though Rollins and Evans perform different tasks and require different skills, her job requires more responsibility, is an argument that the intrinsic worth of her work is greater than Evans. *See Alexander*, 325 F. Supp. 2d at 1294.

**William Merrill** –Merrill's job duties were set forth in connection with Thomas's claim discussed above. Rollins argues that the Operations Accountant position does not oversee any employees, does not have a budget, and does not have signature authority, but is only a paraprofessional job. Rollins argues that Merrill is another egregious example of an employee who had less responsibilities being paid more. Due to the dissimilar nature of their job tasks, however, the court concludes that Merrill, as with other offered comparators, is not a valid

comparator because Rollins's theory is one of comparable worth.[14]

The court cannot conclude that Rollins has established a Title VII or Equal Protection wage claim in this case.

### c.  Ward's Wage Claim

In her brief, Ward states that she has established a prima facie case of wage discrimination because she has demonstrated that she, a female, was paid less wages than comparator Michael Barrett.[15]   Ward argues that on September 9, 2008, Michael Barrett was offered a D-1, Rank 1A, Step 8 Salary Schedule position, for the contract period of August 15, 2008 to May 12, 2009, and on the same day a new contract of employment was created for Ward setting her on Salary Schedule D-1 Rank 1A, Step 5, which resulted in a difference of $2,669.00 in salary.[16]

Ward's wage claim is different from those of other Plaintiffs in that she is not arguing that her job duties and responsibilities would entitle her to pay greater than that which she is

---

[14] The analysis applied in connection with Thomas's pay and promotion claims, that a prima facie case can be established even if the jobs are not substantially similar, does not apply to Rollins's claim because the evidence of Munnerlyn's statement regarding the reason for Merrill's salary did not relate to a position sought by Rollins.  *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1277 (11th Cir. 2008); *Vega v. Invsco Group, Ltd.*, No. 10-11722, 2011 WL 2533755 at *4 (11th Cir. June 24, 2011);  *Coar v. Pemco Aeroplex, Inc.*, 372 Fed. Appx. 1, 4, (11th Cir. 2010).

[15] The Defendants characterize Ward's theory as a new one, stating that in her deposition Ward points to Michael Barrett as a comparator for the credit he received for teaching experience, not for his initial placement on the D-1 Salary Schedule.  The court concludes, however, that Ward is not precluded by her pleadings from advancing this theory based on the evidence available to the Defendants at the time they moved for summary judgment and known by the Defendants to be the basis of claims by Ward.

[16] Ward's initial placement occurred when Molina was President and she was interviewed by Molina and Holt.  Pl. Ex. #1 at p. 43-44.

receiving.  Instead, Ward argues that Trenholm policy required that her salary account for her prior teaching experience, but her salary did not account for that experience, and that a male employee hired on to the same salary schedule was improperly hired at a higher step.   For purposes of this claim, therefore, the fact that the employees were instructors in different disciplines does not make them dissimilarly situated.

The Defendants point to the 2001-2010 D-1 Salary Schedules which state that prior full-time teaching experience will be considered.  *See* Doc. #132-22.   The Defendants state that Ward was placed at Step 1 on the D-1 schedule because she had no prior full-time experience. The Plaintiffs point out that the Salary Schedule Guidelines state that employees "shall be given full credit for prior work experience in the public schools, colleges, and adult education programs of Alabama."  Pl. Ex. #13.  The Defendants contend, however, that the specific requirements for calculation of salary credit are set forth in the salary schedules themselves, and that to the extent that there is a conflict, it is one which does not support a finding of gender-based animus.

The Defendants have pointed out that on the D-1 Salary Schedule, credit may be given for full-time professional high tech experience.  *See* Doc. #132-22.   The Defendants also cite to the affidavit of Wilford Holt.[17]  Holt stated that in his affidavit that Barrett's placement was consistent with the requirements of the D Salary Schedule.  Def. Ex. #18.  Holt states that Barrett's placement was based, in part, on his experience in high-tech manufacturing.  *Id.*  at ¶4. Holt also states that with "the number of years of work experience, his in-field degree and based

_____

[17] The Plaintiffs move to strike the affidavit as not being based on personal knowledge because Holt was not involved in the decision to place Barrett on the D Salary Schedule.  The court will consider his lay opinion that Barrett's placement was consistent with the D-1 Salary Schedule, based on his knowledge of the salary schedules.

on his salary with his employer at the time, he was properly placed on the appropriate salary schedule." *Id.* Holt appears to state, therefore, that Barrett's salary was set based on his full-time high tech experience and his prior salary.

Ward points to two aspects of Holt's affidavit testimony. Ward states that Holt purports to state the reason why Barrett was placed on the Salary Schedule at Step 8, but when asked in his deposition whether he remembered his recommendation as to the placement of Barrett on the salary schedule, Holt answered that he did not remember his recommendation, although he was sure he would have made a recommendation. Pl. Ex. #17 at p. 116: 23-117: 10. Holt states that the President determines the salary schedule placement. *Id.* at 115: 6-8.

Ward also points out that Holt states that Barrett's prior salary is consistent with his placement on the D Salary Schedule, but that taking previous salary into account is not allowed within ACCS guidelines. The Defendants do not appear to have responded to this argument.

What the court has, therefore, is evidence, in the form of Holt's affidavit, that Barrett's placement above Step 1 was consistent with Trenholm's policy, but no evidence from a decision maker with personal knowledge that that was the actual reason for his placement. The court also has evidence from Holt that Barrett's salary was set based on his prior salary, a consideration not provided for in Trenholm policy. Ward's prior teaching experience was not full-time and is not provided for in the D Salary Schedule, but is consistent with the Salary Schedule Guidelines, which state that credit will be given for all prior experience.

Given the Defendants' position in this case that Barrett and Ward were placed as they were on the salary schedule based solely on an application of the salary schedule, and the questions of fact raised as to that placement, as to this limited claim, the court finds that Ward

has established a prima facie case, and also has created a question of fact as to the articulated

reason for the discrepancy in placement, because there are questions of fact as to the reasons for

Barrett's placement.   In other words, while the Defendants have stated that they do not have to

give Ward credit for part-time teaching experience at any point based on a strict application of

the D Salary Schedule, there is evidence that they did not strictly apply the same D Salary

Schedule with respect to Barrett.  Based on the evidence currently before the court, therefore, the

court concludes that summary judgment is due to be DENIED as to this disparate treatment in

pay claim for the 2008-2009 year.[18]

With respect to the Motion for Partial Summary Judgment on the basis of qualified

immunity, while gender discrimination is clearly unlawful, *see Snider v. Jefferson Cmty. College*,

344 F.3d 1325, 1331 (11th Cir. 2003), the basis for liability on the part of Byrne as an individual

is unclear, so that the court cannot properly conduct qualified immunity analysis.  Therefore, the

court will reserve ruling on this aspect of the Motion for Partial Summary Judgment.

### d.  Johnson's Wage Claim

Johnson states that she received lower wages that comparators paid on the C Salary

Schedule including Ross, Horn, Perry, Monroe, Harris, and Merrill.  Johnson states that all of her

comparators are Directors on the C Salary Schedule.   Johnson, like Rollins, argues that the C

Salary Schedule, particularly the C-3, is a tool used by the Defendants to manipulate the system

against women.

Johnson states that when she was originally hired, her job was posted as a C-2 Salary

---

[18] Ward's salary is currently higher than her comparator, Barrett's.  Any issues as to
damages resulting from this claim are not currently before the court.

Schedule job, but that she was told during the interview process that the job was a C-3 position. The Defendant disputes that the position was ever advertised as a C-2 position. Whether or not it was advertised as such, it is undisputed that at the time she was hired, Johnson was hired into a C-3 position.

The court notes that Johnson's reorganization claims have been addressed above in the context of her promotion theory. Her pay claim theory is a claim that comparing her job duties and salaries to the proffered comparators, the court should conclude that she is similarly situated to those men, is paid less, and that any explanation for the discrepancy is a pretext for gender discrimination. Therefore, the court will examine the job duties of the comparators pointed to by Johnson: Danny Perry, Gerald Horn, Quinton Ross, Dennis Monroe, and William Merrill, *see* Doc. #176, p. 53-61, in relation to her own job duties.

Johnson's job duties as Director of Restricted Programs include being responsible for fiscal management that includes budget preparation; working with budget managers in the monitoring of purchase orders, cash vouchers, and verifying compliance with guidelines; monitoring equipment purchased; monitoring restricted accounts; assisting grant managers in setting up budgets; developing payroll and benefit budgets; assisting Dean of Finance of Administrative Services with record-keeping; periodically reviewing compliance on grant and matching funds; working with faculty and staff on grant proposals; assisting in setting up and monitoring current projects and year-end closing procedures; performing return of Title IV calculations; reconciling Business Office records with Financial Aid Office records; attending training and professional development workshops; cross-training in other positions; and facilitating and participating in campus activities. Doc. # 82-2, Appx. C. Johnson also states that

she handled the bid process, posted expenditures to the general ledger, reviewed student accounts, prepared budget amendments, and handled budget center maintenance.

**Danny Perry** –Perry is the Project Director for Health Services.   His primary job duties were also discussed in connection with Rollins's claim and include the daily operations of the Health Workforce grant project.  As examples of similarities in their job duties, Johnson states that she reported on grants and contracts and was responsible for compliance on all federal and state grants and matching funds and Perry reported on the DOL grant and was responsible for compliance with college and grant policies and procedures.  The Defendants also agree with Johnson that Perry's expenditures must be approved by Johnson because the Health Services Program is funded with restricted funds, but the Defendants state that Johnson and Perry merely interact in the performance of different duties.

Clearly, Perry and Johnson are not similarly situated under the *Wilson* nearly-identical standard.  Even under a more lenient standard, however, while Johnson and Perry have some overlap in administrative responsibilities, as acknowledged by the Defendants, Perry's other duties, including development of program curriculum, designing instructional lab facilities, and developing materials, are substantially different from Johnson's duties.  The court concludes, therefore, that Johnson has not established that Perry is a valid comparator.

**Gerald Horn**– Horn is a former Trenholm employee who was an industrial engineer and Project Director, DOL Automotive Manufacturing Training Project.   The evidence presented of the job description for Horn is discussed above in connection with Rollins's claim.  In summary, he was responsible for providing management and leadership related to the Community Based Job Training Grant.  *See*  Doc. #82-2, Appendix C.

The positions of Johnson and Horn both entail some administrative duties, but Horn had several substantially different duties involving student recruitment, curriculum, and program development.   It is evident that Horn had to possess expertise in the automotive area beyond mere administration of the program. *Cf.  Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 593 (11th Cir. 1994).  The court cannot conclude, therefore, that Johnson and Horn are similarly situated under any applicable Title VII and Equal Protection Clause standard.

**Quinton Ross**– The job duties of Ross are listed above in connection with the claims of Plaintiff Rollins.  In summary, Ross is the Director of Adult Education who is paid on the C-1 schedule, and is in charge of planning, implementing, and evaluating the adult education program.

Even under a more lenient standard of comparability, Johnson and Ross are not similarly situated.  Both are Directors, although while titles may be considered, they alone do not establish similarity for a pay claim. *See Sumerlin*, 2007 WL 2209457 at *3 (finding that comparator was not similarly situated even though plaintiff was also a payroll representative, because the two employees performed different tasks).   Both positions involve some budgetary responsibility, but Ross' duties are significantly different, and involve tasks such as curriculum and instructor recruitment.

**Dennis Monroe** –Monroe is the Director of the Physical Plant.  His job duties are discussed in connection with Rollins's claim.  In summary, Monroe is responsible for the grounds, maintenance of electrical, sewage and water systems, all building equipment-HVAC, and educational equipment.

Johnson argues that her position and Monroe's are similar because they are both on the C-

3 Salary Schedule and so grouped by similar levels of administrative responsibilities.  Although

both are Directors, titles alone do not establish similarity for a pay claim.  *See Sumerlin*, 2007

WL 2209457 at *3 (finding that comparator was not similarly situated even though plaintiff was

also a payroll representative, because the two employees performed different tasks).   While both

positions involve some administrative duties, using *Mulhall* as a guide, the court must also

determine whether there is a question of fact as to whether the job tasks which are in addition to

those administrative tasks are sufficiently similar.   It is clear that Monroe is required to perform

a significant amount of duties beyond similar administrative tasks.  The court concludes that in

this case, as in *Alexander v. Chattahoochee Valley Cmty. Coll.*, 325 F. Supp. 2d 1274 (M.D. Ala.

2004), the jobs of Johnson and Monroe are too dissimilar to satisfy the Title VII standard.

     **William Merrill** –The job duties of Merrill as Operations Accountant are set forth above

in the context of Plaintiff Thomas's claim.  In summary, Operations Accountant is responsible

for assisting in and carrying out the duties of the bookkeeping system and operations

management of the school.

     Johnson argues that the Operations Accountant position is not an administrative position

because it does not oversee employees, does not have a budget, and does not possess signature

authority.   Johnson argues that she could have performed the job duties performed by Merrill,

but that Trenholm prevented her from doing that by creating the position and paying him a higher

salary.   The court has concluded that Johnson can proceed on a theory that she was denied a

reorganization when Merrill's position was created, and the court has concluded that Thomas has

created a question of fact as to the pay for Merrill's position, based on Munnerlyn's testimony.

The same analysis does not extend to this pay claim by Johnson, however.  Munnerlyn's

statement does not relate to the salary paid to Johnson for her current position.  Clearly, Johnson and Merrill perform different job tasks.

The court cannot conclude, therefore, that Johnson has established a Title VII or Equal Protection pay claim.

### 3.  Claims for Lack of Compensation for Additional Duties/Qualifications

#### a.  Thomas's Additional Duties Claims

While it is clear that Thomas intends to proceed on a disparate treatment claim based on the failure to compensate her for additional duties, the exact basis of that claim is unclear to the court.   Thomas's claim appears to be primarily based on her evidence that two weeks after being hired as Accounts Receivables clerk in 2002, Thomas assumed the duties of the Accounts Payable position, but did not receive a pay increase, and, in June 2003, Thomas also assumed the duties of payroll clerk, but did not receive a pay increase.   Thomas also stated in her deposition that she was not provided additional compensation for the performance of sales tax duties.

Specifically with respect to a claim based on the failure to compensate Thomas for performance of sales tax duties, the Defendants say that no man was ever paid for those duties as additional duties, but instead that those duties were transferred to Merrill as part of his position. The Defendants point to Thomas's deposition testimony that she was assigned the sales tax duties in January 2007 until Merrill was hired and the duties were given to him.  Def. Ex. #1: 186: 2-5; 200 18-20.  When asked if a male was performing the tax duties as an additional duty, Thomas answered, "No, he was not."  *Id.*  at page 201: 13-15.   The court concludes, therefore, that summary judgment is also due to be GRANTED as a compensation claim based on

Thomas's performance of sales tax duties.[19]

With respect to Thomas's other additional duties claims, Thomas states that men who have an increase in job duties receive more pay.  She contends that she requested that she be given more pay, by a reorganization of her position in light of additional duties, but that her requests were denied.  She argues that men who were required to perform additional duties were given reorganizations and raises, or were paid stipends for additional duties.  She points to Louis Campbell and states that he was given a $10,000 raise in 2008 for a reorganization of his job. She also points to Charles Harris as being given additional duties regarding security and being made an assistant dean.  She states that Wilford Holt is paid a stipend for additional duties as Associate Dean.  She also states that Arnold Stringer, Louis Campbell, and Freddie Williams are allowed to teach part-time and be paid for those duties, while also paid as full time employees. Finally, she states Maurice Goode shared a stipend with Louis Campbell and Larry Achord received a raise to equalize his salary.

The Defendants state that the assignment of the accounts payable duties to Thomas was temporary, and as a result, she was not required to perform full duties of the Accounts Receivable Clerk position.  *See* Ex. #44.   The Defendants also state that when the payroll clerk retired in June 2003 and Thomas assumed her responsibilities, Munnerlyn increased her salary by almost $5,000 and advanced her to the E-2 Salary Schedule.  *See* Def. Ex. # 2.

The Defendants further argue that the persons Thomas has identified are not sufficiently similar to serve as comparators.  The Defendants present evidence that a $10,000 increase for

---

[19] Compensation issues relating to Merrill are addressed in the Title VII and § 1983 Equal Protection claims based on pay.

Campbell was as a result of a reorganization of his position due to his responsibility for supervising prisoners. The Defendants also point out that Goode is a maintenance employee and his stipend was for supervising prisoners. Def. Ex. #47. The court also notes that Harris states he never asked for promotion, he never asked for additional money, that there was a retreat of the President's cabinet, and that during that retreat in 2004 , there was a discussion during which then-President Molina asked to reorganize Harris's position to make him an Assistant Dean for Information Technology and Campus Safety. Pl. Ex. #44 at 97:10-22, 118: 16-20.

Before addressing the comparator evidence for claims based on payment to other employees, the court notes that Thomas has not presented evidence of discriminatory animus which would satisfy her prima facie case with respect to these claims. As discussed, the court has concluded that sufficient evidence of gender-based animus on the part of Munnerlyn exists with respect to Merrill's salary for Thomas to establish a Title VII and an Equal Protection pay claim. *See Wilson*, 376 F.3d at 1092 (stating "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."). In applying that alternative formulation of the prima facie case, however, the Eleventh Circuit has indicated that the evidence of animus must relate to the employment decision at issue. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1277 (11th Cir. 2008). Therefore, the evidence relating to Merrill does not establish a prima facie case with regard to compensation for additional duties to other employees.

The court has reviewed the evidence cited to it regarding the comparators identified by Thomas, their job duties, and the compensation they received for what Thomas has identified as additional duties. The court simply cannot conclude that the comparators referred to in Thomas's

brief are similarly situated to Thomas for purposes of a failure to compensate for additional

duties claim under any applicable standard.  Specifically with respect to the payroll duties, the

documentary evidence indicates that Thomas's performance of those duties was temporary, and

that she was relieved of other duties so that she could perform them.  *See* Def. Ex. #44.  There is

no indication that any other comparators were temporarily given duties and compensated for

those.  With respect to stipends and other remuneration, teachers who received additional

payment for other classes, persons in dean positions, and employees who supervised prisoners

are not similarly situated to Thomas who was in the business office of the school and performed

dramatically different tasks.  *See, e.g., Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d

1518, 1529 (11th Cir. 1992) (a similarly situated employee performs the same type of tasks); *see

also Sylva-Kalonji v. Board of School Com'rs of Mobile County*, No.  8-207-KD, 2009 WL

1418808 (S.D. Ala. May 20, 2009) (under *Wilson* standard, employee who interacted with other

employees not similarly situated to employee who performed data entry).  The court concludes,

therefore, that Thomas has failed to create a question of fact as to her claims for additional

payroll duties and denial of reorganizations based on the comparators she has pointed to and that

summary judgment is due to be GRANTED on her additional duties compensation claims.

### b.  Rollins's Additional Duties/Qualifications Claims

### i.  Extra Duties

Rollins states that the same facts and analysis apply to her claims for extra duties without

pay as applied to her pay and promotion claims.  She states that she was denied reorganization

and additional pay for extra duties.  Having concluded that summary judgment is due to be

GRANTED as to those claims, therefore, the court concludes that summary judgment is similarly

due to be GRANTED as to the extra duties pay claims.[20]

### ii. Additional Qualifications

Rollins also claims that she was treated differently on the basis of her gender in violation of Equal Protection and Title VII because she was required to obtain an advanced degree in Human Resources Management, but men were not required to obtain similar degrees as a condition of employment.

To establish a prima facie case, Rollins must show that (1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) similarly situated male employees were treated differently, and (4) she was qualified to do the job.  *See Knight v. Baptist. Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).

The Defendants state that Rollins cannot establish the second or third element of her claim because Rollins admits that she accepted a conditional offer of employment. The Defendants also contend that her claim is time-barred.

Rollins was employed in 2004.  She states in her deposition that she discovered that men were not required to obtain a degree as a condition of their employment the week after she started her employment.  Def. Ex. #1 at p. 20: 11-16.  In response to the time-bar argument, Rollins

---

[20] One aspect of this claim by Rollins may not have been addressed in her pay and promotion claims, so the court will address it separately here, in an abundance of caution. Rollins has claimed that male employees at Trenholm were allowed to work part-time as adjunct instructions and be paid through contractual services agreements.  Rollins complained that Louis Campbell, Arnold Stringer, and Freddie Williams are permitted to teach evening classes as an adjunct instructor, even though they teach the classes during their full-time duty hours.  In her affidavit, Rollins states that Munnerlyn was made aware of the situation, but did not correct it. Rollins presents no evidence that she sought compensation for additional duties as an adjunct instructor, however.  Therefore, summary judgment is due to be GRANTED on this alternative basis as to this aspect of Rollins's claim.

states that her claims are not limited to claims which occurred within 180-days prior to filing of her EEOC charge because the statute of limitations under § 1983 is four years.  Rollins also states that her claims are not barred under the Lilly Ledbetter Fair Pay Act of 2009.

To the extent that Rollins claims disparate treatment based on being required to obtain a Master's Degree, her claim is not governed by the Lilly Ledbetter Fair Pay Act, which applies to claims based on compensation.  42 U.S.C. § 2000e–5(e)(3)(A).   Also, as stated above, a § 1983 claim for violation of Equal Protection has a two-year statute of limitations. *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336 (11th Cir. 2008).  This case was filed in May of 2009, more than two years after Rollins's hire in 2004.  The court concludes, therefore, that summary judgment is due to be GRANTED on this disparate treatment claim.

### c.  Ward's Additional Duties/Qualifications Claims

Ward advances three claims based on a failure to compensate her/requiring extra qualifications: failure to give her salary credit for prior part-time teaching experience, the requirement of the NOCTI exam, and failure to compensate her for her Master's degree.

### i.  Salary Credit for Prior Experience

Ward states that she was denied salary credit for prior teaching experience while a male comparator, Barrett, was given salary credit for prior teaching experience.   As discussed, the court has previously concluded that a question of fact precluding summary judgment exists as to a pay claim based on this theory, due largely to a lack of substantiating evidence on the part of the Defendants.  To the extent that Ward intends to assert this claim as a separate disparate treatment claim for her initial placement on the D-1 salary, because it is not pay claim, but a discrete action which occurred in May of 2004, it is time-barred as being more than 180 days

before her July 2009 EEOC charge and more than two years before her May 2009 Complaint.

To the extent that she argues it is a disparate treatment action which occurred when Barrett was

placed on the D schedule on September 9, 2008, the claim would also be time-barred under Title

VII, but is within two years of her having been added to this case in April 2010, so that summary

judgment is also due to be DENIED on an Equal Protection claim, for the same reasons and to

the same extent discussed in connection with her pay claim.

### ii.  NOCTI Exam Requirement

Ward states that she has established a prima facie case of gender discrimination based on

the requirement of the NOCTI exam because she has show that she  (1) is a member of protected

class, (2) was subjected to an adverse employment action, (3) her employer treated similarly

situated employees differently, and (4) she was qualified to do the job, citing, among others, *Nix*

*v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185-86 (11th Cir. 1984).

Ward contends that she was discriminated against because the Defendants required her to

take the NOCTI exam, while males have not been required to take the exam.[21]  Ward states that

Barrett was not required to take the exam until 2009.  Ward points to evidence that a former

cosmetology instructor never heard of a cosmetology instructor taking the exam, and that Wilford

Holt never took the NOCTI exam.  Ward points out that the policy relied on by the Defendants

stated that a person must demonstrate competency "through successful completion of an

approved occupational examination (e.g. NOCTI) within the first year of employment."  Def. Ex.

---

[21] Ward contends that the Defendants mis-characterized her claim as a claim for delay, and that, therefore, summary judgment should be denied as to this claim.  Ward having clarified the characterization of her claim, the court will consider the arguments advanced by the Defendants as to the claim based on the requirement of the NOCTI exam.

#17.  Ward says that the NOCTI exam was on the exact subjects she was teaching and had been certified on previously.   She cites to the affidavit of Brenda Buce, a former instructor of Cosmetology at Trenholm who states that the NOCTI exam was inferior to the qualifications, certifications, and training Ward already possessed.  Pl. Ex. #27 at ¶ 10.

Ward argues that Lewis Campbell was given a $10,000 pay raise as an adjunct instructor and was not required to take any additional testing.   Ward also states that Holt stated in his deposition that Brenda Buce and Jean Stockman was required to take the NOCTI exam, but that Buce has declared that neither she nor Stockman were required to take the exam.   Of course, these employees are both women.  The Defendants respond that Campbell is on the E Salary Schedule and is not subject to the NOCTI exam requirement applicable to Group B instructors on the D-1 Salary Schedule.

Ward also points to Syed Raza as a D Salary Schedule employee who was not required to take the NOCTI exam.  The Defendants state that Ward and Raza are in different instructor groups.  The Defendants present an affidavit from Munnerlyn and documentary evidence to explain that there are A and B groups and that advancement to level II A on the D-1 schedule does not require completion of the NOCTI exam.  *See* Ex. #1 to Doc. #197.

The Defendants also point to Holt's deposition testimony wherein he identifies male employees at Trenholm, including Larry Webb, who is an instructor, who have had to take the NOCTI exam.  Pl. Ex. #17 at p. 138-39.  Even Barrett, an instructor to whom Ward compares herself, was required to pass the NOCTI exam.  *Id.* at p. 120.

The court concludes that Ward has failed to show that a similarly situated employee was treated differently.  Ward's evidence as to her knowledge of the requirement, or Buce's opinion

as to the necessity of the requirement, does not create a question of fact as to whether male instructors similarly situated to Ward were also required to complete the NOCTI exam. Summary judgment is due to be GRANTED as to this claim.

### iii.  Failure to Provide a Raise for Master's Degree

Ward states that she obtained her Master's degree but was given no salary credit for it. Ward states that the Defendants have failed to move for summary judgment as to this specific claim.   She acknowledges, however, that the Defendants have argued that Ward did not receive a raise because she was not qualified and that her advanced degree did not warrant advancement. Ward points out that Syed Raza is a male Instructor who was advanced from a rank II to III in 2008 and his salary was increased $3,664.00 for his advanced degree.

The Defendants have presented evidence that Ward was not advanced upon completion of her degree because she had not completed the NOCTI exam.  As explained above, the Defendants also have presented evidence that Syed Raza is not similarly situated because the requirements applicable to his rank within D-1 did not require the NOCTI exam.   Finally, the Defendants point out that once Ward completed the NOCTI exam requirement, she was in fact compensated for her Master's degree, because she received an advancement.

Ward points to a letter from Dean Barbara Anne Spears to Munnerlyn which Ward states establishes that she was due advancement based on her degree.   Upon review of the letter, however, it appears that Ward has left out the reference to the additional requirement for advancement upon which the Defendants rely.  Spears wrote as follows:

> Ms. Ward has completed a M.S. degree in public management from Troy University.  This accomplishment allows her to meet the degree requirement for Level II.
> * * * *

Insofar as the work requirement, Ms. Ward met the three years' experience requirement when hired.  The second requirement in the work segment is "successful completion of an approved occupation examination (e.g. NOCTI) within the first year of employment.  Ms. Ward has not completed such an examination.

* * * *

It seems, therefore, that Ms. Ward has met all criteria for advancement in rank/level other than the work requirement of completing an approved occupation exam.

Pl.  Ex. #18.  Summary judgment is, therefore, due to be GRANTED as to the claim based on failure to compensate for a Master's degree.

### d.  Johnson's Additional Duties/Qualifications Claims

Johnson has argued that she was forced to perform extra duties without pay, and that she was not given salary credit for prior experience

### i.  Pay for Additional Duties

In the argument portion of her brief, Johnson states that the same facts that support her claims for promotion and reorganization also apply to her disparate treatment claim in terms and conditions of employment.  *See* Doc. #175, p. 79.   Therefore, the court will not engage in that analysis again.

### ii.  Salary Credit

Johnson argues that the ACCS Salary Schedule Guidelines require that she be given full credit for work experience in the public schools, colleges, and adult education programs of Alabama, but that she was not given credit for her experience in public education.[22]  Johnson states that every male employee at Trenholm has been given credit for prior experience in public

---

[22] The Plaintiffs' state law claims based on this theory are addressed below.

education.  Johnson specifically points to Ross as a comparator.

The Defendants state that Johnson's claim is time-barred to the extent that she claims she was not given credit for prior teaching experience when she was initially hired because her hire was in 2001.   Johnson clarifies in her brief, however, that her claim is that she was placed on the incorrect step once Trenholm adopted steps for the C-3 Salary Schedule. Doc. #175 p. 81.[23]

The C-3 Salary Schedule provides as follows:

Yearly advancements will be made effective September 1, 2008 from the original placement on the C-3 including Legislative raises to date based on longevity at Trenholm State Technical College.

Doc. # 89-4.

Johnson has pointed to no male employees who were given credit on the C-3 Salary Schedule for prior experience, rather than longevity at Trenholm, once the steps had been implemented in 2008.   Ross is paid on the C-1 Salary Schedule.  Johnson argues that the distinction between C-1 and C-3 is meaningless because the Plaintiffs' position is that C-3 is used to discriminate against women through the lack of objective standards.[24]  That does not, however, establish that men were treated differently under the C-3 Salary Schedule.  The court concludes, therefore, that summary judgment is due to be GRANTED as to this claim.[25]

---

[23] The Defendants initially argued that Johnson was not entitled to credit for prior experience under the C-3, which Johnson states is a violation of state law.  The Defendants later clarified that position.  As will be discussed below, the application of state law in this case is one which is better left to the state courts.

[24] To the extent that Johnson would rely on statistical evidence to establish her separate claim, the statistical evidence is discussed below in connection with the disparate impact claim.

[25] Although Barrett is not argued to be a comparator by the Plaintiffs, because the court has concluded that Barrett is a valid comparator for a similar claim by a different plaintiff, the court notes that Barrett is on the D Salary Schedule, not the C Salary Schedule, and is, therefore,

## B.  Retaliation Claims Under Title VII[26]

A plaintiff establishes a prima facie case of retaliation under Title VII if she shows (1) that she engaged in statutorily protected expression, (2) she suffered an adverse employment action, (3) there was some causal relation between the two events.  *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004).

### 1.  Retaliation Claims by Plaintiff Thomas

Thomas has identified several different alleged protected activities.  Thomas filed an EEOC charge in April of 2009.  She states that she also engaged in protected activity when she filed an administrative grievance on March 25, 2008, which she later withdrew on April 26, 2008.  She also contends that she had been making verbal complaints before 2007.   Finally, states that she had a conversation with Byrne in August 2008 which is a protected activity.

The court has read the deposition portions cited to in Thomas's brief which purport to identify an oral or written grievance.  None of the deposition testimony states that Thomas expressed any complaint that she was being discriminated against on the basis of her gender during these alleged complaints.  For instance, cited pages 68, 69, 73, and 210 reference an inquiry as to pay, but do not say that Thomas complained of discrimination.  With regard to Thomas's testimony about a conversation with Byrne, she states that it occurred in 2008, and that she had an appointment "to discuss my job, my duties, my ability to– to basically – the authority I had in payroll– I was, and still am, processing payroll from beginning to end by myself– and a lot

---

not a valid comparator for Johnson.

[26]  Although Ward asserts retaliation claims under both Title VII and § 1983, as earlier noted, retaliation is not cognizable under the Equal Protection Clause.  *Watkins v. Bowden*, 105 F.3d 1344, 1344 (11th Cir. 1997).

of the issues with Deborah Griggs."  Pl. Ex. #51: 121: 5-10.  The testimony does not state,

however, that she complained of gender discrimination.  *See, e.g.*, *Brown v. City of Opelika,*

*211 Fed. Appx. 862, 864 (11th Cir. 2006)* (no protected activity where the plaintiff "never

mentioned the word 'race' when she complained about Kirby's behavior . . . .")*; Langham v.*

*Alabama Dep't. of Transp.*, No. 07-830-CG-C, 2008 WL 4873422, at *10 (S.D. Ala. Nov. 10,

2008) (internal complaint not a protected activity where there was no indication that plaintiff

asserted that he was being discriminated against when he complained).  Therefore, the court will

only consider the March 25, 2008 withdrawn grievance, the April 22, 2009 EEOC charge, and

the May 2009 filing of the lawsuit as protected activities.

The Defendants have pointed out that the Eleventh Circuit has rejected as temporally

remote adverse actions which are more than a few months after the protected activity.  *Thomas*

*v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that three-month period

without more is not close enough to establish causal connection).  Thomas relies on Eleventh

Circuit precedent that a causal connection element can be established if a "series of adverse

employment actions commenced almost immediately after" the protected activity.  *Wideman v.*

*Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).  "[A]ny intervening retaliatory acts

must have been material."  *Entrekin v. City of Panama City Florida* , 376 Fed. Appx. 987, 996

(11th Cir. 2010).

### a.  Additional Duties

Thomas states that in 2007 she was given the additional duty of sales tax.  She states that

she was never given a stipend or compensated for these duties.   She also states that in August

2008, Munnerlyn added the duty of DAX reporting, which is the personnel reporting from

colleges.[27]

Additional duties given to Thomas in 2007, even if the court assumed that they were materially adverse, predated her 2008 grievance and 2009 EEOC charge, and cannot form the basis of a retaliation claim. *See, e.g., Schecter v. Georgia State Univ.*, 341 Fed. Appx. 560, 563 (11th Cir. 2009) (no causal connection where adverse employment action occurred before protected activity). Thomas states that protected activity occurred through September 2007 and as late as August 2008. As noted above, however, she has not cited the court to any evidence that she voiced a complaint of gender discrimination.[28] Without evidence that the 2007 complaints Thomas has identified were complaints of discrimination, the court cannot conclude that Thomas has adequately met her burden of demonstrating that any purported adverse addition of duties in 2007 was sufficiently close in time to a protected activity. *See Seldon v. Total System Services, Inc.*, 653 F. Supp. 2d 1349, 1380 n. 33 (M.D. Ga. 2009).

With respect to the August 2008 reporting duties, the March 25, 2008 grievance is temporally remote, and the April 22, 2009 EEOC charge, and the May 2009 filing of the original Complaint, are after the alleged retaliatory activity. Summary judgment is therefore due to be GRANTED as to these retaliation claims.

### b. Removal of Duties

---

[27] Other additional duties imposed after she filed the lawsuit, such as running extra payrolls and restoration of the sales tax duty are actions are included in the court's ruling on the Motion to Strike. *See* Doc. # 185.

[28] In her affidavit, she states that in a February 1, 2007 letter she identified two men who were on the EI scale, but does not say that she thought she was being discriminated against. See Pl. Ex. #86 at ¶ 24. She also states that she mentioned her gender in a communication with the Defendants, but does not give a date for that communication.

Thomas states that in January of 2008 the Defendants removed job duties from her, such as duties relating to leave accruals, making adjustments, activating and inactivating employees, ensuring that employees were receiving leave on the correct scale, paying annual leave, and maintaining leave files.  She states that these duties were given to Ann Gordon.

The Defendants state that the reassignment of duties predates the filing of the EEOC charge in 2009.   Removal of duties also predates the withdrawn March 2008 grievance.  In the absence of evidence that she voiced complaints of discrimination before January 2008, the court agrees that Thomas has not established a causal connection between any action taken in December 2008 and a protected activity.   *Schecter*, 341 Fed. Appx. at 563.

### c.  Discussion and Email Regarding the Financial Impact of the Lawsuit

Thomas states that Munnerlyn gave a presentation during a professional development meeting in which he presented a slide addressing the impact of the litigation cost on the college. The Defendants also point out that Thomas says that she received an email on that subject, but the Defendants state that she has not produced that email.

In response to the Motion for Summary Judgment, Thomas states that she is entitled to redress for the act of the slide, but with respect to comments sent by Munnerlyn "she will forego redress for such."  Doc. #173 p. 94.

Thomas states in her brief that the meeting in which Munnerlyn presented a slide on the cost of litigation was a mandatory in-service meeting with all college employees present. Thomas states that the topic was not budgets.  She states that given the climate of a budget in proration, commenting on how an employee is costing the school money in a mandatory meeting would chill the effect of filing or participating in protected activity.  Thomas states that even

though she was not singled out, Munnerlyn did identify the years of the litigation.

Anti-retaliation provisions "protect[ ] an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  To demonstrate that an action taken by an employer is sufficiently harmful to sustain a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

In the face of the Defendants' argument that the slide presented was at most a petty slight or annoyance, Thomas has pointed to no evidence to support her contention that the slide was materially adverse.   The page of Thomas's deposition cited by the Defendants states that Munnerlyn "would list on one of the slides the cost of attorneys fees for the college."  Def. Ex. #1 at p. 110: 22-23.   This testimony does not explain what fees were identified.  While it may be that there could be circumstances under which an employer's discussion of on-going litigation could dissuade a reasonable worker from making or supporting a charge of discrimination, Thomas has failed to present sufficient evidence to create a question of fact on that point in this case.  Summary judgment is, therefore, due to be GRANTED as to this claim.

### d. Merrill's Appointment

The Defendants contend both that Thomas cannot establish that there was an adverse employment action in Merrill's hire as Operations Accountant because Thomas did not apply for the position, and that there is no causal connection between the employment decision and any protected activity.

 For the reasons discussed above in connection with Thomas's promotion claim, the court

cannot agree that Merrill's appointment was not materially adverse to Thomas.   However, Merrill was appointed on December 8, 2008, four months before Thomas filed her EEOC charge on April 22, 2009 and several months after her March 2008 administrative grievance.   The December 8, 2008 appointment, therefore, predates her EEOC charge, and is too remote from her withdrawn grievance to establish causation.  *See Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (three-month time gap does not establish causation).   Additionally, Thomas has not established a theory that there was a pattern of adverse events which immediately followed protected activities in March 2008 to establish causation for this December 2008 action, because the only other alleged action which occurred after a protected activity, the August 2008 action involving DAX reporting duties, did not occur "almost immediately" after her March 2008 grievance.   *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

### 2.  Retaliation Claims by Plaintiff Rollins

Rollins filed a grievance in March 2008 and an EEOC charge on August 27, 2008. Rollins has identified multiple acts of alleged retaliation which she says were in reaction to these protected activities.  Some of these alleged retaliatory acts are excluded by virtue of this court's Order on the Defendant's Motion to Strike because they are based on incidents which were not disclosed during Rollins's deposition because they occurred after the deposition, and they were never added to the Fourth Amended Complaint, but were instead included as claims for the first time in the response to the Motion for Summary Judgment.  *See* Doc. #185.[29]   The Defendants

---

[29] Rollins's deposition was taken in August 2010, so this Order extends to actions such as those identified by Rollins as denial of a request to attend OSHA training in 2011, and alleged comments by Dean Holt on March 30, 2011 that Rollins should quit her job.

have addressed multiple retaliatory acts which are discussed in evidence by Rollins, some of which are not addressed in her brief in response to the Motion for Summary Judgment and, therefore, are not theories upon which Rollins seeks to rely.  The court will address only the alleged acts of retaliation not excluded by the court's Order, and upon which Rollins relies in her brief opposing summary judgment.[30]

Rollins relies on Eleventh Circuit precedent, noted above, that a causal connection element can be established if a "series of adverse employment actions commenced almost immediately after" the protected activity.  *Wideman*, 141 F.3d at 1457.   Therefore, the court will first examine each challenged action to determine whether it is an adverse employment action, then examine the timing of all of the challenged decisions which rise to the level of materially adverse actions to see if Rollins has demonstrated a series of adverse actions which commenced almost immediately after the protected activities.

### Alleged Adverse Actions

### a.  Locks on the Supply Cabinet

Rollins has alleged that the Defendants retaliated against her on December 9, 2008 by placing locks on the cabinet holding promotional items.   In *Burlington No. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), the Supreme Court explained that a retaliatory act must be materially adverse to a reasonable employee and dissuade a reasonable worker from making or supporting a charge of discrimination.   "[P]etty slights, minor annoyances, and simple lack of good manners," are not sufficient to establish a materially adverse action.  *Id.*

---

[30]  Some of the acts Rollins alleges were retaliatory are not discussed in the argument section of her brief, but the facts are outlined in the fact section of her brief.  The court assumes that she seeks to proceed on separate claims for each act identified in the fact section of her brief.

Rollins states that this action was not a minor inconvenience because Human Resources had to provide the materials to new hires, needs access to pens and cups, and at times has prepared hundreds of letters on letterhead.

When asked in her deposition "nobody denied you school letterhead or access to pens or cups, did they" Rollins answered "no, but it implied that I was doing something that I was not doing . . . ." Pl. Ex. # 50 at p. 97: 22-at 98: 3.  Rollins explained that she would have to ask Munnerlyn's administrative assistant for the key, but agreed that no one denied her access to those materials.  *Id.* at p. 97: 14-98: 2.  Her affidavit does not create a question of fact on this point, stating only that the locks made it very difficult to perform her job duties, not denying that she still had access to the needed materials, but stating that other departments did not have "ask for a box of letterhead at a time."  Pl. Ex. #55 at ¶ 39, 40.  The court agrees with the Defendants that this evidence does not rise to the level of dissuading a reasonable employee to engage in protected activity.

#### b.  Computer and Email Problems

Rollins states that on July 16, 2009 and September 2009, she experienced computer problems in the form of increased monitoring of her computer, "access denied" messages, and email messages being removed from her account.   She further states that on October 21, 2009 she was unable to use email and was again unable to access the Human Resource computer in July 2010.

The Defendants state that Rollins has offered no evidence that any Trenholm employee removed her emails, monitored her computer, or denied her access to computer databases.  The Defendants point to evidence that other employees, including the President, were similarly

affected, and that attempts were made to resolve the problems.  The Defendants also point out

that Rollins admitted in her deposition that when the problem was brought to his attention,

Munnerlyn asked a Mr. Harris to rectify the problem and stated that he "felt something was

wrong as well because he had e-mails missing."  Pl. Ex. #50 at p. 159: 13-16.  The court cannot

conclude, therefore, that Rollins has demonstrated that these were material actions taken by any

decision maker with knowledge of her protected activity.

Rollins also apparently asserts a separate claim based on identified dates,  July 16, 2009,

September 2009, and October 2009, upon which she could not access her Human Resources

computer.  These actions appear to be governed by this court's Order on the Motion to Strike, but

if they are not, Rollins has not presented sufficient evidence that these computer lapses were

caused by anyone with knowledge of her protected activity.

Construing the evidence in a light most favorable to the non-movant, the court cannot

conclude that Rollins has established a question of fact sufficient to establish that computer or

email issues were adverse employment actions.

### c.  Exclusion from Meetings/Committees

Rollins states that she was excluded from the Civil Rights Compliance Survey

Committee, a September 20, 2010  Performance Evaluation Committee, the Employee

Recognition Committee, a search committee, and a September 25, 2010 meeting of the Harper's

Cooking Laboratory.  It also appears that Rollins contends that she was assigned to the back of a

room in a May 10, 2010 meeting, and that the Title III-B Director who was appointed to chair the

Professional Development Work Retreat asked Rollins for help.

Most of these committees/meetings have already been excluded by the court's Order on

the Motion to Strike because they were not asserted in the Amended Complaint and were added after the close of discovery, through the Plaintiffs' Reply Brief and affidavit, and were not disclosed during the August 2010 deposition.  *See* Doc. #185.   To the extent that they are not excluded under that Order, for example, the March 2009 Civil Rights Compliance Survey Committee, Rollins not demonstrated that she should have been included, or that exclusion caused her to be unable to perform her job duties.  In fact, specifically as to the Civil Rights committee, while Rollins offers the unsupported opinion that the committee "normally has" a human resources person on the committee, she also states that this committee was set up by Munnerlyn "as a new committee."  Pl. Ex. #55 at ¶ 48.

Essentially, the court has been presented a laundry list of committees/meetings to which Rollins opines she should have been appointed, but for which the court has been provided no supporting evidence from which to evaluate the significance of those committees in terms of whether exclusion from them would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

With respect to the Title III-B meeting, Munnerlyn has stated that the Title III-B Director was chosen to chair the retreat, rather than Rollins, because it is governed by grant requirements, and Rollins was not eligible to chair the retreat under those requirements.  *See* Def. Ex #1 to Reply at ¶ 17.

Therefore, the court will not consider these actions as part of a theory that there was a series of adverse employment actions.

### d. Statements by President Munnerlyn

The Defendants argue that Rollins has relied on statements by Munnerlyn as evidence of

retaliation, but that she has failed to present admissible evidence of the statements, or to show that they were materially adverse.  The Defendants have presented extensive evidence regarding these comments, particularly as to their admissibility as evidence.  While the Defendants cite to testimony by Rollins about comments, the court finds no reference to the majority of these comments either in Rollins's fact section of her brief, or in the argument portion of her brief. The court concludes, therefore, that separate claims based on comments not addressed by Rollins in opposition to the Motion for Summary Judgment, even though the Defendants pointed the comments out, have been abandoned.  *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,* 182 F.3d 888, 892 (11th Cir. 1999) (stating that "assertions not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion for summary judgment.).[31]

The only reference to comments in Rollins's brief of which the court is aware is Rollins's citation to her deposition testimony in which she states that she was told by other employees that during meetings which Rollins did not attend, Munnerlyn made some derogatory statements about her.  The statements were that Munnerlyn said he has to be careful about what he says or he will get letters from Rollins's attorneys, and unspecified derogatory statements.  Even if these statements were reducible to admissible form at trial, the court cannot conclude that they are sufficient to establish a prima facie case of retaliation as statements which would dissuade a reasonable person from engaging in protected activity.

---

[31]  Rollins, in fact, notes that the Defendants "moved for summary judgment on many of Rollins's claims of retaliation, including some that were not alleged."  Doc. #170 p. 113.  The court also applies this analysis to the claim pointed to by the Defendants for the assignment of payroll duties, issues with the emergency alert system, and a March 2009 Civil Rights Compliance/On Sight Review.

### e.  Access to Human Resources Budget

The Defendants state that summary judgment is due on this claim because the separate Human Resources budget was eliminated before Rollins filed her March 2008 grievance, and there was no budget for the fiscal year 2007-08.   Rollins responds only that the last time she was allowed to have an HR budget was for the 2007/2008 fiscal year.  It is apparently undisputed that she filed her first grievance in 2008.  Def. Ex. #1 p. 190: 5-14.   Rollins does not create a question of fact as to timing.  Rollins's evidence, therefore, does not refute the grounds for summary judgment that the alleged adverse action preceded the grievance, and, therefore, summary judgment is due to be GRANTED as to this aspect of the claim.

Rollins also states that in December 2008, her signature authority was removed over expenditures in the Human Resources Department.  The Defendants do not appear to have responded to this aspect of Rollins's claim, although they have raised a general timeliness objection, as noted.  The court will, therefore, consider this December 2008 action as part of its inquiry regarding the alleged series of adverse employment actions.

### f.  Performance Evaluation

Rollins contends that she was retaliated against because Dean Griggs withheld her 2007/2008 performance evaluation.  She states that she requested an October 2008 performance evaluation from then-Dean Griggs, and then spoke to Munnerlyn.   Rollins inquired on multiple occasions about the evaluation and finally filed a grievance concerning it in December 2009.  She received the evaluation on March 31, 2010.   She also states that when she received the evaluation, there was an attempt to lower her evaluation score.

The Defendants state that the evaluation incident occurred in December 2009, 16 months

after Rollins's EEOC charges.  Rollins has stated in her affidavit that she first requested the evaluation on October 7, 2008, and that it was due by August 1, 2008, but had not been provided. The August 1, 2008 date would be relevant for timing purposes only in terms of the grievance in March 2008, because it precedes the EEOC charge.  The October 7, 2008 date would be relevant for the August 2008 EEOC charge.

The Defendants respond that they do not deny that Rollins had a legitimate complaint about her evaluation not being completed in a timely manner, but that Munnerlyn attempted to correct the situation.  Munnerlyn reassigned the evaluation responsibility to Dean Holt, but when the evaluation was lower than Rollins's previous score, Munnerlyn directed Griggs to prepare the evaluation.  The Defendants state, therefore, that the situation was corrected, and arose from a personality conflict between Griggs and Rollins.

Rollins has not presented evidence that would show that a delay in evaluation, which was corrected, and which resulted in a performance evaluation equal to that which she had received in the past, would dissuade a reasonable employee from engaging in protected activity.  *Cf. Cotton v. Cracker Barrell Old Country Store, Inc.,* 434 F.3d 1227, 1234 (11th Cir. 2006) (failure to conduct an evaluation was not an adverse employment action where it was not reported as a problem); *Cox v. City of Tampa*, 418 Fed. Appx. 845, 847 (11th Cir. 2011) (finding no adverse action where the plaintiff "failed to establish that the lower score on her evaluation, which her supervisor testified was 'excellent,' affected the terms or conditions of her employment in any manner and would have dissuaded a reasonable person from filing a complaint.").   Therefore, the court will not consider this action as part of a theory that there was a series of adverse employment actions.

**g.  Participation in the Grievance and Litigation Processes**

Rollins states in her affidavit that Munnerlyn took away her duties of attending Fair Dismissal proceedings involving employees of Trenholm, internal investigations regarding misconduct of employees at Trenholm, involvement in grievances, and access to personnel documents and litigation information that does not involve her personal litigation against Trenholm.  Pl. Ex. #55 at ¶ 35

The Defendants presented Munnerlyn's affidavit in which he states that he made the decision to remove Rollins from Fair Dismissal hearings and litigation-related duties during the pendency of her lawsuit to avoid any potential conflict of interest, and to ensure that processes remained objective and free of influence that might occur as a result of Rollins's participation.  Def. Ex. #1 to Reply at ¶ 19.

The Supreme Court has outlined how a court is to evaluate a re-assignment of job duties within the context of a retaliation claim:

> To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " But here, the jury had before it considerable evidence that the track laborer duties were "by all accounts more arduous and dirtier"; that the "forklift operator position required more qualifications, which is an indication of prestige"; and that "the forklift operator position was objectively considered a better job and the male employees resented White for occupying it."

> *Burlington*, 548 U.S. at 71 (citation omitted).

In this case, therefore, the court cannot merely assume that removal of grievance and litigation duties would be materially adverse to a reasonable employee.   Although Rollins states in her brief that these duties are a key function of her job, she presents no evidence to that effect.

88

Her affidavit does not speak to the significance of these job duties.

The Defendants also point out that during her own grievance process, Rollins complained that she had been assigned additional legal duties without an increase in pay.  Def. Ex. #28.   The evidence the Rollins complained about the duties does tend to demonstrate that she subjectively did not find their removal to be adverse.  Under the objective standard in *Burlington*, that evidence would not preclude a finding of objectively material adversity, but because it is the only evidence regarding material adversity, the court concludes that Rollins has not sufficiently created a question of fact as to whether a reasonable person would have been dissuaded by the reassignment of litigation and grievance duties.

### h.  Access to Supplies

Rollins states that on December 9, 2008 she began asking to obtain supplies since she was denied access to a human resources budget.  She states that on April 20, 2010 she asked the Administrative Assistant for Dean Wilford Holt to purchase two chairs and after several attempts received the chairs.  She states that she has been unable to obtain supplies through the channels she has been told to use.  The only concrete example given by Rollins in support of this claim involves chairs, which were not denied, but just delayed.[32]   The court cannot conclude, therefore, that this evidence establishes a materially adverse action.  *Goldsmith v. Babgy Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) ("[P]etty slights, minor annoyances, and simple lack of good manners" generally do not rise to the level of materially adverse actions.") (citing *Burlington*, 548 U.S. 53, __, 126 S.Ct., at 2415).

---

[32]  The filing cabinets requested on October 12, 2010, are excluded by the court's Order on the Motion to Strike. *See* Doc. #185.

### i.  Audit by Post-Secondary

Rollins has argued that an audit in 2008 is a retaliatory action. She has cited no evidence in support of this argument.  The Defendants characterize this claim as one which falls within the court's Order on the Motion to Strike.

The Defendants have presented evidence from Dupree that she selected Trenholm as her first audit on August 7, 2008 because it was closest to her office.  Def. Ex. #3 to Reply at ¶ 3. Dupree is an employee of the Department of Post-Secondary Education.   She states in her affidavit that she was not instructed by anyone to conduct the audit. *Id.* at ¶ 6. She states that she did not complete the audit.  *Id.* at ¶ 4.  There is no evidence that Dupree was aware of any protected activity of Rollins at the time of the incomplete audit.  The court concludes, therefore, that even if this claim is not due to be excluded under the court's prior Order on the Motion to Strike, summary judgment is nevertheless due to be GRANTED as to this claim.

### j.  Additional Training

Rollins states that in May of 2009, she was instructed by Griggs to attend additional training regarding employee contracts even though Rollins already knew about employee contracts.  Her affidavit evidence on this point simply is that no one had complained about contracts and there were no changes in the contract module.  Pl. Ex. #55 at ¶ 46.  Munnerlyn has stated that he requested some meetings concerning employee contracts based on incidents where employees were not timely paid.  Def. Ex. #1 to Reply at ¶ 9.   Munnerlyn states that Rollins was not singled out.  *Id.*  Even assuming, therefore, that there is a question of fact as to whether the meetings about contracts were triggered by complaints or concerns, without any more evidence than that which has been provided, the court cannot conclude that this action would tend to

dissuade a reasonable employee from engaging in protected activity.

### k. Removal of Archived Files

Rollins asserts that while she was on leave archived employee records were removed in retaliation for her filing this lawsuit.   She argues that in September of 2009, she notified Munnerlyn that personnel, legal, and search files had been removed from Human Resource storage rooms.  She states that she was not told the location of these files until April 2011 and needed them to confirm employment verifications.   Rollins's deposition testimony is that she was aware that there would be a renovation, that then-Dean Griggs ordered the files not to be moved, that the files were moved and Rollins was not told where they were and has been unable to adequately perform her job duties.  Def. Ex. #1 at p. 186 6-188: 13.

The Defendants state that the files were former employee records, they were housed in a separate building, and that Rollins knew the records were removed during a building renovation. Munnerlyn states that the files were relocated to a warehouse on the Trenholm campus after Rollins complained about lack of access and that the files are accessible to her.  Def. Ex. #1 to Reply at ¶ 27.

A September 2009 action is remote in time from her 2008 grievance, August 2008 EEOC charge, and May 29, 2009 Complaint.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that three-month period without more is not close enough to establish causal connection).   As noted above, however, the issue of causation will be addressed below in the context of Rollins's argument regarding a pattern of retaliatory actions.

### l.  Administrative Council Appointment

Rollins contends that she was retaliated against when President Munnerlyn did not

reappoint her to the Administrative Council in 2008.   While it is unclear the exact date that the Administrative Council was selected, evidence before the court indicates that the selection process was occurring in December 2008.  *See* Def. Ex. #23.

Rollins states that because senior management relies on the Human Resources Director to provide them with data and analysis, the president would normally appoint the Human Resources Director to the Counsel, rather than asking for a general college vote.  Rollins states in her deposition that she does not recall being elected, but instead being appointed by then-President Molina.  Pl. Ex. #50 at p. 145 23-146:3.   Rollins states in her affidavit that the Council establishes guidelines for the operation of the college and that it is considered an honor to serve on the Council.  Pl. Ex. #55 at ¶ 42.

The Defendants state that at most her claim concerns a petty and trivial act.   They present evidence to demonstrate that while Munnerlyn did not appoint Rollins to the Council, he did place her name on a list of nominees, and she simply was not selected by her peers.

Accepting Rollins's evidence and viewing it in a light most favorable to her, as the court must do in ruling on a defendants' motion for summary judgment, the court cannot agree that the evidence establishes as a matter of law that not being on the Administrative Council was petty and trivial.  To the contrary, Rollins's testimony creates a question of fact as to whether this action would dissuade a reasonable worker from making or supporting a charge of discrimination.

The decision apparently occurred in December 2008, whereas Rollins's EEOC charge was filed in August 2008.   *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that three-month period without more is not close enough to establish causal

92

connection).   Under a *Wideman* theory, however, a Plaintiff can establish causation if adverse actions commence immediately after the protected activity.   The court, therefore, turns to the *Wideman* causation theory put forth by Rollins.

### Timing of Adverse Actions

As stated earlier, Rollins's grievance was filed in March of 2008, and her EEOC charge was filed on August 27, 2008.   Of the identified allegedly retaliatory actions upon which Rollins has relied in her brief, a genuine issue of material fact as to whether an alleged action is materially adverse exists as to three actions:   the removal of signature authority for expenditures, which occurred in December 2008; what Rollins contends was a removal from the Administrative Council, which occurred in December 2008; and the failure to allow access to personnel files, which occurred in September 2009.

The December 2008 actions did not "almost immediately" follow a protected activity because they occurred more than three months after the EEOC Charge and more than seven months after the grievance.   *See Wideman*, 141 F.3d at 1457 (short period of time of one month establishes causation).   The September 2009 decision to move the personnel files similarly occurred well after the EEOC charge and, even considering the date of the litigation in this case, it occurred three months after Rollins filed her May 29, 2009 Complaint in this case.   *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that three-month period without more is not close enough to establish causal connection).   Therefore, summary judgment is due to be GRANTED as to all of Rollins's retaliation claims.[33]

---

[33] Summary judgment is also due to be GRANTED on the removal from the Administrative Council claim on the alternative basis that Rollins cannot establish pretext.  The articulated reason for her removal is that Rollins was not eligible for an automatic appointment,

### 3.  Retaliation Claims by Plaintiff Ward

Ward has identified alleged adverse actions which she contends were taken in retaliation for her protected activity.

The court first notes that while the Defendants focus on Ward's EEOC charge as an undisputed protected activity, there are two additional issues raised by Ward as to her protected activities.  One, Ward filed her EEOC charge on July 6, 2009, not August 27, 2008 as the Defendants contend in their initial brief.  Def. Ex. #23.[34]  Second, Ward also states that she engaged in protected activity in August 2007.   In support of this argument, she cites an October 4, 2007 letter to Rollins, which is a formal request to receive a salary increase for her Master's Degree.  Pl. Ex. #21.  There is, however, no mention of any allegation of gender discrimination

---

that Munnerlyn placed her name on a list of persons who could have been elected by her peers, and that Rollins was not elected. A memorandum dated December 5, 2008, states that membership of the Administrative Council will consist of individuals elected by their peers and others appointed by the President based on their positions, including representatives from Admissions, Financial Aid, Library, Adult Ed, Maintenance, and Federal Programs.  *See* Pl. Ex. K to Ex. #55.  The Defendants point to a September 14, 2006 document which states that the Administrative Council is made up of the President, members of the President's Cabinet and the members of the Administrative Council, and "All members are elected by their peers except for President's Cabinet."  Pl. Ex. 50, pt. 3, Admin. Counsel Memo.   Rollins's belief that she should have been on the Council by virtue of her position does not establish pretext.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir.2000) (stating "A plaintiff is not allowed to . . . substitute [her] business judgment for that of the employer.").   The mere fact that a different decision maker had placed her on the Council is not sufficient to establish pretext because "in order to show an employment action was a pretext for discrimination or retaliation, a plaintiff must 'establish not that it was unusual but that the stated reason ... was a fabrication, designed to conceal an unlawful reason.'" *Seldon v. Total System Services, Inc.,* 653 F. Supp. 2d 1349, 1380 (M.D. Ga. 2009) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000)).  The court concludes, therefore, that summary judgment is due to be GRANTED as to this claim on this alternative basis.

[34] July 6, 2009 is the date on the documentary evidence supplied by the Defendants, and they provide no explanation for why they cite an August 27, 2008 date in their initial brief.  In the Reply, they adopt the July 2009 date.

in that letter.  Therefore, the court finds that the prima facie case of retaliation is satisfied by the EEOC charge, not by any alleged earlier complaints.   A prima facie case may also be based on the protected activity of the litigation itself.  The court granted a motion to add Ward as a plaintiff in this case on April 8, 2010.  *See* Doc. #56.[35]

Some of the claims asserted by Ward have not been associated with any particular dates.  The court addresses those claims first.  The court will then address the remaining claims.

### Undated Claims

### a.  Additional duties

Ward contends that she was retaliated against because she was assigned to teach seven to eight classes during the regular school year and six or seven classes in the summer, even though the typical teaching load is five courses in the fall and spring and four classes in the summer.

The Defendants state that this action was not materially adverse because it was a temporary teaching load and fell within Ward's job description.  Pl. Ex. #1 at p. 138.  Ward has not presented evidence which demonstrates that a reasonable employee would have been dissuaded from making or supporting a charge of discrimination.

### b. Pay

Ward states that she has not received stipends or supplemental pay for additional work even though men are paid with stipends and supplements for additional work.  Ward states that she never received a stipend as Program Coordinator whereas males have received stipends for

---

[35]  Ward states that she was added as a Plaintiff on July 16, 2010, citing the Fourth Amended Complaint at Doc. #63.  The Fourth Amended Complaint, Doc. #63, was filed on June 16, 2010.  The Fourth Amended Complaint filed that day, however, was in response to a court's Order which allowed amendment and also granted Ward's motion to be added as a Plaintiff in April of 2010.  *See* Doc. #56.

additional work.  She points to Quinton Ross whom she says was given more than $11,000 in additional pay for giving periodic lectures.  Ward also states that Lewis Campbell, Arnold Stringer, and Freddie Williams are paid extra for teaching as adjuncts at Trenholm even though the classes are taught during full-time duty hours.  Ward also argues that summary judgment is due to be denied as to these claims because the Defendants did not move for summary judgment as to these claims.

The Defendants respond that Ward never mentioned in her deposition when asked about her retaliation claims that she contended she had not been offered opportunities to earn additional compensation for part-time work.  The Defendants having raised the issue of causation, therefore, the court will not deny summary judgment merely on the basis that this claim was addressed by the Defendants in response to Ward's own argument.

Ward does not tie the claim to any particular date, much less a date which occurred after a protected activity.  In the portion of Ward's deposition in which she discusses additional duties she agreed that the additional duties were ones she had been performing for the past number of years, and even at her previous employer, which would include a time period before the protected activities.  Pl. Ex. #1 at p. 142: 1-6.  The court concludes, therefore, that summary judgment is due to be GRANTED as to this retaliation claim.

### c.  Liaison for Alabama Board of Cosmetology

Ward also testified in her deposition that she acts as a liaison between her program and the Alabama Board of Cosmetology and that that job duty is not within her job description. Again, however, Ward gives no time frame for when such duty was assigned her, and the court cannot conclude that she has established a prima facie case based on that job duty.

96

**<u>Dated Claims</u>**

Because these claims are associated with dates, the court will evaluate them, as it did with claims by Rollins, first in terms of whether Ward has shown that the alleged actions are materially adverse, and then as to whether causation has been established.  *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

### a.  Co-Op Responsibilities

Ward states in her deposition that she has job duties which are not in her job description, such as being responsible for placing students in co-op positions.  *See* Pl. Ex. #1 p. 139.  There is some evidence of timing in Ward's deposition as to at least one aspect of these duties, because she states that that the other cosmetology instructors used to pick up all of the co-op evaluations, but for the last "nine months to a year maybe," she has picked up the night students' evaluations. *Id.* at p. 142: 13-19.  Ward's deposition was taken on September 17, 2010, so an action which occurred nine months to a year earlier occurred September 17, 2009 to December 2009.

The court has not been provided any evidence that Ward was required to perform the co-op duties described by any person who was aware of her protected activity.  Nor has the court been provided sufficient evidence from which a reasonable juror could conclude that these duties are materially adverse.  Ward states in her deposition that these duties are those in addition to the duties in her job description, Def. Ex. #1 at p. 139: 12-19, but Ward's job description provides that she will perform other duties as directed by the Dean of Academic Services/Director of Technical Education or Division Director.  Def. Ex. #41.  Therefore, without any evidence to show that the addition of these particular duties would dissuade a reasonable person from engaging in protected activity, and in light of evidence that the job duties were within those

required by the position, the court cannot conclude that Ward has demonstrated that the addition

of co-op duties would dissuade a reasonable worker from making or supporting a charge of

discrimination.

**b.  Removal of duties and secondary title as Program Coordinator**

Ward states that the Defendants retaliated against her by removing her secondary title as

Program Coordinator of the Cosmetology Department and the duties of that coordinator.

Ward joined this case as a Plaintiff by Order of this court on April 8, 2010.  She does not

give an exact date for this alleged adverse action, but does state in her deposition that she still

had the title on April 27, 2010, which was the last time she looked at the organizational chart.  *Id.*

at p. 136: 1-11.   The Defendants also state that there is no evidence that compensation and

benefits were adversely affected or that duties associated with the title were removed.

Ward has stated in her brief that Jean Stockman was reassigned Program Coordinator

duties, but the page of her deposition which she cites, page 135, makes no mention of a

reassignment of duties.  Pl. Ex #1 at p. 135: 18-20.  It just states that the organization chart

includes Jean Stockman's name as Program Coordinator.  *Id.*  In her brief, Ward explains that

she knew all along that she was performing the duties of Program Coordinator, but had not been

aware that she had been given the title of Program Coordinator, and then that title was taken

away.  Doc. #169 at p.88 n.37.  This argument undercuts, rather than establishes, any inference

that a change of title also entailed a change in duties.  Furthermore, Ward argues that even when

she had the duties, she was not compensated for them.  *Id.*  It is difficult to see, therefore, how

removal of duties for which she was not compensated, even if the court assumes duties were

removed, is materially adverse.  The court agrees with the Defendants, therefore, that Ward has

not established that removal of the title of Program Coordinator establishes a materially adverse action.  *See Goldsmith v. Babgy Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) ("[P]etty slights, minor annoyances, and simple lack of good manners" generally do not rise to the level of materially adverse actions.").

### c. Removal from Marketing Committee

Ward states in her deposition that she was removed from the Marketing Committee, along with two other persons, sometime "this past July," which the court assumes means July 2010, because her deposition was taken in September 2010.  Pl. Ex. #1 at p. 123: 3.[36]  There is no causal connection established between her being added to the case in April 2010, and removal from a Marketing Committee in July 2010.  And, Ward has not supported a theory that retaliation began immediately after she joined the lawsuit.  The only other dated event occurring between her joining this case and her removal from the committee is the April 2010 Program Coordinator title being removed, which she has not established was an adverse action.

### d.  Daytime schedule

Ward contends that in retaliation for her filing her EEOC charge of discrimination, the Defendants changed her teaching schedule or denied her the opportunity to change to a daytime teaching schedule.  This decision was apparently communicated to her in December 2009.  Ward testified in her deposition that, although she was hired as an evening cosmetology instructor, she thought that when Buce, a daytime instructor, retired, she would replace the daytime instructor.  Ward was told that the new instructor was directly out of high school and would need to work

---

[36] Ward states that the Defendants failed to move for summary judgment on this claim. The Defendants have raised a timing issue and have responded to this claim in their reply, so the court will not deny summary judgment on that basis.  *See Fed. R. Civ. Pro.* 56 (e), (f).

alongside the daytime instructor.

A decision in December 2009 is too remote from her July 6, 2009 EEOC Charge to establish causation. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Ward has not substantiated a theory that there was a series of adverse actions immediately following protected activity. The only other allegedly adverse activity occurring in 2009, for which the court has been given evidence as to a date, is additional co-op duties, which occurred September 17, 2009 to December of 2009, which she has not established as adverse activity. Therefore, Ward has failed to establish causation for this December 2009 action.

### e. August 2010 Hiring

Ward also alleges that the denial of the daytime instructor position once Verna Barrett was terminated in 2010 was retaliation. Ward applied for an instructor position in an attempt to switch to day time classes. The Defendants hired DeQuendolyn Ann Long to fill the position in August 2010. They contend that there is no causal connection between July 6, 2009 EEOC charge and the hiring decision in August of 2010. Even considering Ward's joining this case as protected activity, Ward was added to this case in April of 2010, so the court concludes that causation has not been met. *See Thomas*, 506 F.3d at 1364. Furthermore, there is no evidence before the court to substantiate a theory that there was a series of adverse actions between any protected activity and this hiring decision. The only other dated events occurring between her joining this case in April 2010 and the August 2010 hiring are the Program Coordinator title being removed in April 2010, which she has not shown to be a materially adverse action, *Wideman*, 141 F.3d at 1457, and Ward being removed from the Marketing Committee in July 2010, which did not occur "almost immediately" after the court allowed her to be added to the

lawsuit in April 2010. *Id.*

Alternatively, summary judgment is due to be GRANTED because Ward has not established pretext. The Defendants' articulated reasons are that Ward was aware that the position for which she applied was the same position she held, and was not necessarily a daytime assignment. The Defendants further state that another person was hired and assigned daytime classes because the Defendants wanted the new instructor to have the benefit of an experienced instructor during the day.

Ward has testified in her deposition that when she was hired as an adjunct, she worked at night without the benefit of an experienced instructor. Pl. Ex. #1 at p. 130:11-19. The Defendants contend that Ward's position that the new person could have been hired into the night teaching assignment is a disagreement with the wisdom of the employer's reason.

The court agrees that the employer's decision not to place an inexperienced employee in the evening position is one which might have motivated a reasonable employer, and Ward's criticism of that rationale is not sufficient to establish pretext. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997). Ward does not present evidence to create a question of fact as to whether the employer was actually motivated as stated. The mere fact that Ward herself performed the job without supervision does not mean that an employer cannot make a determination to have supervision for another employee. Summary judgment is due to be GRANTED as to this claim.

### 4. Retaliation Claims by Plaintiff Johnson

Before addressing Johnson's specific claims, the court notes that Johnson does not rely merely on her July 30, 2008 EEOC charges as protected activity in this case. She also states that

101

she complained to her supervisor, Griggs, that women were paid less than men for similar work. She states in her deposition that she made this complaint as far back as 2007. Pl. Ex. #38 at p. 105. In her affidavit she stated that she spoke to Griggs off and on in 2006 and 2007 about how men were being paid higher salaries. Pl. Ex. #87 at ¶ 19.

For Johnson's complaint to Griggs to be the basis of a retaliation claim, however, there must be evidence that a decision maker for an alleged act of retaliation was aware of the complaint. *Bass v. Bd. of County Comm'rs, Orange County, Fla*., 256 F.3d 1095, 1119 (11th Cir. 2001).

In her brief in opposition to the Motion for Summary Judgment, Johnson identifies five actions which she contends were adverse employment actions taken in retaliation for protected activity: the denial of her requests for reorganization, a demotion, denial of salary credit for prior experience, exclusion from a mid-level managers workshop, and conduct at a February 2011 meeting. Johnson's claim based on a February 22, 2011 meeting is precluded by this court's May 18, 2011 Memorandum Opinion and Order, because Johnson did not seek to make it part of the Fourth Amended Complaint. Doc. #185. The court turns, therefore, to the remaining four claims.

### a. Failure to Promote/Reorganization

Johnson refers to the facts surrounding her disparate treatment failure to promote claim and states that the denial of her requests for reorganization were in retaliation for her complaint to Griggs about discrimination in pay to women. The Defendants, in their Reply, contend that this is a new theory of retaliation. Because this theory is based on evidence and arguments available to and discussed by the Defendants in their initial brief, however, and it is not due to be

excluded under the court's May 18, 2011 Memorandum Opinion and Order, and the court will consider it.

The Defendants argue that although Johnson states that she communicated complaints to Griggs, there is no evidence to suggest that Griggs communicated those complaints to Munnerlyn or Byrne, who were the decision makers in the denial of the reorganizations. "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression." *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir.2001). Johnson has not created a question of fact as to who the decision makers were in regard to the denial of her reorganizations, or as to whether those decision makers were aware of complaints made to Griggs. In addition, the evidence regarding Munnerlyn's statement evincing gender-based animus, which has been discussed above, does not reflect any retaliatory animus. The court agrees, therefore, that Johnson has failed to establish a prima facie case of retaliation based on the denial of her requests for a reorganization.

#### b. Demotion

Johnson has alleged that she was demoted when she was told to report to Wright, rather than to Griggs.

The Defendants point to evidence of a letter from Johnson to Munnerlyn in which she complained about Dean Griggs. The letter is dated June 13, 2008 and states that Johnson seeks assistance because she has no confidence in Griggs's leadership and is not comfortable speaking with her one on one. Def. Ex. #40.

In his deposition, Munnerlyn states that he removed Griggs's supervisory authority and

directed Finance Department employees to report directly to the new comptroller, Catherine Wright, whom he appointed on July 1, 2008. Def. Ex. #29 at p. 229-30. The Defendants state that Johnson cannot establish that an adverse employment action was taken against her because it was actually a favorable action in response to Johnson's own complaint. The Defendants further state that the decision to have members of the Finance Department report to Wright was made on July 1, 2008, and so predates the filing of Johnson's July 30, 2008 EEOC charge. *See, e.g., Schecter v. Georgia State Univ.*, 341 Fed. Appx. 560, 563 (11th Cir. 2009) (no causal connection where adverse employment action occurred before protected activity); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."). The court agrees that Johnson has failed to establish a prima facie case of retaliation based on a theory that her reporting to Wright rather than Griggs constituted a demotion.

### c. Salary Credit

Johnson states that the Defendants have not adhered to their own guidelines in placing her on the C-3 Salary steps. She states that she was placed seven steps below where she should have been placed based on her years of experience. Although Johnson does not provide a date upon which her salary was set on the C-3 steps in her brief, in her deposition, Johnson states that she wrote an email on May 2, 2008 to Griggs requesting a review of her experience because she was not given credit for experience. Pl. Ex. # 38 at p. 184: 9-19. Johnson filed her EEOC charge in this case on July 30, 2008. May 2, 2008, a date which predates the July 2008 EEOC charge,

being the only date the court has been provided for the identified action, Johnson has not

established causation.  *See Drago*, 453 F.3d at 1308.

### d.  Exclusion from Meeting

Johnson has stated in her deposition that she was excluded from a mid-level manager's

training meeting that occurred in November or December of 2008.

The Defendants state that Johnson's only knowledge of the meeting is hearsay from two

other employees, so that this claim fails on that basis.   The Defendants also state that although

the date is unspecified, if it fell in November or December of 2008 as Johnson states, it is too

remote in time from her July 2008 EEOC Charge of Discrimination to establish a causal

connection.   The court agrees, and summary judgment is due to be GRANTED as to this claim.

*See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that three-

month period without more is not close enough to establish causal connection).

### C.   Equal Pay Act Claims[37]

As stated earlier, to establish a prima facie case under the Equal Pay Act, the Plaintiff

must show that the employer pays different wages to employees of opposite sexes for equal work

on jobs the performance of which requires equal skill, effort, and responsibility and which are

performed under similar working conditions.  *See Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d

792, 795 (11th Cir. 1992).  Once the Plaintiff makes this showing, the burden then shifts to the

Defendants to demonstrate that the differential was justified under one of the four affirmative

defenses found in 29 U.S.C. § 206(d)(1).  Defendants bear the burden of proof for these

---

[37] These claims are brought against only the state entity Defendants.  *See* Doc. #63, Count
V.

affirmative defenses. *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995).

A female employee demonstrates a prima facie case of an Equal Pay Act violation by showing that her employer paid male employees different wages for equal work for jobs which require " 'equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) and 29 U.S.C. § 206(d)(1)). Although formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content. *Miranda*, 975 F.2d at 1533; *Arrington v. Cobb Cty.*, 139 F.3d 865, 876 (11th Cir.1998) ("[A]lthough formal job titles or descriptions may be considered, the controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content."). A plaintiff need only demonstrate that the jobs at issue are substantially similar, not identical. *Miranda*, 975 F.2d at 1533. Nonetheless, "[t]he standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood, & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir.1989).

### 1. Thomas

"The Equal Pay Act prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992). While evidence of discriminatory intent has precluded summary judgment as to a Title VII and Equal Protection failure to promote claims, for purposes of the Equal Pay Act, the court must examine the two positions to determine whether they are substantially equal. The court has previously concluded that under both a more

lenient and a stricter Title VII comparator standard, Thomas and Merrill are not similarly situated for purposes of a pay claim.  Therefore, the court also concludes that Thomas has not met her burden to show that the positions are of equal skill, effort, and responsibility and are performed under similar working conditions under the stricter EPA standard.  Summary judgment is, therefore, due to be GRANTED as to Thomas's Equal Pay Act claim.  *See Miranda*, 975 F.2d at 1532.

### 2.  Rollins

Rollins states that she has shown that her job as Human Resources Director is similar to jobs of male comparators when the evidence is viewed in a light most favorable to her, as the nonmovant.  Rollins states that in pointing out differences, the Defendants improperly rely on qualifications for the position, not on job duties.

Rollins has not shown that her job duties are substantially equal to the comparators.  *Id.* This court has evaluated an argument similar to Rollins's in *Byrd v. Auburn Univ. at Montgomery*, No. 2:05cv835, 2007 WL 1140424 (M.D.  Ala. April 17, 2007).  In *Byrd*, the plaintiff argued that as Assistant Vice Chancellor for Student Affairs, she was paid less than the Executive Director of Advancement and Alumni Services, the Assistant Vice Chancellor for Academic and Graduate Affairs, and other similar positions.  The plaintiff argued that all of the employees were senior administrators with core responsibilities such as management of staff, budget responsibilities, and role in the university.  The court rejected this argument, reasoning that general similarities are insufficient to meet the plaintiff's burden under the Equal Pay Act. *Id.* at *5; *see also Soble v. Univ. of Md.*, 778 F.2d 164, 167 (4th Cir. 1985) (plaintiff did not meet similarity standard of EPA based on assistant professors in other departments, because those

107

departments required specialized skills).   The court is persuaded by this reasoning in the instant

case and finds that Rollins's argument is largely based on general similarities which is

insufficient to establish a prima facie case of a violation of the Equal Pay Act.  To the extent that

Rollins has compared her job responsibilities and tasks to specific job responsibilities of her

offered comparators, for the reasons discussed in the connection with Rollins's Title VII and

Equal Protection wage claims, which apply a less strict comparison than the EPA, the court

concludes that she has failed to meet her burden of demonstrating sufficient similarity.  Summary

judgment is, therefore, due to be GRANTED on Rollins's EPA claim.

### 3.  Ward

As discussed above, the court has concluded that there is a sufficient question of fact to

preclude summary judgment on the Title VII and Equal Protection wage disparity claims brought

by Ward.  Given the Defendants' position in this case that Barrett and Ward were placed as they

were on the Salary Schedule based solely on an application of the Salary Schedule, and the

questions of fact raised as to that placement, the court concludes that summary judgment is also

due to be DENIED as the Equal Pay Act claim.

### 4.  Johnson

For the reasons discussed in connection with Johnson's Title VII and Equal Protection

wage claims, which apply a less strict comparison analysis than the EPA, the court concludes that

she has failed to meet her burden of demonstrating sufficient similarity.  *See Byrd v. Auburn*

*Univ. at Montgomery*, No. 2:05cv835, 2007 WL 1140424 (M.D. Ala. April 17, 2007).  Summary

judgment is, therefore, due to be GRANTED on Johnson's EPA claim.

### E.  Disparate Impact

The Plaintiffs have argued that Trenholm's use of the C-3 Salary Schedule allows the Defendants to discriminate against women because the standard is subjective. The Plaintiffs state that several suits have been brought against the Defendants regarding the C-3 schedule, and in fact the *Millender* case resolved one challenge to the schedule, but that no one has examined whether the C-3 schedule results in discrimination.

The Defendants argue that the mere fact that subjectivity exists in the system is not a sufficient basis to establish a claim, citing the Supreme Court's recent statement that discretion by local supervisors is a presumptively reasonable way of doing business. *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541 (2011). The Defendants also point out that the Plaintiffs' expert failed to find a statistical significance in the difference of pay between men and women employed by Trenholm. *See* Doc. #82-4 at p. 138: 6-23; Pl. Ex. # 199 at p. 9 n.14.

The Plaintiffs concede that statistical disparities must be sufficiently substantial that they raise an inference of causation. *See Watson v. Ft. Worth Bank and Trust*, 487 U.S. 977, 995 (1988). They state, however, that even the Defendants' expert found evidence of a disparity, and that what is left is simply a battle of the experts over the significance of the disparity. The Plaintiffs rely on the same evidence already addressed by the court in the context of denying the Motion for Class Certification, however, including evidence regarding all ACCS employees, and not merely Trenholm employees. The evidence presented to this court in the form of the Plaintiffs' own expert's testimony is that Trenholm gender wage disparity is not statistically significant. Without evidence that any disparity in pay is statistically significant at Trenholm, the court concludes that there is no question of fact, and that summary judgment is due to be GRANTED as to the disparate impact claim.

109

### D.  Pattern and Practice

The Plaintiffs originally asserted a pattern and practice claim against the Defendants.  In *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955 (11th Cir.2008), the Eleventh Circuit held that a private litigant cannot maintain a pattern or practice claim unless it is brought as a class action and the class is ultimately certified.   In this case, the motion for class certification has been denied.  Therefore, to the extent that the Plaintiffs still seek to assert such a claim, summary judgment is due to be GRANTED as to the pattern and practice claim.

### E.  State law claims

In the Fourth Amended Complaint, the Plaintiffs ask this court to compel the Defendants to conform to ACCS policy § 602.2, pursuant to *Belcher v. Jefferson County Bd. of Educ.*, 474 So. 2d 1063 (Ala. 1985).   Among other arguments, the Plaintiffs contend that the steps implemented on the C-3 Salary Schedule pursuant to the settlement of the *Millender* litigation violate state law.   The Plaintiffs contend that even in the absence of any gender-based discrimination, the policies of Trenholm violate state law.

The Defendants have moved for summary judgment on the basis of immunity, which the Plaintiffs contend does not apply because the Defendants' actions were taken willfully, maliciously, illegally, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of law.  The Plaintiffs have also argued that immunity does not apply because the Defendants removed the case from state court, citing *Lapides v. Bd. of Regents of Univ. System of Georgia*, 535 U.S. 613 (2002).

This court has subject matter jurisdiction over the state law claims in this case because it may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.   District courts may

decline to exercise supplemental jurisdiction over a state law claim if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).

The state law claims in this case involve alleged conflicts between policies of an arm of the state, Trenholm, and the governing state law, and which are alleged to exist separate and apart from any alleged federal civil rights statutes. Those policies were promulgated at least in part as a result of litigation. In addition, state law immunity defenses have been raised. The court concludes, therefore, that the state law claims raise novel and complex issues of state law which may substantially predominate over the federal civil rights claims in the case. Therefore, the court declines to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 (c) (1), (2). *See Frederick v. City of Montgomery*, No. 2:07cv602, 2008 WL 2636563 (M.D. Ala. July 1, 2008) (declining to exercise supplemental jurisdiction where there were conflicts between local and state laws and include action by the defendant after settlement of a case). Because this case was removed to federal court, the court will order the remand of the state law claims.

## V. CONCLUSION

For the reasons discussed, the Motions for Summary Judgment are due to be GRANTED in part and DENIED in part, and the court will reserve ruling in part, as outlined above.

The state law claims are due to be remanded to the state circuit court.

A separate Order will be entered in accordance with this Memorandum Opinion.

111

Done this 26th day of August, 2011.


/s/ W. Harold Albritton
W.  HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE